# 40 YEARS OF EXPERIENCE

## WITH THE FAIR CREDIT REPORTING ACT

### AN FTC STAFF REPORT WITH SUMMARY OF INTERPRETATIONS



EXHIBIT

Ex. A



July 2011
Federal Trade Commission

This report is available on the internet at www.ftc.gov/os/statutes/fcrajump.shtm.
The online version of this report contains live hyperlinks.

# 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT

## AN FTC STAFF REPORT WITH SUMMARY OF INTERPRETATIONS

July 2011 | Federal Trade Commission

# Contents

## Staff Report

Introduction                                                                                          1

Evolution of the Fair Credit Reporting Act                                                            2

FTC Enforcement of the FCRA                                                                           3

FTC's Regulatory and Interpretive Roles                                                               5

FTC Staff Summary and Relationship to 1990 Commentary                                                 7

Other Significant Interpretations in the FTC Staff Summary                                           12

## Summary of Interpretations

Overview                                                                                             17

Reference to multiple sections                                                                       17

Summary references to FCRA                                                                           17

Terminology                                                                                          17

Citations to FACT Act rules                                                                          18

Section 601 – Short Title                                                                            19

Section 602 – Findings and Purpose                                                                   19

Section 603 – Definitions and Rules of Construction                                                  19

Section 604 – Permissible Purposes of Reports                                                        40

Section 605 – Requirements Relating to Information Contained in
              Consumer Reports                                                                       55

Section 605A – Identity Theft Prevention; Fraud Alerts and Active Duty Alerts   60

Section 605B – Block of Information Resulting From Identity Theft                                     61

Section 606 – Disclosure of Investigative Consumer Reports                                           62

Section 607 – Compliance Procedures                                                                  64

Section 608 – Disclosures to Governmental Agencies                                                   70

Section 609 – Disclosures to Consumers                                                               70

Section 610 – Conditions and Form of File Disclosure to Consumer                                     74

Section 611– Procedure in Case of Disputed Accuracy                                                  75

Section 612 – Charges for Certain Disclosures   79

Section 613 – Public Record Information for Employment Purposes   81

Section 614 – Restrictions on Investigative Consumer Reports   82

Section 615 – Requirements on Users of Consumer Reports   82

Sections 616-617 – Civil Liability for Negligent or Willful Noncompliance   89

Section 618 – Jurisdiction of Courts; Limitation of Actions   89

Section 619 – Obtaining Information Under False Pretenses   89

Section 620 – Unauthorized Disclosures by Officers or Employees   89

Section 621 – Administrative Enforcement   89

Section 622 – Information on Overdue Child Support Obligations   91

Section 623 – Duties of Furnishers of Information to CRAs   92

Section 624 – Affiliate Marketing   97

Section 625 – Relation to State Laws   97

Section 626 – Disclosures to FBI for Counterintelligence Purposes   97

Section 627 – Disclosures to Governmental Agencies for Counterterrorism Purposes   98

Section 628 – Disposal of Records   98

Section 629 – Corporate and Technological Circumvention Prohibited   98

1990 Comments not incorporated into 2011 Summary   99

Endnotes   100

List of FTC FCRA Cases   108

40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT

## I.   Introduction

The Fair Credit Reporting Act[1] ("FCRA") governs the collection, assembly, and use of consumer report information and provides the framework for the credit reporting system in the United States. The FCRA was enacted in 1970, and it has been amended several times in the ensuing years. The two most extensive amendments were the Consumer Credit Reporting Reform Act of 1996 (the "1996 amendments")[2] and the Fair and Accurate Credit Transactions Act of 2003 ("FACT Act").[3]

The FCRA regulates the practices of consumer reporting agencies ("CRAs") that collect and compile consumer information into consumer reports for use by credit grantors, insurance companies, employers, landlords, and other entities in making eligibility decisions affecting consumers. Information included in consumer reports generally may include consumers' credit history and payment patterns, as well as demographic and identifying information[4] and public record information (e.g., arrests, judgments, and bankruptcies). Consumer report information may be used by entities to predict the risk of future nonpayment, default, or other adverse events. The FCRA was enacted to (1) prevent the misuse of sensitive consumer information by limiting recipients to those who have a legitimate need for it; (2) improve the accuracy and integrity of consumer reports; and (3) promote the efficiency of the nation's banking and consumer credit systems.

As described below, since its initial passage in 1970, the Federal Trade Commission ("FTC" or "Commission") has played a key role in the implementation, oversight, enforcement, and interpretation of the FCRA. Under the Consumer Financial Protection Act of 2010 ("CFPA"),[5] the FTC retains its enforcement role but will share that role in many respects with the newly-created Consumer Financial Protection Bureau ("CFPB"). The CFPB also will take on primary

---

1. 15 U.S.C. § 1681 *et seq.* The FCRA's provisions are sections 601-629 of the Consumer Credit Protection Act and are commonly cited by those section numbers. The full text of the FCRA, as published on the Commission website, uses both citation forms.

2. Title II, Subtitle D, Chapter 1, of the Omnibus Consolidated Appropriations Act for Fiscal Year 1997 (Pub. L. No. 104-208, Sept. 30, 1996).

3. Pub. L. No. 108-159 (Dec. 4, 2003).

4. The demographic and identifying information (e.g., name, address) generally is not considered "consumer report" information under the FCRA, unless it is used for eligibility determinations. *See In re Trans Union Corp.*, 2000 FTC LEXIS 23 (2000), *aff'd sub nom. Trans Union Corp. v. FTC*, 245 F.3d 809, *reh. denied,* 267 F.3d 1138 (D.C. Cir. 2001), *cert. denied*, 122 S. Ct. 2386 (2002); *FTC v. TRW, Inc.*, Civil No. 3-91-CV2661-H (N.D. Tex. 1993) (consent decree); *Dotzler v. Perot*, 914 F. Supp. 328 (E.D. Mo. 1996). If a CRA obtains demographic and identifying information from a financial institution, however, any redisclosure of that information is subject to the privacy restrictions of the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 *et seq.*

5. Title X of Pub. L. 111-203 (Dodd-Frank Wall Street Reform and Consumer Protection Act).

regulatory and interpretive roles under the FCRA. As the FTC role evolves, the staff seeks to share its extensive experience with the CFPB and the public through a summary of its key interpretations and guidance. The following report gives a brief overview of the FTC's role in the enforcement and the interpretation of the FCRA, followed by an FTC Staff Summary of Interpretations of the FCRA ("Staff Summary") in a section-by-section format.[6] Commission staff anticipates that this report and the Staff Summary will be of aid to the CFPB as it takes over many of the interpretive functions under the FCRA as of July 21, 2011.

## II.  Evolution of the Fair Credit Reporting Act

When it was originally enacted, the FCRA imposed requirements exclusively on CRAs such as credit bureaus, except for those sections of the Act requiring users of consumer reports and other third parties to provide certain notices to consumers. The FCRA established the Commission as the primary federal enforcement agency, with jurisdiction over CRAs and all consumer report users (e.g., retailers, finance companies, employers, insurers, and landlords), except for certain entities over which the Commission does not have jurisdiction.[7] Under the FCRA, CRAs are required to establish procedures to ensure that they report consumer information only to those with a legitimate purpose for it and to achieve maximum possible accuracy in the information they report. The FCRA further sought to improve the accuracy of data in CRA files by requiring CRAs to disclose information in their files to consumers and investigate items disputed in good faith by them.

The Consumer Credit Reporting Reform Act of 1996[8] made extensive revisions to the FCRA (the "1996 Amendments") in a number of areas. First, it expanded the duties of CRAs, particularly in regard to CRA responses to consumers' disputes – establishing a 30-day time frame for completion of an investigation, mandating written notice to the consumer of the results of the investigation within five days of its completion, and adding restrictions on the reinsertion of items that were deleted following a dispute. The 1996 Amendments also increased the obligations of *users* of consumer reports, particularly employers. Most significantly, the 1996 Amendments imposed duties on a class of entities not previously treated by the FCRA

---

6.   Given the complexity of the statute and the volume of private litigation, the Staff Summary is not intended to be a complete compendium of the extensive case law that has developed under the FCRA. Rather, the Staff Summary focuses on the interpretations developed either in response to specific questions or fact patterns presented by industry, or through enforcement actions brought by the FTC.

7.   The primary exceptions are federally regulated financial institutions. Section 621(a)-(b).

8.   Title II, Subtitle D, Chapter 1, of the Omnibus Consolidated Appropriations Act for Fiscal Year 1997 (Pub. L. 104-208, Sept. 30, 1996).

– <u>furnishers</u> of information to CRAs – by including requirements related to accuracy and the handling of disputes by the entities that provided information to CRAs.

The ensuing seven years brought a number of more modest revisions, the most significant of which was a 1999 amendment that specifically authorized the Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Office of the Comptroller of the Currency, Office of Thrift Supervision, and National Credit Union Administration (collectively the "federal financial agencies" or "Agencies") to promulgate regulations under the FCRA for the banks and other entities subject to their jurisdiction.[9]

The FACT Act[10] was Congress' second major expansion of the FCRA. It added several sections to assist consumers and businesses in combating identity theft and reducing the damage to consumers when that crime occurred. The FACT Act established a national fraud alert system, required merchants to truncate account numbers on electronic credit/debit card receipts, and ordered agencies to promulgate rules on proper disposition of consumer report information and on what companies should do to respond to the "red flag" indicators of identity theft. In addition, it granted consumers the right to request free annual reports[11] from national CRAs, required "blocking" of information placed on a consumer report as a result of identity theft, and required businesses to provide copies of relevant business records to identity theft victims. The Commission, often in conjunction with the federal financial agencies, issued numerous rules to implement the various FACT Act provisions.[12]

## III.  FTC Enforcement of the FCRA

The FCRA is enforced at the federal and state levels, as well as through private litigation. At the federal level, the FTC and the federal financial agencies have enforced the FCRA as to entities over which they have jurisdiction.[13] FCRA violations by FTC-regulated entities are considered to be unfair or deceptive practices and are subject to the remedies provided by Section 5 of the FTC

---

9.    Section 506 of the Gramm-Leach-Bliley Act (Pub. L. 106-102; codified at FCRA § 621(e)).

10.   Pub. L. 108-159 (Dec. 4, 2003). See footnote 3, *supra*.

11.   The FACT Act added a new section 612(a) to the FCRA, requiring nationwide CRAs to provide consumers with one free disclosure of the information in their files on request. This is commonly called the "free annual report" requirement. We use the legal term "free annual file disclosure" in our interpretations.

12.   The Commission's FACT Act rules are listed on the agency website, *available at* http://www.ftc.gov/os/statutes/fcrajump.shtm.

13.   Section 621. In general, the banking agencies have jurisdiction over the financial institutions they oversee and the FTC has jurisdiction over CRAs and all other persons. The CFPA adds the CFPB as an enforcement agency under the FCRA, effective July 21, 2011.

Act.[14] The FTC may request injunctive and ancillary relief administratively or through federal district courts.[15] The FTC also is empowered to file civil actions in federal court to recover civil penalties of up to $3,500 per violation, "in the event of a knowing violation, which constitutes a pattern or practice of violations."[16] In a federal court action, the FTC also may seek monetary relief in the form of redress or disgorgement and other equitable relief, based on the court's equitable powers.[17]

During its 40-year history of enforcing the FCRA, the FTC has brought 87 enforcement actions against CRAs, users of consumer reports, and furnishers of information to CRAs.[18] As noted above, the FCRA originally was focused on CRAs and those entities that used consumer reports. As a result, the Commission has extensive enforcement experience against CRAs and users of consumer reports. For example, the Commission has brought a number of cases against CRAs to ensure that consumer reports are only supplied to those with a permissible purpose.[19] The

---

14.  Section 621(a)(1).

15.  Section 621(a); *see also* 15 U.S.C. §§ 41 *et seq*.

16.  The amount set forth in the text, as enacted in 1996, is $2,500 per knowing violation. Section 621(a)(2)(A). Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the Commission increased the amount to $3,500 per violation, effective February 9, 2009. *See* 74 Fed. Reg. 857 (Jan. 9, 2009). In determining the amount of the penalties, courts must take into account the degree of culpability, any history of similar conduct, ability to pay, the effect on ability to continue to do business, and such other matters as justice may require. *See* section 621(a)(2)(B). Examples of FTC civil penalty cases include *United States v. ChoicePoint, Inc.,* No. 1:06cv198 (N.D. Ga. 2006) (consent order) ($10 million civil penalty); *United States v. Performance Capital Management, Inc.*, No. 01-01047TJH (C.D. Cal. 2001) (consent order) ($2 million civil penalty, suspended); *United States v. NCO Group, Inc., et al.*, No. 2:04W2041 (E.D. Pa. 2004) (consent decree) ($1.5 million civil penalty); *United States v. Rental Research Services, Inc.*, No. 0:09-cv-00524 (D. Minn. 2009) (consent order) ($500,000 penalty, suspended) .

17.  *See United States v. ChoicePoint, Inc.,* No. 1:06cv198 (N.D. Ga. 2006) (consent order) (up to $5 million in consumer redress).

18.  A list of the FTC's enforcement cases can be found appended to this report.

19.  E.g*., Equifax Credit Information Services, Inc.*, 130 F.T.C. 577 (1995) (consent order); *Trans Union Corp.*, 116 F.T.C. 1357 (1993) (consent order); *Trans Union Corp. v. FTC*, 81 F.3d 228 (D.C. Cir. 1996); *FTC v. TRW Inc.*, 784 F. Supp. 361 (N.D. Tex. 1991) (consent decree); *Trans Union Corp.*, 102 F.T.C. 1109 (1983) (consent order). In its case against ChoicePoint, Inc., a data broker and CRA, the FTC alleged that the defendant furnished credit reports to identity thieves posing as ChoicePoint subscribers. The complaint alleged that ChoicePoint violated the FCRA by providing consumer reports to persons who did not have a permissible purpose to obtain them and by failing to maintain reasonable procedures to verify both the recipients' identities and how they intended to use the information. In settling the case, ChoicePoint agreed to pay $10 million in civil penalties – at the time, the largest civil penalty in FTC history – and to provide up to $5 million for redress to identity theft victims. *See United States v. ChoicePoint, Inc.,* No. 1:06cv198 (N.D. Ga. Feb. 15, 2006) (consent order). The Order establishes specific procedures that ChoicePoint must follow to ensure that they provide consumer reports only to those with a permissible purpose. *Id.*

4

Commission also has enforced these requirements against resellers of consumer reports.[20] In addition, the FTC has brought several enforcement actions against users that failed to provide adverse action notices when required, including creditors[21] and employers.[22]

Following the adoption of the 1996 Amendments, the FTC brought actions against businesses that furnish information to CRAs, primarily debt collectors and mortgage servicers.[23] In many cases, the FTC has enforced important FCRA requirements together with related requirements under the Fair Debt Collection Practices Act ("FDCPA"), the Equal Credit Opportunity Act ("ECOA"), and Section 5 of the FTC Act.[24]

## IV. FTC's Regulatory and Interpretive Roles

Prior to the FACT Act of 2003, the FTC lacked rulemaking authority under the FCRA. The FACT Act, however, provided the FTC with specific rulemaking authority in a number of areas. Some rules were the sole responsibility of the FTC, and others were to be carried out jointly or in

---

20. E.g., *Settlement One Credit Corp.*; *ACRAnet, Inc.*; *Fajilan and Associates, Inc.* (public comment requested on three cases, Feb. 9, 2011; 76 Fed. Reg. 7213); *W.D.I.A.*, 117 F.T.C. 757 (1994) (consent order); *CDB Infotek*, 116 F.T.C. 280 (1993) (consent order); *Inter-Fact, Inc.*, 116 F.T.C. 294 (1993) (consent order); *I.R.S.C.*, 116 F.T.C. 266 (1993) (consent order).

21. See, e.g., *United States v. Sprint Corp.*, Civ. No. 4:04ev 361RH (N.D. Fla. 2004) (consent decree) (telephone service provider failed to provide adverse action notices when conditioning receipt of service on advance deposit or maximum charge limits); *United States v. AT&T Corp.*, Civ. No. 3:04-cv-04411-SRC-TJB (D.N.J. 2004) (consent order) (same); *see also Hospital & Health Services Credit Union*, 104 F.T.C. 589 (1984) (consent order); *Federated Department Stores*, 106 F.T.C. 615 (1985) (consent order); *United States v. Green Tree Acceptance*, Civ. No. CA 4 86 469 K (M.D. Tex. 1988) (consent order); Quicken Loans Inc., 135 F.T.C. 424 (2003) (consent order); *United States v. Tower Loan of Mississippi*, Civ. No. J90-0447 (J) (S.D. Miss. 1991) (consent order); *United States v. Capital City Mortgage*, Civ. No. 1:98CV00237 (D.D.C. 2005).

22. See, e.g., *United States v. Imperial Palace, Inc.* CV-S-04-0963-RHH-PAL (D. Nev. 2004) (consent decree) (employer failed to provide adverse action notices when denying or rescinding offers of employment based on consumer report information); *see also Electronic Data Systems*, 114 F.T.C. 524 (1991) (consent order); *McDonnell Douglas Corp.*, 115 F.T.C. 33 (1992) (consent order); *Macy's Northeast, Inc.*, 115 F.T.C. 43 (1992) (consent order).

23. E.g., *United States v. DC Credit Services, Inc.*, Civ. No. 02-5115 (C.D. Cal. 2002) (consent decree) ($300,000 civil penalty); *United States v. Performance Capital Management, Inc.*, 2:01cv1047 (C.D. Cal. 2000) (consent decree)($2 million civil penalty); *United States v. Fairbanks Capital Corp.*, Civ. No. 01-12219 (D. Mass. 2003) (consent decree).

24. Several cases in the 1980s involved violations of both the FCRA and the ECOA. E.g., *United States v. Winkleman Stores, Inc.*, Civ. No. 85-2214 (N.D. Ohio 1985); *United States v. Strawbridge & Clothier, Inc.*, Civ. No. 85-6855 (E.D. Pa. 1985); *United States v. Norwest, Inc.*, Civ. No. 87-6025 (C.D. Cal. 1987). The civil penalties in those cases resulted from the ECOA violations, because the Commission was not authorized to seek civil penalties for FCRA violations until 1996. Some more recent cases have involved violations of both the FCRA and the FDCPA. E.g., *United States v. Credit Bureau Collection Services*, Civ. No. 10-0169 (S.D. Ohio 2010).

coordination with one or more of the other agencies that enforce the FCRA.[25] Under the CFPA, this rulemaking responsibility will transfer to the CFPB, with the exception of rules governing the proper disposal of consumer report information and the requirements that companies maintain a program to detect and address the "red flags" of identity theft. The CFPA provides that the FTC will continue to have rulemaking authority in those two discrete areas,[26] as well as with respect to automobile dealers.[27]

Separate from the Commission's rulemaking authority, Commission staff has offered extensive informal interpretation and guidance since the FCRA's adoption in 1970, including the issuance of over 430 opinion letters[28] and the publication of a staff compliance manual.[29] Although staff opinion letters do not represent the formal policy or views of the Commission and are not binding, they provide important guidance on issues of statutory interpretation. Some courts have cited to staff letters to support their findings,[30] although others have rejected them.[31] In addition to the staff opinion letters, the Commission itself issued eight formal interpretations of the FCRA in the 1970s.[32]

Given the volume of formal and informal FCRA interpretations, in May 1990 the Commission created a consolidated, inclusive document that gathered together Commission guidance in

---

25. For example, the FTC was given sole authority to promulgate rules implementing the free annual credit report and prescreen opt-out notice requirements. *See* Section 612(a) (annual credit report), 615(d)(2)(B) (prescreen opt-out notice). Examples of joint or coordinated rules include the risk-based pricing rule (jointly with the Federal Reserve), the disposal, furnisher accuracy, and identity theft red flags rules (coordinated with all of the federal financial agencies), and the furnisher direct dispute rule (jointly with all of the federal financial agencies). The FACT Act also imposed certain non-rulemaking obligations on the FTC, including, for example, the determination of a "fair and reasonable" fee for credit scores and the promulgation of notices of user and furnisher obligations. Section 609(f)(8). Other responsibilities were imposed on other FCRA agencies (*e.g*, the Federal Reserve Board was required to issue the model disclosure for furnishing negative information). Section 623(a)(7)(D). Many of these responsibilities transfer to the CFPB effective July 21, 2011. CFPA § 1088(a)(2).

26. CFPA §1088(a)(2).

27. CFPA §1029(a) and (d).

28. *See* http://www.ftc.gov/os/statutes/fcra/index.htm for a compilation of FTC informal staff opinion letters dated June 27, 1997 and thereafter.

29. The manual (titled "Compliance with the Fair Credit Reporting Act") was first published shortly after enactment and was last updated in March 1979.

30. E.g*., Levine v. World Financial Network Nat'l Bank*, 437 F.3d 1118, 1122 (11th Cir. 2006); *Fischl v. General Motors Acceptance Corp*., 708 F.2d 143, 147 (5th Cir. 1983).

31. E.g*., Johnson v. Federal Express Corp.*, 147 F. Supp. 2d 1268, 1272 (M.D. Ala. 2001) ("The letters are not binding and not persuasive."); *Hartman v. Lisle Park District,* 158 F. Supp. 2d 869, 876 (N.D. Ill. 2001).

32. 16 CFR §§ 600.1 through 600.8 (withdrawn in August 1990, contemporaneously with publication of the Commentary, described in footnote 33, *infra*).

a single source, its comprehensive Commentary on the FCRA (the "1990 Commentary"),[33] providing broad guidance on the Commission's interpretation of the provisions of the FCRA.[34] The Commentary had no binding effect, but some courts have accorded it weight as a policy statement of the primary agency responsible for enforcing the FCRA.[35]

## V.  FTC Staff Summary and Relationship to 1990 Commentary

Through the passage of time and the adoption of significant amendments to the FCRA, the 1990 Commentary has become partially obsolete, and does not reflect the most current interpretive guidance on the FCRA.  Prior to the passage of the CFPA, FTC staff had been working on an updated Commentary as a replacement for the 1990 Commentary.  As a result of the CFPA, however, much of the authority of the Commission and the federal financial agencies to publish rules, regulations, or guidelines under the FCRA transfers to the CFPB.  In this changed context, staff is instead publishing a compendium of interpretations that it believes will be of use to the CFPB staff, the businesses subject to the Commission's jurisdiction under the FCRA, public representatives, and consumers.  The Staff Summary incorporates material from the following sources:

- Interpretations from the 1990 Commentary on sections of the FCRA that have not been amended, which staff continues to believe are timely, accurate, and helpful;

- Issues addressed in informal staff opinions issued after the 1990 Commentary, including post-1996 letters that appear on the Commission's public web site;

- Informal interpretations provided by staff not otherwise reflected in written staff opinions, typically in response to specific questions or fact patterns presented by industry;[36] and

- Commission enforcement actions, and rulemaking proceedings required by the FACT Act.

---

33.  55 Fed. Reg. 18804 (May 4, 1990). The 1990 Commentary was the culmination of a proposal published in August 1988 and the Commission's review of over 100 submissions it received in response to its request for public comments on that proposal. 53 Fed. Reg. 29696 (Aug. 8, 1988).

34.   The Commission specified that the interpretations set forth in the 1990 Commentary were not trade regulation rules or regulations and, as provided in section 1.73 of the Commission's rules, did not have the force or effect of statutory provisions.

35.  E.g., *Davenport v. Farmers Ins. Group*, 378 F. 3d 839, 843 (8th Cir. 2004); *Estiverne v. Saks Fifth Avenue*, 9 F.3d 1171, 1173 (5th Cir. 1993). The FTC provides extensive guidance and assistance to the private sector and consumers on the requirements and protections of the FCRA. The FTC does outreach to the business community through presentations at industry meetings and conferences, informal advice, and published guidance materials.

36.  It had been commonly assumed that the Commission would update the 1990 Commentary at some point. Thus, we continue to receive regular public input on various interpretations of the FCRA.

At the same time the Commission is authorizing issuance of the Staff Summary, it is withdrawing its 1990 Commentary.  Although the Summary incorporates certain of the Commentary interpretations verbatim, it also includes various changes. In an effort to streamline this Summary, staff does not include those interpretations from the 1990 Commentary that (1) related to sections of the FCRA that have been repealed or amended; (2) concerned enforcement by entities other than the FTC or the validity of state law; (3) duplicated other interpretations or were otherwise redundant; or (4) had become obsolete or outdated due to changes in technology, industry practices, or other developments.[37] In addition, the interpretations in the Staff Summary differ from the 1990 Commentary in five significant areas, described below.

A. <u>Departments of Motor Vehicles</u>.  Staff does not adopt the 1990 Commentary's position that a Department of Motor Vehicles ("DMV") providing motor vehicle reports for insurance underwriting purposes can be a "consumer reporting agency."[38]  The 1990 Commentary (comments 603(d)-4C and 603(f)-10) stated that a motor vehicle report can be a "consumer report" and a DMV that sells such reports for insurance underwriting purposes can be a "consumer reporting agency."[39]  Staff now believes that the prior interpretation was problematic, notwithstanding its well-intentioned goal to provide consumers with useful information.

The Commission has never enforced the FCRA against any DMV or other government agency supplying public records. Although a theoretical argument can be made that such public agencies are CRAs based on a literal reading of the FCRA,[40] this interpretation would

---

37. For ease of reference, we have appended a chart of the 1990 Commentary interpretations that are not incorporated in the Staff Summary.

38. *See* 1990 comments 603(d)-4C and 603(f)-10.

39. Those comments essentially adopted a 1973 Commission interpretation (former 16 CFR § 600.4), which resulted from a practical concern that consumers would not be entitled to adverse action notices from insurers taking action on motor vehicle reports if DMVs were not considered CRAs.  38 Fed. Reg. 4945, 4946-47 (Feb. 23, 1973).  The Commission stated that the interpretation did not apply to any reports by DMVs for law enforcement or licensing purposes, for which there would generally not otherwise exist a permissible purpose for the DMV (treated as a CRA) to provide the information.  The 1990 Commentary retained the interpretation in the face of negative reaction from an appreciable number of public commenters, primarily because no practical problems had arisen over the 17 years the predecessor interpretation had been effective.  55 Fed. Reg. 18804, 18806 (May 4, 1990).

40. Section 603(f) states:
The term "consumer reporting agency" means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

lead to absurd results. If DMVs or other government sources of public record information were CRAs, a news reporter could not access public information about individuals because he or she would not have a permissible purpose under the FCRA. Government agencies would be required to suppress accurate public record information more than seven years old.[41] Those who provide information for use in public records – such as police officers – would be deemed furnishers, subject to a host of responsibilities under the FCRA.

Several staff opinion letters subsequent to the 1990 Commentary have addressed the application of the FCRA to state agencies providing public record data to third parties. In response to inquiries concerning the applicability of the FCRA to employers who procure data from a Highway Patrol,[42] a Department of Public Investigation,[43] and a Department of Public Safety,[44] the staff concluded in each case that the entity was not a CRA.[45] Similarly, the staff believes that the DMV should not be considered a CRA.

The fact that a DMV may charge a fee to obtain access to the records it maintains does not change the analysis. Many government entities charge fees associated with access to government records that are used for eligibility purposes, the most notable example of which is the federal court system. Through its Public Access to Court Electronic Records (PACER) site, the federal court system provides centralized electronic access for a fee to court records, including access to bankruptcy filings, to "nearly one million PACER users includ[ing] attorneys, pro se filers, government agencies, trustees, data collectors, researchers, educational and financial institutions, commercial enterprises, the media, and the general public."[46] The fact that the court system provides access to its records for a fee, even to those entities that clearly would use such information for eligibility purposes –

---

41.   If criminal conviction records are involved, or the information was reported for a purpose excepted by Section 605(b) (e.g., a job paying more than $75,000 per year), this restriction would not apply.

42.   *See Goeke*, FTC Informal Staff Opinion Letter, June 9, 1998, *available at* http://www.ftc.gov/os/statutes/fcra/goeke.htm.

43.   *See Copple*, FTC Informal Staff Opinion Letter, June 10, 1998, *available at* http://www.ftc.gov/os/statutes/fcra/copple.htm.

44.   *See Pickett*, FTC Informal Staff Opinion Letter, June 10, 1998, *available at* http://www.ftc.gov/os/statutes/fcra/pickett.htm.

45.   Case law holding that the FBI is not a CRA when making similar reports strongly supports the conclusion that government agencies providing public records are not CRAs. *Cf. Ricci v. Key Bancshares of Maine, Inc.*, 768 F.2d 456, 466 (1st Cir. 1985); *Ollestad v. Kelley*, 573 F. 2d 1109, 1111 (9th Cir. 1978); *see also Makas v. N.Y. State Dept. of Motor Vehicles*, 1998 U.S. Dist. LEXIS 3840, at *5-6 (N.D.N.Y. 1998) (stating that the FCRA does not apply to the New York DMV because the statute only applies to "credit reporting agencies and users of information.").

46.   http://www.pacer.gov/

such as financial institutions – does not turn the federal court system into a CRA. For these reasons, the Staff Summary does not incorporate the 1990 Commentary interpretations with respect to DMVs.

B.  Commercial transactions. The issue of whether and how the FCRA applies in the context of an application for business credit arises when a creditor that is considering a credit application from a small business wants to procure a credit report on the sole proprietor or other principal in the business.

In staff opinion letters from 2000 and 2001, the Commission staff addressed this question.[47] Staff opined that (1) a report by a CRA is a "consumer report" even if it is used for commercial purposes; and (2) an application for business credit does not give rise to a permissible purpose except for a report on an individual who will be personally liable for the debt.  Staff now adopts the interpretations expressed in these staff opinion letters, and deletes or modifies several interpretations in the 1990 Commentary to make them consistent with those views.

C.  Joint users. From the inception of the FCRA, the Commission and other federal financial agencies have grappled with scenarios involving a lender that shares an applicant's consumer report with another party, and the issue of whether the lender sharing the report becomes a CRA by doing so. FCRA guidance issued by the federal financial agencies answered this question in the negative where the lender and the second party (e.g., a loan insurer or guarantor) were involved in the same transaction, stating that the two were "joint users" in that situation.[48] The 1990 Commentary similarly applied the "joint user" terminology to other situations where two users shared the same report for the same permissible purpose with the consumer's consent, as well as to agent-principal and employer-employee sharing of consumer reports.[49]

The Staff Summary does not use the term "joint user" – a term that appears nowhere in the FCRA. Although the concept has proved a useful construct in the fact situations to which it has been applied in the past, it is not in accord with the precise analytical treatment that staff believes is appropriate. Further, consumer transactions have developed more complexity

---

47.  These letters, dated July 26, 2000 and June 22, 2001, can be found on the Commission website, *available at* http://www.ftc.gov/os/statutes/fcra/tatelbaum.htm and http://www.ftc.gov/os/statutes/fcra/tatelbaum2.htm.

48.  Item 19 in "Questions and Answers About the Fair Credit Reporting Act" (May 1971, reissued and expanded in March 1994) CCH Cons. Cred. Guide ¶26,703.

49.  *See* 1990 comments 603(f)-8 and 607(b)-2B. A 1998 staff opinion letter adopts this view as well. *See Throne*, FTC Informal Staff Opinion Letter, Nov. 20, 1998, *available at* http://www.ftc.gov/os/statutes/fcra/throne.shtm.

and often involve more intermediaries, causing the "joint user" concept to become more strained even as the need for a rationale to permit sharing among such parties becomes more apparent.

The Staff Summary looks instead to whether the lender is sharing the report "for the purpose of providing consumer reports to third parties" in these cases, in which case the lender may become a CRA. If the party to whom the report is being provided merely effectuates a particular transaction initiated by the consumer, then that party is not "providing consumer reports to third parties." In short, the Summary reaches the same result as the prior interpretations, without using the "joint user" terminology of 1990 comment 603(f)-8.

D.   Identified information. The 1990 Commentary stated that "credit guides" – listings that rate how well consumers pay their bills – are generally consumer reports. However, the Commentary went on to note that such guides would not be considered consumer reports if they were coded by, for example, Social Security number, driver's license number, or bank account number. As support, the Commentary stated that, "as long as the consumer's identity is not disclosed, [these guides] are not 'consumer reports' until decoded." Given advancements in technology and the public availability of a broad range of data about consumers, staff is concerned the examples of "coding" referenced in the 1990 Commentary – particularly coding based on Social Security numbers – could today lead to the disclosure of a consumer's identity.[50] For this reason, the Staff Summary clarifies that information may constitute a consumer report even if it does not identify the consumer by name if it could "otherwise reasonably be linked to the consumer."

E.   Address in adverse action notice. The 1990 Commentary (comment 615-12) interpreted the FCRA requirement that an adverse action notice contain (among other information) "the name and address of the consumer reporting agency making the report" to require disclosure of "the agency's street address, not just a post office box." The Staff Summary omits this comment.

---

50.   Staff recently hosted a series of privacy roundtables, at which numerous panelists pointed to the blurring distinction between personally identifiable information and supposedly "anonymized" information. *Protecting Consumer Privacy in an Era of Rapid Change*, Preliminary FTC Staff Report, December 2010, at iv, 35-38, *available at* http://ftc.gov/os/2010/12/101201privacyreport.pdf. Similarly, in its report on the use of Social Security numbers in the private sector, the Commission noted that "SSNs are available from many sources, including public records …." *Security in Numbers: SSNs and ID Theft*, FTC Report, December 2008, at p. 1, *available at* http://www.ftc.gov/os/2008/12/P075414ssnreport.pdf.

When the FCRA was enacted in 1970, it was not uncommon for consumers to visit a local CRA for an in-person disclosure, and it made sense to interpret the "address" requirement as more than a post office box.  Today, the consumer reporting industry is mostly concentrated, such that a CRA likely will not have an office close enough for most consumers to make a personal visit practical.  In addition, for those dispute requests made by mail it may be more efficient for consumers to allow CRAs to designate a single P.O. Box to receive such requests.  Thus, the Staff Summary would delete the 1990 Commentary's requirement that adverse action notices include a street address, allowing CRAs to include instead a P.O. Box designated to receive disputes.

## VI. Other Significant Interpretations in the FTC Staff Summary

The Staff Summary also reflects the statutory modifications made to the FCRA over the years,[51] rules issued by the Commission and other Agencies as directed by the 2003 FACT Act, many of the interpretations reflected in the over 80 informal staff opinion letters issued over the last two decades,[52] and the staff's experience from significant enforcement actions. The Staff Summary notes, where appropriate, the related staff opinion letters and enforcement actions. The following are worthy of special note because they continue to generate a significant number of questions from the public.

A.   Application of the FCRA to resellers of credit reports and sellers of software. The Staff Summary clarifies the application of the FCRA to resellers of credit reports as distinguished from sellers of software used to procure such reports, following the Commission's enforcement actions in this area and a 1997 informal opinion letter.

A 1999 consent order, involving the seller of a "merged" report (which combines information from two or three major CRAs), requires the respondent to comply with the duties that the FCRA imposes on CRAs.[53] A series of earlier cases against other entities that were "reselling" credit reports based on information from large CRAs similarly had

---

51.   These are discussed in some detail in Section I above.

52.   *See Staff Opinion Letters (1997-2001), available at* http://www.ftc.gov/os/statutes/fcra/index.htm.

53.   *First American Real Estate Solutions, LLC*, 127 F.T.C. 85 (1999) (consent with a reseller concerning the dispute obligations of consumer reporting agencies), *available at* http://www.ftc.gov/os/1999/08/faresorder.htm. Although the violations charged in the complaint all concerned acts committed before the 1996 Amendments became effective, the order requires the CRA to comply with the amended FCRA.

established that such companies were CRAs subject to all the duties imposed on such agencies by the FCRA.[54]

In a 1997 informal opinion letter, the staff opined that (1) a company that sells "merge and purge" reports that are a compilation of information procured from another CRA reports is itself a CRA, but (2) a seller of a software package that enables the purchaser to perform that task itself is not "assembling or evaluating" the information and is thus not a CRA.[55] The Staff Summary adopts this clarification, specifically distinguishing the resale of consumer reports from a company that sells a software system to a company that resells consumer reports.

B.   "Review" permissible purposes. Section 604(a)(3)(A) of the FCRA provides that obtaining a consumer report "in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the … *review or collection of an account of the consumer*." is a permissible purpose. *Id.* (emphasis added). The issues here concern when a creditor has a permissible "review" purpose and, when it does, whether it may exploit consumer reports obtained for "review" purposes in order to market its products or services.

In a 1999 letter,[56] the staff opined on this issue in the context of closed-end credit transactions. Because the terms of closed-end credit transactions are generally predetermined and thus may not be changed unilaterally by the creditor, the staff opined that the creditor in that instance did not have a "review" permissible purpose. The Staff Summary adopts the essence of this opinion, but makes clear that the analysis does not turn on whether or not the account is open-end or closed-end. Staff believes that the "review" permissible purpose applies only where the creditor has an existing account relationship with the consumer and uses the report solely to decide whether to modify the terms of the

---

54. *See W.D.I.A.*, 117 F.T.C. 757 (1994); *I.R.S.C.*, 116 F.T.C. 266 (1993); *CDB Infotek*, 116 F.T.C. 280 (1993); *Inter-Fact, Inc.*, 116 F.T.C. 294 (1993). Each of these cases charged the respondent CRA/reseller with providing reports to parties without a permissible purpose, in violation of Section 604 of the FCRA. The *WDIA* case also involved alleged violations of Section 613. More recently, the principle was reinforced in the Commission's settlement with ChoicePoint (*United States v. ChoicePoint, Inc.*, Civ. No. 106-CV-019R, N.D. Ga., Feb. 15, 2006), a CRA that also acts as a reseller of consumer reports obtained from Equifax. *See* footnotes 16-17 above.

55. *See Cast*, FTC Informal Staff Opinion Letter, Oct. 27, 1997 *available at* http://www.ftc.gov/os/statutes/fcra/cast.htm. In each case, the purchaser is a creditor with a permissible purpose to procure reports from the bureaus.

56. *See Gowen*, FTC Informal Staff Opinion Letter, Apr. 9, 1999, *available at* http://www.ftc.gov/os/statutes/fcra/gowen.htm.

account.[57] Thus, a creditor may not obtain consumer reports to market its other products or services because it does not have a legitimate "review" permissible purpose.

C.   <u>Permissible purpose for automobile dealers</u>. The Staff Summary includes some clarification on when an automobile dealer has a permissible purpose to obtain a consumer report. The Summary incorporates the analysis reflected in a 1998 opinion letter that discussed various scenarios involving a consumer who visits a car dealer's showroom.[58] When the consumer expresses an interest in buying a car on credit, there would be a permissible "credit" purpose under section 604(a)(3)(A). If the dealer gets the consumer's written consent, there is clearly a permissible purpose under section 604(a)(2).

The auto dealer trade association that sought the opinion asked whether a dealer could demonstrate a permissible purpose by showing it has a "legitimate business need" under section 604(a)(3)(F)(i), in the context of other interactions between consumers and auto sales personnel. That section provides a permissible purpose where the report user "has a legitimate business need for the information in connection with a business *transaction that is initiated by the consumer*" (emphasis added). The 1998 staff opinion letter concluded that this language meant that this section applies only to situations where the consumer clearly understands that he or she is initiating the purchase of a vehicle. The dealer would thus have a permissible purpose to obtain a credit report on a consumer who offers to pay for an automobile with a personal check or asks about credit options to finance a specific purchase. However, this section would not allow the salesperson to obtain a report on "window shoppers" for bargaining purposes, deciding whether to spend time with consumers, or to respond to general questions about available products or financing, because there is no "transaction … initiated by the consumer" in those scenarios. For the same reason, a consumer's request to "test drive" a vehicle, where he or she has not demonstrated an intent to initiate the purchase or lease of a vehicle, does not give rise to a permissible purpose under this section.

The Staff Summary incorporates this interpretation, while at the same time noting that a permissible purpose is always available under section 604(a)(2) if the dealership obtains written consent from the consumer.

---

57. Relevant legislative history explains that "[t]he permissible purpose created by this provision, however, is limited to an account review for the purpose of deciding whether to retain or modify current account terms." S. Rep. No. 104-185 at 35 (1995).

58. *See Coffey*, FTC Informal Staff Opinion Letter, Feb. 11, 1998, *available at* http://www.ftc.gov/os/statutes/fcra/coffey.shtm.

D.  Prescreening ("firm offer of credit"). Sections 603(*l*), 604(c), 604(e), and 615(d) of the FCRA codify procedures that must be followed by creditors and insurers when using (and by CRAs when providing) consumer reports to make unsolicited offers of credit or insurance to consumers, a process known as "prescreening."

Prior to the 1996 Amendments, the FCRA did not specifically address the use of consumer reports for unsolicited offers of credit or insurance. The Commission, however, issued an interpretation of the FCRA in 1973 that permitted the use of consumer reports by creditors for unsolicited offers of credit if creditors followed specific guidelines set forth in the Commission's interpretation.[59] Those guidelines required every consumer on any list resulting from the use of consumer reports to receive a firm offer of credit – i.e., the offer must be unconditional; all the consumer had to do to receive the credit was to accept the offer. The Commission's prescreening guidelines were incorporated in 1990 comment 604(3)(a)-6.

In the 1996 Amendments, Congress added a number of provisions to the FCRA to provide an explicit statutory framework for prescreening. The legislative process leading to the 1996 amendments included an extensive consideration of prescreening issues. As a result of these discussions, the 1996 Amendments (1) explicitly authorize prescreening for the first time; (2) apply the process to insurance offers as well as credit offers; (3) allow creditors and insurers the right to conduct limited "postscreening" so that they can deny credit or insurance to consumers who no longer meet the creditworthiness or insurability criteria initially used to select them for the prescreened offer; (4) allow consumers to "opt out" of prescreened offers; and (5) require creditors and insurers to include specific disclosures in their offers to consumers.

The Staff Summary explains the relationship between the FCRA sections that concern prescreening added by the 1996 Amendments, and incorporates the holdings of significant cases in this area, including *Cole v. U.S. Capital, Inc.*, 389 F.3d 719 (7th Cir. 2004), and *Murray v. New Cingular Wireless*, 523 F.3d 719 (7th Cir. 2008). Specifically, following *Cole*, the Summary notes that although a firm offer of credit may include an offer to sell goods, the offer of credit may not be a "sham offer" used as a ruse to engage in target marketing. Further, the Summary states that a solicitation may be a firm offer of credit even

---

59.  16 CFR § 600.4. The Commission's reasoning for permitting prescreening was that the invasion of consumer privacy involved in prescreening was offset by the fact that every consumer received an offer of credit. The Federal Financial Institutions Examination Council, an umbrella organization of Agencies regulating banks, issued a policy statement to the same effect on November 2, 1991.

if the solicitation does not set forth the terms of the offer or includes a term that is variable, such as the interest rate on a credit card account.

In the Summary that follows, we use a section-by-section format, similar to the organization used by the Commission in its 1990 Commentary. For the convenience of readers, we reference a large number of 1990 comments[60] and informal staff opinion letters as the source of the interpretations.

---

60.   The interpretations in the Summary do not always reflect verbatim the analogous 1990 comments. We have modified some to account for post-1990 FCRA amendments or cases, to make them consistent with other comments, and to make them more relevant to current practice. We have edited others for clarity or to accord with modern style. Even though the 1990 comments listed in the endnotes are not precisely duplicated in the 2011 Staff Summary, staff believes the references will assist readers where a 1990 comment is a source for an interpretation here.

# FTC Staff Summary of Interpretations of the Fair Credit Reporting Act

## OVERVIEW

This Staff Summary contains the Federal Trade Commission staff's interpretations of the Fair Credit Reporting Act. It includes many of the interpretations from the "Statement of General Policy or Interpretations" that the Commission published in May 1990, 16 CFR Part 600. It includes informal guidance staff has provided to the public in the ensuing years and our experience in enforcing the FCRA. The Staff Summary does not have the force or effect of regulations or statutory provisions.

## REFERENCE TO MULTIPLE SECTIONS

Reference to several different provisions of the FCRA is frequently required in order to discuss or provide guidance on an issue. For some sections and subsections of the FCRA, the Staff Summary discusses the most important and common overlapping references under the heading "Relation to other (sub)sections."

## SUMMARY REFERENCES TO FCRA

The Staff Summary should be used in conjunction with the text of the FCRA. In some cases, the Staff Summary includes a partial summary of the statute, rather than the full text, as a preamble to discussion of issues pertaining to various sections and subsections. These summary statements of the law (often very abbreviated, especially for sections where no interpretations are offered) should not be used as a substitute for the statutory text.

## TERMINOLOGY

Several terms that are used repeatedly are abbreviated for convenience:

**"Board"** means the Board of Governors of the Federal Reserve System.

**"Bureau"** means the Bureau of Consumer Financial Protection, which assumed some of the Commission's FCRA responsibilities on July 21, 2011, pursuant to Title X of the Consumer Financial Protection Act of 2010 (Public Law 111-203).

**"CFR"** means the Code of Federal Regulations.

**"Commission"** means the Federal Trade Commission.

**"CRA"** means "consumer reporting agency" as defined in section 603(f) of the FCRA.

**"ECOA"** means the Equal Credit Opportunity Act.

**"FACT Act"** means the Fair and Accurate Credit Transactions Act of 2003, Public Law 108-159 (Dec. 4, 2003).

**"FCRA"** means the Fair Credit Reporting Act.

**"Federal financial agencies"** means agencies assigned administrative authority over financial institutions by section 621(b)(1)(A/B) of the FCRA.

**"1990 Interpretations"** means the Appendix to 16 CFR Part 600 titled "Statement of General Policy or Interpretations" published by the Commission on May 4, 1990.

**"Nationwide CRA"** means "consumer reporting agency that compiles and maintains files on consumers on a nationwide basis" as defined in section 603(p) of the FCRA.

**"Nationwide specialty CRA"** means "nationwide specialty consumer reporting agency" as defined in section 603(x) of the FCRA.

## CITATIONS TO FACT ACT RULES

Some of the rules required by the FACT Act were promulgated by the Commission jointly or in consultation with some or all of the Federal financial agencies. This Staff Summary cites only the Commission's FCRA regulations, which are set forth in 16 CFR Parts 601-699. The other agencies' regulations may be found in 12 CFR Parts 41, 222, 334, 571, and 717.

## Section 601 – Short Title

"This title may be cited as the Fair Credit Reporting Act."

> The FCRA is Title VI of the Consumer Credit Protection Act, which also includes other federal statutes relating to consumer credit, such as the Truth in Lending Act (Title I), the Credit Repair Organizations Act (Title II-A), the Equal Credit Opportunity Act (Title VII), and the Fair Debt Collection Practices Act (Title VIII).

## Section 602 – Findings and Purpose                    15 USC 1681

Section 602 recites the Congressional findings regarding the significant role of CRAs in the nation's financial system, and states that the basic purpose of the FCRA is to require CRAs to adopt reasonable procedures for providing information to credit grantors, insurers, employers and others in a manner that is fair and equitable to the consumer with regard to confidentiality, accuracy, and the proper use of such information.

## Section 603 – Definitions and Rules of Construction        15 USC 1681a

**Section 603(a)** states that "definitions and rules of construction set forth in this section are applicable for the purposes of this title."

**Section 603(b)** defines "person" to mean "any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency or other entity."

1.  EXAMPLES

> The term "person" is broadly defined to include not only individuals, but also universities, creditors, collection agencies, insurance companies, private investigators, and employers.[1]

**Section 603(c)** defines "consumer" to mean "an individual."

1.  GENERAL

> The term "consumer" includes only a natural person. It does not include artificial entities, such as partnerships, corporations, trusts, estates, cooperatives, associations or entities created by statute, such as governmental agencies.[2]

**Section 603(d)(1)** defines "consumer report" to mean "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (A) credit or insurance to be used

primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purpose authorized under section 604" (except for exclusions set forth in section 603(d)(2)).

1. RELATION TO "CONSUMER REPORTING AGENCY"

To be a "consumer report," the information must be furnished by a "consumer reporting agency" as that term is defined in section 603(f). The term "consumer reporting agency" means a person that regularly engages in assembling or evaluating information on consumers for the purpose of furnishing "consumer reports" to third parties. The terms "consumer reporting agency" in section 603(f) and "consumer report" in section 603(d) are mutually dependent and must be construed together. Information is not a "consumer report" if the person furnishing the information is not a "consumer reporting agency."[3] For example, a communication to an employer about a job applicant from a source that is not a CRA (such as a prior employer) does not constitute a "consumer report."[4]

2. ELEMENTS OF THE DEFINITION OF "CONSUMER REPORT"

There are two basic elements of the definition. First, the information in the report must have a "bearing on" one or more specified consumer characteristics (e.g., credit standing). Second, the report must be "used or expected to be used … for the purpose of … establishing the consumer's eligibility" for credit, employment, insurance, or other permissible purposes allowed by the FCRA. Both elements of the definition must be satisfied in order for a report to be a consumer report; thus, information that is not "used or expected to be used" to determine eligibility for a permissible purpose is not a consumer report, even if the information bears on one of the seven specified consumer characteristics. For example, a "skip tracer" report of prior addresses used solely to locate an uninsured automobile driver is not an investigative or other "consumer report" if it would not be used to determine eligibility for credit, employment, insurance, or other permissible business purposes allowed by the FCRA.

3. EXCLUSIONS FROM THE DEFINITION

Sections 603(d)(2-3), 603(o), and 603(y)[5] exclude some communications from the definition of "consumer report" even if they otherwise contain the elements set forth in section 603(d)(1). Most significantly, they set forth the circumstances in which information reported by a party about its own transactions or experience with a consumer, information shared by affiliated companies, certain communications by employment agencies, and reports in the context of alleged workplace misconduct are not "consumer reports."

4. INCORPORATION OF INFORMATION FROM PRIOR CONSUMER REPORTS

If information from a consumer report is added to a report that is not otherwise a consumer report, that report becomes a consumer report.[6]

5. REPORT CONCERNING A "CONSUMER'S" ATTRIBUTES AND HISTORY

A. General. A "consumer report" is a report on a "consumer" to be used for certain purposes involving that "consumer."[7] Information that does not identify a specific consumer does not constitute a consumer report even if the communication is used in part to determine eligibility. For example, a communication that flags a specific Internet transaction as potentially fraudulent based on comparison to aggregate data about Internet transactions (e.g., time-of-day activity, geographic location, amount of the transaction, etc.), without reference to

an individual consumer, is not a consumer report. However, information may constitute a consumer report even if it does not identify the consumer by name if it could otherwise reasonably be linked to the consumer.

B. <u>Artificial entities</u>. Reports about corporations, associations, and other collective entities are not reports about a consumer, and thus are not consumer reports subject to the FCRA.[8]

C. <u>Reports on individuals in a business context</u>. A report that concerns the consumer's *business* history (as opposed to personal credit or employment history) that is collected and provided by a commercial reporting service solely for use in *business* transactions is not a "consumer report." (Similarly, the report provider is not a CRA.)[9] However, a report from a CRA on the personal credit of a consumer to a business credit grantor is a "consumer report" regardless of the purpose for which the information may in fact be used.[10] Reports obtained from CRAs on consumers retain their character as "consumer reports" even if they are subsequently furnished in connection with a commercial credit or insurance transaction.

6. *"CREDIT WORTHINESS, CREDIT STANDING, CREDIT CAPACITY, CHARACTER, GENERAL REPUTATION, PERSONAL CHARACTERISTICS, OR MODE OF LIVING …."*

A. <u>General</u>. To be a "consumer report," the information must bear on at least one of the seven characteristics listed in this definition.[11]

B. <u>Credit scores</u>. The term "consumer report" includes numerical or other evaluation of data by a CRA, such as a credit score that bears on a consumer's creditworthiness.

C. <u>Consumer lists</u>.

i. <u>List of creditworthy individuals</u>. A list of the names of creditworthy individuals, or of individuals on whom CRAs have derogatory information, is a series of "consumer reports" because the information bears on credit worthiness and is used or expected to be used for permissible purposes.[12]

ii. <u>Lists of names and contact information</u>. A report limited to identifying information such as a consumer's name, address, former addresses, or phone numbers, does not constitute a "consumer report" if it does not bear on any of the seven factors and is not used to determine eligibility. A list of consumers' names and addresses, if assembled or defined by reference to characteristics or other information that is also used (even in part) in eligibility decisions, is a series of consumer reports. For example, a list comprised solely of consumer names and addresses, but compiled based on the criterion that every name on the list has at least one active trade line, updated within six months, is a series of consumer reports.[13]

iii. <u>Directories</u>. Telephone and other directories that only provide names, addresses, and phone numbers, are not "consumer reports," because the information is not collected to be used or expected to be used in evaluating consumers for credit, insurance, employment or other purposes. A trade directory that simply lists commercial information that would be used for commercial purposes is also not a consumer report.[14]

D. <u>Public record information</u>. A communication consisting solely of public record information is not a "consumer report" unless that information is provided by a CRA, is used or expected to be used for the purposes identified in section 603(d), and bears on at least one of the seven characteristics listed in the definition. Public record information relating to records of arrest,

bankruptcies, or the institution or disposition of civil or criminal proceedings, bears on one or more of these characteristics.[15]

E.   Rental history. Reports about rental experiences such as consumers' evictions, rental payment histories, or treatment of premises are consumer reports, if provided by a CRA, because they relate to the consumer's "character, general reputation, personal characteristics, or mode of living."[16]

F.   Information provided to employers. A "consumer report" includes more than just consumer credit information. When CRAs provide information to employers regarding consumers' driving records, employment records, criminal histories, education, and licenses held by job applicants or current employees, they are providing "consumer reports" because the data involves the individual consumer's "character, general reputation, personal characteristics, or mode of living."[17] For example, when a private investigator who compiles and provides court documents to employer clients requests criminal or civil records on employees or job applicants, the investigator is a CRA providing a "consumer report."[18] Similarly, an employment screening service that provides education verifications, employment verifications, and reference checks for employers is a CRA providing "consumer reports" because that information bears upon an individual's "character, general reputation, personal characteristics, or mode of living" and is used for employment purposes.[19] A CRA's provision of information regarding the prior work experience of job applicants to prospective employers is a "consumer report," even where the information is communicated telephonically.[20]

7.   *"USED OR EXPECTED TO BE USED OR COLLECTED IN WHOLE OR IN PART FOR THE PURPOSE OF SERVING AS A FACTOR IN ESTABLISHING THE CONSUMER'S ELIGIBILITY" FOR ENUMERATED PERMISSIBLE PURPOSES*

A.   Law enforcement purposes. Information that is assembled and provided solely for law enforcement purposes is not a "consumer report." For example, bulletins that are limited to a series of descriptions, sometimes accompanied by photographs, of individuals who are being sought by law enforcement authorities for alleged crimes are not a series of "consumer reports" because they have not been collected for use in evaluating consumers for credit, insurance, employment or other enumerated permissible purposes.[21]

B.   Consumer transaction purposes. A report of information about a consumer from a database relating to fraud losses (including fraud committed under fictitious names) is a "consumer report" if it is intended for use by creditors to evaluate consumers' credit applications. A report containing information on returned checks (volume, dates, amounts, circumstances) would be a "consumer report" if used in connection with transactions involving the report subject, such as closing, restricting or otherwise altering the terms of depository or other accounts that were used primarily for personal, family or household purposes.

C.   Use of reports for purposes not reasonably anticipated by the party that supplies the report. A report that is not otherwise a consumer report may become a consumer report when it is subsequently used by the recipient for a permissible purpose. If the entity supplying the report has taken reasonable steps to insure that the report is not used for such a purpose, and if it neither knows of, nor can reasonably anticipate such use, the report should not be deemed a consumer report by virtue of uses beyond the entity's control. The entity supplying the report might establish that it does not reasonably anticipate such use of the report by requiring the recipient to certify that the report will not be used to determine eligibility for a permissible

purpose, by auditing report recipients for compliance, and by taking appropriate action against those who violate such certifications.[22]

D. "In whole or in part." Where an entity reports information regarding individuals and companies, both for covered purposes under the FCRA (e.g., employment checks, credit checks) and non-covered purposes (e.g., businesses or commercial purposes), the report is a "consumer report."

8. *"ESTABLISHING THE CONSUMER'S ELIGIBILITY FOR (A) CREDIT OR INSURANCE TO BE USED PRIMARILY FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES, OR (B) EMPLOYMENT PURPOSES, OR (C) OTHER PURPOSES AUTHORIZED UNDER SECTION 604"*

A. Relation to section 604(a). Because section 603(d)(1)(C) refers to any "purpose authorized under section 604" (often described as "permissible purposes" of consumer reports), some of which overlap with purposes enumerated in section 603, sections 603 and 604 must be construed together to determine what are "consumer reports" and "permissible purposes" under the two sections. See comment 604(a)-1.[23]

B. Relation to section 604(a)(3)(C) – "eligibility … for insurance." Reports provided to insurers by claims investigation services solely to determine the validity of insurance claims – and not for underwriting purposes – are not consumer reports. Section 604(a)(3)(C) specifically sets forth only underwriting (not claims) as an insurance-related purpose, and section 603(d)(1) deals specifically with eligibility for insurance and no other insurance-related purposes.[24] Compare comment 603(f)-6.

C. Relation to sections 604(a)(3)(B) and 603(h) – "employment purposes." Section 604(a)(3)(B) lists "employment purposes" as a permissible purpose. Section 603(h) defines "employment purposes" to include "promotion, reassignment or retention," as well as to evaluate a job applicant. Accordingly, a report provided by a CRA that is used or is expected to be used or collected in whole or in part in connection with these purposes is a consumer report.[25]

D. "Other purposes authorized under section 604" – apartment rentals and personal checks. A report provided by a CRA and used to determine whether to rent a residence to a consumer is a consumer report, regardless of whether it includes credit information, because it is used for a business transaction that the consumer has initiated for "personal, family or household purposes."[26] Similarly, a report by a CRA indicating that an individual has issued bad checks is a consumer report. The information furnished bears on consumers' character, general reputation, and personal characteristics, and it is used or expected to be used in connection with business transactions that a consumer has initiated. Compare comment 603(d)-7A, stating that information that is compiled and used only for law enforcement or similar purposes is not a "consumer report."

**Section 603(d)(2)(A)(i)** excludes from the definition of consumer report "any report containing information solely as to transactions or experiences between the consumer and the person making the report."

1. TRANSACTION OR EXPERIENCE INFORMATION

A. General. Reports limited to transactions or experiences between the consumer and the entity making the report are not consumer reports. An opinion that is based only on transactions or experiences between the consumer and the reporting entity is also within the exception. For

example, a creditor's description of an account as "slow pay" would not be a consumer report if the description was based on the creditor's own experience with the account and did not come from a CRA.[27]

B. <u>First-hand report of consumer's performance</u>. A communication by an employer that describes an employee's job performance, by a creditor about a customer's repayment of a debt, or by a collection agency to a CRA that is limited to the agency's own transactions and experiences with the debtor (whether acting on its own or on behalf of a creditor/client) is not a "consumer report."

C. <u>Lab reports</u>. Drug test results provided by a lab directly to an employer are not "consumer reports" because they constitute reports based on the experience of the laboratory with the consumer (applying scientific methods to test urine or other samples from the consumer).[28]

D. <u>Personal observations</u>. A report that consists solely of information communicated by a person who drives by the consumer's residence, a property appraiser who evaluates property, or an investigator who makes a video recording of events, is not a "consumer report" because it consists solely of the experience of the party supplying the report.

E. <u>Reference checks</u>. A communication from a former or current employer to a CRA or other third party, involving only transactions between the consumer (the employee or applicant) and the person making the report (the current or former employer) is not a consumer report because it is based on the "experiences between the consumer and the person making the report."[29] However, a communication of such information from a CRA to a potential employer is a consumer report because the transactions or experiences referred to in the communication are not between the job applicant and the CRA. See comment 603(d)-6F.

F. <u>Creditor information</u>. A list provided by a creditor of its customers who have account balances of $10,000 or more would constitute "transaction or experience" information and would therefore be excluded from the definition of "consumer report" when provided by the creditor.[30]

2. INFORMATION BEYOND THE REPORTING ENTITY'S "TRANSACTIONS OR EXPERIENCES" WITH THE CONSUMER

A. <u>General</u>. Reports of information that go beyond an entity's own transactions or experiences with the consumer are not within the exclusion, and thus may be consumer reports. For example, a creditor's or an insurance company's report to a third party of the reasons it cancelled credit or insurance, if based on information from an outside source (e.g., a consumer report), may be a consumer report.[31]

B. <u>Application information</u>. A report by a creditor of application information supplied by the consumer (including lists of his or her assets and liabilities, and lists of the names of companies from whom the customer has purchased insurance and securities) is not the creditor's "transaction or experience" information because it includes the customer's transactions with entities <u>other</u> than the creditor.[32]

**Section 603(d)(2)(A)(ii)** excludes from the definition of consumer report any communication of transaction and experience information among affiliated companies. **Section 603(d)(2)(A)(iii)** excludes from the definition of consumer report any "communication of other information among persons related by

common ownership or affiliated by corporate control," if the consumer receives notice of such communications and an opportunity to opt out.

1.  RELATION TO SECTION 624 AND THE AFFILIATE MARKETING RULE

    Section 603(d)(2)(A)(ii) and (iii) allow affiliates to share information among themselves about their own transactions and experiences with consumers without such information being deemed a "consumer report." They also allow consumers to opt out of having any of their other information shared among affiliates. Section 624 provides consumers with a similar right to "opt out" of the use of their information among affiliates for marketing purposes. The FACT Act, which added section 624 to the FCRA, directed the Commission and Federal financial agencies to promulgate regulations implementing this right. Starting July 21, 2011, the Bureau assumes rulemaking authority under this section. See comment 624-1 for more details concerning the Affiliate Marketing Rule. The Commission staff will interpret section 603(d)(2)(A) consistently with section 624 and the Affiliate Marketing Rule, which use similar terminology. The Commission rule is set forth at 16 CFR Parts 680 and 698 App. C.

2.  CONSUMER CONSENT

    A person provides a reasonable "opportunity" to opt out if the consumer affirmatively consents to communications with affiliates, after having been properly notified of the right to prohibit such communications.

**Section 603(d)(2)(B)** exempts from the definition of consumer report "any authorization or approval of a specific extension of credit directly or indirectly by the issuer of a credit card or similar device."

1.  GENERAL

    A credit or debit card issuer's written, oral, or electronic communication of its decision whether to authorize a charge, in response to a request from a merchant or other party that the consumer has asked to honor the card, is not a "consumer report."[33]

**Section 603(d)(2)(C)** exempts from the definition of consumer report "any report in which a person who has been requested by a third party to make a specific extension of credit directly or indirectly to the consumer conveys his decision with respect to such request, if the third party advises the consumer of the name and address of the person to whom the request was made" and such person provides appropriate adverse action notices under section 615.

1.  GENERAL

    This exemption covers retailers' attempts to obtain credit for their individual customers from an outside source, such as a bank or a finance company. The creditor's communication of its decision whether to extend credit is not a "consumer report" if the retailer informs the customer of the name and address of the creditor to which the application or contract is offered and, if the credit application is denied, the creditor provides an adverse action notice to the consumer.[34]

2.   INFORMATION INCLUDED WITHIN EXEMPTION

Because this exemption applies to "any report," it includes not only the "yes" or "no" decision as to whether to extend credit, but also the information constituting the basis for the credit decision.[35]

3.   HOW THIRD PARTY CREDITORS CAN INSURE THAT EXEMPTION APPLIES

Creditors can insure that the exemption contained in this section applies by (1) having a written agreement requiring the retailer to inform the consumer of the creditor's name and address and (2) providing adverse action notices if they deny credit.[36]

## Section 603(d)(2)(D) exempts from the definition of consumer report any "communication described in subsection (o) or (x)."

1.   RELATION TO OTHER SECTIONS

Section 603(o) exempts from the definition of "consumer report" certain reports by employment agencies engaged in procuring jobs for applicants or employees for employers under prescribed circumstances. Section 603(x) – re-designated 603(y) by the Consumer Financial Protection Act of 2010 – exempts reports made in connection with investigations of employee misconduct.

## Section 603(d)(3) provides that the exemptions from the definition of "consumer report" do not apply if the communication includes medical information other than that specified in section 604(g)(3).

1.   RELATION TO OTHER SECTIONS

This section cross references section 604(g)(3) and works as follows.

Section 603(d)(2) exempts from the definition of consumer report (1) certain communications among affiliates; (2) information relating to transactions or experiences between the consumer and person making the report; (3) a card issuer's decision to approve specific charges; (4) a third party creditor's decision to approve a retailer's payment card; and (5) certain employment-related communications. If any such exempted communications or information relates to medical information, section 603(d)(3) provides that the foregoing exemptions do not apply, and the information will be deemed a consumer report.

Section 604(g)(3), however, provides that the following communications involving medical information will not be deemed to be a consumer report: (1) information relating to the business of insurance or annuities; (2) information for which disclosure is permitted under the Health Insurance Portability and Accountability Act, and rules issued thereunder; (3) information for which disclosure is permitted under the Gramm-Leach Bliley Act; or (4) information for which disclosure is determined to be necessary and appropriate in rules issued by Federal financial agencies or state insurance authorities. See comment 604(g)-2.

## Section 603(e) defines "investigative consumer report" as "a consumer report or portion thereof in which information on a consumer's character, general reputation, personal characteristics, or mode of living is obtained through personal interviews …. However, such information shall not include specific factual information on a consumer's credit record obtained directly from a creditor of the consumer or from

a consumer reporting agency when such information was obtained directly from a creditor of the consumer or from the consumer."

1. RELATION TO OTHER SECTIONS

The term "investigative consumer report" describes a type of "consumer report" for which the FCRA imposes additional and different requirements on recipients and CRAs. Persons procuring "investigative consumer reports" must make certain disclosures to the consumers who are the subjects of the reports, as required by section 606. Under section 614, CRAs generally must verify certain adverse information from a previous "investigative consumer report" when furnishing subsequent consumer reports. CRAs making file disclosures to consumers pursuant to section 609 are not required to disclose "sources of information acquired solely for use in preparing an investigative consumer report and actually used for no other purpose."[37]

2. "INVESTIGATIVE CONSUMER REPORT"

An "investigative consumer report" is a type of "consumer report" that includes information obtained through personal interviews with the consumer's neighbors, friends, associates or others.[38] If a communication does not fall within the definition of "consumer report," however, it will not be an "investigative consumer report."

3. "PERSONAL INTERVIEWS"

A. General. "Personal interviews" include interviews with a neighbor, friend, or associate of the consumer conducted by mail, telephone or electronic means, as well as in person.[39] A report containing interview information obtained solely from the report subject is not an "investigative consumer report" because the information was not collected through personal interviews with third persons.[40] A report that consists solely of information gathered from observation by one who drives by the consumer's residence is not an "investigative consumer report," because it contains no information from "personal interviews."[41] See also comment 603(d)(2)(A)(i)-1D.

B. Employment confirmation or evaluation. A discussion between a CRA and a job applicant's former or current employer to verify or confirm facts reported on an employment application – e.g., the time and/or duration of employment, job titles/and or salaries during the employment period – is not an "interview" for purposes of this section, and the report is not an investigative consumer report. However, an evaluation of the applicant's job performance by a prior or current employer to a CRA that goes beyond fact-checking – e.g., whether the applicant had been disciplined on the job or terminated for cause – would constitute an interview, and a report compiling those responses for a potential employer would be an investigative consumer report.[42]

C. Unsolicited information. If a former or current employer or other source voluntarily offers opinions or other unsolicited information and the CRA includes the opinions or other unsolicited information in the report, the report would become an investigative consumer report despite the fact that the CRA did not originally intend to obtain the information. If the CRA does not include the unsolicited information in its report, then it is not an investigative consumer report.[43]

4.   NONINVESTIGATIVE INFORMATION IN "INVESTIGATIVE CONSUMER REPORTS"

A report that is obtained by personal interviews with the consumer's neighbors, friends, associates or others does not lose its status as an "investigative consumer report" if it also contains noninvestigative information (such as a credit report), because the definition includes reports, a "portion" of which are investigative reports.[44]

**Section 603(f)** defines "consumer reporting agency" as "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports."

1.   RELATION TO OTHER SECTIONS

A.   Duties imposed on CRAs. The FCRA imposes a number of duties on "consumer reporting agencies." They must have permissible purposes to furnish consumer reports (section 604), take certain actions relating to identity theft (sections 605A, 605B), avoid furnishing obsolete adverse information in certain consumer reports (sections 605, 607(a)), adopt reasonable procedures to assure privacy (sections 604, 607(a)) and accuracy (section 607(b)) of consumer reports, provide only limited disclosures to governmental agencies (section 608) except in cases involving counterintelligence and counterterrorism (sections 625-626), provide consumers certain disclosures upon request (sections 609 and 610) at no cost or for a reasonable charge (section 612), follow certain procedures if a consumer disputes the completeness or accuracy of any item of information contained in his file (section 611), and follow certain procedures in reporting public record information for employment purposes or when reporting adverse information other than public record information in investigative consumer reports (sections 613, 614). CRAs that resell consumer reports procured from other CRAs have additional obligations (section 607(e)).[45]

B.   Relation to "consumer reports." The terms "consumer report" in section 603(d) and "consumer reporting agency" as defined in section 603(f) are defined in a mutually dependent manner, and must therefore be construed together. For example, the term "consumer reporting agency" includes certain persons who assemble or evaluate information on consumers for the purpose of furnishing "consumer reports" to third parties. Thus, a person is not a "consumer reporting agency" if it provides only information that (1) is not included in the definition of consumer report (e.g., information that does not bear on the consumer's creditworthiness or any of the other six consumer characteristics) or (2) is excepted from the definition of consumer report (e.g., reports limited to the party's own transactions or experiences with a consumer).[46]

2.   *"FOR MONETARY FEES, DUES, OR ON A COOPERATIVE NONPROFIT BASIS, …."*

A.   Information pools or exchanges. Entities that work together for a common purpose without monetary compensation may form a CRA. For example, loan exchanges, which are generally owned and operated on a cooperative basis by consumer finance companies, establish a mechanism through which each member can (1) provide the identities and loan amounts of their borrowers, and (2) receive information on the outstanding loans of its applicants. Because such loan exchanges operate on a cooperative nonprofit basis, they are CRAs.[47]

28

B. <u>Information provided to CRAs</u>. A creditor that provides a consumer's application information to a CRA to obtain a credit report does not become a "consumer reporting agency." In this circumstance, the creditor is not providing the information for "fees, dues, or on a cooperative nonprofit basis;" rather, *it* pays the CRA to provide a consumer report so that the creditor can verify the information on the application.[48]

3.   *"REGULARLY ENGAGES IN WHOLE OR IN PART IN THE PRACTICE OF ASSEMBLING OR EVALUATING CONSUMER CREDIT INFORMATION OR OTHER INFORMATION ON CONSUMERS …."*

A. <u>Isolated transactions</u>. A business that furnished information on a customer or employee in response to a single inquiry from another party would not "regularly" be making such disclosures.[49]

B. <u>Assembling or evaluating</u>. "Assembling" means gathering, collecting, or bringing together consumer information such as data obtained from CRAs or other third parties, or items provided by the consumer in an application. "Evaluating" means appraising, assessing, determining or making a judgment on such information. For example, an entity that collects consumer report information from multiple sources, evaluates the information, and displays it according to the relative reliability of parallel data, is a CRA because it is assembling and/or evaluating the information.[50]

   i.   <u>General</u>. An entity whose record searchers collect publicly available information such as criminal records for employer screening of applicants, then forwards the information to its headquarters where a report is prepared consisting of that information, has conducted "assembling" activities sufficient to meet the definition of a CRA.[51]

   ii.   <u>Conduit functions</u>. An entity that performs only mechanical tasks in connection with transmitting consumer information is not a CRA because it does not assemble or evaluate information. For example, a business that delivers records, without knowing their content or retaining any information from them, is not acting as a CRA even if the recipient uses the records to evaluate the consumer's eligibility for insurance or another permissible purpose.[52] Similarly, a party that arranges for a job applicant's lab test, collects and forwards samples to the lab, and transmits test results to a prospective employer, is not a CRA making a consumer report.[53]

   iii.   <u>Sale of software products</u>. A seller of software to a company that uses the software product to process credit report information is not a CRA because it is not "assembling or evaluating" any information.[54] However, a company that uses software to assemble, or otherwise assembles, consumer information (other than its own experiences with the consumer) for transmission to third parties may be a CRA.[55]

C. <u>Employment background screening service as a CRA</u>. A third party that provides oral or written reports to prospective employers about the prior work experience of applicants is a CRA.[56] An entity that regularly researches the criminal records of job applicants and reports them to its clients is a CRA.[57]

D. <u>Tenant screening service as a CRA</u>. A business that regularly compiles information on consumers as tenants, and provides such data to residential property owners for use in evaluating consumer rental applications, is a CRA.

4.   *"FOR THE PURPOSE OF FURNISHING CONSUMER REPORTS TO THIRD PARTIES ...."*

A.   <u>Service providers</u>. A creditor that transmits information about a consumer to a service provider (i) solely for the purpose of using the information to service that consumer's account, and (ii) under circumstances that allow the service provider to use the information only in the manner that the creditor would be permitted to use it, is not a CRA. The creditor's purpose is to enable the provider to carry out a function on behalf of the creditor with respect to the account. Therefore, a creditor would not become a CRA by providing consumer report data to another entity such as (i) an underwriter to service or process a transaction with the consumer; (ii) a loan servicer to maintain, service, or review the consumer's account established as part of the transaction with the consumer, or (iii) a collection agency to collect on an unpaid debt.

B.   <u>Consummation of transaction</u>. A creditor does not become a CRA by communicating consumer report information about a loan applicant to an entity that must participate in the transaction in order for it to be completed (e.g., if the creditor communicates with an actual or potential loan insurer or guarantor to determine whether the entity would issue its insurance or guaranty to the holder of an obligation). In these circumstances, where the transactions are mutually dependent upon one another, the creditor's purpose is to use the report information to consummate the loan transaction for which the consumer applied.

C.   <u>Law compliance</u>. A creditor does not become a CRA by providing consumer information in order to comply with compulsory legal process, or for the purpose of assisting law enforcement, regulatory, judicial, or public safety authorities. Thus, a creditor may supply consumer information (i) to the extent specifically permitted or required under federal, state, or local laws, rules, and other applicable legal requirements, and in accordance with the Right to Financial Privacy Act of 1978 (12 USC 3401 *et seq.*); (ii) to law enforcement agencies, state insurance authorities, and self-regulatory organizations within the meaning of 15 U.S.C. § 7006; (iii) to comply with a properly authorized civil, criminal, or regulatory investigation, or subpoena or summons by federal, state, or local authorities; or (iv) to respond to judicial process or government regulatory authorities having jurisdiction over the creditor for examination, compliance, or other purposes as authorized by law.

D.   <u>Successors</u>. An entity that transmits consumer information to a successor in interest incident to the transfer of all or a portion of the underlying consumer asset, liability, account, or other relationship, or to any potential successor in interest for the purpose of evaluating the potential transaction does not become a CRA, because its purpose is to consummate the sale. A creditor's potential or actual successor in interest may include (i) participants in a securitization, secondary-market sale (including sales of servicing rights), or similar transactions related to a transaction of the consumer; (ii) purchasers or merger partners in a sale, merger, transfer, or exchange of all or a portion of a business or operating unit if the furnishing of consumer report information concerns only customers of such business or unit; (iii) purchasers of the assets or liabilities of a branch; (iv) transferees in a transfer of the creditor's receivables or accounts; (v) acquirers of a loan participation; (vi) a bankruptcy trustee; or (vii) a receiver.

E.   <u>Information conveyed at the consumer's request</u>. An entity acting as an intermediary on behalf of the consumer who has initiated a transaction does not become a CRA when it furnishes information to a prospective creditor to further the consumer's application. Thus, a mortgage broker does not become a CRA by furnishing consumer reports to prospective creditors on behalf of a consumer that has sought the broker's assistance in obtaining a loan. An entity

does not become a CRA solely because it conveys, with the consumer's consent, information about the consumer to a third party in order to provide a specific product or service that the consumer has requested.

F. Provision of credit report to report subject. A consumer report user does not become a CRA by regularly giving a copy of the report, or otherwise disclosing it, to the consumer who is the subject of the report (or the consumer's representative), because it is not disclosing the information to a "third party." See also section 607(c).[58]

G. Internal uses. A lender that uses a software package to combine credit reports it obtained from two or more major CRAs for its own internal use is not a CRA because it is not compiling the information "for the purpose of furnishing consumer reports to third parties."[59]

H. Employees and agents. An agent or employee that obtains consumer reports does not become a CRA by sharing such reports with its principal or employer in connection with the purposes for which the reports were initially obtained. Similarly, individual employees and agents hired by CRAs to collect information are not CRAs because the employees or agents themselves do not provide data to "third parties" but rather acquire information for the CRA to conduct its business.[60]

I. Collectors and creditors. Collection agencies or creditors may become CRAs if they regularly furnish "consumer report" information about debtors beyond their transactions or experiences with consumers (e.g., credit report or application data) to third parties for use in eligibility decisions on consumers' transactions.[61]

J. Dishonored checks. An entity that provides information on returned checks (dates, amounts, circumstances) for use by financial institutions or merchants in connection with transactions involving the report subjects would be a CRA making consumer reports to third parties. However, an entity that provided this information solely for law enforcement purposes would not be a CRA. See comment 603(d)-7A.

5. GOVERNMENT AGENCIES

A. Federal agencies. The Office of Personnel Management ("OPM") collects and files data concerning current and potential employees of the federal government and transmits that information to other government agencies for employment purposes. OPM is not a CRA included in the scope of this definition, because the recipient is another governmental branch and not a "third party."[62]

B. State agencies. A state agency that provides information such as criminal records checks to further law enforcement or other state functions mandated by the state legislature is not a CRA.[63] A state agency that provides publicly available data to third parties, as part of its normal operations, is also not a CRA.[64]

6. CLAIMS HISTORIES FOR UNDERWRITING PURPOSES

An entity that compiles claim payment histories on individuals from insurers and furnishes them to insurance companies solely for use in underwriting decisions concerning those individuals is a CRA.[65] Compare comment 603(d)-8B.

**Section 603(g)** defines "file," when used in connection with information on any consumer, to mean "all of the information on that consumer recorded and retained by a consumer reporting agency regardless of how the information is stored."

### 1.   RELATION TO OTHER SECTIONS

CRAs are required to make disclosures of all information in their "files" to consumers upon request (section 609) and to follow investigation procedures if the consumer disputes the completeness or accuracy of any item of information contained in his or her "file" (section 611).[66]

### 2.   SCOPE

The term "file" includes all information on the consumer that is recorded and retained by a CRA – regardless of how the information is stored – that has been or might be provided in a consumer report on that consumer.[67] The term includes such information that a CRA has kept for archival purposes, because the definition includes all data "retained" and "stored" by the CRA.[68]

### 3.   INFORMATION NOT RETAINED FOR INCLUSION IN CONSUMER REPORTS

The term "file" does not include information in a CRA's billing or consumer relations records on a consumer who obtains a disclosure or files a dispute, or an "audit trail" (a list of changes made by a CRA to a consumer's credit history record, maintained to detect fraudulent changes to that record), if the information would not be included in a report on the consumer.[69]

**Section 603(h)** defines "employment purposes" to mean "a report used for the purpose of evaluating a consumer for employment, promotion, reassignment or retention as an employee."

### 1.   RELATION TO OTHER SECTIONS

The term "employment purposes" is used as part of the definition of "consumer reports" (section 603(d)) and as a permissible purpose for the furnishing of consumer reports (section 604(a)(3)(B)). When an employer procures reports for employment purposes, it must make certain certifications and disclosures, and obtain consumer consent. (See section 604(b). When a CRA furnishes public record information in reports "for employment purposes," it must provide notice to the consumer or maintain strict procedures for keeping the information up to date. (See section 613.)[70]

### 2.   INDEPENDENT CONTRACTORS, AGENTS, AND VOLUNTEERS

Because the term "employment purposes" is interpreted liberally to effectuate the broad remedial purpose of the FCRA, it may apply to situations where an entity uses individuals who are not technically employees to perform duties.[71] Thus, it includes a trucking company that obtains consumer reports on individual drivers who own and operate their own equipment;[72] a title insurance company that obtains consumer reports on individuals with whom it frequently enters into contracts to sell its insurance, examine title, and close real property transactions;[73] or a nonprofit organization staffed in whole or in part by volunteers.[74]

### 3.   SECURITY CLEARANCES

A consumer report used in connection with security clearances of a government contractor's employees would be for "employment purposes" under this section.[75]

**Section 603(i)(1)** defines the term "medical information" to mean "information or data, whether oral or recorded, in any form or medium, created by or derived from a health care provider or the consumer, that relates to (A) the past, present, or future physical, mental, or behavioral health or condition of an individual; (B)

the provision of health care to an individual; or (C) the payment for the provision of health care to an individual." **Section 603(i)(2)** excludes identifying and other non-germane information, "including the existence or value of any insurance policy."

### 1. RELATION TO OTHER SECTIONS

Sections 603(d)(3), 604(g), 605(a)(6), and 623(a)(9) set forth standards concerning the use or communication of medical information. The Federal financial agencies have issued rules specifying "necessary and appropriate" uses of medical information. See comment 604(g)-1.

## Section 603(j) sets forth definitions with respect to child support obligations.

## Section 603(k)(1) defines the term "adverse action."

### 1. RELATION TO OTHER SECTIONS

The term "adverse action" is defined in the credit context by section 603(k)(1)(A), in the insurance context by section 603(k)(1)(B)(i), in the employment context by section 603(k)(1)(B)(ii), in the context of a license or benefit granted by the government by section 603(k)(1)(B)(iii), and in other contexts by section 603(k)(1)(B)(iv). The subsections of the "adverse action" definition in section 603(k)(1) thus parallel the permissible purposes provided for credit, insurance, employment, governmental benefit or license, and other consumer purposes provided in section 604(a)(3).[76] See comment 604(a)-1.

Section 615(a) requires users of consumer reports to provide notice to consumers against whom they take "adverse action" based in whole or in part on a consumer report. Section 615(b) imposes notice requirements on creditors who take "adverse action" based on information other than consumer reports.

## Section 603(k)(1)(A) states that the term adverse action "has the same meaning as in section 701(d)(6) of the Equal Credit Opportunity Act."

### 1. RELATION TO OTHER LAWS

Under regulations implementing the Equal Credit Opportunity Act ("ECOA"), an "adverse action" is "a refusal to grant credit in substantially the amount or on substantially the same terms requested in an application unless the creditor makes a counteroffer (to grant credit in a different amount or on other terms) and the applicant expressly accepts the credit offered …." 12 CFR § 202.2(c)(1)(i).

### 2. ACTION ON CREDIT APPLICATION

Under the definition of "adverse action" set forth in the ECOA and incorporated into the FCRA, where a consumer applies for credit on particular terms and is offered credit only on less favorable terms, such as a lower credit limit, or a higher interest rate, based in whole or in part on information from a consumer report, and the consumer refuses to accept those terms or use the credit offered, the consumer has suffered an "adverse action." (An example of an application for credit on particular terms is an application that provides information regarding the type and amount of credit sought, the down payment amount, and the annual percentage rate.) However, if the applicant accepts the less favorable terms counter offered, the applicant does not suffer an "adverse action."[77] See also comments 615(a)-1B, 615(a)-2A, and 615(h) concerning "risk based pricing" notices

provided to credit applicants who receive less than optimal terms in whole or in part because of a consumer report.

### 3.   PRIMARY CREDIT APPLICANT, CO-APPLICANT, AND GUARANTOR

Because the FCRA adopts the definition of "adverse action" from the ECOA, only an "applicant" experiences "adverse action" in the context of a credit transaction. See 12 CFR § 202.2(c)(1). A co-applicant is an "applicant" but a guarantor is not. 12 CFR. § 202.2(e). Therefore, where a creditor denies an application, both the primary applicant and any co-applicant have suffered an "adverse action," but any guarantor has not. See comment 615(a)-2B.[78]

### 4.   DECISION NOT TO SOLICIT FOR CREDIT

It is not an "adverse action" for a creditor to decide not to include a current borrower in a credit solicitation based in whole or in part on the creditor's review of consumer report information because that decision does not involve either (a) an "application" by the consumer or (b) a termination of the consumer's account or an unfavorable change in the terms of that account. 12 CFR §202.2(c)(1)(i-ii).[79]

**Section 603(k)(1)(B)(i)** defines the term adverse action as including "a denial or cancellation of, an increase in any charge for, or a reduction or other adverse or unfavorable change in the terms of coverage or amount of, any insurance, existing or applied for, in connection with the underwriting of insurance."

### 1.   INITIAL PREMIUM

The term "increase in any charge for" insurance applies to the initial premium charged to the consumer, as well as to a premium that is raised during the term a policy is in effect. If an insurer considers an applicant's credit history (or a score based on that history) as part of the application process, and offers a higher premium than it would otherwise have offered, the higher premium is an "increase in (the) charge for" insurance. The consumer has suffered an adverse action because the insurance would cost more than it would if the consumer's credit history had not been considered.

### 2.   MORTGAGE INSURANCE

A mortgage insurer's refusal to insure a consumer loan is an "adverse action" under this subsection because it is a "denial in connection with the underwriting of insurance."[80]

**Section 603(k)(1)(B)(ii)** defines the term adverse action as including "a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee."

### 1.   RELATION TO OTHER SECTIONS

The term "employment purposes" is defined in section 603(h).

### 2.   DISCIPLINARY ACTION TAKEN BY AN EMPLOYER

Corrective or disciplinary action taken by an employer based in whole or in part on a consumer report is an "adverse action."[81]

3.   CHANGE IN DUTIES OR STATUS

An employer's decision may "adversely" affect an employee even if his or her pay is not reduced. For example, an employee who is denied an assignment requiring a security clearance that is withheld in whole or in part because of a consumer report suffers an "adverse action" in employment even if the assignment would not have raised the employee's salary.

**Section 603(k)(1)(B)(iii)** defines the term adverse action as including "a denial or cancellation of, an increase in any charge for, or any other adverse or unfavorable change in the terms of, any license or benefit described in section 604(a)(3)(D)."

1.   GENERAL

Subsection 603(k)(1)(B)(iii) provides a specific "adverse action" definition in the context of a consumer's application for a license or other governmental benefit where the applicant's financial responsibility or status is a factor that must be considered.

2.   WORKER'S COMPENSATION CLAIM

The use of information from a consumer report to deny worker's compensation benefits to the consumer or to grant less than the amount claimed is an "adverse action."[82]

**Section 603(k)(1)(B)(iv)** defines the term adverse action as including "an action taken or determination that is (I) made in connection with an application that was made by, or a transaction that was initiated by, any consumer, or in connection with a review of an account under section 604(a)(3)(F)(ii); and (II) adverse to the interests of the consumer."

1.   GENERAL

Subsection 603(k)(1)(B)(iv) provides a specific "adverse action" definition in the context of consumer transactions other than those involving credit, insurance, employment or government benefits, such as an apartment rental or a purchase by personal check.

2.   ACTION BASED ON CO-SIGNER'S OR GUARANTOR'S REPORT

A landlord's decision to deny a rental application based on a co-signer or guarantor's consumer report is an "adverse action" with respect to the co-signer or guarantor. By voluntarily assuming liability for the tenant's rental payments, a co-signer or guarantor seeks to ensure that the tenant receives housing, as in the case of a parent who co-signs a rental application submitted by a son or daughter. The rejection is thus "adverse" to the "interests" of the potential co-signor or guarantor.[83] But see comments 603(k)(1)(A)-3 and 615(a)-2B, concerning the application of "adverse action" to a guarantor in a credit context where the definition is tied to the ECOA.

3.   DEPOSIT REQUIREMENT

A business that determines, based on information contained in a consumer report, that a consumer must pre-pay, pay a cash deposit, or pay a larger deposit rather than would normally be required, has taken adverse action against that consumer.[84]

4.  ACTION ON RESIDENTIAL RENTAL APPLICATION

A residential property owner that denies a consumer's application to rent an apartment, or charges a higher rent, or requires a larger deposit, based in whole or in part on a consumer report, has taken adverse action with respect to that consumer.

**Section 603(k)(2)** provides that all appropriate Bureau findings, decisions, commentary, and orders issued under "section 701(d)(6) of the Equal Credit Opportunity Act" shall apply for the purposes of determining whether an adverse action has taken place.

1.  EQUAL CREDIT OPPORTUNITY ACT

The Equal Credit Opportunity Act is codified at 16 U.S.C. 1691 *et seq.*, and implemented by Regulation B, 12 CFR. Part 202. See comment 603(k)(1)(A)-1.

**Section 603(*l*)** defines the term "firm offer of credit or insurance" to mean "any offer of credit or insurance to a consumer that will be honored if the consumer is determined, based on information in a consumer report on the consumer, to meet the specific criteria used to select the consumer for the offer." In general, once a consumer accepts such an offer, the entity making the offer cannot condition it on further consumer report information, except that it can verify that the consumer continues to meet the criteria established before the firm offer is extended.

1.  RELATION TO OTHER SECTIONS

"Firm offer of credit or insurance" is the term used in the FCRA for "prescreened" solicitations. Section 603(*l*) defines the parameters of a firm offer. Section 604(c) provides the permissible purpose for prescreening, and imposes some limitations on the information that a CRA may provide for the purpose of making prescreened offers. Section 604(e) discusses the consumer's right to opt out from prescreened lists. Section 615(d) sets forth the disclosures that users of prescreening services must make to consumers on written solicitations.

2.  PRESCREENING

"Prescreening" is the common term for the process by which creditors and insurers use consumer report information to identify consumers to receive firm offers. Prescreening is the only circumstance in which consumer report information may be used for marketing purposes, and one of the few circumstances in which consumer report information may be provided in the absence of a consumer-initiated transaction. A CRA either edits a list of consumers developed by the requesting creditor or insurer (or its agents) or independently creates a list of consumers according to the requesting entity's specifications.

3.  USE OF CONSUMER REPORTS IN POSTSCREENING

The use of consumer report information in the postscreening process is limited to verifying that consumers continue to meet the criteria established and used before the firm offer is communicated to consumers on the list. Therefore, a credit grantor may not employ a two-step process where a CRA first provides a list of all consumers who have credit scores above a certain minimal level for the initial offer, and then provides each responding consumer's report to enable the creditor

36

to postscreen by applying new, more refined criteria to set the interest rate or to determine other specifics of the offer.

### 4.   TIERED LISTS

A user of prescreening lists may have the CRA provide separate or tiered lists for consumers who meet different criteria, and make different offers of credit or insurance to the consumers depending on which criteria the consumers meet.

### 5.   OFFER OF CREDIT COMBINED WITH SALE OF GOODS OR SERVICES

The FCRA does not establish a permissible purpose to obtain a consumer report in situations not involving an actual offer of credit or insurance, such as where an apparent offer of credit is actually a sham used to engage in the targeted marketing of a non-credit product, or is some other guise to obtain a consumer report for an impermissible purpose. Typically, this would not arise in cases involving stand-alone credit offers, but rather in situations where the purported offer of credit is accompanied by, and perhaps linked to, the marketing of a non-credit product. For example, an offer of $1 in credit toward the purchase of a BMW is, in reality a marketing pitch masquerading as an offer of credit, and there would be no permissible purpose under the FCRA to obtain a consumer report for such purposes.

Where there is reason to suspect, based on the credit offer and other factors, that the person making the apparent offer is engaged in a ruse to obtain a consumer report for an impermissible purpose, one looks at the entire proposed transaction in determining whether or not there is a permissible purpose or a sham offer. The salient factors include (i) the type of credit offered, (ii) the purposes for which the credit may be used, including whether the credit is restricted to the financing of a non-credit product marketed jointly with the credit, (iii) the likelihood that the credit would be adequate to achieve those purposes, and (iv) whether any consumers applied for and received the credit.[85]

### 6.   TERMS OF THE FIRM OFFER OF CREDIT

The FCRA does not require a lender, in the initial solicitation, to disclose the terms of the credit an individual consumer will receive in order for the solicitation to meet the "firm offer" requirements. The only term that this section requires to be specified in the offer is the collateral, if any, that is required for the credit to be provided. The creditor must also include all the disclosures required by section 615(d) in written solicitations to consumers identified by prescreening.

**Section 603(m)** states that the term "credit or insurance transaction that is not initiated by the consumer" does not include the use of a consumer report by a person with whom the consumer has an account or insurance policy, for purposes of (1) reviewing the account or insurance policy; or (2) collecting the account.

### 1.   GENERAL

Section 604(c) provides that, generally, it is not a permissible purpose to provide a consumer report in connection with "any credit or insurance transaction not initiated by the consumer" unless the consumer consents or the transaction consists of a firm offer of credit or insurance. However, an existing creditor's use of consumer reports for review or collection of its accounts does not fall within the definition of "credit or insurance transaction that is not initiated by the consumer." Rather, an existing creditor may obtain consumer reports for review or collection of its accounts

under section 604(a)(3)(A), but its use of those reports is limited to that purpose. Accordingly, a CRA may provide reports to creditors to review or collect existing credit accounts, but not to market other products or services.[86] See comment 604(a)(3)(A)-4A.

**Section 603(n)** defines the term "State" to mean any State, the Commonwealth of Puerto Rico, the District of Columbia, and any territory or possession of the United States.

**Section 603(o)** states that certain employment agency communications are exempt from the definition of "consumer report," where the agency follows prescribed procedures to provide prior notice to, and obtain prior consent from, consumers.

1. EMPLOYMENT AGENCIES

   This section exempts from the FCRA communications by employment agencies engaged in procuring (a) jobs for applicants or (b) employees for employers.[87]

2. EMPLOYMENT SCREENING SERVICES

   The exemption does not apply to an employment screening service that conducts reference checks on behalf of employers in connection with employment applications.[88] See comment 603(f)-3C.

**Section 603(p)** defines the term "consumer reporting agency that compiles and maintains files on consumers on a nationwide basis" to mean a consumer reporting agency that regularly assembles, evaluates, and maintains public record information and credit account information on a regular basis about consumers residing nationwide.

1. RELATION TO OTHER SECTIONS

   A CRA that meets this definition has different duties from other CRAs in some cases. Section 604(e)(6) requires nationwide CRAs to maintain a joint system to enable consumers to opt out from prescreening with a single call. Sections 605(h) and 605A impose several duties on nationwide CRAs designed to reduce or mitigate consumer injury due to identity theft. Section 609 requires nationwide CRAs to maintain a toll-free phone number. Section 611(a)(5)(D) requires nationwide CRAs to maintain an automated system to enable them to notify other CRAs when investigation of an item reveals an inaccuracy.

   Section 612(a) imposes "free annual disclosure" duties on nationwide CRAs. Comment 612(a)-2 discusses how those duties differ from those imposed on CRAs described in Section 603(x), which defines "nationwide specialty consumer reporting agency" to include different types of CRAs from those defined under this section.

2. HISTORICAL BACKGROUND

   The legislative history indicates that Congress expected this term to apply to the "big three" national CRAs that existed when this section was enacted in 1996, and to others that meet the definition in the future. 140 Cong. Rec. 25,871 (1994) (statement of Rep. Kennedy).

3.   RESELLERS

A CRA whose business consists solely of obtaining credit reports from other CRAs for resale (e.g., in mortgage transactions) is not a "nationwide" CRA if it does not maintain files on consumers on a nationwide basis and does not receive credit account information from creditors on a regular basis.[89] See comment 603(u)-1 concerning the term "reseller" and sections that impose duties on such parties.

**Section 603(q)** defines the following terms relating to fraud alerts – active duty military consumer, fraud alert, active duty alert, identity theft, identity theft report, and new credit plan. **Sections 603(q)(3) and (4)** authorized the Commission to further define "identity theft" and "identity theft report." Starting July 21, 2011, the Bureau assumes rulemaking authority under this provision.

1.   RELATION TO OTHER SECTIONS

The defined terms are used in sections 605A ("Identity theft prevention; fraud alerts and active duty alerts"), 605B ("Block of information resulting from identity theft"), 609(b) ("Summary of rights of identity theft victims"), 609(e) ("Information available to victims"), 615(e) ("Red flag guidelines and regulations required"), and 623(a)(6) ("Duties of furnishers upon notice of identity theft-related information"), which are designed to prevent identity theft and assist consumers who have been the victims of identity theft.

2.   IMPLEMENTING RULES

The terms "identity theft" and "identity theft report" are further defined by Commission rule (16 CFR 603.2 and 603.3). See 69 Fed Reg. 63922, 63933 (Nov. 3, 2004).

**Section 603(r)** defines the following credit and debit related terms – card issuer, credit card, debit card, account, electronic fund transfer, credit, and creditor.

**Section 603(s)** states, "The term 'Federal banking agency' has the same meaning as in section 3 of the Federal Deposit Insurance Act" which in turn defines the term to mean the Comptroller of the Currency, the Director of the Office of Thrift Supervision, the Board of Governors of the Federal Reserve System, or the Federal Deposit Insurance Corporation.

**Section 603(t)** defines "financial institution" as "a State or National bank, a State or Federal savings and loan association, a mutual savings bank, a State or Federal credit union" or anyone else that holds a transaction account (such as a checking account) belonging to a consumer.

**Section 603(u)** defines "reseller" as a CRA that (1) assembles and merges information from other consumer reporting agencies for purposes of furnishing such information to third parties; and (2) does not maintain a database of the assembled or merged information.

### 1.   RELATION TO OTHER SECTIONS

A CRA that is a "reseller" has somewhat different duties from other CRAs in some situations. Section 605A(f) requires resellers of consumer reports with any alerts in the file to include them in resold reports. Section 605B(d) provides different blocking obligations for resellers than other CRAs. Section 611(f) provides different investigation duties for resellers than other CRAs.

**Section 603(v)** defines "Commission" as the Federal Trade Commission.

**Section 603(w)** defines "Bureau" as the Bureau of Consumer Financial Protection.

**Section 603(x)** defines "nationwide specialty consumer reporting agency" as a CRA "that compiles and maintains files on consumers on a nationwide basis relating to (1) medical records or payments; 2) residential or tenant history; (3) check writing history; (4) employment history; or (5) insurance claims."[90]

### 1.   RELATION TO OTHER SECTIONS

Section 612(a) imposes "free annual disclosure" duties on nationwide specialty CRAs. Comment 612(a)-2 discusses how those duties differ from those imposed on CRAs described in Section 603(p), which defines "nationwide consumer reporting agency" to include different types of CRAs from those defined under this section.

**Section 603(y)(1)** excludes from the definition of "consumer report" those reports made solely for the purpose of investigating (1) suspected employment misconduct or (2) compliance with applicable laws or rules or "any pre-existing written policies of the employer." **Section 603(y)(2)** requires that an employer that has taken adverse action based on such a report provide the employee a summary of the "nature and substance" of the information.

### 1.   PRE-EXISTING WRITTEN POLICIES

The term "pre-existing written policies of the employer" means reasonable rules relating to the job. A report qualifies under this section only if it bears on compliance with the policy.

### 2.   "NATURE AND SUBSTANCE"

The adverse action disclosure of a summary of the "nature and substance" of the communication need not name information sources.

## Section 604 – Permissible Purposes of Reports          15 USC 1681b

**Section 604(a)** says that "any consumer reporting agency may furnish a consumer report under the following circumstances and no other …." Its subsections enumerate specific permissible purposes.

### 1.   RELATION TO SECTION 603(d) (DEFINITION OF "CONSUMER REPORT")

Sections 603(d)(1) and 604(a)(3) must be construed together to determine what are "permissible purposes," because section 603(d)(1) refers to any "purpose authorized under section 604" (often

described as "permissible purposes" of consumer reports). In addition, some permissible purposes are enumerated in section 603(d)(1)(A) and 603(d)(1)(B).[91]

## 2. RELATION TO OTHER SECTIONS

A. <u>CRA procedures</u>. Section 607(a) requires CRAs to safeguard consumer report information by furnishing consumer reports only for permissible purposes, and to follow specified, reasonable procedures to achieve this end.[92]

B. <u>Improper procurement of consumer reports</u>. Section 604(f) prohibits the use or procurement of a consumer report without a permissible purpose. Section 619 provides criminal sanctions against any person who knowingly and willfully obtains information on a consumer from a CRA under false pretenses.[93]

C. <u>Government agencies</u>. Section 608 allows CRAs to provide government agencies specified identifying information concerning consumers, notwithstanding the limitations of section 604.[94] Section 626 requires CRAs to provide consumer reports or specific information in their files to the Federal Bureau of Investigation in connection with investigations relating to international terrorism or clandestine intelligence activities. Section 627 allows CRAs to provide all information in their files to government agencies conducting such investigations.

D. <u>Prescreening</u>. Section 604(c) allows CRAs to provide creditors and insurers with limited information in the context of prescreening services.

## 3. FURNISHING OF CONSUMER REPORTS TO OTHER CRAS

A CRA may furnish a consumer report to another CRA, so that the second CRA can sell such reports to subscribers with a permissible purpose. In these circumstances, the receiving CRA must carry out the responsibilities of companies that procure reports for resale, as set forth in section 607(e). If the CRA meets the definition of "reseller," it must also comply with provisions imposed on "resellers." See comment 603(u)-1.[95] The CRA that distributes consumer reports to other CRAs also must comply with FCRA requirements to implement reasonable policies and procedures to limit the distribution of consumer reports to those with permissible purposes. Among other things, such policies and procedures could include internal programs such that each intermediary relied upon by a CRA for distribution of consumer reports is audited and monitored on a regular and periodic basis.

## 4. REPORT FOR PERMISSIBLE PURPOSE AUTHORIZED, NOT REQUIRED

Even if a business has a permissible purpose to receive a consumer report, a CRA is not required to supply a report to such business because the statute is permissive, not mandatory.[96]

## 5. AGENTS

A. <u>General</u>. An agent of a party with a "permissible purpose" may obtain a consumer report where he is acting on behalf of his principal for that purpose.[97]

B. <u>Real estate agent</u>. A real estate agent may obtain a consumer report on behalf of a seller to evaluate the eligibility of a potential buyer who has offered to purchase the property.[98]

C. <u>Private detective agency</u>. A private detective agency may obtain a consumer report for its client while investigating a client's prospective employee. A private detective agency may obtain a consumer report as an agent for a creditor client attempting to collect an account owed. In these circumstances, the detective agency is acting on behalf of its client.[99]

    D.  <u>Property manager</u>. A landlord's representative investigating applicants for apartment rentals may obtain consumer reports on prospective tenants.[100]

    E.  <u>Attorney</u>. An attorney collecting a debt for a creditor client has a permissible purpose to obtain a consumer report on the debtor to the same extent as the client.[101]

6.   PURPOSES NOT ALLOWED BY THE FCRA

    A.  <u>General prohibition</u>. Because this section allows a CRA to provide a consumer report for the listed purposes "and no other," it may not provide a report for any other purpose.

    B.  <u>Marketing</u>. Sellers of goods and services do not have a permissible purpose to obtain consumer reports for marketing purposes. But see sections 603(*l*) and 604(c), which allow CRAs to provide creditors and insurers limited information for firm offers of credit or insurance.

    C.  <u>Curiosity</u>. A CRA may not furnish a consumer report to satisfy a requester's curiosity. A news reporter does not have a permissible purpose to obtain a consumer report in preparing a newspaper or magazine article.[102]

    D.  <u>Acceptance of free trial</u>. A consumer's acceptance of a complimentary product or service, standing alone (i.e., with no indication of intent to purchase additional products or services on credit), is insufficient to provide a permissible purpose.[103]

    E.  <u>Law enforcement</u>. This section does not permit CRAs to furnish consumer reports for the purpose of locating a person suspected of committing a crime. But see section 608 (permitting the furnishing of specified, limited identifying information to governmental agencies) and sections 625-627 (requiring CRAs to provide consumer report data in cases involving counterintelligence and counterterrorism).[104] See comment 604(a)-2C.

7.   CONSUMER'S PERMISSION NOT NEEDED WHERE OTHER PERMISSIBLE PURPOSE EXISTS

Generally, when permissible purposes other than employment exist, CRAs may furnish consumer reports without a consumer's specific permission or authorization. For example, where a consumer applies for credit (by phone, mail, in person, or electronically), the creditor has a permissible purpose to obtain a consumer report on the applicant. Similarly, consumer permission is not needed for entities to furnish information concerning their transactions with consumers to CRAs, or for CRAs to gather information.[105]

8.   USER MAY DISCLOSE REPORT TO CONSUMER

The FCRA does not prohibit a consumer report user from providing a copy of the report, or otherwise disclosing it or any item or items of information in it (or any score based on the information), to the consumer who is the subject of the report.[106] See also section 607(c).

**Section 604(a)(1)** allows CRAs to furnish consumer reports in response to the "order of a court having jurisdiction to issue such an order, or a subpoena issued in connection with proceedings before a Federal grand jury."

1.   SUBPOENA

A subpoena is not an "order of a court" unless it is signed by a judge. Thus, administrative subpoenas, attorney-issued subpoenas, and similar formal process issued by entities other than a federal grand jury, do not provide a permissible purpose under this section.[107]

### 2.   INTERNAL REVENUE SERVICE SUMMONS

An Internal Revenue Service summons is an exception to the requirement that an order be signed by a judge before it constitutes an "order of a court" under this section, because another statute (26 U.S.C. §7609) specifically requires a CRA to furnish a consumer report in response to an IRS summons.[108] See comment 604(a)-1C, concerning specific provisions of the FCRA that allow or require CRAs to supply information to governmental entities.

## Section 604(a)(2) allows CRAs to furnish consumer reports in accord "with the written instructions of the consumer to whom it relates."

### 1.   CONSUMER INSTRUCTION

A consumer's written consent qualifies as an "instruction" that provides a permissible purpose under this section if it clearly authorizes the issuance of a consumer report on that consumer.[109] For example, a consumer's clear and specific written statement that "I authorize you to procure a consumer report on me" provides a permissible purpose under this section. However, the consumer's signature on a form that includes the statement "I understand that where appropriate, credit bureau reports may be obtained" is not a sufficiently specific instruction from the consumer to authorize a CRA to provide a consumer report. This language is more in the nature of a notification that a consumer report might be procured, as opposed to a grant of permission to obtain the consumer report.[110]

### 2.   WRITTEN AUTHORIZATION

A consumer may transmit "written" authorization electronically or by facsimile, in addition to regular mail or in person.[111] The Electronic Signatures in Global and National Commerce Act ("ESIGN") (15 U.S.C. §§7001 *et seq.*, Public Law 106-229; June 30, 2000) provides that a consumer's consent is not invalid merely because it is communicated in electronic form. A consumer's "electronic signature" may be an acceptable method of providing "written instructions" under the FCRA. To be valid under the ESIGN Act, electronic authorization must be in a form that can be retained and retrieved in a perceivable form. Whether an e-mail, a mouse click "yes," or other electronic means clearly conveys the consumer's instructions depends on the specific facts.[112]

## Section 604(a)(3)(A) allows a CRA to furnish consumer reports to a person which it has reason to believe "intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer"

### 1.   REPORTS "IN CONNECTION WITH A CREDIT TRANSACTION INVOLVING THE CONSUMER"

A.   Credit application. An application by a consumer for credit gives rise to a permissible purpose to obtain a consumer report, regardless of form. When a consumer applies for credit, whether in person, by phone, by mail, or by electronic means, the creditor has a permissible purpose to obtain a consumer report on the applicant, and thus does not need specific authorization from the applicant.[113]

B.   Real estate transactions. A seller of property has a permissible purpose under this subsection to obtain a consumer report on a prospective purchaser to whom the seller has been requested

to extend credit.[114] Similarly, a real estate agent acting on behalf of a seller with a permissible purpose may obtain the consumer report.[115]

## 2.   INFORMATION ON AN APPLICANT'S SPOUSE

A.   Where permissible purpose exists. A creditor has a permissible purpose to obtain a consumer report on an applicant's spouse if that spouse will be permitted to use the account or will be contractually liable upon the account, or if the applicant is relying on the spouse's income as a basis for repayment of the credit requested. In addition, a creditor may obtain a consumer report on an applicant's spouse if (i) the state law doctrine of necessaries (which may make a consumer liable for certain debts of a spouse) applies to the transaction, (ii) the applicant resides in a community property state, (iii) the property upon which the applicant is relying as a basis for repayment of the credit requested is located in such a state, or (iv) the applicant is acting as the agent of the nonapplicant spouse.[116]

B.   Where permissible purpose does not exist. A creditor does not have a permissible purpose to obtain a report on a nonapplicant spouse if the creditor receives information indicating that (i) the applicant is not acting as the agent of the nonapplicant spouse, (ii) the applicant is relying only on separate property to repay the credit extended, (iii) the state law doctrine of necessaries does not apply to the transaction, or (iv) the applicant does not reside in a community property state. Where Regulation B, issued under the ECOA (12 CFR 202), prohibits the creditor from requesting information on such a spouse, a permissible purpose for making a consumer report on a nonapplicant spouse can never exist under the FCRA. There is no permissible purpose to obtain a consumer report on a nonapplicant former spouse or on a nonapplicant spouse who has legally separated or otherwise indicated an intent to legally disassociate with the marriage. (This does not preclude reporting a prior joint credit account of former spouses for which the spouse that is the subject of the report is still contractually liable.)[117]

## 3.   REPORTS FOR "REVIEW OR COLLECTION OF AN ACCOUNT" – PERMISSIBLE PURPOSE EXISTS

A.   Creditor. In order for a creditor to have a permissible purpose to obtain a consumer report to review an account, it must have an existing credit account with the consumer and must use the consumer report solely to consider taking action with respect to the account (e.g., modifying the terms of an open end account).[118] A creditor has a permissible purpose to obtain a consumer report on one of its customers for the purpose of review of the account, even where the customer has sought to discharge his/her debt in bankruptcy. A creditor who is deciding whether to participate in a debt management plan which would involve the cooperation of all of the consumer's creditors has a permissible "review" purpose under this section.

B.   Debt collection. A collection agency, detective agency, private investigator, or attorney has a permissible "collection" purpose under this section to obtain a consumer report on a consumer for use in obtaining payment of that consumer's account on behalf of a creditor.[119] A creditor may obtain a consumer report on an existing account to formulate its collection strategy. An attorney collecting a debt for a creditor client has a permissible purpose to obtain a consumer report on the debtor to the same extent as the client.[120]

C.   Bad checks. A person attempting to recover the amount due on a bad check is attempting to collect a debt and, therefore, has a permissible purpose to obtain a consumer report on the consumer who wrote it, and on any other consumer who is liable for the amount of that check under applicable state law.[121]

44

4.   REPORTS FOR "REVIEW OR COLLECTION OF AN ACCOUNT" – PERMISSIBLE PURPOSE DOES NOT EXIST

    A.   <u>Marketing purposes</u>. This section does not allow a CRA to provide a creditor with consumer reports to "review" accounts in order to market its other products or services.[122] See also comments 603(m)-1 and 604(a)(3)(F)-6.

    B.   <u>Paid off and closed accounts</u>. Once an account is paid off and closed, the creditor does not have a permissible purpose for obtaining a consumer report from a CRA because there no longer exists any account to "review."[123]

    C.   <u>Unsolicited reports</u>. A CRA may not send an unsolicited consumer report to the recipient of a previous report on the same consumer, because the recipient will not necessarily have an account with the consumer that provides a permissible purpose to receive the unsolicited report. For example, the recipient may have rejected the consumer's application or ceased to do business with the consumer. (See also discussion in comment 607(a)-3G)[124] However, upon the consumer's request, a CRA must furnish notifications to prior recipients required by section 611(d) when an item is deleted or is the subject of a dispute statement as a result of the CRA's investigation.

    D.   <u>Automobile dealer</u>. An automobile dealer does not have a permissible purpose to obtain a consumer report on a consumer who simply asks for information about vehicles and prices, because there is no "credit transaction involving the consumer" at that point in time. For the same reason, the dealer will usually not have a permissible purpose when the consumer test drives one or more vehicles.[125] See also discussion in comment 604(a)(3)(F)-5.

    E.   <u>Tax obligations</u>. A tax collection agency does not have a permissible purpose to obtain a consumer report to collect delinquent tax accounts because this section applies only to "credit" accounts. However, if a consumer taxpayer entered an agreement with a tax collection agency to pay taxes, that agreement may create a debtor-creditor relationship, thereby giving the agency a permissible purpose to obtain a consumer report on that consumer.[126]

5.   COMMERCIAL TRANSACTIONS – REPORTS ON PRINCIPALS OF A BUSINESS ENTITY

A lender has a permissible purpose to obtain a consumer report on a consumer in connection with a business credit transaction when the consumer is or will be personally liable on the loan as a co-signer or guarantor, because such a transaction involves the "extension of credit to … the consumer" by virtue of the individual's liability. A lender would not have a permissible purpose to obtain a consumer report on a consumer who will not be personally liable for repayment of the credit (even an individual proprietor, shareholder, director, or officer of a corporation), because this section does not include the extension of credit to commercial entities.[127] If a consumer has executed a promissory note reflecting an obligation to make capital contributions to a limited partnership, and that individual defaults, the creditor has a permissible purpose for obtaining the consumer report of the individual.

**Section 604(a)(3)(B)** allows a CRA to furnish consumer reports to a person which it has reason to believe "intends to use the information for employment purposes."

1.   RELATION TO OTHER SECTIONS

This subsection establishes that CRAs may provide reports for employment purposes. Section 604(b) imposes certain duties on employers and CRAs in such cases.

2.   CURRENT EMPLOYEES

An employer may obtain a consumer report on a current employee, provided that the employer has obtained prior, written authorization, because "promotion, reassignment, or retention as an employee" is included in the definition of "employment purposes" (section 603(h)).[128]

3.   GRAND JURORS

The fact that grand jurors are usually paid a stipend for their service does not provide a district attorney's office a permissible purpose for obtaining consumer reports on them, because the consumer does not seek such service, which is a duty.[129]

## Section 604(a)(3)(C) allows a CRA to furnish consumer reports to a person which it has reason to believe "intends to use the information in connection with the underwriting of insurance involving the consumer."

1.   PERMISSIBLE PURPOSE EXISTS FOR "UNDERWRITING OF INSURANCE"

An insurer may obtain a consumer report to determine whether or not to issue a policy to the consumer, the amount and terms of coverage, the duration of the policy, the rates or fees charged, or whether or not to renew or cancel a policy, because these are all "underwriting" decisions.[130] An insurance company has a permissible purpose to obtain a consumer report to determine whether existing policy holders qualify for a different premium upon renewal, because that is an "underwriting" decision.[131]

2.   PERMISSIBLE PURPOSE DOES NOT EXIST FOR EVALUATING INSURANCE CLAIMS

An insurer may not obtain a consumer report for the purpose of evaluating a claim (to ascertain its validity or otherwise determine what action should be taken), because permissible purposes relating to insurance are limited by this section to "underwriting" purposes.[132]

## Section 604(a)(3)(D) allows a CRA to furnish consumer reports to a person which it has reason to believe "intends to use the information in connection with a determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status."

1.   GENERAL

Any person charged by law with responsibility for assessing the consumer's eligibility for a government benefit (not only the agency directly responsible for administering the benefit) has a permissible purpose to obtain a consumer report.

2.   APPROPRIATE RECIPIENTS

A.   Financial status. A social services agency, required by law to consider a consumer's financial status in determining whether that consumer qualifies for social service benefits, has a permissible purpose to obtain a report on the consumer for that purpose. Similarly, government entities that are required by law to consider financial status in determining consumers' eligibility for assistance, and professional boards required by law to consider such information on applicants for admission to practice, have a permissible purpose to obtain a consumer report.[133]

46

B. Continuing eligibility for benefit. A government agency has a permissible purpose to obtain a consumer report to determine a consumer's continuing eligibility for a benefit or to conduct a random check to confirm continued eligibility.[134]

C. Worker's compensation claims. A state workers' compensation fund may have a permissible purpose to obtain consumer reports on consumers who submit claims to the fund if (a) insurance payments paid by the fund constitute a "benefit" and (b) the fund is required by law to consider the claimants' financial responsibility or status when deciding whether to make the payments.[135]

3. INAPPROPRIATE RECIPIENTS

A. Persons not charged with eligibility determination. No one other than the entity charged with the responsibility of determining a consumer's eligibility for a license or other benefit has a permissible purpose to obtain a consumer report under this provision. For example, a party competing for an FCC radio station construction permit would not have a permissible purpose to obtain a consumer report on the other competitor.[136]

B. Purposes not related to government license or benefit. A state does not have a permissible purpose to obtain a consumer report of the officers, directors, or stockholders of a corporation submitting bids for a procurement contract, because the purpose for obtaining the report in those circumstances does not concern the consumer's eligibility for a state "license" or "benefit," but rather to assess the advisability of a commercial contractual relationship with a particular company.

**Section 604(a)(3)(E)** allows a CRA to furnish consumer reports to a person which it has reason to believe "intends to use the information, as a potential investor or servicer, or current insurer, in connection with a valuation of, or an assessment of the credit or prepayment risks associated with, an existing credit obligation."

**Section 604(a)(3)(F)** allows a CRA to furnish consumer reports to a person which it has reason to believe "otherwise has a legitimate business need for the information (i) in connection with a business transaction that is initiated by the consumer or (ii) to review an account to determine whether the consumer continues to meet the terms of the account."

1. RELATION TO OTHER SUBSECTIONS OF SECTION 604(a)(3)

The issue of whether credit, employment, or insurance provides a permissible purpose is determined exclusively by reference to subsection (A), (B), or (C), respectively.[137] Subsection (F)(i) provides a permissible purpose to businesses other than creditors, employers, or insurers to obtain a consumer report for use in connection with a transaction the consumer initiates that is not more specifically covered by subsections (A), (B), or (C).

2. "BUSINESS TRANSACTION"

The term "business transaction that is initiated by the consumer" in section 604(a)(3)(F)(i) means a business transaction that is primarily for personal, family, or household purposes. This section does not cover business transactions that involve purely commercial purposes.[138]

3.   "LEGITIMATE BUSINESS NEED"

   A.   <u>General</u>. Section 604(a)(3)(F)(i) provides a permissible purpose to obtain a consumer report on a consumer for use in connection with a transaction the consumer initiates from which he or she might expect to receive a benefit that is not more specifically covered by subsections (A), (B), or (C), where the report user has a legitimate business need for the information.

   B.   <u>Apartment rental</u>. A landlord has a permissible purpose to obtain a consumer report on a consumer who applies to rent an apartment.[139]

   C.   <u>Brokerage account</u>. The provision authorizes a CRA to provide a report on an individual who applies to open a brokerage account.[140]

   D.   <u>Personal check</u>. A retailer has a permissible purpose to obtain a consumer report on a consumer who pays for merchandise (e.g., an automobile or TV set) by personal check.[141]

4.   LITIGATION IS NOT A PERMISSIBLE PURPOSE

   A.   <u>General</u>. Litigation, whether threatened, possible, or ongoing, is not a "business transaction" and is not within the "legitimate business need" purpose provided by section 604(a)(3)(F)(i). However, parties considering litigation may have a permissible purpose for obtaining a consumer report if the transaction that gives rise to the potential litigation would provide a permissible purpose for obtaining a consumer report. For example, a party seeking to sue on a credit account would have a permissible purpose under section 604(a)(3)(A).[142]

   B.   <u>Potential defendants</u>. This section does not provide parties considering litigation with a general permissible purpose to obtain reports on potential defendants to determine whether they are worth suing. Thus, there is no permissible purpose for a consumer report to be obtained on the potential defendant in a contemplated tort action.[143]

   C.   <u>Attempt to locate wrongdoer or witness</u>. An insurance company attempting to locate an uninsured automobile driver who was responsible for an auto accident with one of the insurance company's insured does not have a permissible purpose for obtaining the uninsured driver's consumer report. Neither does a company hired by the insurance company to locate the uninsured driver have a permissible purpose. Similarly, a consumer report may not be obtained solely for locating a witness or for use in discrediting a witness at trial.[144]

5.   AUTOMOBILE DEALERSHIP

An automobile dealer does not have a permissible purpose to obtain a consumer report on a consumer who simply asks for information about vehicles and prices, because there is no "transaction … initiated by the consumer" at that point in time. For the same reason, the dealer will usually not have a permissible purpose when the consumer test drives one or more vehicles.[145] See also discussion in comment 604(a)(3)(A)-4D. The dealership would not have a permissible purpose under this provision to obtain a consumer report when a consumer pays for a vehicle in cash because it has no "legitimate business need" for the information.[146] However, the dealer would have a permissible purpose if it obtained the consumer's written instruction (comment 604(a)(2)-1) or the consumer offered to pay with a personal check (comment 604(a)(3)(F)-3D).

6.   "REVIEW" PURPOSES

Section 604(a)(3)(F)(ii) provides a permissible purpose to banks that have a legitimate business need to consult a current customer's consumer report in order to determine whether the terms of a consumer's current non-credit (savings or checking) accounts should be modified.[147] However, it

48

does not allow CRAs to provide businesses with consumer reports to "review" accounts in order to market other products or services.[148] As noted in comment 604(a)(3)(F)-1, subsection (F) does not apply to credit, insurance, and emplyment scenarios that are specifically covered by other subsections.

**Section 604(a)(3)(G)** allows CRAs to provide consumer reports to "executive departments and agencies in connection with the issuance of government-sponsored individually-billed travel charge cards."

**Sections 604(a)(4)** and **604(a)(5)** permit child support authorities to obtain consumer reports on parents in connection with the assessment of child support obligations. One of the requirements for a child support enforcement agency to obtain a report is that it has to certify that it "has provided at least 10 days' prior notice to the consumer whose report is requested by certified or registered mail to the last known address of the consumer."

1. GENERAL

   Sections 604(a)(4) and 604(a)(5) permit child support authorities to obtain consumer reports on parents in connection with the assessment or modification of child support obligations.

2. NOTICE PROCEDURE

   Section 604(a)(4)(C) requires only that the child support authority notify the report subject (usually a non-custodial parent who owes child support) by certified or registered mail. It does not require the agency to procure a signed receipt or to follow any additional procedures, such as service of process that would be required to bring a lawsuit.[149]

**Section 604(a)(6)** permits the Federal Deposit Insurance Corporation and National Credit Union Administration to obtain consumer reports in connection with their duties as conservator, receiver, or liquidating agent for failed or failing financial institutions under applicable laws.

**Section 604(b)** sets forth provisions relating to consumer reports for employment purposes, imposing specific duties on CRAs and employers in this context.

1. SCOPE OF "EMPLOYMENT PURPOSES"

   Section 604(b)'s disclosure and authorization requirements apply where the consumer report is obtained for "employment purposes" even where the consumer is not technically an "employee" of the report user. See comment 603(h)-2.

2. SUSPECTED WORKPLACE WRONGDOING

   An exclusion from the definition of "consumer report" in sections 603(d)(2)(D) and 603(y) removes certain reports from the scope of the FCRA when they are provided to employers for the sole purpose of investigating suspected employee workplace misconduct. Section 603(y) sets forth the specific procedures and limitations applicable to such reports.

3.   EMPLOYMENT AGENCIES

An exclusion from the definition of "consumer report" in sections 603(d)(2)(D) and 603(o) removes certain communications by employment agencies from the scope of the FCRA. Section 603(o) sets forth the specific procedures and limitations applicable to such reports.

4.   CRIMINAL RECORDS CHECK

An employer that obtains criminal or civil court records from a CRA (which may be a private investigator or record search firm) is "using consumer reports for employment purposes" and therefore must comply with section 604(b).[150]

5.   PRIVATE INVESTIGATOR

An employer that hires a private investigator to conduct background investigations in which the investigator contacts persons identified by the applicant, and others whose names are discovered as inquiries are made (who can verify various kinds of information such as dates of employment, positions held, reasons for leaving, performance, character, or whether the person would be rehired) is required to comply with section 604(b).[151] See also comment 603(f)-3C.

**Section 604(b)(1)** requires that, when a CRA furnishes a consumer report for employment purposes, it must obtain a certification from the user stating that the user (1) has obtained the consumer's consent, (2) will provide the consumer with a copy of his or her report and a summary of rights under the FCRA before taking adverse action, and (3) will not use the report to violate employment opportunity laws.

1.   GENERAL

Section 604(b)(1) requires a CRA that provides consumer reports for employment purposes to obtain certification from an employer obtaining a report that it has made the proper disclosure to the consumer; has received the consumer's written authorization to obtain the report; will comply with any adverse action requirements; and will not use any information contained in a consumer report in violation of any applicable federal or state equal opportunity law or regulation.[152]

**Section 604(b)(2)** provides that, except for employers in the trucking industry, a person may not obtain a consumer report for employment purposes unless the person makes "(i) a clear and conspicuous disclosure in writing to the consumer at any time before the report is procured or caused to be procured, in a document that consists solely of the disclosure, that a consumer report may be obtained for employment purposes; and (ii) the consumer has authorized in writing (which authorization may be made on the document referred to in clause (i)) the procurement of the report by that person."

1.   RELATION TO OTHER SECTIONS

A.   Investigative consumer reports. Section 604(b)'s disclosure must be made before a consumer report – including an investigative consumer report as defined in section 603(e) – is requested for employment purposes, even though an additional disclosure for investigative consumer reports is also required by section 606.[153]

B. <u>Employment reports with public record data</u>. An employer must comply with the disclosure and consumer authorization requirements of section 604(b)(2), even where the consumer report is comprised of public records and the CRA has already made the disclosure required by section 613, which specifically covers reports of public record information for employment purposes.[154]

## 2. WRITTEN DISCLOSURE AND CONSENT REQUIRED

Section 604(b)(2)(A) imposes an obligation on employers. It requires that, before obtaining consumer reports for employment purposes, employers must disclose this fact to each affected consumer in writing and obtain the consumer's written authorization.[155]

## 3. "IN A DOCUMENT THAT CONSISTS SOLELY OF THE DISCLOSURE"

A. <u>May include brief description of the nature of consumer reports</u>. The document that sets forth the disclosure to the consumer that a consumer report may be obtained for employment purposes may contain only minor additional items. The document may include a brief description of the nature of the consumer reports covered if the description does not confuse the consumer or detract from the mandated disclosure.[156]

B. <u>May include consumer authorization</u>. The disclosure document may include the required request for consumer authorization for procurement of a report for employment purposes.[157] If the disclosure notice and the consumer authorization are combined, certain identifying information may be included in the form; however, the notice may not include extraneous or contradictory information, such as a request for a consumer's waiver of his or her rights under the FCRA.[158]

C. <u>May include investigative consumer report disclosure</u>. If an employer intends to do an investigative consumer report on an employee or prospective employee, it must provide a disclosure under both this section and section 606.[159] An employer may include, with the disclosure required by section 604(b)(2)(A), a very limited notice of intent to procure an investigative consumer report required by section 606(a). However, the employer may not meet its obligation under section 606(b) to describe the nature and scope of the investigation in the same notice, because it would likely overshadow the disclosure required by this section.[160]

D. <u>May not be included in employment application</u>. The disclosure cannot be part of a printed employment application.[161]

## 4. TIMING AND EFFECTIVENESS OF DISCLOSURE AND AUTHORIZATION

The required disclosure may be made, and the authorization obtained, when the consumer applies for or commences employment.[162] An employer may use a one-time blanket disclosure, and obtain permission from applicants or current employees to procure consumer reports, at any time during the application process or during the employee's tenure.[163] The disclosure must state "clearly and conspicuously" that the employer intends for the disclosure and authorization to cover both the application for employment and, if the consumer is hired, any additional consumer reports obtained while the individual is an employee.[164] A valid disclosure and consent remain effective throughout the duration of employment.

51

5.   REFUSAL TO CONSENT

The FCRA does not prohibit an employer from taking adverse action against an employee or applicant who refuses to authorize the employer to procure a consumer report. However, it does not specifically authorize such action.[165]

**Section 604(b)(3)** provides that, except for employment in the trucking industry, an employer intending to take adverse action shall, before taking such action, provide the consumer a copy of his or her consumer report and a summary of the consumer's rights under the FCRA. The summary is to be in a form prescribed by the FTC under section 609(c)(3).

1.   GENERAL RULE

Section 604(b)(3)(A) imposes a specific disclosure obligation on employers. Before taking any adverse action based on a consumer report, employers must provide the consumer with a copy of the report and a written summary of consumer rights under the FCRA. This requirement is generally known as a "pre-adverse action notice."

2.   TRUCKING INDUSTRY EXCEPTION

In the trucking industry, the employer is not required to provide a written summary and copy of the consumer report before taking adverse action. Section 604(b)(3)(B-C) provides alternate pre-adverse action notices for consumers who have applied for jobs in the trucking industry by mail, phone, or computer.

3.   RELATION TO OTHER SECTIONS – ADVERSE ACTION REQUIREMENTS

This paragraph requires employers to provide to the consumer, before taking any adverse action based on a consumer report, a copy of the report, and a written summary of consumer rights under the FCRA. Section 615(a) applies more generally to any party who has taken adverse action that is based, in whole or in part, on a consumer report, and requires the report user to notify the consumer of the fact that adverse action was taken based on a consumer report. Because the notice under this paragraph must be provided to consumers before adverse action is taken, and a section 615(a) notice must be provided after adverse action is taken, the notices may not be included in the same document.[166]

An employer may provide this section 615(a) adverse action notice in a way that minimizes duplication with the pre-adverse action notice under this section. For example, in its adverse action notice, it could note that the consumer has already received a copy of his or her report and a summary of consumer rights under the FCRA.[167]

4.   RELATION TO OTHER SECTIONS – SUMMARY OF CONSUMER RIGHTS

 This section requires employers to provide a written summary of consumer rights under the FCRA as part of a pre-adverse action disclosure. Section 609(c) requires CRAs to provide the summary to a consumer who requests disclosure of the information in his or her file.

5.   TIMING OF PRE-ADVERSE ACTION DISCLOSURE

There is no specific period of time an employer must wait after providing a pre-adverse action notice and before taking adverse action against the consumer. Some reasonable period of time must elapse, but the minimum length will vary depending on the particular circumstances involved.[168] An

employer can comply with the pre-adverse action disclosure requirement by sending a copy of the report to the consumer (with the summary of consumer rights) as soon as it is prepared by the CRA or received by the employer.[169]

6.   REQUIREMENT TO INCLUDE "A COPY OF THE REPORT"

   A.   Redacted report. Because the requirement that an employer provide "a copy of the report" is unqualified, an employer who uses an investigative consumer report may not redact references to investigative sources if those sources are included in the report.[170] To preserve the confidentiality of sources, CRAs may provide employers with reports that do not specifically identify sources, and employers may release the reports to consumers as they have received them.[171]

   B.   Oral report. Where the employer possesses no written report because the information is provided verbally by the CRA, the employer may tell the applicant orally what is in the report before taking adverse action. Because the report itself is oral, an oral "copy" is the proper method of compliance, as it conveys the information that Congress intended the consumer to know prior to suffering adverse action.[172]

7.   SOURCE OF CONSUMER RIGHTS SUMMARY

The CRA is responsible for sending the summary of consumer rights to employers. The employer must supply the summary to consumers before taking any adverse action based on a consumer report.[173]

8.   PROVISION OF NOTICE BY THIRD PARTY

Employers may arrange to have the CRA provide pre-adverse action notices directly to consumers, but the employer is liable if the CRA does not provide the notices.[174]

9.   CERTAINTY OF ADVERSE ACTION

Employers must comply with the pre-adverse action disclosure requirement even where the information contained in the consumer report (such as a criminal record) would automatically disqualify the individual from employment or lead to an adverse employment action.[175]

**Section 604(c)** governs the practice of "prescreening" in connection with credit and insurance solicitations. Subsection (1) allows prescreened solicitations only if the consumer consents or if the "transaction consists of a firm offer of credit or insurance" and the consumer has not opted out of receiving such solicitations. Subsection (2) limits the information that the CRA can provide to the business seeking the information for prescreening purposes. Subsection (3) prohibits the CRA from informing anyone other than the consumer that his or her information has been provided by a CRA to a business for prescreening purposes.

**Section 604(d)** is reserved.

**Section 604(e)** requires CRAs to allow consumers to opt out of prescreened offers. CRAs must establish and maintain a toll-free telephone number that a consumer

can call to opt out. Nationwide CRAs must establish a joint notification system for processing prescreening opt-outs.

1.  RELATION TO OTHER SECTIONS

Sections 604(c) and 604(e) set forth the permissible purpose for and limitations on prescreening, along with the consumer's right to "opt out" from prescreened lists. Section 607(a) requires CRAs to establish specified, reasonable procedures to ensure that they furnish consumer reports only for permissible purposes, including the prescreening purpose provided by Section 604(c). See comment 604(a)-2A.

Section 603(*l*) defines the type of offer that qualifies for "prescreening" service by a CRA. Section 603(p) defines the "nationwide CRAs" that are required to establish a joint notification system for processing prescreen opt outs. Section 615(d) requires users of prescreening services to make certain disclosures to consumers who receive written prescreened solicitations.

**Section 604(f)** prohibits any person from using or obtaining a consumer report, unless the person obtains the report for a permissible purpose and certifies that it will be used for that permissible purpose.

**Section 604(g)** generally prohibits CRAs from furnishing medical information in consumer reports without consumer consent, unless the information being furnished pertains to medical debts, and the information is coded to avoid identifying the provider and nature of the transaction, prohibits creditors from obtaining uncoded medical information for credit purposes, with limited exceptions, requires parties who receive medical information to keep such information confidential, and directs the Federal financial agencies to promulgate rules permitting the transmission of certain medical information to creditors to determine a consumer's eligibility for credit. Starting July 21, 2011, the Bureau assumes rulemaking authority under this section.

1.  IMPLEMENTING RULES

Pursuant to the mandate imposed by Section 604(g)(5), the Federal financial agencies promulgated rules relating to necessary and appropriate uses of medical information by creditors, limits on redisclosure, and sharing of medical information with affiliates (12 CFR Parts 41, 222, 232, 334, 571, 717). See 70 Fed. Reg. 70664, 70675-96 (Nov. 22, 2005). The Commission will enforce the FCRA as to creditors under its jurisdiction, using the same principles set forth in those rules, including any changes that may be made by the Bureau.

2.  RELATION TO OTHER SECTIONS

Section 603(d)(3) excludes medical information from the definition of "consumer report" in certain cases. Section 603(i) defines the term "medical information." In regard to the exception in section 604(g)(1) allowing reporting of "coded" medical debts, section 605(a)(6)(A) prescribes the coding of names, addresses and phone numbers so that neither the provider, nor the nature of the products or services out of which the debt arises, are identifiable in the report. Section 623(a)(9) requires medical information furnishers to disclose their status if they report information to CRAs.

54

## Section 605 –
## Requirements Relating to Information Contained in Consumer Reports

15 USC 1681c

**Section 605(a)** generally provides time limits beyond which CRAs cannot include information in consumer reports, subject to exceptions set forth in section 605(b).

### 1.   GENERAL

This section sets forth time periods beyond which CRAs may not include information in consumer reports, except in the circumstances set out in section 605(b).[176] Even if no specific adverse item is reported, a CRA may not furnish a consumer report referencing the existence of adverse information that predates the times set forth in this subsection.[177] Section 605(a) does not require CRAs to report all adverse information within the time periods set forth, but only prohibits them from reporting adverse items beyond those time periods.[178]

### 2.   SECTION APPLIES TO CRAS, NOT USERS

This section applies only to reporting by CRAs and does not limit creditors or others from using adverse obsolete information. Similarly, this section does not bar a creditor from disclosing adverse obsolete information concerning its transactions or experiences with a consumer, because the information is not a consumer report.[179]

### 3.   DATE THAT CRA ACQUIRED THE INFORMATION IRRELEVANT

The times or dates set forth in this section relate to the occurrence of events involving adverse information, which determine whether the item is obsolete. The date that the CRA acquired the adverse information is irrelevant to how long that information may be reported.[180]

### 4.   PROVISION LIMITED TO "ADVERSE" INFORMATION

The seven-year reporting period applies only to "adverse" information that casts the consumer in a negative or unfavorable light. CRAs are not bound by that seven-year limit in reporting dates of employment and educational histories, because such dates are not "adverse" information.[181]

### 5.   RETENTION OF INFORMATION IN FILES

CRAs may retain adverse information described in subsection (a) and furnish it in reports for purposes that are exempt under subsection (b), described below. For example, the CRA may retain obsolete information for the purpose of furnishing it to persons engaged in (1) credit transactions or the underwriting of life insurance involving a principal amount of $150,000 or more, or (2) the employment of any individual with an annual salary expected to equal $75,000 or more.[182]

**Section 605(a)(1)** prohibits CRAs from reporting "Cases under title 11 of the United States Code or under the Bankruptcy Act that, from the date of entry of the order for relief or the date of adjudication, as the case may be, antedate the report by more than 10 years."

### 1.   RELATION TO OTHER SUBSECTIONS

Section 605(a) imposes time limitations on reporting of adverse information by CRAs. The reporting of bankruptcies is governed by subsection (a)(1). The reporting of accounts placed for collection or charged to profit and loss is governed by subsection (a)(4). The reporting of

other delinquent accounts is governed by subsection (a)(5). Any such item, even if discharged in bankruptcy, may be reported separately for the applicable seven year period, while the existence of the bankruptcy filing may be reported for ten years.[183]

2.  VOLUNTARY BANKRUPTCY

A voluntary bankruptcy petition may be reported for ten years from the date that it is filed (even though formal discharge of the debts occurs by later ruling), because the filing of the petition constitutes the entry of an "order for relief" under this subsection, just like a filing under the Bankruptcy Act (11 U.S.C. §301).[184]

3.  DISMISSED BANKRUPTCY

A dismissed involuntary bankruptcy petition, or a withdrawn or dismissed voluntary petition, may be included in a consumer report for ten years from the date that the order dismissing the petition was entered.[185] See discussion in comment 611(a)-4.

**Section 605(a)(2)** prohibits CRAs from reporting "Civil suits, civil judgments, and records of arrest that from date of entry, antedate the report by more than seven years or until the governing statute of limitations has expired, whichever is the longer period."

1.  OPERATIVE DATE

For a civil suit, the term "date of entry" means the date the suit was filed. A protracted civil suit may be reported for more than seven years from the date the case was filed, if the governing statute of limitations has not expired. For a civil judgment, the term "date of entry" means the date the judgment was entered.[186]

2.  PAID JUDGMENTS

Paid judgments cannot be reported for more than seven years after the judgment was entered, because payment of the judgment eliminates any "governing statute of limitations" under this subsection that might otherwise lengthen the time period.[187]

**Section 605(a)(3)** prohibits CRAs from reporting "Paid tax liens which, from date of payment, antedate the report by more than seven years."

1.  INAPPLICABILITY TO UNPAID LIENS

If a valid tax or other lien remains unsatisfied, it may be reported as long as it remains filed against the consumer because this subsection addresses only paid tax liens.[188] See comment 605(a)(5)-2.

**Section 605(a)(4)** prohibits CRAs from reporting "Accounts placed for collection or charged to profit and loss which antedate the report by more than seven years."

1.  RELATION TO OTHER SECTIONS

This section establishes the reporting period for collections and chargeoff accounts at seven years. Section 605(c)(1) sets forth the method for determining the date that starts the seven year period. Section 623(a)(5) requires a party that reports such accounts to a CRA to provide the "date of delinquency" that the CRA will use to calculate the seven year period. See comments 605(c)-2 and 623(a)(5)(A)-2.

2.   "PLACED FOR COLLECTION"

The term "placed for collection" means internal collection activity by the creditor, as well as placement with an outside collector. Placement for collection occurs when dunning notices or other collection efforts are initiated. (A simple "reminder" notice does not constitute placement for collection.) The reporting period is not extended by assignment to another entity for further collection, or by a partial or full payment of the account. A consumer's repayment agreement with the creditor or a collection agency may be treated as a new account that has its own seven year period.[189]

3.   "CHARGED TO PROFIT AND LOSS"

The phrase "charged to profit and loss" means action taken by the creditor to write off the account. If an account that was charged off is later paid in part or paid in full by the consumer, the reporting period of seven years from the charge off is not extended by the subsequent payment.[190]

**Section 605(a)(5)** prohibits CRAs from reporting "Any other adverse item of information, other than convictions of crimes which antedates the report by more than seven years."

1.   RELATION TO OTHER SUBSECTIONS

This section applies to all adverse information that is not covered by section 605(a)(1)-(4). For example, a delinquent account that has neither been placed for collection, nor charged to profit and loss, may be reported for seven years from the date of the commencement of the delinquency.[191]

2.   LIENS

Liens (other than paid tax liens) may be reported as long as they remain filed against the consumer or the consumer's property and remain effective (under any applicable statute of limitations). See comment 605(a)(3)-1.[192] A lien that is paid or otherwise terminated may be reported for seven years from the date it is paid or otherwise rendered ineffective.

3.   CRIMINAL CONVICTIONS

A CRA may report information about criminal convictions without any limitation as to length of time that they antedate the report.[193]

4.   CRIMINAL RECORDS OTHER THAN CONVICTIONS

The seven year reporting period for criminal record information "other than convictions of crimes" runs from the date of the reported event.[194]

5.   IMPACT OF LAWS THAT REQUIRE EMPLOYERS TO SEARCH FOR CRIMINAL RECORDS OVER SEVEN YEARS OLD

A CRA is not permitted to report criminal records other than convictions beyond seven years, even where the CRA is providing information to an employer that state or federal law requires to check criminal records beyond seven years. However, an employer that checks public records on its own is not covered by the FCRA, and therefore may conduct searches without regard to the seven year time limit.[195] See comment 603(d)(1)-6D.

**Section 605(a)(6)** prohibits a CRA from reporting the name or contact information of any medical information furnisher that has notified the CRA of its status, unless

(1) such information is coded so that a recipient cannot infer the specific provider or the nature of the services; or (2) the report is being provided to a life or health insurance company.

1.   RELATION TO OTHER SECTIONS

This section parallels Section 604(g)(1), which allows CRAs to report information about debts arising from the receipt of medical services, products, or devices only where the identity of the furnisher is coded to avoid identifying the provider and nature of the transaction. Section 623(a)(9) requires medical information furnishers to disclose their status if they report information to CRAs, so that the CRAs may fulfill the requirements of this section.

**Section 605(b)** states that the time period limitations in section 605(a) "are not applicable in the case of any consumer credit report to be used in connection with (1) a credit transaction involving, or which may reasonably be expected to involve, a principal amount of $150,000 or more; (2) the underwriting of life insurance involving, or which may reasonably be expected to involve, a face amount of $150,000 or more; or (3) the employment of any individual at an annual salary which equals, or which may reasonably be expected to equal $75,000, or more."

1.   APPLICATION TO REPORTS OTHER THAN CREDIT REPORTS

Notwithstanding the words "consumer *credit* report" in Section 605(b), the exemptions apply to any "consumer report" (e.g., a report for employment screening purposes containing only public record data) obtained in connection with insurance and employment transactions meeting the dollar limits specified in subsections (2) and (3).

2.   "REASONABLY BE EXPECTED"

A CRA may provide the information described in subsection (a) about a consumer to employers or prospective employers, only if such employers reasonably expect to pay the consumer $75,000 or more per year for work to be performed.

**Section 605(c)** provides that the seven-year period for reporting accounts placed for collection, charged to profit or loss, or similar action by a creditor, "shall begin, with respect to any delinquent account that is placed for collection (internally or by referral to a third party, whichever is earlier), charged to profit and loss, or subjected to any similar action, upon the expiration of the 180-day period beginning on the date of the commencement of the delinquency which immediately preceded the collection activity, charge to profit and loss, or similar action."

1.   RELATION TO OTHER SECTIONS

Section 623(a)(5) requires an information furnisher that reports a collection or chargeoff or similar action to a CRA to provide the month and year of the commencement of the delinquency that led to the action. This section requires the CRA to use that date as the start of the obsolescence period.

2.   BASIC RULE

In calculating the seven-year period during which a CRA is permitted to report accounts that a creditor has reported as having been placed for collection or charged off, the period begins 180 days from the date of the first missed payment of the delinquency that leads the creditor to take the action.[196]

3.   EVENTS OTHER THAN "COMMENCEMENT OF THE DELINQUENCY" IRRELEVANT

The period is calculated from the date specified in this section, not subsequent events such as (a) the date the creditor first reported the charge-off or collection to the CRA;[197] (b) the dates of payments made or missed during the delinquency that leads to the chargeoff or collection;[198] (c) the date of the sale or transfer of the account from the original creditor to another creditor;[199] or (d) the date a consumer disputes the debt.[200]

**Section 605(d)(1)** requires a CRA that provides a consumer report with bankruptcy information to include "an identification of the chapter of [Title 11, United States Code] under which such case arises if provided by the source of the information" and any voluntary withdrawal by the consumer before a final judgment "upon receipt of documentation certifying such withdrawal."

**Section 605(d)(2)** requires most CRAs, in consumer reports that include a score, to disclose those cases in which the number of enquiries (requests for reports on the consumer) are a key factor that adversely affects the score.

If an account has been voluntarily closed by the consumer, **section 605(e)** requires CRAs to include that fact in a report that refers to the account. If a consumer disputes an item, **section 605(f)** requires the CRA to indicate that fact in a consumer report that includes the disputed information.

**Section 605(g)** provides that "no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of the sale or transaction." This section specifies that it requires card number truncation only on "electronically printed" receipts.

1.   SCOPE

This section applies only to electronic receipts provided by merchants "to the cardholder." It does not apply to receipts that are generated by non-electronic means, such as those created by a device which makes an imprint of the card. It does not apply to receipts other than those provided to the cardholder, such as those retained by the merchant for its records.

**Section 605(h)(1)** provides that when a nationwide CRA receives a request for a consumer report that "includes an address for the consumer that substantially differs from the addresses in the file of the consumer," the CRA shall notify the requester of the existence of the discrepancy when it provides the report. Section **605(h)(2)** required the Commission and Federal financial agencies to promulgate

"regulations providing guidance regarding reasonable policies and procedures that a user of a consumer report should employ when such user has received a notice of discrepancy." Starting July 21, 2011, the Bureau assumes rulemaking authority under this section.

1.  IMPLEMENTING RULES

As directed by this section, the Commission and the Federal financial agencies issued rules to implement its provisions (16 CFR 681.1). See 72 Fed. Reg. 63718, 63771-72 (Nov. 9, 2007).

## Section 605A – Identity Theft Prevention; Fraud Alerts and Active Duty Alerts

15 USC 1681c-1

**Section 605A** imposes duties on nationwide CRAs with respect to identity theft. **Section 605A(a)** requires such CRAs to include a 90-day initial fraud alert in a consumer's file when the consumer "asserts in good faith a suspicion that the consumer has been or is about to become a victim of fraud or related crime." **Section 605A(b)** requires nationwide CRAs to include a seven-year extended fraud alert when the consumer submits an "identity theft report" and to exclude the consumer from any "prescreening" lists for 5 years. Along with fraud alerts, the consumer is entitled to additional free file disclosures. **Section 605A(c)** requires that, upon request of an active duty military consumer, nationwide CRAs must include an "active duty alert" in the consumer's file for a period of 12 months (or a longer period that may be established by the Commission (Bureau, starting July 21, 2011), and exclude the consumer from any "prescreening" lists for 2 years.

**Section 605A(d)** requires nationwide CRAs to establish procedures to comply with subsections (a), (b), and (c), and advise consumers of their rights thereunder. Subsections (e) and (f) require nationwide CRAs and resellers receiving reports from other CRAs to include the alerts in the reports they provide. Subsection (g) requires CRAs that do not operate nationwide to explain to consumers, who suspect they have been or are about to be a fraud victim, how to contact nationwide CRAs and the Commission (Bureau, starting July 21, 2011) concerning the alerts required by Section 605A.

**Section 605A(h)** imposes duties on creditors receiving consumer reports that include alerts. It generally restricts them from providing additional credit without establishing "reasonable policies and procedures" to confirm the identity of the person making the request.

1.  RELATION TO OTHER SECTIONS

Section 603(q) defines several terms relating to identity theft and fraud alerts.

2.   IMPLEMENTING RULES

The Commission issued regulations concerning "appropriate proof of identity" for placing alerts and other purposes (16 CFR 614). See 69 Fed. Reg. 63922, 63934 (Nov. 3, 2004). In that proceeding, the Commission confirmed 12 months as the duration of active duty alerts (16 CFR 613), noting that an active duty military consumer could place a subsequent alert when necessary in the case of a longer deployment. See 69 Fed. Reg. 63922, 63930, 63934 (Nov. 3, 2004). In addition to the definitions in section 603(q), the terms "identity theft" and "identity theft report" are further defined by Commission rule (16 CFR 603.2 and 603.3). See 69 Fed Reg. 63922, 63933 (Nov. 3, 2004).

3.   SCOPE

When a consumer's file contains an alert, a nationwide CRA must include the alert with all consumer reports it provides on that consumer. The action is necessary so that (1) a report user will know that it should not extend additional credit to the named consumer unless it has "reasonable policies and procedures" in place to ensure that it knows the identity of the individual seeking credit; and (2) a reseller will be able to provide "the alert placed in the file of a consumer" to the end user as required by section 605A(f).

4.   CREDITOR DUTIES

Section 605A(h) imposes restrictions and duties on creditors who receive consumer reports that include initial, extended, and active duty alerts, which vary depending on the type of alert. Most importantly, section 605A(h)(1)(B) forbids any user of a consumer report that includes a fraud alert or active duty alert from extending additional credit to the named consumer unless it has "reasonable policies and procedures" in place to identify the individual seeking credit. A policy of denying credit to any applicant whose consumer report includes a fraud alert or active duty alert is not a "reasonable" method of compliance with that provision.

5.   "GOOD FAITH"

The consumer's right under section 605A(a)(1) to an initial fraud alert in the consumer's file is triggered only when the consumer asserts "in good faith" his or her status as a victim of fraud, identity theft, or other similar crime.

## Section 605B – Block of Information Resulting From Identity Theft

15 USC 1681c-2

**Section 605B(a)** requires CRAs to "block" the reporting of any information that the consumer identifies as information that resulted from an alleged identity theft, within 4 business days after it receives "(1) appropriate proof of the identity of the consumer; (2) a copy of an identity theft report; (3) the identification of such information by the consumer; and (4) a statement by the consumer that the information is not information relating to any transaction by the consumer."

**Section 605B(b)** requires the CRA to promptly notify the furnisher of the information about the block and the identity theft report. **Section 605B(c)** allows a CRA to refuse, decline, or rescind a block because of error or consumer

misrepresentation, or because the consumer benefitted from the blocked transaction. **Section 605B(d)** limits the duties of CRAs that are resellers. **Section 605B(e)** limits the duties of CRAs that are check verification services. **Section 605B(f)** states that CRAs are not required to block information in consumer reports provided to law enforcement agencies.

1. RELATION TO OTHER SECTIONS

Section 603(q) defines several terms relating to identity theft and fraud alerts. Section 615(f) prohibits creditors from placing for collection, and debt collectors from selling, any account after being notified under section 605B that it resulted from identity theft. Section 623(a)(6) specifies duties for businesses that furnish information to CRAs after they are notified of blocked information.

2. IMPLEMENTING RULES

The Commission issued regulations concerning "appropriate proof of identity" for placing information blocks and other purposes (16 CFR 614). See 69 Fed. Reg. 63922, 63934 (Nov. 3, 2004). In addition to the definitions in Section 603(q), the terms "identity theft" and "identity theft report" are further defined by Commission rule (16 CFR 603.2 and 603.3). See 69 Fed Reg. 63922, 63933 (Nov. 3, 2004).

## Section 606 – Disclosure of Investigative Consumer Reports   15 USC 1681d

**Section 606(a)** states that a person may not order an investigative consumer report on any consumer unless it is clearly and accurately disclosed to the consumer that an investigative consumer report including information as to his character, general reputation, personal characteristics, and mode of living (as applicable) may be made. The disclosure must be provided to the consumer no later than three days after the date on which the report was requested, and must inform the consumer of his or her right to request additional disclosures. Users of investigative consumer reports must certify to the CRA that they have made this disclosure to the consumer, and that they will provide required additional information upon the consumer's request.

1. RELATION TO OTHER SECTIONS

Section 603(e) defines the term "investigative consumer report" to mean a consumer report, all or a portion of which contains information obtained through personal interviews with persons other than the subject, which information relates to the subject's character, general reputation, personal characteristics, or mode of living.[201] Section 614 imposes special restrictions on investigative consumer reports for employment purposes.

Section 604(b) imposes duties on persons who obtain consumer reports for employment purposes or take adverse actions based in whole or in part on such reports. An employer that uses investigative consumer reports must comply with those provisions as well as those imposed by

section 606. See comment 604(b)(2)-3C concerning compliance when the notice requirements of both sections 604(b)(2) and 606 are applicable.[202]

Because an "investigative consumer report" is a type of "consumer report," providers and users of investigative consumer reports must comply with all FCRA provisions relating to consumer reports. Generally, a report that is specifically excluded from the definition of "consumer report" would not be an "investigative consumer report." For example, a report that is not a "consumer report" because it involves suspected workplace misconduct described in section 603(y), is not an investigative consumer report.

## 2.   LIMITED SCOPE

A.   Consumer reporting agencies. This section applies only to report users, not CRAs. The FCRA does not require CRAs to inform consumers that information will be gathered or that reports will be furnished concerning them.[203]

B.   Reports provided by business's own personnel. This section applies only to investigative consumer reports prepared by CRAs. If an employer uses its own personnel to contact persons identified by a job applicant from the applicant's previous work sites, for example, the employer does not have to comply with section 606 or other FCRA provisions in that case because such information is not an "investigative consumer report."[204]

## 3.   TIMING OF DISCLOSURE AND SUMMARY OF FCRA RIGHTS

The report user must provide the consumer with notice that an investigative consumer report "may be made" on the consumer any time up to three days after the report is first requested.[205] At the same time, the user must provide the consumer with the summary of rights required by section 606(a)(1)(B). See Notice to Users of Consumer Reports: Obligations of Users Under the FCRA (16 CFR Part 698, Appendix H, Section IV, first bullet).

## 4.   FORM AND DELIVERY OF NOTICE

The notice must be in writing and mailed or otherwise delivered to the consumer. The user may include the disclosure in an application for insurance or credit, if it is clear and not obscured by other language.[206]

## 5.   CONTENT OF NOTICE

The notice must: (a) clearly and accurately disclose that an "investigative consumer report" may be made, which may include information as to the consumer's character, general reputation, personal characteristics and mode of living (whichever are applicable); (b) state that an investigative consumer report involves personal interviews with sources such as neighbors, friends, or associates; and (c) include a statement informing the consumer of his or her right to request complete and accurate disclosure of the nature and scope of the investigation. The notice may include any additional, accurate information about the report, such as the types of interviews that will be conducted.[207]

**Section 606(b)** states: "Any person who procures or causes to be prepared an investigative consumer report on any consumer shall, upon written request made by the consumer within a reasonable period of time after receipt by him of the disclosure required by subsection (a)(1), make a complete and accurate disclosure of the nature and scope of the investigation requested. This disclosure shall be

made in a writing mailed, or otherwise delivered, to the consumer not later than five days after the date on which the request for such disclosure was received from the consumer or such report was first requested, whichever is the later."

1.   CONTENT OF DISCLOSURE OF REPORT

When the consumer requests disclosure of the "nature and scope" of the investigation, such disclosure must include a complete and accurate description of the types of questions asked, the types of persons interviewed, and the name and address of the investigating agency. For example, a report user that provides the consumer with a blank copy of the form used to transmit the report from the agency to the user complies with the requirement that it disclose the "nature and scope" of the investigation. This section does not require the report user to disclose the names of sources of information, or to provide the consumer with a copy of the report.[208] Employers may combine the disclosures required by section 606(b) relating to the "nature and scope of the investigation" with the initial disclosure that an investigative consumer report may be obtained, required by section 606(a), but only in those cases where the employer is able to describe with sufficient specificity the nature and scope of any such investigation that might be requested in the future.[209]

**Section 606(c)** limits a person's liability for a violation of subsection (a) or (b) upon a showing that the person maintained reasonable procedures to assure compliance.

**Section 606(d)** provides that a CRA shall not (1) furnish an investigative consumer report unless it has received a certification that the required disclosures to consumers have been made; (2) violate any equal employment opportunity laws; (3) include certain public record information, unless the CRA has verified the accuracy of the information, obtained consumer consent, or maintains strict procedures to assure the accuracy of any such information (as provided in section 613); or (4) include adverse information obtained through a personal interview unless the CRA has followed reasonable procedures to corroborate that the information or the person interviewed is the best possible source of the information.

## Section 607 – Compliance Procedures                    15 USC 1681e

**Section 607(a)** states: "Every consumer reporting agency shall maintain reasonable procedures designed to avoid violations of section 605 and to limit the furnishing of consumer reports to the permissible purposes listed under section 604. These procedures shall require that prospective users of the information identify themselves, certify the purposes for which the information is sought, and certify that the information will be used for no other purpose. Every consumer reporting agency shall make a reasonable effort to verify the identity of a new prospective user and the uses certified by such prospective user prior to furnishing

such user a consumer report. No consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a purpose listed in section 604."

1.  RELATION TO OTHER SECTIONS

    This section imposes an obligation on CRAs to follow reasonable procedures to (1) limit the furnishing of reports to those with permissible purposes under section 604, and (2) comply with duties imposed by section 605 related to information contained in consumer reports, such as the responsibility to avoid reporting obsolete information.

2.  PROCEDURES TO AVOID REPORTING OBSOLETE INFORMATION

    A.  General. A CRA must establish procedures with its sources of adverse information that will avoid the risk of reporting obsolete information. For example, the CRA must require a creditor or debt collector to supply the date an account was placed for collection or charged off, as required by section 623(a)(5).[210]

    B.  Retention of obsolete information for reporting in excepted circumstances. If a CRA retains adverse information in its files that is "obsolete" under section 605(a) (i.e., information about a satisfied judgment that is more than seven years old), so that it may be reported for use in transactions described by section 605(b) (applications for credit or life insurance for $150,000 or more, or employment at an annual salary of $75,000 or more), it must have procedural safeguards to avoid reporting the information except in those situations. The safeguards should ensure that the CRA releases obsolete information only to the extent permitted by section 605(b).[211]

3.  PROCEDURES TO LIMIT DISCLOSURE SOLELY TO USERS WITH PERMISSIBLE PURPOSE

    A CRA must have reasonable procedures in place to ensure that it furnishes consumer reports only to those with a "permissible purpose" and to verify that users of the information have identified themselves, certified the purpose for which the information is obtained, and certified that the information will be used for no other purpose. What constitutes adequate verification will vary with the circumstances. Appropriate procedures might require an on-site visit to the user's place of business, a check of the user's references, confirmation of the business identity of the applicant (e.g., via phone directories or publicly available data such as governmental licensing information), and examining applications and supporting documentation supplied by applicants, or other reasonable methods, to detect suspect representations, discrepancies, illogical information, suspicious patterns, factual anomalies, and other indicia of unreliability.[212]

4.  REQUIREMENT THAT USERS CERTIFY A PERMISSIBLE PURPOSE

    A.  General. A CRA must adopt procedures that require prospective report users to identify themselves, certify the purpose for which the information is sought, and certify that the information will be used for no other purpose. A CRA must determine initially that users have permissible purposes and ascertain what those purposes are. It should obtain a specific, written certification that the recipient will obtain reports for those particular purposes and no others. The user's certification that the report will be used for no other purposes should expressly prohibit the user from sharing the report or providing it to anyone else, other than the subject of the report or to another party having the same purpose in the same transaction.[213]

65

B. <u>Blanket or individual certification</u>. Once the CRA obtains a certification from a user (e.g., a creditor) that typically has a permissible purpose for receiving a consumer report, stating that the user will use consumer reports only for permissible purposes, it need not require the user to certify its purpose for each individual report obtained unless there is reason to believe the user may be violating its certification. If the user could have both permissible and impermissible purposes for ordering consumer reports (e.g., an attorney or a private investigator), the CRA must require the user to provide a separate certification each time it requests a consumer report.[214]

C. <u>Certification listing multiple permissible purposes</u>. A CRA may accept a blanket certification that lists multiple permissible purposes. However, the certification must be limited to the consumer report user's actual purposes for ordering consumer reports. The certification may not, for example, state all purposes that are permissible under the statute unless that person actually intends to use consumer reports for all of those purposes.

D. <u>Procedures to avoid recipients' abuse of certification</u>. When doubt arises concerning any user's compliance with its contractual certification that it will use reports only for permissible purposes, a CRA must take additional steps to ensure compliance as appropriate, such as requiring a separate, advance certification for each report it furnishes that user, or auditing that user to verify that it is obtaining reports only for permissible purposes. A CRA must cease furnishing consumer reports to users who request consumer reports for impermissible purposes.[215]

## 5. APPLICATION TO MULTIPLE CRAS INVOLVED IN RESALES

When a CRA supplies consumer reports to another CRA and relies on that other CRA to identify and verify the end users of consumer reports, the supplying CRA must have reasonable procedures to ensure that the receiving CRA is identifying and verifying the end users in accord with this section. Further, the supplying CRA must obtain sufficient information from the receiving CRA regarding the identity of the end user so that the supplying CRA can investigate whenever it has reason to question the identity of an end user of a consumer report, thus allowing CRAs to promptly and effectively limit or cut off access to users who should not receive consumer reports.

## 6. PROCEDURES TO LIMIT ACCESS TO AND MONITOR DATABASE

A CRA must have reasonable and effective procedures to limit unauthorized access to its databases. Such procedures may include a system of monitoring access to its database of consumer reports, including a system to monitor anomalies and other suspicious activity to guard against unauthorized access to the database and against users obtaining consumer reports without a permissible purpose. Procedures also may include sufficient restrictions on user accounts (i.e., Internet Protocol address and time-of-day restrictions), installation and use of appropriate computer hardware and software, and sufficient screening of employees who will have access to the database and consumer reports. If it appears that a person has obtained unauthorized access to a CRA's computerized files, the CRA must take appropriate steps including altering the means of access, such as changing codes and passwords, and making random checks to verify that reports are obtained only for permissible purposes.[216]

## 7. REPORTS ON CREDITOR'S OWN CUSTOMERS

If a CRA provides consumer reports to a credit grantor on all its open-end account customers, it must make certain that the credit grantor always notifies the CRA when accounts are paid off

and closed or terminated, to avoid furnishing reports on former customers or other customers for whom the credit grantor lacks a permissible purpose. (See also discussion in comment 604(a)(3)(A)-4C).[217]

### 8.   CONSUMER AUTHORIZATION

A CRA providing reports pursuant to written consumer consent, as permitted by section 604(a)(2), must maintain reasonable procedures to assure that the authorizations are genuine.[218]

## Section 607(b) states: "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

### 1.   RELATION TO OTHER SECTIONS

Section 623 imposes accuracy duties on creditors, debt collectors, and other furnishers of information to CRAs. It does not expand or reduce CRAs' duties under this section.[219]

### 2.   GENERAL

A CRA must accurately transcribe, store and communicate consumer information received from a source that it reasonably believes to be reputable, in a manner that is logical on its face. If a CRA reports an item of information that turns out to be inaccurate, it does not violate this section if it has established and followed reasonable procedures in reporting the item. However, when a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.[220]

A consumer report need not be tailored to the user's needs, and may contain any information that is complete, accurate, and not obsolete on the consumer who is the subject of the report. A consumer report may include a list of recipients of reports on the consumer, subject to the prohibition in section 604(c)(3) against disclosing prescreening inquiries to parties other than the consumer.[221]

### 3.   REQUIRED STEPS TO IMPROVE ACCURACY

If the CRA's review of its procedures reveals, or the CRA should reasonably be aware of, steps it can take to improve the accuracy of its reports at a reasonable cost, it must take any such steps. It should correct inaccuracies that come to its attention. A CRA must also adopt reasonable procedures to eliminate systematic errors that it knows about, or should reasonably be aware of, resulting from procedures followed by its sources of information. For example, if a particular credit grantor has often furnished erroneous consumer account information, the CRA must require the creditor to revise its procedures to correct whatever problems cause the errors or stop reporting information from that creditor.

### 4.   COMPLETENESS

A.   <u>Completeness of report</u>. CRAs are not required to include all existing derogatory or favorable information about a consumer in their reports. (See, however, discussion in comment 611(c)-2, concerning inclusion of consumer dispute statements.) However, a CRA may not mislead

its subscribers as to the completeness of its reports by deleting favorable information and not disclosing its policy of making such deletions.[222]

B. <u>Completeness of item of information</u>. A CRA must report significant, verified information it possesses about a credit account or other item of information included in the consumer's credit file. For instance, a CRA may report delinquent accounts in consumer reports, but must accurately note later payments or other significant activity on the account.[223]

## 5.   REPORTING OF CREDIT OBLIGATIONS

A. <u>Past due accounts</u>. A CRA that employs reasonable procedures to keep its files current on past due accounts (for example, by requiring its creditors to notify the CRA when a previously past due account has been paid or discharged in bankruptcy) complies with this section.[224] A CRA that refuses to accept updated and corrected information from a party providing data on loan accounts, and still maintains that information in its database, does not have in place "reasonable procedures to assure maximum possible accuracy of information" to comply with section 607(b) with respect to such accounts.[225]

B. <u>Joint obligations</u>. Any report of a joint obligation must accurately report the relation of the consumer to the obligation. A personal guarantee of a debt incurred by another (including a corporation) may be included in a consumer report on the individual who is the guarantor, if the report accurately reflects the nature of the individual's involvement.[226]

## 6.   REPORTING OF BANKRUPTCIES

A consumer report may include an account that was discharged in bankruptcy (as well as the bankruptcy itself), as long as it reports a zero balance to reflect the fact that the consumer is no longer liable for the discharged debt. Similarly, if a reported bankruptcy has been dismissed, the CRA should report that fact.[227] It is not a reasonable procedure to label an account that has been discharged in bankruptcy as "charged off as bad debt" if the account was open and not charged off when the consumer filed bankruptcy. Such a designation would be inaccurate or misleading, as it would indicate that the creditor had written off the account at the time of bankruptcy when it had not in fact done so.[228] However, a creditor or CRA is not prohibited from reporting that an account has been charged off when it in fact was charged off.[229]

## 7.   PROTECTION AGAINST ALTERATION

CRAs must adopt reasonable security procedures to minimize the possibility that computerized consumer information can be altered by either authorized or unauthorized users of the information system.[230]

## 8.   LOGICAL ERRORS

A CRA must maintain procedures to avoid reporting information with obvious logical inconsistencies, such as a credit account opened when the consumer was known to be a minor.

**Section 607(c)** states: "A consumer reporting agency may not prohibit a user of a consumer report furnished by the agency on a consumer from disclosing the contents of the report to the consumer, if adverse action against the consumer has been taken by the user based in whole or in part on the report."

**Section 607(d)** requires CRAs to "provide to any person (A) who regularly and in the ordinary course of business furnishes information … with respect to any consumer; or (B) to whom a consumer report is provided by the agency, a notice of such person's responsibilities" under the FCRA that is substantially similar to the content prescribed by the Commission. (Starting July 21, 2011, the Bureau assumes the authority to prescribe the content of the notice.)

1.  PRESCRIBED NOTICES

    The Commission prescribed notices to describe FCRA responsibilities of (a) furnishers of information to CRAs and (b) users of consumer reports (16 CFR Part 698, App. G&H). See 69 Fed. Reg. 69776, 69790, 69795 (Nov. 30, 2004).

2.  ELECTRONIC DELIVERY OF NOTICES

    If the CRA delivers a notice electronically, it must be clear and prominent. Each notice must be presented so that it is unavoidable, of a size and shade and on the screen for a sufficient time that an ordinary consumer can read and understand it, and easily printable.[231]

**Section 607(e)(1)** states, "A person may not procure a consumer report for purposes of reselling the report (or any information in the report) unless the person discloses to the consumer reporting agency that originally furnishes the report (A) the identity of the end-user of the report (or information); and (B) each permissible purpose under section 604 [§ 1681b] for which the report is furnished to the end-user of the report (or information)." **Section 607(e)(2)** requires persons who procure consumer reports for others to establish and comply with reasonable procedures designed to ensure that the information is resold only for a purpose for which the report may be furnished under section 604. **Section 607(e)(3)** states that disclosure of a federal agency as an "end-user" is not required where the agency properly certifies that the nondisclosure is necessary to protect classified information or safety of agency employees or contractors.

1.  RELATION TO OTHER SECTIONS

    The term "reseller" is defined in section 603(u). As noted in comment 603(u)-1, in some cases a CRA that is a "reseller" is subject to additional duties from other CRAs.

2.  GENERAL

    When a CRA obtains a credit report from another CRA, it is procuring a consumer report for the purpose of reselling the report, and is thus subject to the section 607(e) requirements that apply to resellers, including the requirement to identify the end-user to the CRA from which it procures the report.[232]

## Section 608 – Disclosures to Governmental Agencies          15 USC 1681f

Section 608 allows CRAs to furnish identifying information on consumers to governmental agencies, limited to their "name, address, former addresses, places of employment, or former places of employment."

1.   GENERAL

A CRA may furnish specified identifying information concerning a consumer to a governmental agency, even if that agency does not have a "permissible purpose" under the FCRA to receive a consumer report. A governmental agency may obtain information beyond what is authorized by this section only if it has a permissible purpose under section 604, if such disclosure is required by state law under section 625, if the disclosure is made to the FBI under section 626, or if the disclosure is made for counterterrorism purposes under section 627.[233]

2.   GOVERNMENTAL AGENCIES

The term "governmental agency" includes federal, state, county and municipal agencies, and grand juries.[234]

## Section 609 – Disclosures to Consumers          15 USC 1681g

**Section 609(a)** requires CRAs, upon request, to disclose to the consumer (1) "all information in the consumer's file at the time of the request" (but not credit scores or other risk predictors), except that the CRA must truncate the consumer's Social Security number if requested; (2) "sources of the information; except that the sources of information acquired solely for use in preparing an investigative consumer report and actually used for no other purpose need not be disclosed;" (3) except for some cases involving federal agencies and classified information, identification of each person that procured a consumer report during the previous year (two years, in the case of reports made for employment purposes); (4) "the dates, original payees, and amounts of any checks upon which is based any adverse characterization of the consumer, included in the file at the time of the disclosure;" (5) "a record of all inquiries received by the agency during the 1-year period preceding the request that identified the consumer in connection with a credit or insurance transaction that was not initiated by the consumer;" and (6) "if the consumer requests the credit file and not the credit score, a statement that the consumer may request and obtain a credit score." **Section 609(b)** exempts certain information received prior to the enactment of the FCRA.

1.   RELATION TO OTHER SECTIONS AND RULES

This section specifies the information that CRAs must disclose to consumers with proper identification, upon request. Section 610 sets forth the conditions under which these disclosures must be made, and the form in which they must be made. Section 612 sets forth the circumstances

under which CRAs may charge (and the maximum amount allowed) for making such disclosures. The term "file" as used in section 609(a)(1) is defined in section 603(g). The term "investigative consumer report," which is used in section 609(a)(2), is defined in section 603(e).[235] The Commission issued regulations concerning "appropriate proof of identity" for obtaining file disclosures and other purposes (16 CFR 614). See 69 Fed. Reg. 63922, 63934 (Nov. 3, 2004).

## 2.   POWER OF ATTORNEY

A CRA may disclose a consumer's file to a third party authorized by the consumer's written power of attorney to obtain the disclosure, if the third party presents adequate identification and fulfills other applicable conditions of disclosure (e.g., pays a fee, if required).[236]

## 3.   "ALL INFORMATION IN THE CONSUMER'S FILE"

A.   General. A CRA must disclose all items in the consumer's file, no matter how or where they are stored. A CRA is required to make the consumer disclosure regardless of whether it designates its records as "files" or "archives" or uses any other terminology for the information it retains on a consumer.[237] A CRA that resells consumer report information from other CRAs may have no information to disclose if it has no retained file of the data at the time it receives a consumer's disclosure request;[238] however, it still must disclose recipients of consumer reports as provided in this section.

B.   Ancillary records. Ancillary records such as a CRA's audit trail of changes it makes in the consumer's file, billing records, or the contents of a consumer relations folder, are not included in the term "information in the consumer's file" that must be disclosed to the consumer pursuant to this section.[239]

## 4.   DISCLOSURE OF "SOURCES" OF INFORMATION

CRAs must disclose the sources of information in the consumer's file, except for sources of information acquired solely for use in preparing an investigative consumer report.[240]

## 5.   DISCLOSURE OF USERS "THAT PROCURED A CONSUMER REPORT"

A.   General. CRAs must maintain records of recipients of consumer reports sufficient to permit compliance with the requirement that they disclose the identity of recipients of consumer reports for one year prior to the request for file disclosure (two years for employment purposes).[241]

B.   Recipients of prescreened lists. A CRA must furnish to a consumer requesting a file disclosure the identity of recipients of any prescreened lists that contained the consumer's name within the previous year.[242]

C.   Recipient of erroneous report. Even if a CRA furnishes a consumer report in error, it must retain that information on file so that it can comply with its obligation to identify all persons that procured a consumer report on an individual, upon the consumer's request for a file disclosure.[243] The provision of section 605B that allows an identity theft victim to block information resulting from identity theft would allow the consumer to suppress information on recipients that received reports as a result of identity theft.

D.   Resales. A CRA that provides information to an intermediary that will resell the information to a third party must disclose the name of the third party (the "end-user") to the consumer as part of its file disclosure.[244] Similarly, a CRA that furnishes a consumer report directly to a report user at the request of another CRA must disclose the name of the user that was the ultimate

recipient of the report, not the name of the other agency that made the request.[245] See section 607(e), concerning the duty of persons who procure consumer reports for resale to identify the "end-user" to the originating CRA.

**Section 609(c)** directed the Commission to "prepare a model summary of the rights of consumers" under the FCRA, which CRAs must include in all written file disclosures to consumers. Starting July 21, 2011, the Bureau assumes responsibility for the summary. Nationwide CRAs also must include "a toll-free telephone number established by the agency, at which personnel are accessible to consumers during normal business hours."

1.   PRESCRIBED SUMMARY

The Commission published the model Summary of FCRA Rights, as required by this provision (16 CFR Part 698, App. F). CRAs are required to include that Summary, or a substantially similar document, to consumers with each written file disclosure. 69 Fed. Reg. 69776, 69787 (Nov. 30, 2004).

2.   TOLL FREE NUMBER "AT WHICH PERSONNEL ARE ACCESSIBLE TO CONSUMERS DURING NORMAL BUSINESS HOURS"

Nationwide CRAs must provide with each written file disclosure a toll-free number at which personnel are available during normal business hours – Monday through Friday, 9 am to 5 pm in the time zone in which the call originates. A CRA that prevents these consumers from reaching personnel, whether by blocking calls (e.g., busy signals) or placing the consumer on hold for an unreasonable amount of time, violates this provision. The CRAs should maintain sufficient service levels that are consistent with levels maintained by comparable call centers for the anticipated demand.[246] See comments 603(p)-2&3, concerning the CRAs that are and are not subject to this requirement.[247]

**Section 609(d)** directed the Commission to prepare a model summary of identity theft victim rights under the FCRA. Starting July 21, 2011, the Bureau assumes responsibility for the summary. When consumers contact CRAs stating that they are victims of fraud or identity theft, the section requires CRAs to provide consumers with information in that summary.

1.   PRESCRIBED SUMMARY

The Commission published the model Summary of Consumer Identity Theft Rights, as required by this provision (16 CFR Part 698, App. E). CRAs are required to provide that Summary, or a substantially similar document, to consumers who are identity theft victims. See 69 Fed. Reg. 69776, 69784 (Nov. 30, 2004).

**Section 609(e)** provides a mechanism through which identity theft victims and law enforcers can obtain applications and other records from businesses for transactions made by the alleged identity thief.

1.  RELATION TO OTHER SECTIONS

    Section 615(g)(2) provides that debt collectors must furnish certain information to identity theft victims.

2.  SCOPE

    This section affords relief only to individuals, because "victim" in this context is a "consumer" whose information has been used without authorization for criminal purposes.

3.  IRRELEVANCE OF VICTIM LIABILITY

    Even if the business states that it will not attempt to collect debts from the consumer in whose name an identity thief has purchased goods or services, it must supply the information required by this section to an identity theft victim.

**Section 609(f)** specifies the content, manner, and time frame for CRA disclosure of credit scores to consumers. It also provides, among other things, that (1) no score disclosure is required of a CRA that does not develop or distribute scores in connection with mortgage loans; (2) CRAs need not explain unmodified scores created entirely by a third party, but need only provide identifying and contact information on the score creator; (3) CRAs need not maintain scores in their files; and (4) CRAs "may charge a fair and reasonable fee, as determined by the Commission" for providing a credit score. Starting July 21, 2011, the Bureau assumes the authority to determine the reasonable fee.

1.  RELATION TO OTHER SECTIONS

    Section 609(a)(6) requires CRAs to include a statement that the consumer may request and obtain a credit score when they make a file disclosure that does not include a score.

2.  SALE OF OTHER PRODUCTS WITH CREDIT SCORE

    A CRA cannot condition the sale of a credit score on the purchase of other products.

3.  "REASONABLE FEE" DETERMINATION

    The Commission did not determine a specific dollar amount that constitutes a "fair and reasonable fee" under this section. Rather, it stated that a CRA may charge an amount that does not significantly exceed the current market rate for credit scores. See 69 FR 64698, 64701 (Nov. 8, 2004). Unless and until the Bureau publishes such a determination, the Commission staff will look to the market in credit scores to determine whether a fee is "fair and reasonable" under this section.

**Section 609(g)** generally requires any person who "makes or arranges loans and who uses a consumer credit score … in connection with an application initiated or sought by a consumer for a … loan for a consumer purpose that is secured by 1 to 4 units of residential property" to provide consumers with their credit score, along with a required disclosure.

1.  APPLIES TO SECOND MORTGAGES

    This section requires disclosure of a credit score for all transactions secured by residential real property. It is not limited to the initial sale of property or its refinancing; it applies equally to an application for a second mortgage or equity line of credit.

2.  APPLIES TO A "PERSON WHO MAKES OR ARRANGES LOANS"

    The disclosure duty applies to brokers, because this section specifies that it applies to any party that "arranges" mortgage loans covered by this provision.

3.  DISCLOSURE OF SCORES

    A.  Pre-application consultation. This section requires a score disclosure by any person who "uses (a score) in connection with an application *initiated or sought* by the consumer" for a real estate secured loan. When a consumer consults a broker or lender about the options available, and that broker or lender procures and uses a score as part of that process, a disclosure is required even if the consultation does not include a formal or informal application.

    B.  Duplicate disclosures. The consumer is entitled to only one score disclosure per transaction, even in a circumstance involving an extended application process. For example, if a broker has provided a disclosure at the start of the process, no lender or prospective lender needs to make a duplicate disclosure.

4.  DISCLOSURE MAY BE COMBINED WITH RISK-BASED PRICING NOTICE

    A person required to provide a credit score and notice under this section, and a risk-based pricing notice under section 615(h) and its implementing rule, may do so in a single document by utilizing the model credit score exception notice for loans involving real property under the risk-based pricing rule. See 16 CFR 640.5(d), 16 CFR Part 698 (Form B-3).

## Section 610 – Conditions and Form of File Disclosure to Consumer

15 USC 1681h

**Sections 610(a) and (b)** state that CRAs must require that the consumer furnish "proper identification" before sharing the information in the consumer's file with him or her. The disclosure is required to be provided in writing, except that the consumer may specify that it be made "(A) in person, upon the appearance of the consumer at the place of business of the consumer reporting agency where disclosures are regularly provided, during normal business hours, and on reasonable notice; (B) by telephone, if the consumer has made a written request for disclosure by telephone; (C) by electronic means, if available from the agency; or (D) by any other reasonable means that is available from the agency," in which case the CRA "may make the disclosures" in such other form.

**Sections 610(c) and (d)** require CRAs to provide trained personnel to explain to the consumer any information furnished in the required disclosure, and allow the

consumer to be accompanied by one other person of his choosing to an in-person disclosure.

1. IMPLEMENTING RULES

   The Commission issued regulations concerning "appropriate proof of identity" for file disclosure and other purposes (16 CFR 614). See 69 Fed. Reg. 63922, 63934 (Nov. 3, 2004).

2. EXTRA CONDITIONS PROHIBITED

   A CRA may not add conditions not set out in the FCRA and related rules as a prerequisite to the required disclosure.[248]

3. DISCLOSURE IN THE PRESENCE OF THIRD PARTIES

   When the consumer requests disclosure in a third party's presence at an in-person disclosure, the CRA may require that a consumer sign an authorization before such disclosure is made. The consumer may choose the third party to accompany him or her when receiving the disclosure.[249]

4. METHOD OF DISCLOSURE

   Disclosure should usually be provided in writing. However, where the consumer specifies a preference for an in-person, electronic, phone, or other reasonable means of disclosure available from the CRA, the CRA may make the disclosure in that fashion.

**Section 610(e)** prohibits certain non-FCRA (defamation, invasion of privacy, or negligence) civil suits against CRAs, users, and furnishers.

**Section 611 –
Procedure in Case of Disputed Accuracy**                    15 USC 1681i

**Section 611(a)** provides that "if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file ..., before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller." The CRA may refuse to investigate "frivolous or irrelevant" disputes. The CRA must provide notice of the dispute to any person who furnished information in dispute, which shall include "all relevant information regarding the dispute." If a disputed item is found to be inaccurate or incomplete or cannot be verified, the CRA must delete or modify the information and notify the furnisher. Upon conclusion of the investigation, the CRA must notify the consumer of the results of the investigation in accord with the procedure set forth in this section.

A CRA must establish procedures to ensure that information that has been disputed by the consumer under this section and deleted by the CRA does not reappear in the file. A previously deleted item may be reinserted into the consumer's file only if (1) the furnisher of the information certifies that it is accurate and complete, and (2) the CRA notifies the consumer of the reinsertion within five days.

1.  RELATION TO OTHER SECTIONS

This section sets forth procedures CRAs must follow if a consumer disputes the completeness or accuracy of any item of information in the consumer's file. Section 605B, which deals with information resulting from identity theft, allows consumers to block, rather than dispute, such information in their files. Section 623(b) describes the duties of furnishers when CRAs ask them to verify information that a consumer has disputed.[250]

2.  REASONABLE INVESTIGATION

A CRA responding to a dispute must make a good faith effort to determine the accuracy of the disputed item or items. In some cases, evidence submitted by the consumer (e.g., a clear copy of a dated cancelled check paying off an account showing an outstanding balance), standing alone, will make it clear that an item is inaccurate or incomplete. In other cases, the CRA must conduct a "reasonable" investigation that, at a minimum, would include checking with the original sources or other reliable sources of the disputed information and inform them of all relevant information and evidence submitted by the consumer as part of his or her dispute, state the consumer's position, and then ask whether the source would confirm the information, qualify it, or accept the consumer's explanation. In investigating and attempting to verify a disputed credit transaction, a CRA need not require the creditor to produce documentation such as the actual signed sales slips. However, depending on the nature of the dispute, investigation and verification may require more than asking the original source of the disputed information the same question and receiving the same answer.[251]

3.  "COMPLETENESS" OF ITEMS IN FILE

A.  General. The consumer may dispute the "completeness … of any item of information" in his file (e.g., that a charged off item was subsequently paid). If a consumer disputes a debt, the CRA must investigate its validity and/or status by ascertaining whether the debt was owed by the consumer or whether the debt had subsequently been paid. For example, if a consumer alleges that she has satisfied a judgment reflected in the report as unpaid or that she has paid a debt reflected in the report as unpaid, the CRA must investigate the matter. If a file reflects a debt discharged in bankruptcy without reflecting subsequent reaffirmation and payment of that debt, a consumer may require that the item be investigated.[252]

B.  No right to add new accounts to file. A CRA is not required to create new files on consumers for whom it has no file, nor is it required to add information about accounts not reflected in an existing file, because consumers may dispute only the completeness or accuracy of particular items of information in the file. A CRA may charge fees for creating or adding items to files on consumers at their request, or for other services not required by the FCRA that are requested by consumers.[253]

C.  No right to add explanation of extenuating circumstances. A CRA has no duty to investigate, or take any other action under this section, if a consumer merely provides an explanation for failing to pay a debt such as sudden illness or layoff, and does not challenge the accuracy

or completeness of the item of information in the file relating to a debt. Although a CRA is not required to accept a consumer dispute statement that does not challenge the accuracy or completeness of an item in the consumer's file, it may accept such a statement and include it in the file.[254]

## 4. CRA DUTY TO "RECORD THE CURRENT STATUS OF THE DISPUTED INFORMATION"

The CRA must, upon investigation, "record the current status" of the disputed item. This requires inclusion of any information relating to a change in status of an ongoing matter. For example, it must include in the report that a credit account had been closed, that a debt shown as past due had subsequently been paid or discharged in bankruptcy, or that a debt shown as discharged in bankruptcy was later reaffirmed and/or paid.[255] If an involuntary petition for bankruptcy is being reported without identifying it as involuntary or without disclosing that it has been dismissed, the consumer may dispute the item as incomplete and require the CRA to update the file to reflect its complete and accurate current status.[256]

## 5. DISPUTE THAT REPORT USER LACKED PERMISSIBLE PURPOSE

When a CRA receives a dispute from a consumer alleging that an inquiry that appears in his/her file was not made by a person who had a permissible purpose for obtaining the consumer report, and those allegations are supported by the CRA investigation, the CRA has two options. It may either delete the inquiry as inaccurate, or amend the file to make the item "complete" by reflecting clearly that the inquiry was generated by a party who did not have a permissible purpose to obtain a consumer report on the consumer.

## 6. INVESTIGATION OF "FRIVOLOUS OR IRRELEVANT" DISPUTES NOT REQUIRED

The mere presence of contradictory information in the file does not provide the CRA reasonable grounds to believe that the dispute by the consumer is "frivolous or irrelevant." A CRA must assume a consumer's dispute is bona fide, unless there is evidence to the contrary. Such evidence may constitute receipt of letters from consumers disputing all information in their files without providing any allegations concerning the specific items in the files, or of several letters in similar format that indicate that a particular third party (e.g., a "credit repair" operator) is counseling consumers to dispute all items in their files, regardless of whether the information is known to be accurate. The CRA is not required to repeat an investigation that it has previously conducted simply because the consumer reiterates a dispute about the same item of information, unless the consumer provides further information indicating that the item is inaccurate or incomplete, or alleges changed factual circumstances.[257]

## 7. NO PREREQUISITES TO DUTY TO INVESTIGATE

A CRA's obligation to investigate disputed items is not contingent upon the consumer's obtaining a file disclosure from the CRA, suffering denial of a benefit, or asserting any rights under other provisions of the FCRA.[258]

## 8. REQUIREMENT THAT CRA COMMUNICATE "ALL RELEVANT INFORMATION"

A CRA must communicate the dispute to the furnisher in a fashion that enables the furnisher to fully investigate and properly respond to the dispute. It may do so electronically in those cases where it can provide "all relevant information" submitted by the consumer so that the furnisher is fully informed of the basis for the dispute and can research relevant sources (e.g., original application or payment ledgers). In some cases, a CRA may provide all relevant information

received from the consumer in the notice of the dispute to the furnisher by (a) placing a description of the relevant information in the narrative field (e.g., "12/15/01 ltr from S. Jones at Sears states never late" or "point-of-contact D. Smith at 203-555-1212"); and (b) employing a code that adequately and fully describes the nature of the evidence received from the consumer. A CRA does not comply with this provision if it merely indicates the nature of the dispute, without communicating to the furnisher the specific relevant information received from the consumer. For example, if the consumer claimed "never late" and submitted documentation (such as cancelled checks) to support his/her dispute, a CRA does not comply with the requirement that is provide "all relevant information" if it simply notifies the furnisher that the consumer disputes the payment history without communicating the evidence received. The CRA may comply in all cases by forwarding all communications and documents provided by the consumer.

9.   DISPUTE MUST BE CONVEYED TO A CRA "DIRECTLY" BY THE CONSUMER

A CRA need not investigate a dispute about a consumer's file raised by a third party – such as a "credit repair organization" defined in 15 U.S.C. §1679a(3) – because the obligation under this section arises only where file information is disputed "by the consumer" who notifies the agency "directly" of such dispute. A CRA is not required to respond to a dispute of information that the consumer merely conveys to others, although furnishers of information have independent duties with respect to those disputes. (See also discussion in comment 607(b)-2 of CRAs' duties to correct errors that come to their attention.)[259] However, a CRA must investigate a dispute by the consumer to another CRA to which it has provided reports for resale, after the reseller refers it to the originating CRA. See comment 611(f)-1.

**Section 611(b)** provides, "If the reinvestigation does not resolve the dispute, the consumer may file a brief statement setting forth the nature of the dispute. The consumer reporting agency may limit such statements to not more than one hundred words if it provides the consumer with assistance in writing a clear summary of the dispute."

**Section 611(c)** provides, "Whenever a statement of a dispute is filed, unless there is reasonable grounds to believe that it is frivolous or irrelevant, the consumer reporting agency shall, in any subsequent consumer report containing the information in question, clearly note that it is disputed by the consumer and provide either the consumer's statement or a clear and accurate codification or summary thereof."

1.   CONSUMER STATEMENT OF DISPUTE

If the investigation does not resolve the dispute, the consumer may file a statement of dispute, which the CRA may limit to one hundred words. The "one hundred word" limitation applies to each disputed item. A consumer who disputes multiple items of information in his or her file may submit a 100-word statement as to each item for which the dispute has not been resolved.[260]

2.   CONVEYING DISPUTE STATEMENTS TO RECIPIENTS OF SUBSEQUENT REPORTS

A CRA may not merely tell the recipient of a subsequent report containing disputed information that the consumer's statement is on file, but must provide the statement or a clear and accurate

summary.[261] This section does not require the CRA to exactly duplicate the organization or styles used in the consumer's written dispute.[262]

**Section 611(d)** requires that, upon a consumer's request, the CRA shall notify certain prior consumer report recipients of the deletion of inaccurate or unverifiable information or of a consumer's statement of dispute.

**Section 611(e)** provides for the Commission to transmit consumer complaints relating to the dispute process to nationwide CRAs, who must report regularly on the disposition of such complaints to the Commission, which in turn must annually report to Congress on the process. Starting July 21, 2011, the Bureau assumes the duties provided in this section.

**Section 611(f)** provides a special procedure for resellers to investigate disputes.

1.   SPECIAL RULE FOR DISPUTES DIRECTED TO RESELLERS

When a consumer disputes information in his or her file with a reseller of consumer reports who has received information from another CRA, the reseller must first determine whether the disputed item is inaccurate or incomplete because of its own act or omission. If so, it must correct or delete the item within 20 days. If not, the reseller must convey the dispute (and all relevant information) to any CRA from which it received the disputed information.

## Section 612 – Charges for Certain Disclosures                    15 USC 1681j

**Section 612(a)(1)** requires nationwide CRAs to make free annual file disclosures upon consumer request to a centralized source established for that purpose. It also requires nationwide "specialty" CRAs, as defined by section 603(x), to make free annual file disclosures upon consumer request through a "streamlined" process including a toll-free phone number to process such requests. Finally, it directed the Commission to issue regulations to implement this process as to both types of nationwide CRAs. Starting July 21, 2011, the Bureau assumes rulemaking authority under this section.

1.   IMPLEMENTING RULE

The Commission issued regulations implementing the consumer's right to request free annual file disclosures (16 CFR 610, 698 App. D), as required by this section. See 69 Fed. Reg. 35468, 35496, 35500 (June 24, 2004). It later amended and expanded the regulations. See 75 Fed. Reg. 9736 (March 3, 2010).

2.   DIFFERENT OBLIGATIONS OF "NATIONWIDE" AND "NATIONWIDE SPECIALTY" CRAS

Section 612(a)(1)(A) and (B) require nationwide CRAs to make free annual file disclosures to consumers only when the requests come through the centralized source created for receiving such requests. Section 612(a)(1)(C), on the other hand, requires nationwide specialty CRAs to make

free annual file disclosures to consumers who submit their requests directly to the CRAs through a streamlined process.

**Section 612(b)** provides that CRAs must make free file disclosures upon a consumer's request within 60 days of the consumer receiving an adverse action notice or a risk-based pricing notice. **Section 612(c)** provides for free file disclosures to a consumer "once during any 12-month period without charge to that consumer if the consumer certifies in writing that the consumer (1) is unemployed and intends to apply for employment in the 60-day period beginning on the date on which the certification is made; (2) is a recipient of public welfare assistance; or (3) has reason to believe that the file on the consumer at the agency contains inaccurate information due to fraud." **Section 612(d)** states that nationwide CRAs must make disclosures without charge if there is a fraud alert in the consumer's file.

1. CONSUMERS MAY BE ENTITLED TO MULTIPLE FREE ANNUAL FILE DISCLOSURES ("FREE REPORTS")

All consumers are entitled to one free annual file disclosure from nationwide CRAs under section 612(a)(1). Some consumers are entitled to additional free disclosures because they fall into certain categories (i.e., they are unemployed or on welfare). Other consumers are entitled to additional free disclosures as the result of specified events (i.e., they have received adverse action or risk-based pricing notices, placed fraud alerts in their files, or found information resulting from fraud in their files). As a result, a single consumer may be entitled to more than one free disclosure in a year. For example, a consumer is entitled to a free file disclosure from a CRA following receipt of an adverse action notice, even if he or she obtained "annual" free disclosures from that CRA two months previously and would not be entitled to an additional free annual disclosure for another ten months.

**Section 612(f)** states that CRAs may "impose a reasonable charge on a consumer" for providing file disclosures in circumstances other than the ones described in this section. CRAs may also impose such a reasonable charge when they provide a statement, codification, or summary to consumer report recipients at the request of the consumer following an investigation under section 611. The Commission must increase the maximum charge for a file disclosure annually based on the Consumer Price Index. Starting July 21, 2011, the Bureau assumes that duty. **Section 612(e)** prohibits any other charge to consumers for disclosures and any other notices required by the FCRA.

1. MAXIMUM CHARGE BY CRAS FOR DISCLOSURES

Section 612 sets forth certain situations when CRAs are required to provide free file disclosures, and otherwise limits charges to consumers, as discussed in comment 612(b/c/d)-1. This subsection provided for an $8.00 maximum when it was added to the FCRA in 1996, and directed the Commission annually to increase that amount based on the Consumer Price Index. Before the end of each year since enactment of this provision, the Commission has announced the maximum

allowable charge for the following calendar year. As of January 1, 2011, the maximum allowable charge is $11.00.

## Section 613 – Public Record Information for Employment Purposes

15 USC 1681k

**Section 613(a)** provides that a CRA, when it compiles and provides public record information that is likely to have an adverse effect on a consumer's ability to obtain employment, shall either (1) notify the consumer at the time such information is provided to an employer or potential employer or (2) maintain strict procedures to insure that the information is complete and up to date. It further provides that "items of public record relating to arrests, indictments, convictions, suits, tax liens, and outstanding judgments shall be considered up to date if the current public record status of the item at the time of the report is reported." **Section 613(b)** provides an exemption to a federal agency or department when the head of the agency or department (or an appropriate delegate) makes certain written findings.

1.  RELATION TO OTHER SECTIONS

    A CRA that furnishes public record information must also follow reasonable procedures to assure maximum possible accuracy of that information as required by section 607(b), even if it chooses to comply with this section by providing the subsection (a)(1) notice when providing public record information to employers.[263] An employer using the information must comply with the notice, consent, and disclosure provisions of section 604(b).[264]

2.  GENERAL

    A CRA that furnishes public record information for employment purposes must comply with either subsection (a)(1) or (a)(2), but need not comply with both.[265] CRAs that provide reports for employment purposes must comply with this section, even if they are merely resellers of consumer reports obtained from other CRAs.[266] The procedures required by this section cannot be waived by the consumer to whom the report relates.[267]

3.  METHOD OF PROVIDING NOTICE UNDER SUBSECTION (a)(1)

    A CRA may use first class mail or other reasonable means to notify consumers that it is providing public record information for employment purposes under subsection (a)(1).[268]

4.  STRICT PROCEDURES UNDER SUBSECTION (a)(2)

    A.  <u>Stored public information</u>. A CRA that furnishes consumer reports for employment purposes based on previously acquired public record information (purchased periodically from a third party) must verify that any such information is complete and up to date, in order to comply with subsection (a)(2).[269]

    B.  <u>Only reported "items" must be complete and up-to-date</u>. This section requires that each "item of [public record] information" reported be complete and up to date. For example, if the CRA reports an indictment, it must also report any dismissal or acquittal available on the public record as of the date of the report. Similarly, if the CRA reports a conviction, it must

report a reversal that has occurred on appeal. In some cases, often at an employer's request, a report may deliberately omit data such as arrest or probation data. Although the report is not a "complete" reflection of every single piece of public record information, because the requirement to report complete and up-to-date information is item-specific, the CRA complies if its report includes the current, complete, and up-to-date public record status of each individual item reported.[270]

## Section 614 – Restrictions on Investigative Consumer Reports

15 USC 1681*l*

Section 614 provides, "Whenever a consumer reporting agency prepares an investigative consumer report, no adverse information in the consumer report (other than information which is a matter of public record) may be included in a subsequent consumer report unless such adverse information has been verified in the process of making such subsequent consumer report, or the adverse information was received within the three-month period preceding the date the subsequent report is furnished."

## Section 615 – Requirements on Users of Consumer Reports

15 USC 1681m

**Section 615(a)** provides that any party who "takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report" shall provide to the consumer orally, in writing, or electronically: notice of the adverse action; the name, address, and telephone number of the CRA (toll-free telephone number, in the case of a nationwide CRA); a statement that the CRA "did not make the decision to take the adverse action" and is unable to provide specific reasons for the action; and notice of the consumer's right to obtain a free file disclosure from the CRA, and to dispute with a CRA the accuracy or completeness of any information in a consumer report furnished by the CRA. Effective July 21, 2011, the party taking the adverse action must also disclose any numerical credit score that contributed to the adverse action, along with certain related information.

1.   RELATION TO OTHER SECTIONS AND REGULATION B

   A.   FCRA – employment. An employer who uses consumer reports to make employment decisions must make the adverse action disclosures required by both section 604(b) and section 615(a), even though there is some duplication of the disclosures required by those two subsections in the employment context.[271] Because the section 604(b)(3) notice must be provided to consumers before adverse action is taken, and the section 615(a)(2) notice must be provided after adverse action is taken, they may not be included in the same document.[272]

   B.   FCRA – risk-based pricing. Section 615(h) generally requires creditors, in those cases that are not "adverse action" but involve extensions of credit on terms materially less favorable than

those available to a substantial portion of customers, to provide a "risk-based pricing notice" when the decision is based in whole or in part on a consumer report. See comment 615(h)-1.

C. FCRA – miscellaneous. Section 606 also requires users of investigative consumer reports to make certain disclosures to consumers.[273] Section 603(k) defines the term "adverse action."

D. ECOA. Creditors should not confuse compliance with the adverse action notice provisions of section 615(a) with compliance with the Equal Credit Opportunity Act, 15 U.S.C. §§1691 et seq. and Regulation B, 12 CFR Part 202, which require disclosure of the reasons for adverse action. Providing the adverse action notice required by section 615(a), therefore, does not necessarily constitute compliance with Regulation B, although a creditor can comply with both the FCRA and the ECOA through the use of a single notice. See 12 CFR Part 202, Appendix C (model adverse action notices that can be used to comply with FCRA and ECOA).[274]

## 2.   ADVERSE ACTION INVOLVING CREDIT

A. In general. A creditor must provide an adverse action notice when it denies the consumer's request for credit or for increased credit (including a rejection based on a scoring system) based in whole or in part on a consumer report.[275] Where a consumer applies for credit on particular terms, is offered credit only on less favorable terms based on information in his/her consumer report, and refuses to accept those terms or use the credit offered, the consumer is entitled to an adverse action notice. However, if the consumer accepts the credit offered, the consumer is not entitled to the adverse action notice.[276] See comment 603(k)(1)(A)-1, which sets forth the definition of "adverse action" under the ECOA and its implementing Regulation B that also serves as the definition of "adverse action" for FCRA purposes under section 603(k)(1)(A). However, the consumer may be entitled to a "risk-based pricing notice" under section 615(h).

B. Multiple applicants. When there are two applicants, a creditor must provide an adverse action notice to both applicants if the application is denied, even in part, based on information in a co-applicant's consumer report. However, a creditor need not provide a guarantor with an adverse action notice, even if the application is denied in whole or in part based upon information from the consumer report of the guarantor. Regulation B states that only an "applicant" can experience "adverse action" in a credit context and excludes a guarantor from its definiton of "applicant." 12 CFR Part 202.2(c)(1) and (e). See comment 603(k)(1)(A)-3.[277]

## 3.   ADVERSE ACTIONS INVOLVING INSURANCE

A. In general. An insurer that refuses to issue a policy, or charges a higher than normal premium, based on a consumer report is required to comply with section 615(a).[278] See comments 603(k)(1)(B)(i)-1&2.

B. Variations in premiums offered. In offering a discounted premium rate for those with "good credit," an insurance company must provide an adverse action notice when (1) it decides not to offer the discounted rate to an existing policyholder upon renewal, based on the consumer's credit report; (2) it offers the higher rate to a potential customer based on a credit report that indicates that the individual does not qualify for the discounted rate; or (3) it quotes the discounted rate to a potential customer but later charges a higher rate due to the consumer's credit report. Similarly, a health insurer that increases premiums of a consumer, in whole or in part based on a consumer report, must provide an adverse action notice.

C.  Mortgage insurance. A mortgage insurer that refuses to insure a consumer loan, based in whole or in part on a consumer report, must provide the consumer with an adverse action notice, because the insurer has made a "denial in connection with the underwriting of insurance" that requires the notice. Such refusal is an "adverse action" even if the loan application itself is ultimately approved when a second insurer agrees to provide coverage.[279]

D.  Actions applicable to entire existing class of policyholders. An adverse action that applies to all or substantially all of an established class of policyholders, such as a generally applicable increase in premiums or decrease in coverage, is not "based on" a consumer report that was used at a prior time to assign the consumer to that class if the insurer provided an adverse action notice at that prior time.

4.  ADVERSE ACTIONS INVOLVING EMPLOYMENT

A.  General. An employer must provide an adverse action notice to an individual who has applied for employment and has been rejected based on a consumer report. Similarly, an employer must provide an adverse action notice to an existing employee who is subject to an employment decision that adversely affects his or her employment, such as termination or discipline, based in whole or in part on a consumer report. See comment 603(k)(1)(B)(ii)-2.

B.  Additional adverse action duties of employers. In addition to providing the adverse action notice required by this section, employers must also comply with section 604(b)(3) by supplying the consumer (job applicant or employee) with a copy of the consumer report and a written statement of consumer rights under the FCRA before taking adverse action.

5.  ADVERSE ACTION NOT INVOLVING CREDIT, INSURANCE OR EMPLOYMENT

A business that takes adverse action against a consumer in a context other than credit, insurance, or employment (e.g., a residential landlord), based in whole or in part on a consumer report, must also provide an adverse action notice. A business that determines, based on information contained in a consumer report, that a customer must pay a cash deposit (or a larger deposit) not required of all consumers, is obligated to provide a notice of adverse action to that customer.[280] An owner of a residential property that denies a consumer's rental application, or increases the rental or deposit charges, must provide an adverse action notice when information from a consumer report contributed in any way to such action. See comment 603(k)(1)(B)(iv)-3&4.

6.  CREDITORS OR INSURERS USING "PRESCREENED" MAILING LISTS

A creditor or insurer is not required to provide adverse action notices regarding mailing lists prepared by CRA "prescreening" services. Consumers who have not applied for credit or insurance have not suffered adverse action in being excluded from such lists of consumers to be solicited for these products.[281] However, a consumer who agrees to accept a prescreened offer of credit or insurance, but is later denied based on a subsequent report, is entitled to an adverse action notice.

7.  ADVERSE ACTION "BASED IN WHOLE OR IN PART ON ANY INFORMATION CONTAINED IN A CONSUMER REPORT"

A.  No requirement that information in consumer report be derogatory. A user of a consumer report that takes adverse action wholly or partly because of information contained in a consumer report must provide the required notice to the consumer, even if the information is not derogatory. For example, the user must give the notice if the action is based wholly or partly on the absence of a file or on the fact that the file contained insufficient trade lines.[282]

    B.  <u>Denial based partly on a consumer report</u>. The user of a consumer report must provide an adverse action notice even if the adverse action is based only partly on a consumer report.[283] Similarly, if information received from a consumer report was used to prompt further investigation of the applicant's insurability, and that investigation leads to adverse action, the consumer is entitled to receive an adverse action notice.

## 8.  ADVERSE ACTION BASED ON DIRECT INFORMATION

This section does not require any notice of adverse action if such action is based solely on information provided by the consumer in an application, or is based on past experience in direct transactions with the consumer.[284]

## 9.  NOTICE PROVIDED BY THIRD PARTY

A user may contract with a third party to deliver the adverse action notice to the consumer, but the user remains liable if the notice is not provided.[285]

## 10.  CONTENT OF THE NOTICE

The consumer report user must provide the name and address of the CRA from which it obtained the consumer report, even if that CRA obtained all or part of the report from one or more other CRAs.[286] See section 607(e) concerning the obligation of the intermediary agency to identify the "end-user" to the originating CRA.

Section 615(a)(1)'s mandate that the user provide "notice of the adverse action" does not require the use of the word "adverse" or the like, but it does require that the notice convey to the consumer accurately that the report led to less than optimal results for the consumer. The adverse action notice should not include untrue statements. For example, a report user may not state that the CRA from which it obtained the consumer report "did not make the decision to take the adverse action" – one of the specified disclosures – if that statement is factually incorrect (e.g., when an employer has asked the CRA to provide an opinion on whether a job applicant should be hired).[287]

## 11.  LIMITED SCOPE OF REQUIREMENTS

This section does not require that creditors disclose their credit criteria or standards, or that employers furnish copies of personnel files to former employees. In most cases, this section does not require that the user provide advance notification to consumers before a consumer report is obtained. (But see section 606 regarding notice of investigative consumer reports, and section 604(b) regarding reports for employment purposes.)[288] This section does not impose any requirements on CRAs to compel users of consumer reports to provide adverse action notices; rather, it imposes the duty to provide adverse action notices only on users.[289]

## 12.  REASONS FOR ACTION

Unlike the ECOA, the FCRA does not require report users to disclose specific reasons for taking adverse action, or to identify information from a consumer report that contributed to the action. However, should a report user choose to tell a consumer the reasons for the adverse action, nothing in the FCRA precludes it from doing so.[290]

**Section 615(b)(1)** provides different rights to consumers who suffer adverse action based on information obtained by "a person other than a consumer reporting agency" in the credit context. At the time the creditor informs the consumer of an adverse action, it must disclose the consumer's right to make a written request

within 60 days for the "nature of the information" that led to the adverse action. Upon receiving such a request, the creditor must comply. Section **615(b)(2)** provides similar rights to consumers who suffer adverse action based on certain information received from an affiliate of the party taking the action.

1. DENIAL OF CREDIT BASED ON INFORMATION FROM "PERSONS OTHER THAN CONSUMER REPORTING AGENCIES"

   Subsection (b)(1) imposes requirements on a creditor when it denies, or increases the charge for credit, based on information from a non-affiliated "third party" source, which is a source other than (1) a CRA, (2) the creditor's own files, or (3) the consumer's application. Examples of "persons other than consumer reporting agencies" whose information is covered by this section include application references (creditors, employers, landlords) or the public record. This subsection also requires the creditor to provide a disclosure when it denies a consumer's application based on information obtained directly from another lender, even if the other lender's name was furnished to the creditor by a CRA.[291]

2. SUBSTANCE OF REQUIRED DISCLOSURES

   When the adverse action is communicated to the consumer, the creditor must clearly and accurately disclose to the consumer his or her right to make a written request for the disclosure of the nature of the third party information that led to the adverse action. Upon timely receipt of such a request, the creditor need disclose only the nature of the information that led to the adverse action (e.g., history of late rent payments or bad checks); it need not identify the source that provided the information or the criteria that led to the adverse action. A statement of principal, specific reasons for adverse action based on third party information that is sufficient to comply with the requirements of Section 701(d) of the ECOA and its implementing Regulation B, 12 CFR 202.9(b)(2) (e.g., "unable to verify employment") constitutes disclosure of the "nature of the information" under subsection (b).[292]

3. TIMING OF REQUIRED DISCLOSURES

   A creditor may comply with subsection (b)(1) by providing a statement of the nature of the third party information that led to the adverse action when it notifies the consumer of the action.[293]

4. SECTION APPLICATION LIMITED TO "CREDIT"

   Landlords that charge monthly rent to tenants do not have an obligation under section 615(b)(1) to provide notices when they base an adverse landlord-tenant decision upon information obtained from persons *other than CRAs* (e.g., from an applicant's previous landlord) because section 615(b)(1) only applies to "credit" as defined in section 603(r)(5). Landlords do, however, have obligations to provide adverse action notices if they take adverse actions based on consumer reports.[294]

**Section 615(c)** provides that a party, when charged with failing to provide adverse action notices, may avoid liability by showing that at the time of the alleged violation, he maintained reasonable procedures to provide the required notice.

**Sections 615(d)** requires creditors or insurers who make prescreened offers to consumers to provide a clear and conspicuous statement (in a type size and manner specified under Commission rules) that "(A) information contained in the consumer's consumer report was used in connection with the transaction; (B) the consumer received the offer of credit or insurance because the consumer satisfied the criteria for credit worthiness or insurability under which the consumer was selected for the offer; and (C) … the credit or insurance may not be extended if, after the consumer responds to the offer, the consumer does not meet the criteria used to select the consumer for the offer or … does not furnish any required collateral …." It further requires that the notice inform the consumer of the right to "opt out" of prescreening and provide the address and toll-free telephone number to contact to opt out, using a format to be established by rule by the Commission, in consultation with the Federal financial agencies. Starting July 21, 2011, the Bureau assumes rulemaking authority under this section. Finally, this section specifies that it does not "affect the authority of any Federal or State agency to enforce a prohibition against unfair or deceptive acts or practices" in connection with prescreening or any other practice.

1.   RELATION TO OTHER SECTIONS

This section prescribes specific disclosures when businesses offer "prescreened" products to consumers based on their consumer report information. Section 603(*l*) defines the type of offer that is subject to the FCRA's prescreening provisions. Section 604(c) sets forth the permissible purpose for and limitations on prescreening. Section 604(e) discusses the consumer's right to "opt out" from prescreened lists.

2.   IMPLEMENTING RULE

The Commission published a rule and model form for the disclosures required by this section (16 CFR 642, 16 CFR 698 App. A). See 70 Fed. Reg. 5022, 5025, 5032-33 (Jan. 31, 2005). The rule requires that a "short" notice be on the front of the first page of any written solicitation, which informs consumers of their right to opt-out of future prescreened offers, provides a toll-free number to opt out, and directs consumers to a "long" notice that complies in full with this section.

3.   DECEPTIVE OFFERS

This section does not limit federal or state enforcement against unfair or deceptive practices in prescreened offers. For example, a solicitation may not tell consumers they are "pre-approved" when in fact the creditor or insurer re-evaluates consumers who respond to the solicitation. Similarly, a creditor's phone representatives may not falsely state that they are representing the consumer's existing creditor, or that an existing creditor has referred their application.

**Section 615(e)** requires the Commission and the Federal financial agencies to issue guidelines and regulations for financial institutions and certain creditors, regarding identity theft with respect to customers of such entities.

1.  IMPLEMENTING RULES

The Commission and the Federal financial agencies issued rules to implement this provision (16 CFR 681.2-.3). See 72 Fed. Reg. 63718, 63772-73 (Nov. 9, 2007)

**Section 615(f)** generally prohibits the sale, transfer, or placement for collection of a debt that the creditor has been notified pursuant to section 605B may be the result of identity theft.

**Section 615(g)** requires debt collectors handling accounts for a creditor, when notified that an obligation may be the result of fraud or identity theft, to (1) so notify the creditor and (2) upon request by the consumer, furnish application and transaction records information to which a consumer who was "not a victim of identity theft" would be entitled.

1.  RELATION TO OTHER SECTIONS

Section 609(e) provides, among other things, that identity theft victims have a right to receive, free of charge, application and transaction records (e.g., invoices, credit applications, or account statements) associated with the fraudulent use of their accounts, from any business that dealt with an alleged identity thief. This section provides a parallel right with respect to debt collectors.

2.  RELATION TO FAIR DEBT COLLECTION PRACTICES ACT (FDCPA)

Section 809(g) of the FDCPA ("Validation of Debts") permits consumers who are contacted by a debt collector about a debt to require the collector to provide written notice with specified information to the consumer before attempting to collect the debt. Section 615(g) provides that, in the case of an obligation fraudulently incurred in the name of the consumer, the identity theft victim can require a debt collector to provide that same information as would have been required by the FDCPA (i.e., to which the consumer would be entitled if he or she was "not a victim of identity theft") or similar state law.

**Section 615(h)** requires what is commonly called a "risk-based pricing notice" in credit transactions. It provides that "if any person uses a consumer report in connection with an application for, or a grant, extension, or other provision of, credit on material terms that are materially less favorable than the most favorable terms available to a substantial proportion of consumers from or through that person, based in whole or in part on a consumer report, the person shall provide an oral, written, or electronic notice" that so informs the consumer, and provides identifying and contact information on the CRA that provided the report. Effective July 21, 2011, the party providing the risk-based pricing notice must also disclose any numerical credit score that contributed to the adverse action, along with certain related information. This section required the Commission and the Federal Reserve Board to jointly prescribe rules implementing the provision. Starting July 21, 2011, the Bureau assumes rulemaking authority under this section.

1.   IMPLEMENTING RULES

The Commission and the Board issued regulations to implement this provision (16 CFR 640, 16 CFR 698 App. B). See 75 Fed. Reg. 2724 (Jan. 15, 2010); 76 Fed. Reg. 41602 (July 15, 2011).

## Sections 616-617 – Civil Liability for Negligent or Willful Noncompliance
**15 USC 1681n - 15 USC 1681o**

Sections 616 and 617 impose liability for willful noncompliance and negligent noncompliance, respectively. The monetary penalties mandated by these two sections include actual damages proven by a consumer or a CRA, plus costs and attorneys fees. In the case of willful violations, the court may also award punitive damages to a consumer.

## Section 618 – Jurisdiction of Courts; Limitation of Actions
**15 USC 1681p**

Section 618 allows civil actions to be brought in any court of competent jurisdiction not later than the earlier of (1) two years after the date of discovery by the plaintiff of the violation or (2) five years after the date on which the violation occurred.

## Section 619 – Obtaining Information Under False Pretenses
**15 USC 1681q**

Section 619 provides criminal sanctions against any person who knowingly and willfully obtains information about a consumer from a CRA under false pretenses.

## Section 620 – Unauthorized Disclosures by Officers or Employees
**15 USC 1681r**

Section 620 provides criminal sanctions against any officer or employee of a CRA who knowingly and willfully provides information concerning an individual from the agency's file to a person not authorized to receive it.

## Section 621 – Administrative Enforcement
**15 USC 1681s**

**Section 621(a)(1)** gives the Commission authority to enforce the FCRA with respect to CRAs, users of reports, furnishers of information to CRAs, and all others, except to the extent that **section 621(b)** provides otherwise, and subject to coordination with the Bureau pursuant to subtitle B of the Consumer Financial Protection Act of 2010.

1.   THE COMMISSION'S JURISDICTION

The Commission may use its cease-and-desist power and other procedural, investigative, and enforcement powers under the FTC Act to secure compliance with the FCRA, irrespective of any jurisdictional tests in the FTC Act. For example, even though the FTC Act excludes nonprofit organizations from the FTC's jurisdiction, the Commission could take enforcement action against a nonprofit organization for a violation of the FCRA. In addition, under general principles of constitutional law, the Commission's jurisdiction to enforce FCRA violations extends to activities conducted in the United States or affecting consumers in the United States.[295]

**Section 621(a)(2)** gives the Commission authority to seek civil penalties for violations of the FCRA in an amount not more than $2,500 per violation, "except as otherwise provided by subtitle B of the Consumer Financial Protection Act of 2010" (titled "General Powers of the Bureau"). In setting a civil penalty amount, it requires a court to consider "the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require."

1.   GENERAL

Section 621 governs FCRA enforcement actions brought by the Commission, other federal agencies, and the states, and provides for various monetary and injunctive penalties.

2.   CIVIL PENALTIES

At the time of enactment in 1996, this provision allowed the Commission to seek monetary penalties for knowing FCRA violations of up to $2,500 per violation in a civil action brought in federal district court.[296] Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the Commission subsequently increased the maximum civil penalty to $3,500 per violation. See 74 Fed. Reg. 857 (Jan. 9, 2009).

**Section 621(a)(3)** states that a court may not impose a civil penalty for a violation of section 623(a)(1) against any furnisher of information, unless the Commission has obtained an injunction against the furnisher, and the furnisher later violates the injunction.

**Section 621(b)** assigns FCRA jurisdiction to other federal agencies that regulate certain financial institutions, common carriers, air carriers, and certain other businesses in the agricultural, commodities, and securities industries. (Subtitle B of the Consumer Financial Protection Act of 2010 provides for cooperation among the Bureau and such agencies.) **Section 621(c)** allows states to enforce the FCRA, with certain specified limitations.

**Section 621(d)** gives agencies other than the FTC the power to enforce the FCRA in the same manner that they would enforce other laws within their jurisdiction.

**Section 621(e)** provides the Bureau with authority to prescribe regulations under the FCRA, "except with respect to sections 615(e) and 628."

1.   RULEMAKING AUTHORITY

This subsection confers general FCRA rulemaking authority on the Bureau, even as to entities over which FCRA enforcement is assigned to or concurrent with another agency. Several provisions in the FACT Act, and sections of the FCRA added by the FACT Act, directed the Commission and other agencies to promulgate rules in specific areas. After July 21, 2011, the Bureau will assume rulemaking authority under the FCRA except for the "red flags" and "disposal" rules assigned to the Commission and other federal agencies by sections 615(e) and 628 (respectively) of the FCRA, and to the Commission for the motor vehicle sales industry by section 1029 of the Consumer Financial Protection Act of 2010.

**Section 621(f)** provides for coordination of consumer complaints relating to identity theft among creditors, nationwide CRAs, the Commission, and Federal financial agencies. It required the Commission (in consultation with the Federal financial agencies) to develop model forms and procedures for identity theft victims to contact CRAs and creditors. Starting July 21, 2011, the Bureau will assume responsibility for these functions.

1.   FORMS AND PROCEDURES FOR IDENTITY THEFT VICTIMS

The Commission published forms and procedures for identity theft victims, as required by this provision. See 70 Fed. Reg. 21792 (Apr. 27, 2005).

**Section 621(g)** permits, but does not require, the Commission to issue guidance with respect to the identification of furnishers of medical information under Section 623(a)(9). Starting July 21, 2011, the Bureau will assume responsibility for the guidance permitted by this section.

1.   RELATION TO OTHER SECTIONS

Section 604(g)(1) allows CRAs to report information about debts arising from the receipt of medical services, products, or devices only where the identity of the furnisher is coded to avoid identifying the provider and nature of the transaction. Section 605(a)(6)(A) describes the coding requirements for the reporting of names, addresses and phone numbers of medical information furnishers. Section 623(a)(9) requires medical information furnishers to disclose their status if they report information to CRAs.

| Section 622 – Information on Overdue Child Support Obligations | 15 USC 1681s-1 |
|---|---|

Section 622 requires CRAs to include certain information on overdue child support obligations in consumer reports they provide to those with a permissible purpose.

## Section 623 – Duties of Furnishers of Information to CRAs    15 USC 1681s-2

**Section 623(a)(1)(A)** prohibits furnishing information to any CRA if the furnisher "knows or has reasonable cause to believe that the information is inaccurate." However, **section 623(a)(1)(C)** provides a safe harbor if the furnisher clearly and conspicuously specifies an address where consumers can send disputes concerning the accuracy of information about them.

1.  GENERAL

    Persons may furnish information concerning their transactions with consumers to CRAs and others, and CRAs may gather information, without consumers' permission and over their objection.

2.  FURNISHER ADDRESS FOR DISPUTING INFORMATION

    An address specification is effective only if the furnisher "clearly and conspicuously" communicates the address to consumers. For example, the furnisher could mail a letter to the most recent address supplied by the consumer, consisting solely of information about where consumers should send dispute notices. A creditor that provides regular billing statements may include the address in such statements.

**Section 623(a)(2)** provides, "A person who (A) regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about the person's transactions or experiences with any consumer; and (B) has furnished to a consumer reporting agency information that the person determines is not complete or accurate, shall promptly notify the consumer reporting agency of that determination and provide to the agency any corrections to that information, or any additional information, that is necessary to make the information provided by the person to the agency complete and accurate, and shall not thereafter furnish to the agency any of the information that remains not complete or accurate."

1.  RELATION TO OTHER SECTIONS

    Section 623(e) required the Federal financial agencies and the Commission to issue guidelines and regulations on the "accuracy and integrity" of information supplied to CRAs, which they published in 2009. See comment 623(e)-1. Starting July 21, 2011, the Bureau assumes this rulemaking authority.

2.  CESSATION OF RELATIONSHIP WITH CRA

    If a furnisher of information to a CRA determines that previously provided information "is not complete or accurate," it must "promptly notify" the CRA and provide anything needed to make the information complete and accurate. This obligation applies even when a furnisher no longer has a contractual relationship with the CRA to which it originally furnished information.[297]

**Section 623(a)(3)** provides, "If the completeness or accuracy of any information furnished by any person to any consumer reporting agency is disputed to such

person by a consumer, the person may not furnish the information to any consumer reporting agency without notice that such information is disputed by the consumer."

1. RELATION TO OTHER SECTIONS

Section 623(a)(8) allows consumers to dispute items directly with furnishers, in accord with rules that this section required the Commission and the Federal financial agencies to establish. See comment 623(a)(8)-1. Starting July 21, 2011, the Bureau assumes that rulemaking authority.

2. GENERAL

This section provides that, when a consumer disputes the completeness or accuracy of any information furnished to a CRA, the furnisher may not furnish the information in question to the CRA without notice that it is disputed by the consumer. It addresses the furnisher's obligation only when the furnisher continues to report disputed information. The furnisher may choose to temporarily cease reporting the disputed information while it investigates the matter. After the investigation, the furnisher may either (1) correct the information or (2) report the item as disputed by the consumer.[298]

**Section 623(a)(4)** provides, "A person who regularly and in the ordinary course of business furnishes information to a consumer reporting agency regarding a consumer who has a credit account with that person shall notify the agency of the voluntary closure of the account by the consumer, in information regularly furnished for the period in which the account is closed."

**Section 623(a)(5)(A)** provides, "A person who furnishes information to a consumer reporting agency regarding a delinquent account being placed for collection, charged to profit or loss, or subjected to any similar action shall, not later than 90 days after furnishing the information, notify the agency of the date of delinquency on the account, which shall be the month and year of the commencement of the delinquency on the account that immediately preceded the action."

1. RELATION TO OTHER SECTIONS

Section 605(c)(1) requires a CRA receiving collection, chargeoff, or similar information about an account to use the same date set forth in this section to calculate the date when the CRA may no longer report the delinquency because the information is obsolete.

2. GENERAL

Furnishers of consumer information to CRAs must provide the month and year of the commencement of the delinquency that immediately preceded placement for collection, charge to profit or loss, or similar action. They may not substitute an alternate, later date such as a "paid-to-date" denoting the due date of the last paid periodic installment.[299] The month and year of the commencement of the delinquency that immediately preceded the chargeoff is the month the first payment was missed, regardless of how long after delinquency the creditor waits to report the chargeoff to the CRA.[300]

3.   "COMMENCEMENT OF DELINQUENCY" AS FIRM DATE

The "commencement of delinquency" date is not changed where an account is in arrears and the consumer makes a later payment, but does not bring the account up to date.[301] Neither sale of the account by the creditor, nor a payment on or dispute about the account by the consumer, changes the allowable period for a CRA to report a chargeoff because the commencement of the delinquency remains the same.[302]

4.   "SIMILAR ACTION"

Section 623(a)(5), which applies to an account placed for collection, charged to profit or loss, "or subjected to any similar action," would apply, for example, where a vehicle has been "repossessed" or "voluntarily repossessed."[303]

**Section 623(a)(5)(B)** provides a "rule of construction" for the "commencement of delinquency" that applies in certain circumstances to credit account information on delinquent accounts supplied by a furnisher, provided that the consumer has not disputed the information. In such cases, the furnisher complies (1) if the creditor to which the account was owed at the time when the commencement of the delinquency occurred previously reported a date of delinquency ("DoD") to a CRA, and the furnisher reports that date to the CRA as the DoD, (2) if the previous creditor did not report the DoD to a CRA, and the furnisher follows reasonable procedures to obtain the DoD from the creditor or other reliable source and reports that date to the CRA as the DoD; or (3) if the previous creditor did not report the DoD to a CRA and the DoD cannot be reasonably obtained, and the furnisher follows reasonable procedures to ensure the DoD it reports to the CRA precedes the date on which the account is placed for collection, charged to profit or loss, or subjected to any similar action.

1.   RULE OF CONSTRUCTION

If the date of delinquency has been provided to a CRA by the creditor to whom the debt was owed when the account became delinquent (scenario 1 in this section), any subsequent furnisher must report that date and may not use the alternatives set forth in scenarios 2 or 3, regardless of whether the prior creditor has supplied that information to the furnisher. The other options (scenarios 2 and 3) apply only where no prior date of delinquency had been reported.

**Section 623(a)(6)** requires furnishers to have reasonable procedures to respond to any notification that they receive from a CRA about an identity theft "block," and to prevent refurnishing such "blocked" information. It also states that after a consumer has submitted an identity theft report "at the address specified by (the furnisher) for receiving such reports," the furnisher may not report such information to a CRA unless it "subsequently knows or is informed by the consumer that the information is correct."

1.   RELATION TO OTHER SECTIONS

The terms "identity theft" and "identity theft report" are defined in sections 603(q)(3) and(4), and by Commission rules cited in comment 603(q)-2. (Starting July 21, 2011, the Bureau assumes that rulemaking authority.) Section 605B concerns CRA "blocking" of information resulting from identity theft.

2.   ADDRESS FOR RECEIVING IDENTITY THEFT REPORTS

A furnisher may "specify" an address for receiving identity theft reports by clearly and conspicuously advising the consumer of the address in writing, or electronically if the consumer has agreed to the electronic delivery of information from the furnisher. If the furnisher has not specified such an address, the furnisher must block the information if the consumer conveys the report to the furnisher's regular address for consumer correspondence.

**Section 623(a)(7)** requires a "financial institution" that regularly reports negative information to nationwide CRAs to provide one clear and conspicuous written notice of that practice to consumers, no later than 30 days after first reporting such information. After providing the notice, the furnisher may provide further negative information "with respect to the same transaction, extension of credit, account, or customer without providing additional notice to the customer." The Federal Reserve Board was assigned to provide a brief model form for this purpose. Starting July 21, 2011, the Bureau will assume that authority.

1.   RELATION TO OTHER SECTIONS

This requirement applies to a "financial institution" as defined by the Gramm-Leach-Bliley Act, 15 U.S.C. § 6809, not a "financial institution" as defined in section 603(t) for other FCRA purposes.

2.   MODEL FORMS

The Board has published model forms (12 CFR 222, App. B). See 69 Fed. Reg. 33281 (June 15, 2004).

**Section 623(a)(8)** allows consumers to directly dispute with furnishers the accuracy of information supplied to CRAs, in accord with rules required to be promulgated by the Commission and Federal financial agencies. (Starting July 21, 2011, the Bureau will assume rulemaking authority under this section.) It requires the furnisher to investigate good faith disputes, considering "all relevant information" submitted by the consumer. If the investigation shows that the information was inaccurate, the furnisher is required to promptly notify each CRA to which it reported the information, and provide to the CRA any correction necessary to make the information accurate.

1.   IMPLEMENTING REGULATIONS

The Commission and the Federal financial agencies issued the rules required to implement this provision. The Commission rule is codified at 16 CFR Parts 660.4. See 74 Fed. Reg. 31484, 31525-27 (July 1, 2009).

**Section 623(a)(9)** requires an entity whose principal business is "providing medical services, products, or devices," that furnishes consumer information to a CRA, to notify the CRA that it is a "medical information furnisher" for FCRA purposes.

**Section 623(b)** requires that a furnisher that receives a dispute notice from a CRA must investigate the disputed information, review all relevant information provided by the CRA, and report the results of the investigation to the CRA. If the furnisher finds that the information is incomplete or inaccurate, it must report those results to all nationwide CRAs to which it furnished the information. If it finds that the disputed information is inaccurate or incomplete, or cannot be verified, it must modify, delete, or permanently block that item of information (for purposes of reporting to CRAs) before the expiration of the period specified by section 611(a)(1).

1. GENERAL

   Once a CRA notifies a furnisher that a consumer disputes the completeness or accuracy of the furnisher's information, the furnisher is required to conduct an investigation of the disputed information, review all relevant information provided by the CRA, and report its findings to the CRA (and to other CRAs if it finds the data to be inaccurate or incomplete).[304] The obligation to investigate under this section is triggered by the receipt of a notification from a CRA; the furnisher may not require a separate written request from the consumer before conducting the required investigation.[305]

2. NATURE OF INVESTIGATION

   The furnisher's investigation must be reasonable under the circumstances. It may be either simple or complex, depending on the nature of the dispute. See comment 611(a)-2, discussing CRA dispute investigations. Unless the furnisher is able to confirm the disputed item of information, it must cease reporting it.

**Section 623(c)** provides that sections 616-617 (which allow individual actions for violations of most provisions of the FCRA) do not apply to violations of section 623(a)&(e) (furnishers providing accurate information to CRAs) or 615(e) ("red flags" rules). **Section 623(d)** provides that those sections "shall be enforced exclusively by the federal agencies and officials and the State officials identified in section 621."

**Section 623(e)** assigned the Commission and Federal financial agencies responsibility for promulgation of guidelines and regulations regarding the accuracy and integrity of information provided to CRAs. Starting July 21, 2011, the Bureau will assume rulemaking authority under this section.

96

1.   IMPLEMENTING REGULATIONS

The Commission and the Federal financial agencies issued the rules required to implement this provision. The Commission rule is codified at 16 CFR Parts 660.3 and the Appendix to that Part. See 74 Fed. Reg. 31484, 31525-27 (July 1, 2009).

## Section 624 – Affiliate Marketing                                        15 USC 1681s-3

Section 624 provides consumers the right to "opt out" of affiliates' marketing solicitations. There are exceptions for situations where there is a pre-existing business relationship or a consumer-initiated communication, among others. Section 214(b) of the FACT Act, which is not part of the FCRA, required the Commission and Federal financial agencies to prescribe rules to implement this provision. Starting July 21, 2011, the Bureau, the Commodities Futures Trading Commission, and the Securities and Exchange Commission will assume rulemaking authority under this section.

1.   IMPLEMENTING RULES

The Commission and the Federal financial agencies issued rules required to implement this provision. The Commission rule is codified at 16 CFR Parts 680 and 698 (Appendix C). See 72 Fed. Reg. 61424, 61455-64 (Oct. 30, 2007). The other agencies' rules are codified at 12 CFR Parts 41.3, 222.3, 334.3, 571.3, 717.3; 70 Fed. Reg. 70664, 70675-96 (Nov. 22, 2005).

## Section 625 – Relation to State Laws                                     15 USC 1681t

**Section 625(a)** sets forth a general rule that the FCRA preempts state law only to the extent that those laws are inconsistent with the FCRA. Sections **625(b) and (c)** then prohibit or limit state law in specified areas, in some cases specifically "grandfathering" specified state laws that were in effect before the relevant FCRA provisions were enacted.

## Section 626 –                                                            15 USC 1681u
## Disclosures to FBI for Counterintelligence Purposes

Section 626 requires CRAs to provide consumer reports or specific information in their files when a certain supervisory official of the Federal Bureau of Investigation certifies in writing that the report or information "is sought for the conduct of an authorized investigation to protect against international terrorism or clandestine intelligence activities …." It states that the CRA (and its personnel) may not disclose "in any consumer report, that the FBI has sought or obtained" such information or report.

97

## Section 627 –               15 USC 1681v
## Disclosures to Governmental Agencies for Counterterrorism Purposes

Section 627 provides for CRAs to provide all information in their files "to a government agency authorized to conduct investigations of, or intelligence or counterintelligence activities or analysis related to, international terrorism when presented with a written certification by [a certain supervisory level official of] such government agency that such information is necessary for the agency's conduct or such investigation, activity or analysis." It states that the CRA (and its personnel) may not "disclose to any person, or specify in any consumer report, that a government agency has sought or obtained access to information" under this provision.

## Section 628 – Disposal of Records        15 USC 1681w

Section 628 directs the Commission and other federal agencies to prescribe regulations "requiring any person that maintains or otherwise possesses consumer information, or any compilation of consumer information, derived from consumer reports for a business purpose to properly dispose of any such information or compilation."

   1.   IMPLEMENTING RULES

> The Commission has issued the required rules on the proper disposal of consumer report information by entities under its jurisdiction (16 CFR 682). See 69 Fed. Reg. 68690, 68697 (Nov. 24, 2004)

## Section 629 –               15 USC 1681x
## Corporate and Technological Circumvention Prohibited

Section 629 required the Commission to "prescribe regulations to prevent a consumer reporting agency from circumventing or evading treatment" as a nationwide CRA. Starting July 21, 2011, the Bureau will assume rulemaking authority under this section.

   1.   IMPLEMENTING RULES

> The Commission issued rules prohibiting CRAs, including newly-formed firms, from evading treatment as a nationwide CRA (16 CFR 611), as required by the provision. See 69 Fed. Reg. 29061, 29063 (May 20, 2004) and 69 Fed. Reg. 8532, 8533 (Feb. 24, 2004).

# 1990 COMMENTS NOT INCORPORATED INTO 2011 SUMMARY

| | |
|---|---|
| Comment 603(b)-1 | Redundant. |
| Comment 603(c)-1 | Redundant. |
| Comment 603(d)-3C | Staff Summary adopts different analysis, now discussed in 604(a)(3)(A)-5. |
| Comment 603(d)-4B | Staff Summary adopts different analysis, now discussed in 603(d)-5A. |
| Comment 603(d)-4C | Staff Summary adopts different analysis, now discussed in 603(f)-5B. |
| Comment 603(d)-6B | Staff Summary adopts different analysis, now discussed in 604(a)(3)(A)-5. |
| Comment 603(e)-5 | Redundant. |
| Comment 603(f)-4 | Statutory amendment. |
| Comment 603(f)-6 | Redundant. |
| Comment 603(f)-8 | Staff Summary adopts different analysis, now discussed in 603(f)-4. |
| Comment 603(f)-10 | Staff Summary adopts different analysis, now discussed in 603(f)-5B. |
| Comments 603(i)-1, 2 | Statutory amendment. |
| Comments 604-1A, B, C | Redundant. |
| Comments 604(3)(A)-2 , 3, 4 | Statutory amendment. |
| Comment 604(3)(A)-6 | Statutory amendment. |
| Comment 604(3)(A)-8 | Staff Summary adopts different analysis, now discussed in 603(d)-5A. |
| Comment 604(3)(B)-2 | Redundant. |
| Comment 604(3)(E)-3 | Redundant. |
| Comment 605(a)(1)-1 | Statutory amendment. |
| Comment 605(a)(1)-2 | Redundant. |
| Comment 605(a)(4)-3 | Statutory amendment. |
| Comment 605(a)(5)-1 | Statutory amendment. |
| Comment 605-6 | Redundant. |
| Comments 606-3 | Redundant. |
| Comment 606-4 | Statutory amendment. |
| Comment 607-2F | Obsolete. |
| Comment 607-3C | Obsolete. |
| Comment 607-3D | Redundant. |
| Comment 607-3E | Obsolete. |
| Comment 607-4 | Redundant. |
| Comment 607-5 | Obsolete. |
| Comments 609-2, 3 | Statutory amendment. |
| Comment 609-5 | Obsolete. |
| Comment 609-6 | Statutory amendment. |
| Comment 609-8 | Redundant. |
| Comment 609-12 | Statutory amendment. |
| Comment 610-1 | Statutory amendment. |
| Comment 610-3 | Statutory amendment. |
| Comment 610-5 | Statutory amendment. |
| Comment 610-6 | Not relevant to Commission FCRA enforcement. |
| Comment 611-10 | Statutory amendment. |
| Comment 611-12 | Statutory amendment. |
| Comment 612-1 | Statutory amendment. |
| Comment 612-2 | Statutory amendment. |
| Comment 615-7 | Redundant. |
| Comment 615-3 | Statutory amendment. |
| Comment 615-8 | Statutory amendment. |
| Comment 615-10 | Statutory amendment. |
| Comment 615-12 | Obsolete. |
| Comment 619-1 | Redundant. |
| Comments 621-1, 2, 3, 4 | Not relevant to Commission FCRA enforcement. |

# ENDNOTES

1.  1990 Commentary on the Fair Credit Reporting Act, Appendix to Part 600, comment 603(b)-2 (cited herein as "1990 comment").

2.  1990 comment 603(c)-2.

3.  1990 comment 603(d)-1.

4.  Goeke, FTC Informal Staff Opinion Letter, June 9, 1998; Lewis, FTC Informal Staff Opinion Letter, June 11, 1998.

5.  Previously section 603(x). Redesignated section 603(y) effective July 21, 2011. See Public Law 111-203, §1088(a)(1)(A).

6.  1990 comment 603(d)-5C.

7.  1990 comment 603(d)-3A.

8.  1990 comment 603(d)-3B.

9.  1990 comment 603(d)-2.

10. Tatelbaum, FTC Informal Staff Opinion Letter, July 26, 2000.

11. 1990 comment 603(d)-4A.

12. 1990 comment 603(d)-4D.

13. 1990 comment 603(d)-4F.

14. 1990 comment 603(d)-5B.

15. 1990 comment 603(d)-4E.

16. 1990 comment 603(d)-4G.

17. Islinger, FTC Informal Staff Opinion Letter, June 9, 1998; Poquette, FTC Informal Staff Opinion Letter, June 9, 1998; Lewis, FTC Informal Staff Opinion Letter, June 11, 1998; Halpern, FTC Informal Staff Opinion Letter, June 11, 1998.

18. Slyter, FTC Informal Staff Opinion Letter, June 12, 1998; Pickett, FTC Informal Staff Opinion Letter, July 10, 1998.

19. Beaudette, FTC Informal Staff Opinion Letter, June 9, 1998.

20. Leathers, FTC Informal Staff Opinion Letter, Sept. 9, 1998; Hinkle, FTC Informal Staff Opinion Letter, July 9, 1998.

21. 1990 comment 603(d)-5A; 1973 Commission Interpretation #2.

22. 1990 comment 603(d)-5D.

23. 1990 comment 603(d)-6A.

24. 1990 comment 603(d)-6C.

25. 1990 comment 603(d)-6D.

26. 1990 comment 603(d)-6F.

27. 1990 comments 603(d)-7A(1) and 603(d)-7A(3).

28. Islinger, FTC Informal Staff Opinion Letter, June 9, 1998.

29. Hinkle, FTC Informal Staff Opinion Letter, July 9, 1998; Pickett, FTC Informal Staff Opinion Letter, July 10, 1998.

30. Novak, FTC Informal Staff Opinion Letter, Sept. 9, 1998.

31. 1990 comment 603(d)-7A(2).

32. Novak, FTC Informal Staff Opinion Letter, Sept. 9, 1998.

33. 1990 comment 603(d)-7B(1).

34. 1990 comment 603(d)-7C(1); Kelley, FTC Informal Staff Opinion Letter, July 16, 1998.

35. 1990 comment 603(d)-7C(2).

36. 1990 comment 603(d)-7C(3).

37.   1990 comment 603(e)-1.

38.   1990 comment 603(e)-2.

39.   1990 comment 603(e)-4.

40.   1990 comment 603(e)-3.

41.   1990 comment 603(e)-7.

42.   Hinkle, FTC Informal Staff Opinion Letter, July 9, 1998; Willner, FTC Informal Staff Opinion Letter, March 25, 1999; Beaudette, FTC Informal Staff Opinion Letter, June 9, 1998.

43.   Hinkle, FTC Informal Staff Opinion Letter, July 9, 1998.

44.   1990 comment 603(e)-6.

45.   1990 comment 603(f)-1A.

46.   1990 comment 603(f)-1B.

47.   1990 comment 603(f)-9; 1973 Commission Interpretation #3.

48.   1990 comment 603(f)-12.

49.   1990 comment 603(f)-2.

50.   In the matter of First American Real Estate Solutions, LLC ("Credco"), FTC File No. 952 3267 (Oct. 28, 1998).

51.   Le Blanc, FTC Informal Staff Opinion Letter, June 9, 1998.

52.   Lee, FTC Informal Staff Opinion Letter, June 28, 1998.

53.   Islinger, FTC Informal Staff Opinion Letter, June 9, 1998; Lewis, FTC Informal Staff Opinion Letter, June 11, 1998.

54.   Cast, FTC Informal Staff Opinion Letter, Oct. 27, 1997.

55.   Credco, FTC File No. 952 3267.

56.   Leathers, FTC Informal Staff Opinion Letter, Sept. 9, 1998.

57.   Sum, FTC Informal Staff Opinion Letter, Sept. 15, 1999.

58.   1990 comment 603(f)-3.

59.   Cast, FTC Informal Staff Opinion Letter, Oct. 27, 1997.

60.   LeBlanc, FTC Informal Staff Opinion Letter, June 9, 1998.

61.   1990 comment 603(f)-7.

62.   1990 comment 603(f)-11; 1973 Commission Interpretation #6.

63.   Copple, FTC Informal Staff Opinion Letter, June 10, 1998; Pickett, FTC Informal Staff Opinion Letter, July 10, 1998.

64.   Goeke, FTC Informal Staff Opinion Letter, June 9, 1998.

65.   1990 comment 603(f)-5.

66.   1990 comment 603(g)-1.

67.   1990 comment 603(g)-2.

68.   Cohan, FTC Informal Staff Opinion Letter, Aug. 1, 2000.

69.   1990 comments 603(g)-3 and 603-4.

70.   1990 comment 603(h)-1.

71.   See Hoke v. Retail Credit Corp., 521 F.2d 1079, 1082 (4th Cir. 1975), cert. denied, 423 U.S. 1087 (1976).

72.   Allison, FTC Informal Staff Opinion Letter, Feb. 23, 1998.

73.   Solomon, FTC Informal Staff Opinion Letter, Oct. 27, 1998.

74.   See Hoke, 521 F.2d at 1082; see also Allison, FTC Informal Staff Opinion Letter, Feb. 23, 1998; Solomon, FTC Informal Staff Opinion Letter, Oct. 27, 1998.

75.   1990 comment 603(h)-2G.

76.   Latour, FTC Informal Staff Opinion Letter, June 28, 2001.

77.   Latour, FTC Informal Staff Opinion Letter, June 28, 2001.

78.   Stinneford, FTC Informal Staff Opinion Letter, July 14, 2000.

79. Gowen, FTC Informal Staff Opinion Letter, April 29, 1999.

80. Schieber, FTC Informal Staff Opinion Letter, March 3, 1998; Hall, FTC Informal Staff Opinion Letter, Oct. 26, 1998.

81. Vail, FTC Informal Staff Opinion Letter, April 5, 1999.

82. Greathouse FTC Informal Staff Opinion Letter, Oct. 20, 1998.

83. Spritz, FTC Informal Staff Opinion Letter, Nov. 5, 1998.

84. Everson, FTC Informal Staff Opinion Letter, July 28, 1998.

85. See Cole v. U.S. Capital, Inc., 389 F.3d 719 (7th Cir. 2004); Murray v. New Cingular Wireless, 523 F.3d 719 (7th Cir. 2008).

86. Gowen, FTC Informal Staff Opinion Letter, April 29, 1999.

87. Basting, FTC Informal Staff Opinion Letter, June 11, 1998.

88. Basting, FTC Informal Staff Opinion Letter, June 11, 1998.

89. Cohan, FTC Informal Staff Opinion Letter, June 29, 1999.

90. Sections 603(x) and (y) are redesignated sections 603(w) and (x), respectively, effective July 21, 2011. See Public Law 111-203, §1088(a)(1)(A).

91. 1990 comment 604-1.

92. 1990 comment 604-2A.

93. 1990 comment 604-2A.

94. 1990 comment 604-2B.

95. 1990 comment 604G-1.

96. 1990 comment 604(2)-2.

97. 1990 comment 604(3)(E)-6A.

98. 1990 comment 604(3)(E)-6B.

99. 1990 comment 604(3)(E)-6C.

100. 1990 comment 604(3)(E)-6D.

101. 1990 comment 604(3)(E)-6E.

102. 1990 comment 604(3)(E)-5.

103. Shibley, FTC Informal Staff Opinion Letter, June 8, 1999.

104. 1990 comment 604(3)(E)-4.

105. 1990 comment 604G-2.

106. 1990 comment 604G-3.

107. 1990 comment 604(1)-1.

108. 1990 comment 604(1)-2.

109. 1990 comment 604(2)-1.

110. Shibley, FTC Informal Staff Opinion Letter, June 8, 1999.

111. Landever, FTC Informal Staff Opinion Letter, Oct. 12, 1999.

112. Zalenski, FTC Informal Staff Opinion Letter, May 24, 2001.

113. Landever, FTC Informal Staff Opinion Letter, Oct. 12, 1999.

114. 1990 comment 604(3)(A)-7.

115. 1990 comment 604(3)(E)-6B.

116. 1990 comment 604(3)(A)-5A.

117. 1990 comment 604(3)(A)-5B.

118. Gowen, FTC Informal Staff Opinion Letter, April 29, 1999.

119. 1990 comment 604(3)(A)-1A.

120. 1990 comment 604(3)(E)-6E.

121. 1990 comment 604(3)(A)-9.

122.    Gowen, FTC Informal Staff Opinion Letter, April 29, 1999; Benner, FTC Informal Staff Opinion Letter, April 30, 1999.

123.    Benner, FTC Informal Staff Opinion Letter, April 30, 1999.

124.    1990 comment 604(3)(A)-1B.

125.    Coffey, FTC Informal Staff Opinion Letter, Feb. 11, 1998.

126.    1990 comment 604(3)(A)-4.

127.    Tatelbaum 1, FTC Informal Staff Opinion Letter, July 26, 2000; Tatelbaum 2, FTC Informal Staff Opinion Letter, June 22, 2001.

128.    1990 comment 604(3)(B)-1.

129.    1990 comment 604(3)(B)-3.

130.    1990 comment 604(3)(C)-1.

131.    Ball, FTC Informal Staff Opinion Letter, March 1, 2000.

132.    1990 comment 604(3)(C)-2; Greathouse, FTC Informal Staff Opinion Letter, Oct. 29, 1998.

133.    1990 comment 604(3)(D)-1.

134.    1990 comment 604(3)(D)-3.

135.    Greathouse, FTC Informal Staff Opinion Letter, Oct. 29, 1998.

136.    1990 comment 604(3)(D)-2.

137.    1990 comment 604(3)(E)-1.

138.    1990 comment 604(3)(E)-2.

139.    1990 comment 604(3)(E)-3.

140.    Greenblatt, FTC Informal Staff Opinion Letter, Oct. 27, 1998.

141.    Kaiser, FTC Informal Staff Opinion Letter, July 16, 1998; Coffey, FTC Informal Staff Opinion Letter, Feb. 11, 1998.

142.    1990 comment 604(3)(E)-4.

143.    1990 comment 604(3)(E)-4.

144.    1990 comment 604(3)(E)-4.

145.    Coffey, FTC Informal Staff Opinion Letter, Feb. 11, 1998.

146.    Kaiser, FTC Informal Staff Opinion Letter, July 16, 1998; Coffey, FTC Informal Staff Opinion Letter, Feb. 11, 1998.

147.    Gowen, FTC Informal Staff Opinion Letter, April 29, 1999.

148.    Gowen, FTC Informal Staff Opinion Letter, April 29, 1999; Benner, FTC Informal Staff Opinion Letter, April 30, 1999.

149.    Baughn, FTC Informal Staff Opinion Letter, April 30, 1999.

150.    Beaudette, FTC Informal Staff Opinion Letter, June 9, 1998; Slyter, FTC Informal Staff Opinion Letter, June 12, 1998.

151.    Pickett, FTC Informal Staff Opinion Letter, July 10, 1998.

152.    Beaudette, FTC Informal Staff Opinion Letter, June 9, 1998.

153.    Hawkey, FTC Informal Staff Opinion Letter, Dec. 18, 1997.

154.    Slyter, FTC Informal Staff Opinion Letter, June 12, 1998.

155.    Beaudette, FTC Informal Staff Opinion Letter, June 9, 1998.

156.    Coffey, FTC Informal Staff Opinion Letter, Feb. 11, 1998.

157.    Steer, FTC Informal Staff Opinion Letter, Oct. 21, 1997; Solganik, FTC Informal Staff Opinion Letter, Oct. 23, 1997; Hauxwell, FTC Informal Staff Opinion Letter, June 12, 1998.

158.    Hauxwell, FTC Informal Staff Opinion Letter, June 12, 1998.

159.    Hawkey, FTC Informal Staff Opinion Letter, Dec. 18, 1997.

160.    Willner, FTC Informal Staff Opinion Letter, March 25, 1999.

161.    Hawkey, FTC Informal Staff Opinion Letter, Dec. 18, 1997; Leathers, FTC Informal Staff Opinion Letter,

Sept. 9, 1998; Coffey, FTC Informal Staff Opinion Letter, Feb. 11, 1998.

162.  Brisch, FTC Informal Staff Opinion Letter, June 11, 1998; James, FTC Informal Staff Opinion Letter, Aug. 6, 1998; Hawkey, FTC Informal Staff Opinion Letter, Dec. 18, 1997.

163.  Brisch, FTC Informal Staff Opinion Letter, June 11, 1998; Slyter, FTC Informal Staff Opinion Letter, June 12, 1998.

164.  James, FTC Informal Staff Opinion Letter, Aug. 6, 1998.

165.  Fischel, FTC Informal Staff Opinion Letter, Oct. 1, 1999.

166.  Solganik, FTC Informal Staff Opinion Letter, Oct. 23, 1997.

167.  Weisberg, FTC Informal Staff Opinion Letter, June 27, 1997; Solganik, FTC Informal Staff Opinion Letter, Oct. 23, 1997; Hawkey, FTC Informal Staff Opinion Letter, Dec. 18, 1997.

168.  Weisberg, FTC Informal Staff Opinion Letter, June 27, 1997; Hawkey, FTC Informal Staff Opinion Letter, Dec. 18, 1997; Coffey, FTC Informal Staff Opinion Letter, Feb. 11, 1998; Lewis, FTC Informal Staff Opinion Letter, June 11, 1998.

169.  Rosen, FTC Informal Staff Opinion Letter, June 9, 1998.

170.  Hahn, FTC Informal Staff Opinion Letter, July 8, 1998; Hinkle, FTC Informal Staff Opinion Letter, July 9, 1998; Willner, FTC Informal Staff Opinion Letter, March 25, 1999; Vail, FTC Informal Staff Opinion Letter, April 5, 1999.

171.  Hahn, FTC Informal Staff Opinion Letter, July 8, 1998; Meisinger, FTC Informal Staff Opinion Letter, Aug. 31, 1999.

172.  Leathers, FTC Informal Staff Opinion Letter, Sept. 9, 1998.

173.  Coffey, FTC Informal Staff Opinion Letter, Feb. 11, 1998.

174.  Rosen, FTC Informal Staff Opinion Letter, June 9, 1998.

175.  Rosen, FTC Informal Staff Opinion Letter, June 9, 1998.

176.  1990 comments 605-1 and 605-2.

177.  1990 comment 605-6.

178.  1990 comment 605-4.

179.  1990 comment 605-5.

180.  1990 comment 605-7.

181.  Seham, FTC Informal Staff Opinion Letter, April 17, 1998; Nadell, FTC Informal Staff Opinion Letter, Dec. 10, 1998.

182.  1990 comment 605-3.

183.  1990 comment 605(a)(1)-1.

184.  1990 comment 605(a)(1)-3.

185.  Anonymous, FTC Informal Staff Opinion Letter, Nov. 5, 1999.

186.  1990 comment 605(a)(2)-1.

187.  1990 comment 605(a)(2)-2.

188.  1990 comment 605(a)(3)-1.

189.  1990 comment 605(a)(4)-1.

190.  1990 comment 605(a)(4)-2.

191.  1990 comment 605(a)(6)-1.

192.  1990 comment 605(a)(6)-2.

193.  Nadell, FTC Informal Staff Opinion Letter, Dec. 10, 1998.

194.  1990 comment 605(a)(5)-2.

195.  Halpern, FTC Informal Staff Opinion Letter, June 11, 1998.

196.  Johnson, FTC Informal Staff Opinion Letter, Aug. 31, 1998.

197.  Johnson, FTC Informal Staff Opinion Letter, Aug. 31, 1998.

198.  Kosmerl, FTC Informal Staff Opinion Letter, June 4, 1999; Amason, FTC Informal Staff Opinion Letter,

    Feb. 15, 2000.

199.   Amason, FTC Informal Staff Opinion Letter, Feb. 15, 2000.

200.   Amason, FTC Informal Staff Opinion Letter, Feb. 15, 2000.

201.   1990 comment 606-1.

202.   Willner, FTC Informal Staff Opinion Letter, March 25, 1999.

203.   1990 comment 606-2.

204.   Pickett, FTC Informal Staff Opinion Letter, July 10, 1998.

205.   Hawkey, FTC Informal Staff Opinion Letter, Dec. 18, 1997.

206.   1990 comment 606-5; Brisch, FTC Informal Staff Opinion Letter, June 11, 1998; James, FTC Informal Staff Opinion Letter, Aug. 6, 1998; Hawkey, FTC Informal Staff Opinion Letter, Dec. 18, 1997.

207.   1990 comment 606-6.

208.   1990 comment 606-7.

209.   Willner, FTC Informal Staff Opinion Letter, March 25, 1999.

210.   1990 comment 607-1A.

211.   1990 comment 607-1B.

212.   1990 comment 607-2A; see United States v. ChoicePoint, Inc., No. 1:06cv198 (N.D. Ga. 2006); United States v. Rental Research Services, Inc., No. 0:09-cv-00524 (D. Minn. 2009) .

213.   1990 comment 607-2B.

214.   1990 comment 607-2C.

215.   1990 comment 607-2D.

216.   1990 comment 607-2E; see Settlement One Credit Corp., ACRAnet, Inc., and Fajilan and Associates, Inc., 76 Fed. Reg. 7213 (2011) (proposed consent orders).

217.   1990 comment 607-2G.

218.   Landever, FTC Informal Staff Opinion Letter, Oct. 12, 1999.

219.   Watkins, FTC Informal Staff Opinion Letter, June 24, 1999.

220.   1990 comments 607-3A and 607-3D.

221.   1990 comment 607-6.

222.   1990 comment 607-7.

223.   1990 comment 607-3F/2.

224.   1990 comment 607-3F/1.

225.   Harris, FTC Informal Staff Opinion Letter, March 22, 1999.

226.   1990 comment 607-3F/3.

227.   1990 comments 607-3F/2 and 607-F/6.

228.   Lovern, FTC Informal Staff Opinion Letter, April 24, 1998.

229.   McCorkell, FTC Informal Staff Opinion Letter, June 3, 1999.

230.   1990 comment 607-3C.

231.   See United States v. TALX Corp., No. 4:09-CV-01071 (E.D. Mo. July 9, 2009).

232.   Beaudette, FTC Informal Staff Opinion Letter, June 9, 1998.

233.   1990 comment 608-1.

234.   1990 comment 608-2.

235.   1990 comment 609-1.

236.   1990 comment 609-4.

237.   Cohan, FTC Informal Staff Opinion Letter, Aug. 1, 2000.

238.   Lee, FTC Informal Staff Opinion Letter, June 28, 1998.

239.   1990 comment 609-7.

240.   1990 comment 609-9.

241.   1990 comment 609-10.

242.   1990 comment 609-11.

243.   Cohan, FTC Informal Staff Opinion Letter, Aug. 1, 2000.

244.   Benner, FTC Informal Staff Opinion Letter, April 30, 1999.

245.   1990 comment 609-10.

246.   United States v. Equifax Credit Info. Servs., Inc., No. 1:00-CV-0087 (N.D. Ga. Jan. 13, 2000); FTC v. Experian Mktg. Solutions, Inc., No. 3-00CV0056-L (N.D. Tex. Jan. 13, 2000); United States v. Trans Union LLC, No. 00C 0253 (N.D. Ill. Jan. 13, 2000).

247.   Cohan, FTC Informal Staff Opinion Letter, June 29, 1999.

248.   1990 comment 610-2.

249.   1990 comment 610-4.

250.   1990 comment 611-1.

251.   1990 comment 611-2.

252.   1990 comment 611-5.

253.   1990 comments 611-3 and 612-3.

254.   1990 comment 611-4.

255.   1990 comment 611-6.

256.   Anonymous, FTC Informal Staff Opinion Letter, Nov. 5, 1999.

257.   1990 comment 611-11.

258.   1990 comment 611-9; see United States v. First Advantage SafeRent, Inc., No. 8:10-cv-0090-PJM (D. Md. Jan. 14, 2010).

259.   1990 comments 611-7 and 611-8.

260.   1990 comment 611-13.

261.   1990 comment 611-14.

262.   Edwards, FTC Informal Staff Opinion Letter, July 15, 1998.

263.   1990 comment 613-1.

264.   Slyter, FTC Informal Staff Opinion Letter, June 12, 1998.

265.   1990 comment 613-2.

266.   1990 comment 613-3.

267.   1990 comment 613-5.

268.   1990 comment 613-4.

269.   Allan, FTC Informal Staff Opinion Letter, May 5, 1999.

270.   Holland, FTC Informal Staff Opinion Letter, Dec. 16, 1999.

271.   Weisberg, FTC Informal Staff Opinion Letter, June 27, 1997; Solganik, FTC Informal Staff Opinion Letter, Oct. 23, 1997; Hawkey, FTC Informal Staff Opinion Letter, Dec. 18, 1997.

272.   Solganik, FTC Informal Staff Opinion Letter, Oct. 23, 1997.

273.   1990 comment 615-1.

274.   1990 comment 615-1.

275.   1990 comment 615-9.

276.   Latour, FTC Informal Staff Opinion Letter, June 28, 2001.

277.   Stinneford, FTC Informal Staff Opinion Letter, July 14, 2000.

278.   1990 comment 615-6.

279.   Schieber, FTC Informal Staff Opinion Letter, March 3, 1998; Hall, FTC Informal Staff Opinion Letter, Oct. 26, 1998.

280.   Everson, FTC Informal Staff Opinion Letter, July 28, 1998.

281.   1990 comment 615-5.

282.   1990 comment 615-11.

283.   1990 comment 615-14; Everson, FTC Informal Staff Opinion Letter, July 28, 1998.

284.   1990 comment 615-4.

285.   Schieber, FTC Informal Staff Opinion Letter, March 3, 1998.

286.   1990 comment 615-13.

287.   Allan, FTC Informal Staff Opinion Letter, Feb. 14, 2000.

288.   1990 comment 615-2.

289.   1990 comment 607-8.

290.   Sheffield, FTC Informal Staff Opinion Letter, Nov. 10, 1998.

291.   1990 comment 615-15.

292.   1990 comment 615-16.

293.   1990 comment 615-16.

294.   Riddle, FTC Informal Staff Opinion Letter, March 17, 1999.

295.   1990 comment 621-1 and 621-2.

296.   Greenblatt, FTC Informal Staff Opinion Letter, Oct. 27, 1998.

297.   Harris, FTC Informal Staff Opinion Letter, March 22, 1999.

298.   Harvey, FTC Informal Staff Opinion Letter, Dec. 23, 1997.

299.   Harvey, FTC Informal Staff Opinion Letter, Dec. 23, 1997.

300.   Johnson, FTC Informal Staff Opinion Letter, Aug. 31, 1998; Kosmerl, FTC Informal Staff Opinion Letter, June 4, 1999.

301.   Gillespie, FTC Informal Staff Opinion Letter, March 10, 1998.

302.   Amason, FTC Informal Staff Opinion Letter, Feb. 15, 2000.

303.   Gillespie, FTC Informal Staff Opinion Letter, March 10, 1998.

304.   Cohan, FTC Informal Staff Opinion Letter, Aug. 1, 2000; Tabler, FTC Informal Staff Opinion Letter, Oct. 27, 1998.

305.   Cohan, FTC Informal Staff Opinion Letter, Aug. 1, 2000.

40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT

# LIST OF FTC FCRA CASES

| | |
|---|---|
| 1. Credit Bureau of Lorain, Inc. et al.[1] | 81 F.T.C. 381 (1972) |
| 2. Credit Bureau of Columbus, Inc., et al. | 81 F.T.C. 938 (1972) |
| 3. Credit Bureau of Greater Syracuse, Inc., et al    . | 84 F.T.C. 1660 (1974) |
| 4. National Credit Exchange, Inc. t/a Robert N. Barnes (d/b/a/ National Fraudulent Check Bureau) | 85 F.T.C. 520 (1975) |
| 5. Filmdex Chex System, Incorporated, et al. | 85 F.T.C. 889 (1975) |
| 6. Credit Data Northwest, et al. | 86 F.T.C. 389 (1975) |
| 7. Checkmate Inquiry Service, Inc. et al. | 86 F.T.C. 681 (1975) |
| 8. American Express Company | 87 F.T.C. 1293 (1976) |
| 9. Interstate Check Systems, Inc. et al. | 88 F.T.C. 984 (1976) |
| 10. Alexander's, Inc. | 89 F.T.C. 531 (1977) |
| 11. American Service Bureau, Inc. | 92 F.T.C. 330 (1978) |
| 12. Moore & Associates, Inc. et al. (d/b/a Uni-Check, etc) | 92 F.T.C. 440 (1978) |
| 13. Credit Bureau Associates | 92 F.T.C. 837 (1978) |
| 14. Aldens, Inc. | 92 F.T.C. 901 (1978) |
| 15. Howard Enterprises, Inc. et al. | 93 F.T.C. 909 (1979) |
| 16. Westinghouse Credit Corp. | 94 F.T.C. 1280 (1979) |
| 17. Equifax, Inc. [Retail Credit Company] | 96 F.T.C. 844 (1980)[2] |
| 18. Southern Maryland Credit Bureau, Inc. | 101 F.T.C. 19 (1983) |
| 19. MIB, Inc., d/b/a Medical Information Bureau | 101 F.T.C. 415 (1983) |
| 20. Trans Union Credit Information Company (omnibus) | 102 F.T.C. 1109 (1983) |
| 21. Hospital & Health Services Credit Union | 104 F.T.C. 589 (1984) |
| 22. U.S. v. Allied Finance Corp. | Civ. No. 85-1933 (N.D. Tex.1985) |
| 23. Associated Dry Goods Corporation | 105 F.T.C. 310 (1985) |
| 24. Wright-Patt Credit Union, Inc. | 106 F.T.C. 354 (1985) |
| 25. Federated Department Stores, Inc. | 106 F.T.C. 615 (1985) |
| 26. U.S. v. Winkleman Stores, Inc. | Civ. No. 85-2214 (N.D. Ohio 1985) |
| 27. U S. v. Strawbridge & Clothier, Inc. | Civ. No. 85-6855 (E.D. Pa. 1985) |
| 28. U.S. v. Norwest, Inc. | Civ. No. 87-6025 (C.D. Cal. 1987) |
| 29. U.S. v. Green Tree Acceptance, Inc. | Civ. No. 86-0469 (M.D. Tex.1988) |
| 30. U.S. v. City Finance Corp., et al. | Civ. No. 90-0246 (N.D. Ga. 1990) |
| 31. U.S. v. Tower Loan of Mississippi | Civ. No. 90-0447 (S.D. Miss. 1991) |
| 32. U.S. v. Barclay American Corp. | Civ. No. 91-0014 (W.D.N.C. 1991) |
| 33. U.S. v. American International Acceptance Corp, et al. | Civ. No. 91-2738 (N.D. Ga. 1990) |
| 34. Electronic Data Systems Corporation | 114 F.T.C. 524 (1991) |
| 35. Kobacker Company | 115 F.T.C. 13 (1992) |
| 36. Keystone Carbon Company | 115 F.T.C. 22 (1992) |
| 37. McDonnell Douglas Corporation | 115 F.T.C. 33 (1992) |
| 38. Macy's Northeast, Inc., et al. | 115 F.T.C. 43 (1992) |
| 39. Marshall-Field & Company | 116 F.T.C. 777 (1993) |

1.   Cases published in *F.T.C. Reports* are recorded in the same style on this list as in the printed volume.

2.   *Reversed in part, Equifax, Inc. v. FTC*, 678 F.2d 1047 (11th Cir. 1982), *modified*, 100 F.T.C. 514 (1982).

| | |
|---|---|
| 40. F.T.C. v. TRW Inc. (mixed files) | 784 F. Supp. 361 (N.D. Tex. 1991) |
| F.T.C. v. TRW Inc. (state omnibus, FTC "me too") | Civ. No. 3-91-2661 (N.D. Tex. 1993) |
| 41. Trans Union Corp.[3] (prescreening procedures) | 116 F.T.C. 1334 (1993) |
| (target marketing) | 118 F.T.C. 821 (1994)[4] |
| 42. I.R.S.C., Inc., et al. | 116 F.T.C. 266 (1993) |
| 43. CDB Infotek, et al. | 116 F.T.C. 280 (1993) |
| 44. Inter-Fact, Inc., et al. | 116 F.T.C. 294 (1993) |
| 45. W.D.I.A. Corporation, et al. | 117 F.T.C. 757  (1994) |
| 46. Equifax Credit Information Services, Inc. (omnibus) | 120 F.T.C. 577 (1995) |
| 47. Bruno's, Inc. | 124 F.T.C. 126 (1997) |
| 48. U.S. v. Bonlar Loan Co., Inc. | Civ. No. 97-7274 (N.D. Ill. 1997) |
| 49. Aldi, Inc. | 124 F.T.C. 207 (1997) |
| 50. Altmeyer Home Stores, Inc. | 125 F.T.C. 1295 (1998) |
| 51. First American Real Estate Solutions, LLC | 127 F.T.C. 85 (1999) |
| 52. U.S. v. Unicor Funding, Inc. | Civ. No. 99-1228 (C.D. Cal. 1999) |
| 53. U.S. v. Franklin Acceptance Corp. | Civ. No. 99-2435 (E.D .Pa. 1999) |
| 54. U.S. v. Equifax ("busy signal") | Civ. No. 00-0087 (N.D. Ga. 2000) |
| 55. U.S. v. Experian ("busy signal") | Civ. No. 00-0056 (N.D. Tex. 2000) |
| 56. U.S. v. TransUnion ("busy signal") | Civ. No. 00-0235 (N.D. Ill. 2000) |
| 57. U.S. v. Action Loan Company, Inc. | Civ. No. 00-0511 (W.D. Ky. 2000) |
| 58. U.S. v. Performance Capital Management, Inc. | Civ. No. 01-1047 (C.D. Cal. 2001) |
| 59. U.S. v. DC Credit Services, Inc. | Civ. No. 02-5115 (C.D. Cal. 2002) |
| 60. U.S. v. Citigroup, Inc. [The Associates] | Civ. No. 01-0606 (N.D. Ga. 2003) |
| 61. U.S. v. Fairbanks Capital Corp., et al | Civ. No. 03-12119 (D. Mass. 2003) |
| 62. Quicken Loans, Inc. | 135 F.T.C. 424 (2003) |
| 63. U.S. v. Equifax[5] | Civ. No. 00-0087 (N.D. Ga. 2003) |
| 64. U.S. v. NCO Group, Inc. | Civ. No. 04-2041 (E.D. Pa. 2004) |
| 65. U.S. v. Imperial Palace, Inc. | Civ. No. 04-0963 (D. Nev. 2004) |
| 66. U.S. v. AT&T Corp. | Civ. No. 04-4411 (D.N.J. 2004) |
| 67. U.S. v. Sprint Corp. | Civ. No. 04-0361 (N.D. Fla. 2004) |
| 68. U.S. v. Far West Credit, Inc. | Civ. No. 06-0041 (D. Utah 2006) |
| 69. U.S. v. ChoicePoint, Inc. | Civ. No. 06-0198 (N.D. Ga. 2006) |
| 70. U.S. v. American United Mortgage Co. | Civ. No. 07-7064 (N.D. Ill. 2007) |
| 71. FTC v. Navone | Civ. No. 08-1842 (D. Nev. 2008)[6] |
| 72. Milliman, Inc. | Docket No. C-4213 (02/06/2008) |
| 73. Ingenix, Inc. | Docket No. C-4214 (02/06/2008) |
| 74. FTC v. EMC Mortgage Corp. | Civ. No. 08-0338 (E.D. Tex. 2008) |

3.   Consent settlement of *prescreening issues only* in 1992 target marketing complaint

4.   *Reversed in part and affirmed in part, Trans Union Corp. v. FTC*, 81 F.3d 228 (D.C. Cir. 1996); *modified*, 129 F.T.C. 362 (2000), *aff'd, Trans Union Corp. v. FTC,* 245 F.3d 809, *reh. denied*, 267 F.3d 1138 (D.C. Cir. 2001), *cert. denied*, 536 U.S. 915 (2002)

5.   The 2003 enforcement case charged Equifax with violating the 2000 order.  The 2003 settlement modi-fied the 2000 order, and assessed Equifax $250,000 disgorgement for its violation of that order.

6.   Complaint filed on December 30, 2008.  Consent order entered on December 29, 2009.

| | |
|---|---|
| 75. U.S. v. Rental Research Services, Inc. | Civ. No. 09-0524 (D. Minn. 2009) |
| 76. U.S. v. TALX Corp. | Civ. No. 09-1071 (E.D. Mo. 2009) |
| 77. U.S. v. Rail Terminal Services, LLC | Civ. No. 09-1111 (W.D. Wash. 2009) |
| 78. U.S. v. Quality Terminal Services, LLC | Civ. No. 09-1853 (D. Colo. 2009) |
| 79. U.S. v. Metropolitan Home Mortgage, Inc. | Civ. No. 09-0936 (C.D. Cal. 2009) |
| 80. U.S. v. First Advantage SafeRent, Inc. | Civ. No. 10-0090 (D. Md. 2010) |
| 81. U.S. v. Credit Bureau Collection Services | Civ. No. 10-0169 (S.D. Ohio 2010) |
| 82. U.S. v. Direct Marketing Associates Corp. | Civ. No. 10-0696 (D. Ariz. 2010) |
| 83. U.S. v. Central Credit, LLC | Civ. No. 10-0565 (D. Nev. 2010) |
| 84. U.S. v. Teletrack | Civ. No. 11-2060 (N.D. Ga. 2011) |
| 85. Settlement One Credit Corp. | Docket No. C-43xx (0-/--/2011) |
| 86. ACRAnet, Inc. | Docket No. C-43xy (0-/--/2011) |
| 87. Fajilan and Associates, Inc. | Docket No. C-43xz (0-/--/2011) |