# Report to Congress

# Under Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003

## Federal Trade Commission

## December 2004

EXHIBIT

Ex. B

Federal Trade Commission

# Report to Congress

# Under Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003

## December 2004

Federal Trade Commission

Deborah Platt Majoras, Chairman
Orson Swindle, Commissioner
Thomas B. Leary, Commissioner
Pamela Jones Harbour, Commissioner
Jon Leibowitz, Commissioner

**Federal Trade Commission**

# Contents

**Executive Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *i*

**I.     Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**II.    The Information Gathering Process** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

**III.   Accuracy And Completeness** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
    A.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    B.  The Credit Reporting System in the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    C.  Challenges in Assuring Accuracy and Completeness  . . . . . . . . . . . . . . . . . . . . . . 11
    D.  The Accuracy and Completeness Requirements of the FCRA . . . . . . . . . . . . . . . . . . . 16
    E.  FTC Efforts to Promote Compliance with the FCRA Accuracy Requirements  . . . . . . . 18
    F.  Prior Studies of Accuracy and Completeness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    G.  FTC Proposed Pilot Study and Nationwide Survey . . . . . . . . . . . . . . . . . . . . . . . . . 31

**IV.    Data Matching** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **35**
    A.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
    B.  CRA Databases and the Matching Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    C.  Benefits and Costs of the Proposed Matching Requirements . . . . . . . . . . . . . . . . . . . 46
    D.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

**V.     Same Credit Report** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **55**
    A.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
    B.  Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
    C.  Benefits and Costs of a "Same Report" Requirement . . . . . . . . . . . . . . . . . . . . . . . 60
    D.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

**VI.    Negative Information Notices** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **67**
    A.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
    B.  Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
    C.  The Benefits and Costs of Negative Information Notices  . . . . . . . . . . . . . . . . . . . . . 73
    D.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

**VII.   Common Unreported Transactions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **77**
    A.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
    B   Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
    C.  Possible Approaches to Increase Reporting of Non-Traditional Credit Data . . . . . . . . . 82
    D.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

**VIII.  Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **85**

**Appendix A:  Roundtable Federal Register Notice**

**Appendix B:  Pilot Study Federal Register Notice**

**Appendix C:  "Same Report" Federal Register Notice**

**Federal Trade Commission** ————————————————————————

## Executive Summary

The Federal Trade Commission ("FTC" or "Commission") submits this report pursuant to Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003, Pub. L. 108-159, 117 Stat. 1952 ("FACT Act").  The FACT Act, which was enacted on December 4, 2003, amends the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.* ("FCRA"), and contains, among other things, a number of provisions designed to enhance the accuracy and completeness of credit reports.  Among these provisions are Sections 318 and 319, which require the Commission to conduct five studies regarding credit report accuracy and completeness.

The accuracy and completeness of credit report data is of paramount importance to consumers.  Credit reports are used by creditors and others to make critical decisions about the availability and costs of various products and services, including credit, insurance, and employment.  The reports enable creditors to make fast and accurate decisions in providing these products and services, which benefits both creditors and consumers.  At the same time, any errors in the data contained in these reports can cause consumers to lose these benefits or pay higher costs for them.

Since the emergence of the credit reporting industry nearly a century ago, creditors and others have furnished data to the consumer reporting agencies ("CRAs") on a voluntary basis.  In 1970, Congress passed the FCRA, which provided significant consumer protections to, among other things, assure the accuracy of the data in credit reports.  The FCRA's protections include mechanisms for consumers to learn about possible errors in their credit reports and have them corrected, and a requirement that the CRAs that collect this data follow "reasonable procedures to assure maximum possible accuracy of the information" they report.  Amendments in 1996 strengthened these protections by, among other things, placing certain legal obligations on creditors and other furnishers of data to the CRAs with respect to the accuracy of the information they provide.  In 2003, the FACT Act further enhanced the FCRA by adding new requirements related to accuracy and completeness.  These requirements include measures to strengthen the dispute and reinvestigation process, a new consumer right to obtain a free annual file disclosure, new requirements on those who furnish information to the CRAs, and measures designed to reduce identity theft (the unauthorized procurement and use of another's personal information for fraudulent purposes).

In addition to imposing new substantive protections, the FACT Act also directs the Commission to study and report to Congress on various issues related to credit report accuracy and completeness.  Specifically, Section 319 requires an ongoing study of credit report accuracy and completeness, with a final report due to Congress in 2014.  (*See* "Accuracy and Completeness," below.)  During the ongoing study, the Commission must submit five interim reports to Congress every two years beginning in December 2004.  Part III of this report is the Commission's first interim report to Congress.

Section 318 directs the Commission to study and report to Congress on the benefits and costs of various specific proposals for improving credit report accuracy and completeness. Specifically, the studies must examine:

- the effects of requiring the CRAs to match more points of identifying information (e.g., name, social security number, address) to ensure that a consumer is the correct individual to whom a credit report relates (See "Data Matching Proposal," below);

- the effects of requiring that a consumer who has experienced an "adverse action" (for example, the denial of credit) based on a credit report receives a copy of the same report that the creditor relied on in taking the adverse action (See "Same Report Proposal," below);

- the effects of requiring notification to consumers when negative information has been added to their credit reports (See "Negative Information Notice Proposal," below); and

- whether there are any common financial transactions that are not generally reported to the CRAs, but that would provide useful information in determining creditworthiness, and what actions might be taken to encourage greater reporting of these transactions.  (See "Common Unreported Transactions," below.)

Parts IV, V, VI, and VII of this report comprise the Commission's Report to Congress under Section 318.

Over the past year, the FTC has used a variety of means to obtain information for these studies.  Among other things, FTC staff interviewed consumer advocacy groups, the CRAs, resellers of credit reports, furnishers and users of credit report information, and numerous other knowledgeable sources.  The staff also issued *Federal Register* Notices seeking relevant information and convened a roundtable meeting of experts to discuss issues related to designing the ongoing Section 319 study.  For all of the studies, the FTC focused primarily on the activities of the three nationwide credit bureaus, which comprise the vast majority of the credit reporting industry.  The studies also focused on the use of credit reports in credit transactions, which is the chief concern of the Section 318 proposals.

## Accuracy and Completeness Study

In its ongoing accuracy and completeness study, the FTC has thus far (1) examined the history and current practices of the credit reporting industry; (2) identified the key areas where errors in credit report data could occur; (3) reviewed and evaluated the studies conducted to date on credit report accuracy and completeness; (4) examined possible methodologies for conducting a more reliable and comprehensive study, focusing in particular on the possibility of conducting a national consumer survey; and (5) proposed to conduct a pilot study to determine the feasibility of such a national consumer survey.

As described in the report, there are a number of potential sources of inaccuracy and incompleteness in credit reports.  These include the following:

- First, a creditor or other furnisher of data to the CRAs may provide information that is incorrect, may provide incomplete information, or may not provide information at all.

- Second, there may be problems with assigning data to the proper consumer's file, perhaps because the identifying information accompanying the data is incomplete or wrong.  In such cases, the data might be assigned to the wrong file – thus creating a "mixed file" that includes data from more than one consumer.  Alternatively, the CRA might mistakenly create a new file for a consumer that already has a file in the CRA's system – thus creating a "fragmented file."

- Third, there may be problems when the CRA retrieves a consumer's file in response to an inquiry from a user of credit reports.  For example, a CRA might send the wrong report, might send multiple reports (one or more of which pertain to the right person), or might send no report at all for a consumer with a file in the system.

In addition, there is a trade-off between accuracy and completeness.  For example, when a CRA receives data from a furnisher, the information identifying the consumer may be inaccurate or incomplete.  In such cases, the CRA must choose between adding information to an existing file or creating a new file.  If the CRA adds information to an existing file, and the information in fact belongs to a different consumer, the CRA has created a "mixed file," which is a source of inaccuracy.  Further, if the added information is negative, it can lead to an erroneous denial of credit or an increase in the cost of credit.  On the other hand, if the CRA creates a new file, but the information belongs to a consumer's file already in the CRA's system, the CRA has created a "fragmented file," which is a source of incompleteness.  Such a file can harm consumers to the extent that it fails to include information that reflects the consumer's positive credit experience.

Prior studies of consumer report accuracy and completeness essentially fall into three categories – consumer surveys, studies based on dispute data statistics, and studies based on anonymous data provided by the CRAs about a large number of individual consumers.  The FTC's review of these studies determined that, although each approach provides some useful information about credit report accuracy and completeness, none provides a comprehensive view.  Indeed, none of the existing studies relied on the participation of all three of the key stakeholders in the credit reporting process: consumers, data furnishers, and the CRAs.  Questions have also been raised about the reliability and representativeness of the samples used in the prior studies.  For many of the same reasons, looking to consumer complaints filed with the Commission and other law enforcement agencies does not give a statistically reliable picture of the accuracy of all information in CRA files.  (Consumer complaints are important, however, for other FCRA compliance purposes and the FACT Act thus prescribes a complaint-sharing mechanism, discussed further below.)

The FTC is evaluating whether and how to conduct a survey that would attempt to address some of the limitations of the prior studies.  In particular, it would focus on consumers and their experiences in identifying and disputing errors in their credit reports, would be based on a nationally representative sample, and would use a reliable method for identifying errors and omissions.  The survey would also categorize errors by type and seriousness in terms of potential consumer harm.  The pilot study will both test the feasibility of a national survey and allow the FTC to estimate the potential costs of such a survey.  Depending on the outcome of the pilot study, the FTC may conduct further pilot studies; it may also need to reassess the design currently being contemplated for the national survey.  The results of the pilot study, and the next

Federal Trade Commission ─────────────────────────────────────────

steps taken by the FTC in its ongoing accuracy study, will be provided in a later interim Report to Congress under Section 319.

## Data Matching Proposal

The FTC's Data Matching study examines the costs and benefits of requiring the CRAs to increase the number of points of identifying information used to match a consumer to a credit report – for example, requiring an "exact match" on name, social security number, address, and zip code. The proposed requirement is intended to address an important potential source of inaccuracy in credit reporting – namely, that a CRA could fail to assign data to the correct consumer's file, or could furnish a file to a creditor or other user of credit reports relating to the wrong consumer. The FTC's study examines the effects of the proposal on both the process of assigning data to consumer files ("file building") and the process of retrieving data in response to an inquiry ("file retrieval").

As described in the report, matching difficulties arise from problems with the data available to the CRAs. For example, furnishers of information to the CRAs may possess and report identifying information for individual consumers that is not accurate or complete. As a result, matching with 100% certainty is sometimes impossible.

The report concludes that, if the proposed matching requirement were imposed on the matching process for file building, there would likely be a reduction in "mixed files" because data would be less likely to be assigned to the wrong file. Although mixed files can be costly for consumers, the purpose of the FCRA's dispute procedure is to reduce these costs by enabling consumers to spot and correct errors. (How CRAs and furnishers handle consumer disputes is the subject of another study, which will be separately reported to Congress under Section 313(b) of the FACT Act.) For this reason, the benefits of the proposal may be limited. At the same time, because the data provided by furnishers is imperfect and unlikely to allow precise matching, the proposal also would likely lead to more "fragmented files." If this occurred, credit reports would be less informative and the cost of credit could increase substantially.

For file retrieval, the proposed requirement could lead to a reduction in the number of times the CRA furnishes the wrong file. However, available evidence suggests that the incidence of this problem may be quite small, whereas the matching requirements could impose substantial costs. For example, the requirements would likely increase the frequency with which a user's request does not return any file, which would impose costs and inconveniences on both users of credit reports and credit applicants.

The report also discusses a new FACT Act requirement which may further the same goals intended by the matching proposal. Section 315 of the FACT Act requires CRAs to notify the user of a credit report when the address provided for a consumer "substantially differs" from the addresses in the CRA's file. Although the main goal of this provision is to create a "red flag" pointing to possible identity theft, such a notice would also serve to notify the user of the possibility of an error. The FTC and the federal banking agencies are currently developing regulations to implement this new requirement.

## Same Report Proposal

The Same Report study examines the effects of providing a consumer who has experienced an "adverse action" with the "same report" relied on by the creditor in taking the adverse action. Under current law, consumers can request a free copy of their credit report following denial of a loan or other adverse action. This right enables them to spot and dispute any errors in the report that may have led to the adverse action. The purpose of the "same report" proposal is to address the situation in which a report provided to a consumer following an adverse action does not contain the same information that was provided to the creditor. The FTC study examines the effect of the proposal under two possible approaches: (1) requiring the CRA that provided the report to the creditor to provide the "same report" to the consumer, and (2) requiring the creditor who took the adverse action to provide the "same report."

The report concludes that the proposed requirement could benefit consumers in those situations when a creditor was provided with the wrong consumer's report or with multiple reports, not all of which pertain to the correct consumer. In both cases, however, the extent of harm caused by these errors, and the presumed benefits of the proposed requirement, are unclear. For example, available data suggest that multiple files are sent in less than 1% of cases. Although even this small percentage could translate into a significant number of credit reports each year, many creditors who receive multiple reports already take extra steps to correct the problem. For example, some creditors show the reports they receive to the consumer, which would alert the consumer to the existence of multiple reports. Thus, the harm caused by this practice – and the benefit of the proposed "same report" requirement – is likely to be limited.

At the same time, the proposal could impose substantial costs on both consumers and industry as a whole. The potential costs to consumers would include the privacy concerns raised by receiving a report that could pertain to another person. Further, if creditors were required to provide reports automatically with an "adverse action" notice, this could increase the volume of reports being sent and thus raise identity theft concerns. Additionally, a same report requirement would help consumers understand only what was in their file at the time the report was furnished. To the extent that a consumer wanted to verify the accuracy of information currently in the file, the same report requirement would be less helpful because the "same report" would be somewhat out of date and perhaps incomplete. In contrast, consumer disclosures currently mandated under the FCRA provide all information about a consumer in the CRA's files at the time the consumer requests disclosure. A same report requirement could thus indirectly impose additional costs on consumers attempting to identify and correct information currently contained in their reports.

The potential costs to industry would be substantial because, if the CRAs were required to provide the report, they would need to build systems to house every report that is ever provided to a creditor, even though only a fraction of these (those subsequently leading to "adverse action") would ever be sent to consumers. If the creditors were required to provide the reports, they would need to build systems to produce reports in a consumer-friendly format. Further, creditors who receive only summary data from the CRAs might need to supplement their data to ensure complete and meaningful disclosures to consumers.

New FACT Act requirements may provide a more targeted response to this concern. For example, Section 315, discussed above, requires CRAs to notify the user of a credit report when

Federal Trade Commission

the address of a consumer "substantially differs" from the address on file.  Section 114 requires users of credit reports to implement procedures to identify and respond to identity theft "red flags," or common signs that identify theft has occurred.  Both of these requirements will impose added responsibilities on creditors to determine that the credit applicant is indeed the person to whom a credit report pertains.  For example, if the creditor receives two credit reports, one of which pertains to the wrong consumer, it is likely that the wrong report will contain an address that does not match that of the applicant.  This will trigger a notification by the CRA to the creditor that the address in that report does not match.

## Negative Information Notice Proposal

The Negative Information Notice study examined the effects of requiring notification to consumers when negative information has been added to their credit reports.  Currently, the FCRA requires creditors to notify consumers when they take "adverse action" based on information in a credit report.  By the time a consumer receives this notification, however, it may be too late for the consumer to salvage the transaction by correcting any inaccuracies in his or her report.  The idea behind the proposed notice is that consumers would learn about negative information in their reports before they apply for credit, when there still might be sufficient time to remedy the problem.

The report concludes that the proposed notice could benefit consumers by allowing them to check the accuracy of information in their credit reports before any errors become an obstacle to obtaining credit or other services.  However, these benefits may be limited.  For example, if the furnisher provided the notice, it would not be in a position to notify consumers about certain negative information that is added to consumers' files – for example, public record information, which the CRAs obtain themselves.  A requirement that the CRA provide the notice would not have these limitations.

Regardless of who provides the notice, the costs to both industry and consumers could be substantial.  Although furnishers are in regular contact with consumers, they would still need to revise their systems and procedures in order to be able to provide this new notice.  If CRAs provided the notice, the costs would be even higher.  Every year, a significant amount of negative information is added to credit reports from a variety of sources.  The CRAs would be required to provide the notice each time such information is added, even when the information is accurate.  In addition, it is unclear how consumers would respond to notices received from a CRA, especially if they are unfamiliar with the sender.   Some would not read the notices; others could find unsolicited notices intrusive.  Sending numerous unsolicited notices to consumers could also open avenues for fraud.  Some reports will inevitably be misdirected or sent to old addresses.  Moreover, there is a risk of creating an environment conducive to "phishing" schemes, in which fraudulent operators pose as CRAs to obtain sensitive consumer information.

An opt-in system, in which consumers elect to receive negative information notices, could fulfill the goals of the proposed requirement while avoiding many of the costs.  The market has begun to provide such systems in the form of credit monitoring services.  These services are new, and the costs and benefits they provide should become clearer as the market develops.  In addition, the new FACT Act requirement mandating a free annual report should increase



consumers' access to their consumer reports, and the likelihood that they will spot and correct any errors.  The FTC has issued regulations implementing this requirement and the program began to take effect on December 1.

## Common Unreported Transactions

The Common Unreported Transaction study examined whether there are common financial transactions that are not generally reported to the CRAs, but that would provide useful information in determining creditworthiness.  It also examined whether there are any actions that might be taken within a voluntary system to encourage the reporting of these types of transactions.

The idea behind the study is that many Americans may be missing out on the benefits associated with the credit reporting system because certain types of payments are not typically reported to the CRAs.

The report concludes that there are common underreported transactions that could be useful in evaluating creditworthiness – in particular, rental payments and utility payments.  It also concludes that there are certain barriers to reporting these payments that may or may not hinder efforts to encourage greater reporting.  For rental payments, the main barrier appears to be the diffuse rental market and the lack of centralized data collection, which could be difficult to change.  For utility payments, the barriers appear to be cost, some state privacy laws, and possible disincentives created by state regulatory systems.  To the extent that state regulatory systems create barriers, these would need to be addressed at the state level.

Despite these barriers, there are private sector efforts underway to capture and report this type of data.  These efforts are still at the beginning stages.  As they develop, the FTC will continue to monitor these efforts to determine whether they succeed in providing greater access to information about common unreported transactions.

## Conclusion

Based on the findings and conclusions of these studies, the Commission is not making legislative or administrative recommendations at this time.  In addition to concluding that the costs of specific proposals examined in the Section 318 studies could exceed their benefits, the Commission believes that it is premature to enact alternative requirements of this nature.  Indeed, as discussed above, the FACT Act imposed a host of new requirements that, when fully implemented, should further enhance the accuracy and completeness of credit reports.  These requirements should also address some of the specific concerns underlying the Section 318 proposals.  For example, consumers' new right to obtain a free annual file disclosure should help consumers spot negative information before it causes harm, consistent with the goals of the negative information notice proposal.  Also, the requirement that CRAs notify creditors when the address that a creditor provides for a consumer "substantially differs" from the address in the CRA's file coincides with the goals of the proposed matching requirements.

**Federal Trade Commission** _____

In addition, the credit reporting industry is in a period of rapid change, due not only to the FACT Act reforms but also to the increasing prominence of consumer reports in today's economy.  Once limited to credit transactions, credit reports are now used, for example, to screen job applicants and price insurance.  The greater use of risk-based pricing increasingly means that relatively modest differences in credit scores are more relevant to consumers.  Consumers are also increasingly aware of the importance of credit reports and the need to check their accuracy.  In the midst of these changes, the market appears to be responding to some of the problems highlighted in the Section 318 proposals.  For example, the industry now provides credit monitoring services that, for a fee, alert consumers when certain information is added to their files.  Although these services are relatively new, they could fulfill some of the same goals as the negative information notice, albeit at a cost to consumers.  Further, new products have been recently introduced that attempt to gather information on rental payments, utility payments, and other common unreported transactions.  The success of these products remains to be seen, but they could help ensure that this information is considered in evaluating consumers for credit.

Finally, the ongoing accuracy and completeness study that the Commission is considering, beginning with the pilot study, could help shed light on the continuing concerns that are addressed in this report.  In particular, the Commission believes that the ongoing accuracy study may provide a better estimate of the costs and benefits of the specific proposals that the Commission currently considers to be premature.  As the Commission pursues the study, it will attempt to identify any areas where further reform is needed, as well as any improvements observed due to the FACT Act or the ongoing changes in the marketplace.



# I.   Introduction

The Federal Trade Commission ("FTC" or "Commission") submits this report pursuant to Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003, Pub. L. 108-159, 117 Stat. 1952 ("FACT Act").  The FACT Act, which was enacted on December 4, 2003, amends the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.* ("FCRA"), the statute that governs the operation of the nation's consumer reporting system.

As described more fully in the following sections, the enactment of the FCRA in 1970, and its amendment in 1996, coincided with the development of a modern credit reporting system in the United States.  This system consists of a number of consumer reporting agencies ("CRAs"), three of which have emerged as the major national credit bureaus, and numerous smaller CRAs. CRAs compile consumer information (such as payment history) submitted voluntarily by creditors and other businesses ("furnishers"), and disseminate compilations of that information in "consumer reports"[1] to creditors, insurance companies, employers, and others with a legitimate business need for that information.  These consumer report "users" analyze the information to assess risks, often through a credit score that represents the risk numerically.[2]  This flow of information enables credit grantors and others to make more expeditious and accurate decisions, to the benefit of consumers.

The FCRA provides the framework for the operation of the consumer reporting system, and includes significant protections for consumers.  Chief among those protections are a variety of provisions designed to enhance the accuracy of consumer reports.  Consumer report data are used to make critical decisions about consumers' eligibility for credit and insurance (and the cost of those services), as well as employment and other benefits.  Because even small differences in a consumer's credit score can affect the cost or availability of credit, the accuracy of the information underlying the score is of great importance.  Moreover, consumer report information often is the first indication to a consumer that he or she has been a victim of identity theft.

As will be discussed in more detail, the FCRA employs two primary approaches to achieving the goal of optimal accuracy.  First, it requires CRAs to follow "reasonable procedures to assure maximum possible accuracy of the information" they report.  Second, the FCRA establishes mechanisms for consumers to learn about possible errors in their consumer reports and have them corrected.  For example, consumers have the right to know all of the information in their files, receive notice when they suffer "adverse action" as a result of information in their report, and dispute the accuracy or completeness of that information.

---

1.  Consumer reports include credit reports and other "written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for" credit, insurance, employment, or other "permissible purpose" as defined by the FCRA.  FCRA § 603(d), 15 U.S.C. § 1581a(d).

2.  *See* Robert B. Avery, Paul S. Calem, Glenn B. Canner & Raphael W. Bostic, *An Overview of Consumer Data and Credit Reporting, Federal Reserve Bulletin* (Feb. 2003), at 49 [hereinafter 2003 FRB Study]; *see also The Accuracy of Credit Report Information and the Fair Credit Reporting Act: Hearing Before the Senate Committee on Banking, Housing, and Urban Affairs,* 108th Cong. (July 10, 2003) (statement of Stuart K. Pratt, Consumer Data Industry Association ("CDIA")) [hereinafter Statement of Stuart K. Pratt].

**Federal Trade Commission** ————————————————————————————————

The FACT Act, among other things, enhances the accuracy provisions of the FCRA in several respects.  For example, the FACT Act provides consumers with the right to a free annual consumer report from each of the three nationwide CRAs, as well as from "nationwide specialty consumer reporting agencies."  In addition, the FACT Act gives consumers the right to obtain their credit scores in certain situations, and to dispute information in their reports directly with the furnisher of that information.  The FACT Act also requires creditors to provide a "risk-based pricing" notice when they offer consumers less advantageous terms based on information in consumer reports.  Further, the Act contains a number of new provisions designed to prevent or remedy identity theft.[3]

In addition to these affirmative requirements, Sections 318 and 319 of the FACT Act direct the Commission to study and report to Congress on various issues related to the accuracy and completeness of consumer reports.  Specifically, Section 319 requires "an ongoing study of the accuracy and completeness of information contained in consumer reports prepared or maintained by CRAs and methods for improving the accuracy and completeness of such information."  The study is to take place over eleven years, with the final report due to Congress in 2014.  During the ongoing study, the Commission must also submit five interim reports to Congress, to be completed every two years beginning in December 2004.  Each report must contain a summary of the Commission's findings to date, as well as any recommendations for legislative or administrative action.  Part III of this report is the Commission's first interim Report to Congress under Section 319.

Section 318 directs the Commission to study proposals to improve the operation of the FCRA.  The proposals to be studied are:

• *Increasing the number of points of identifying information (e.g., name, social security number, address, etc.) that a credit reporting agency is required to match to ensure that a consumer is the correct individual to whom a consumer report relates.*  Section 318(a)(2)(A) of the FACT Act directs the FTC to study whether increasing the amount of identifying information might be an effective means of ensuring that the data in a consumer's file relate to the intended consumer.  This is discussed in Part IV ("Data Matching Study") below.

• *Requiring that a consumer who has experienced an adverse action based on a credit report receives a copy of the same report that the creditor relied on in taking the adverse action.*  Section 318(a)(2)(C) of the Act asks the FTC to study the degree to which providing consumers with the same report that the creditors used might help consumers spot errors (for example, that the wrong consumer's information was provided).  This is addressed in Part V ("Same Report Study") below.

• *Requiring notification to consumers when negative information has been added to their credit reports*.  Section 318(a)(2)(B) of the Act asks the FTC to study whether informing consumers when negative information, such as a reported delinquency, has been added to their files might be an effective way to help consumers identify errors or fraudulent information in their reports.  This is addressed in Part VI ("Negative Information Study") below.

——————————————————

3.   Many of the regulations implementing these FACT Act provisions are still being developed.

- *Identifying any common financial transactions that are not generally reported to the consumer reporting agencies, but that would provide useful information in determining creditworthiness, and any actions that might be taken to encourage greater reporting of such transactions.* Sections 318(a)(2)(D) and (E) of the Act ask the FTC to study whether there are transactions that are not generally reported and whether there might be ways to encourage greater reporting. The question is motivated by the notion that many consumers, who may be hampered in obtaining credit because they lack traditional credit histories, might have other unreported payment experiences that are useful predictors of risk. This is addressed in Part VII ("Common Unreported Financial Transactions Study") below.

Section 318 directs the Commission to submit a report to Congress one year after enactment that includes the findings and conclusions of the study, along with any legislative or administrative recommendations. Parts IV, V, VI, and VII of this report comprise the Commission's Report to Congress under Section 318.

This report examines issues that have generated considerable discussion and disagreement in recent years. Although a variety of interested parties – including consumer groups, industry organizations, Federal Reserve Board ("Board" or "FRB") staff, and the Government Accountability Office (formerly General Accounting Office) ("GAO") – have examined consumer report accuracy and completeness, they often have reached different conclusions, and the reliability of the data is uncertain. As discussed below, the Commission plans to conduct a pilot study, as part of the study required by Section 319 of the FACT Act, to determine the feasibility of conducting a more comprehensive and reliable survey of this issue.

The report is organized as follows: Part II describes the information gathering process that the Commission staff used in preparing this report. Part III, the Section 319 portion of the report, summarizes the Commission's findings and conclusions thus far in the ongoing accuracy study and, in particular: (1) summarizes the history and current practices of the credit reporting industry; (2) provides background on the FCRA's accuracy requirements and the FTC's efforts to ensure compliance with them; (3) reviews the studies that have been undertaken to date to examine consumer report accuracy and completeness; and (4) discusses the FTC's preparation and design of a pilot study to assess the feasibility of a nationwide consumer survey. Parts IV, V, VI, and VII – which together comprise the Section 318 portion of the report – provide detailed discussions of the benefits and costs of each of the Section 318 proposals. Finally, Part VIII contains the report's conclusion.

## II.   The Information Gathering Process

In preparing this report, the Commission used a variety of means to obtain information.[4] The Commission staff reviewed current literature. In addition, the Commission sought comment on specific issues related to the studies from interested parties, obtaining input from over 50 organizations and 100 individuals. Those consulted represent a wide spectrum of interests, and include consumer groups, consumer reporting agencies, resellers of consumer reports, furnishers of consumer report information, and users of consumer report information.

---

4.    Not every study used all of the information gathering techniques.

Depending on the specifics of the information required, Commission staff used different methods of collecting information for the different parts of the report.  For instance, in analyzing the data matching proposal, the Commission staff found it necessary to gather information about the specific matching processes used by the nationwide CRAs.  Because these matching techniques are proprietary, and the CRAs were unwilling to disclose them in a public forum, Commission staff conducted confidential interviews with representatives of the nationwide CRAs.

In collecting information for the "same report" proposal, it was important to understand the experiences of creditors and consumers in the use of consumer reports.  To this end, the Commission solicited comments in a *Federal Register* Notice seeking public comment on the issues raised by the "same report" proposal.[5]  The notice sought comment on a number of specific issues related to the proposal, including the factors that account for the differences between the reports received by creditors and those received by consumers; the problems created by these differences; the benefit to consumers from a requirement that they be given the "same report" provided to creditors; the impact of the proposed requirement on identity theft; and the costs associated with implementing the proposed requirement.  The Commission received 63 comments in response to this notice,[6] which greatly assisted the agency in preparing the "same report" study and were also useful in preparing the other studies.

In addition, the Commission convened a roundtable meeting on June 30, 2004 to discuss issues related to designing the Section 319 Accuracy Study.[7]  FTC staff invited many researchers and practitioners in the consumer reporting industry to give prepared remarks at the roundtable.  Appendix A includes the *Federal Register* Notice announcing the roundtable.  The agenda, list of participants, and official transcript of the proceedings are available through the Commission's website.[8]

For all of the studies, the FTC focused primarily on the activities of the three nationwide CRAs – Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and TransUnion LLC ("TransUnion"), which comprise the vast majority of the industry.  To understand their operations in more detail, Commission staff obtained information from these CRAs and conducted discussions with their representatives, including their technical staff.  Although much of this information was provided on a confidential basis, the information provided allowed FTC staff to gain considerable insight into the CRAs' procedures.

The report also focuses, in particular, on the use of consumer reports in credit transactions.  Although consumer reports are increasingly used in non-credit related determinations such

5.   69 Fed. Reg. 33,387 (June 15, 2004).  This *Federal Register* Notice can be found in Appendix C and at http://www.ftc.gov/os/statutes/fcrajump.htm.

6.   These comments are available on the FTC's website at http://www.ftc.gov/os/comments/factaadverseactstudy/index.htm.

7.   69 Fed. Reg. 32,549 (June 10, 2004).  This *Federal Register* notice can be found in Appendix A and at http://www.ftc.gov/os/statutes/fcrajump.htm.

8.   *See* http://www.ftc.gov/be/workshops/.

as insurance and employment,[9] the provisions of the FACT Act mandating the studies focus primarily on "credit reports." Further, many of the issues that the studies address – e.g., the effectiveness of matching systems and the accuracy of information furnished to CRAs – have particular relevance and importance in the context of credit determinations. Focusing on credit determinations also limits the scope of the studies in a way that ensures their manageability.

## III.  Accuracy And Completeness

### A.  Introduction

Section 319 of the FACT Act requires the Commission to conduct:

an ongoing study of the accuracy and completeness of information contained in consumer reports prepared or maintained by consumer reporting agencies and methods for improving the accuracy and completeness of such information.[10]

The study is to take place over eleven years, with the final report due to Congress in 2014 and five interim reports to be completed every two years from December 2004 onward (until December 2012).

In preparing this first interim report, Commission staff reviewed the current literature on the accuracy of credit reporting, and convened a roundtable of experts and interested parties to discuss methods for conducting the mandated study. Commission staff also held discussions with many representatives of industry and consumer groups, and these discussions were helpful in gathering the information for this report.

This report summarizes the Commission's findings and conclusions thus far on the ongoing study and, in particular:  (1) summarizes its research on the history and current practices of the consumer reporting industry; (2) provides background on the FCRA's accuracy requirements and the FTC's efforts to ensure compliance with them; (3) reviews the studies that have been undertaken to date to examine consumer report accuracy and completeness; and (4) discusses the FTC's preparation and design of a pilot study to assess the feasibility of a nationwide consumer survey. The discussion in this report also provides background for the Section 318 studies described later in this report, which examine specific proposals for improving the accuracy and completeness of consumer reports.

---

9.   A credit report is one type of "consumer report" regulated by the FCRA. As defined in the FCRA, consumer reports include a broad array of information used to make decisions in consumer-initiated transactions, such as reports provided by tenant screening or employment screening services. FCRA § 603(d), 15 U.S.C. § 1681a(d).

10.  "Completeness" as used in Section 319 of the FACT Act (and in this report) has a different meaning from "completeness" under Section 611 of the FCRA. Under Section 319, "completeness" refers to the quantity of information in a consumer's file that would be increased by the addition of more transactions, such as those referred to in FACT Act Section 318(a)(2)(D) and (E) to the consumer reporting system. (A file would be more "complete" if it included information about the consumer's rental payments.) "Completeness" in Section 611 of the FCRA refers to the sufficiency of the information in a specific item in the consumer's file. (A credit account item would not be "complete" if it omitted two payments that had been made after the item was last updated by the CRA.).

## B.  The Credit Reporting System in the United States

The U.S. credit reporting industry consists primarily of three nationwide CRAs and currently contains a wide range of information on approximately 200 million consumers.[11] Creditors and others voluntarily submit this information to centralized, nationwide repositories of information.  Users of consumer reports analyze this data and other information to assess the risk posed by applicants, often using sophisticated predictive models such as credit scores.[12] This flow of information enables credit grantors and others to make fast and accurate decisions about a consumer's eligibility for various products and services, which benefits both lenders and consumers.  Indeed, in the U.S., consumers can typically obtain credit from a complete stranger within minutes.

Once used primarily for granting loans, the information held by CRAs and the credit scores derived from it are increasingly used in other transactions, such as the granting and pricing of telecommunications services and insurance.  Given the wide use of credit reports for multiple purposes, the accuracy and completeness of the data contained in them is of great importance to consumers.

### 1.  History

Credit reporting has a long history in the United States.[13]  CRAs emerged more than a century ago, at a time when most consumer credit was extended by retailers.  At the time, retail markets were local, limited to a single town or neighborhood.  Most CRAs began as cooperative agreements through which retailers shared information about customers who had failed to repay their obligations.  Faced with a new customer, a retailer could draw on the experience of other local shops in deciding whether to extend credit.  These early CRAs operated on a reciprocal basis – furnishing information to the bureau was a precondition for gaining access to the CRA's information.

During the 20th century, consumer reporting evolved considerably in response to changes in the economy and technology.  One important change was that lending moved from local to national markets.  Retail markets became larger, expanding to regional and then national chains. At the same time, the primary source of consumer credit shifted from retailers to banks and finance companies.  Although banks were constrained for a long time by restrictive banking laws, these restrictions became less important with the growth of bank-issued credit cards, which banks were interested in offering on a regional or national scale.  These changes made local consumer report information less valuable and spurred demand for access to more comprehensive data,

---

11.  *See* 2003 FRB Study and Statement of Stuart K. Pratt, *supra* note 2.

12.  Scoring products (sometimes referred to as "risk scores" or "credit scores") are predictive models based on analyses of historical consumer credit history and performance data.  When a consumer applies for credit or insurance, the models use information in the consumer's credit history to predict the risk posed by that consumer.  The risk is typically summarized in a numerical score.

13.  For a more detailed discussion of the history and development of the consumer reporting system in the United States, see Robert M. Hunt, *The Development and Regulation of Consumer Credit Reporting in America* (Federal Reserve Bank of Philadelphia Working Paper No. 02-21, Nov. 2002).

which in turn spurred the growth of the larger credit bureaus.  Additionally, the development of computers made it possible to store and retrieve consumer credit data much more efficiently.  Apart from improving the efficiency of CRA operations, the computerization of creditor records enabled CRAs to accept automated account updates in electronic format.

These changes led to a shift from local, cooperative CRAs to a system dominated by a few nationwide firms.  By the end of the 1980s, several firms had made the significant fixed investment in information technology and data necessary to offer national coverage; three of them (Equifax, Experian, and TransUnion) now dominate the U.S. market for consumer credit reporting.[14]  Instead of a reciprocal system in which members share information, the CRAs sell information to "subscribers."  These subscribers may or may not provide information about their accounts to the CRAs.  Most large banks and finance companies supply information about their credit accounts to all three of the nationwide CRAs, though they may be a customer of only one.[15]

The total amount of consumer credit extended grew substantially over the course of the 20th century.  From 1919 to 1969, consumer credit grew at four times the pace of the expansion in consumer spending.[16]  As consumer credit expanded after the Second World War, consumer reporting also became more widespread; by the end of the 20th Century, credit reports were used in a wide variety of credit and non-credit transactions.  As consumer reports became more important, concerns grew about their accuracy and how inaccurate information might harm consumers.  The CRAs make money by selling information, and the quality of their product is largely determined by the accuracy and completeness of the information.  This implicit quality requirement creates market incentives to maintain and improve the accuracy and completeness of the reports they sell.  Nevertheless, given the inevitable costs involved in achieving maximum accuracy, concerns arose about whether the CRAs were taking sufficient steps to ensure accuracy.  Consumers who were the subject of inaccurate reports had little or no recourse.  In some cases, CRAs forbade their subscribers from sharing the information in a consumer report with the consumer who was the report's subject.[17]  This situation led to the concern that a consumer's reputation might be unfairly tarnished by an inaccurate report provided by an anonymous source.

---

14.   Some nationwide CRAs have contractual relationships with various smaller regional or local CRAs.  These smaller agencies, traditionally called "service bureaus" or "affiliates," generally are independently owned and operated entities.  In the Commission's Free Annual File Disclosures Rule, these agencies are termed "associated consumer reporting agencies."  16 C.F.R. § 610.1(b)(2).  Associated agencies generally are not under common ownership or control with a nationwide CRA and are thus not corporate affiliates.  Rather, they typically have a contracted right to house some or all of the consumer data that they own on the systems of one or more nationwide CRAs.  The nationwide CRA with which such an entity is associated maintains the data for the associate bureau and has the right to sell that consumer data to its customers; the associated CRA may also have the right to sell consumer information owned by the nationwide CRA.

15.   *See* Statement of Stuart K. Pratt, *supra* note 2.

16.   *See* Hunt, *supra* note 13, at 10.

17.   *See* Michael E. Staten & Fred H. Cate, *Joint Center for Housing Studies Working Paper Series No. BABC 04-14: Does the Fair Credit Reporting Act Promote Accurate Credit Reporting?* (Feb. 2004).

The Fair Credit Reporting Act of 1970 addressed these issues by providing a number of new consumer protections.  First, it gave consumers a right to information about their CRA file,[18] without charge in the case of a consumer who has been turned down for credit as a result of a report from the CRA.[19]  Second, it created a dispute process by which a consumer could contest items in a consumer report that he or she believed to be in error.[20]  Third, the FCRA required that CRAs implement "reasonable procedures to ensure maximum possible accuracy" in consumer reports.[21]  In guaranteeing consumers access to their own credit reports and creating the dispute process, Congress recognized that consumers have a critical role in ensuring the accuracy of consumer reports.  Rather than precisely regulating the way that CRAs maintain their files, Congress opted to hold CRAs accountable for their procedures, and to give consumers the opportunity to check the accuracy of their files.  Amendments in 1996 strengthened the FCRA's consumer protections by, among other things, placing certain legal obligations on furnishers with respect to the accuracy of information provided.[22]  In passing the FACT Act in 2003, Congress further strengthened this approach by, for example, requiring that consumers have access to a free copy of their consumer report each year.

Consumer credit in the U.S. has continued to expand since enactment of the FCRA.  For instance, the Federal Reserve Board reports that the fraction of U.S. households with bank-type credit cards increased from 16% in 1970 to 68% in 1998.[23]  Among the lowest income quintile, the fraction rose from 2% of households in 1970 to 28% in 1998.  Further, as the credit market has matured, lenders' incentives have changed.  In addition to avoiding bad credit risks, lenders now focus on identifying people with good credit history so as to expand the market for lender products.[24]

## 2.   How the system works today

The three nationwide CRAs maintain files on approximately 200 million U.S. consumers and issue more than 1.5 billion reports a year in response to consumer applications for credit,

---

18.   FCRA § 609, 15 U.S.C. § 1681g.  Originally, consumers had a right under the FCRA only to the "nature and substance" of the information in their file.  In the 1996 FCRA amendments, this right was expanded to include all information in the consumer's file, except for risk scores.  *See* Consumer Credit Reporting Reform Act of 1996, P.L. 104-208, 110 Stat. 3009-426 (the Omnibus Consolidated Appropriations Act for Fiscal Year 1997, Title II, Subtitle D, Chapter 1).

19.   FCRA § 612(b), 15 U.S.C. § 1681j(b).

20.   FCRA § 611, 15 U.S.C. § 1681*i*.

21.   FCRA § 607(b), 15 U.S.C. § 1681e(b).

22.   Consumer Credit Reporting Reform Act of 1996, 110 Stat. at 3009-426.

23.   *Testimony of Dolores S. Smith, Federal Reserve Board, before the Subcommittee on Financial Institutions and Consumer Credit of the House Committee on Financial Services*, 107th Cong. (Nov. 1, 2001).

24.   *See, e.g.,* John M. Barron & Michael Staten, *The Value of Comprehensive Credit Reports: Lessons from the U.S. Experience* (2001) (Credit Research Center, Georgetown University).  In the section entitled "The Value of Positive Information," these authors describe a simulated measurement of the curtailment of credit when information in consumer reports is restricted to negative information.

employment, and insurance.  The data in these files are provided on a voluntary basis by about 30,000 data furnishers.[25]

The CRAs obtain records related to consumers' credit history from creditors, collection agencies, and public sources.  Each record is attached to identifying information such as name, social security number ("SSN"), address, and birth date.  The CRAs organize these records into "files," which refer to all records that the CRA believes to belong to the same person.  The CRAs attempt to maintain exactly one file for every credit-using consumer and to include as many of that consumer's accounts and other records as possible.  This report will refer to the process of adding information to consumer files as "file building."  A simplified version of the process is described in Figure 1a.[26]

The CRAs make the information in their files available to subscribers.  Subscribers may be the final users of consumer reports, or they may be "resellers," entities that purchase consumer reports from the nationwide CRAs and sell the information to final users.  In some cases, the reseller provides further input to the consumer report information, such as merging the reports from different nationwide CRAs, checking for accuracy, or adding information from other data sources.  This report refers to the process of furnishing consumer reports in response to inquiries as "file retrieval."  (See Figure 1b.)



**Figure 1a**: The file building process

| Furnisher updates consumer accounts | → | Furnisher submits consumer account information to CRA | → | CRA matches account information to consumer files | → | CRA updates files with new information |

**Figure 1b**: The file retrieval process

| Consumer applies for credit | → | Creditor submits inquiry about consumer to CRA | → | CRA matches inquiry to a consumer file | → | CRA returns file to creditor |

---

25.  *See* Statement of Stuart K. Pratt, *supra* note 2.  These figures and the discussion that follows were also based on conversations between FTC staff and representatives of the three nationwide CRAs.

26.  In the past, at least one of the nationwide CRAs organized its database differently.  Rather than maintaining consumer files, it maintained a dataset of separate records (accounts or public records).  When an inquiry was submitted, the CRA's computer program located all records that matched the identifying information in the inquiry and compiled that data into a consumer report.  This meant that two inquiries that used different identifying information for the same consumer might yield different reports (e.g., a credit report for Ann Margaret Smith might be different depending on whether she applied for credit under the name "Ann Smith" or "A. M. Smith").  It also meant that the same trade line might show up on the reports of two different consumers.  For example, an account belonging to "John Doe" might show up on the reports of both John Doe, Jr. and John Doe, Sr.  None of the nationwide CRAs follows this procedure any longer; every incoming record is assigned to exactly one consumer file within a given CRA's database.

**Federal Trade Commission**

The FCRA refers to information furnished to a final user as a "consumer report." Although this report is based on the information in an individual's file, it may not contain all the information in the file.[27]  In many cases, it may consist only of a credit "score" that summarizes a consumer's credit history.

There are many different types of credit scores in use today.[28]  Each of the nationwide CRAs offers a variety of scores, such as scores that measure general creditworthiness, scores that are specific to certain types of credit such as auto loans or mortgages, and credit-based scores used to measure risk for auto or homeowners insurance.[29]  Some of these scores are developed by the CRAs themselves, and others are developed by third parties, such as Fair Isaac Corp. (developers of the "FICO" scores).[30]  Users have the option to purchase a score for a consumer without receiving any other information from the consumer's file.  There are also lenders and insurers that have developed their own custom scores.  Some of these companies receive raw credit data from the CRA, typically in machine readable format, and use that data to calculate the score.[31]  Others make arrangements with a CRA to have the CRA calculate the score.

### 3.    What is in a file?

Consumer information in the files maintained by the nationwide CRAs can be divided into five categories:

1.    Identifying information.  This information typically includes name, address, birth date, SSN, and past or alternate names and addresses.  Identifying information is used to link information provided by different furnishers, and to determine to which consumer file a subscriber's inquiry pertains.

2.    Credit account information.  This category involves information about current and past credit accounts, including mortgages, car loans, credit cards, and installment payments for retail goods.  The 2003 Federal Reserve study, which examined a sample of files from one of the nationwide CRAs, reported that 87% of files in the sample contained at least one credit account, and 80% contained an account that is open and active.[32]  Credit account information includes the identity of the creditor, the date the account was opened (and closed, if applicable), whether the account is open and in good standing, the balance and credit limit, the amount past due, and past payment performance.

---

27.  In fact, the FCRA prohibits CRAs from disclosing some information in a consumer's file to most users – for example, inquiries for certain transactions not initiated by the consumer and some medical information. FCRA §§ 604(c), (g), 15 U.S.C. §§ 1681b(c), (g).

28.  Section 215 of the FACT Act mandates a study of the effects of "credit scores and credit-based insurance scores on availability and affordability of financial products," to be completed jointly by the FTC and the Federal Reserve Board, in consultation with the Department of Housing and Urban Development.  This study is in progress and is due in December of 2005.

29.  There are also scores that measure different types of risk, such as default risk or bankruptcy risk.

30.  Fair Isaac representatives provided an overview of their score development at the roundtable meeting hosted by the FTC on June 30, 2004.  A transcript is available at http://www.ftc.gov/ftc/workshops.htm (pages 65-73).

31.  They may also combine the credit history data with other information, such as information from an application, to calculate a score based on more than just credit history.

32.  *See* 2003 FRB Study, *supra* note 2, at 51.

3.  Public records.  Public records listed in consumer reports can include bankruptcies, foreclosures, civil judgments, and tax liens.  According to the 2003 Federal Reserve study, approximately 12% of files included at least one public record.[33]

4.  Collection accounts.  This category includes unpaid debts that have been turned over to a collections agency – for example, an unpaid hospital bill.  The 2003 Federal Reserve study found that approximately 30% of files had at least one collection agency account listed in them, although 52% of these collection actions appeared to be associated with medical bills and only 6% were associated with credit accounts.  For about 10% of the files surveyed, the only information in them was a collections account.[34]

5.  Inquiries.  When a subscriber requests a consumer report, a record of that "inquiry" becomes part of the consumer's file.  Approximately 58% of consumer files in the Federal Reserve study included at least one inquiry.[35]

## C.  Challenges in Assuring Accuracy and Completeness

Accurate and complete consumer reports are important for consumers in two basic ways:

•   For an individual consumer, a good credit rating may be the key to getting approved for a loan, job, apartment, insurance, phone service, or other services and benefits.  For products or services where the credit rating determines approval or denial, an inaccuracy in a consumer report could cause the consumer to be rejected rather than accepted.  For many products, such as credit and insurance, consumer reports are widely used to set pricing or other terms, depending on the consumer's risk ("risk-based pricing").[36]  For these products, an inaccuracy could cause the consumer to pay a higher price.

•   At the market level, accurate and complete credit ratings provide lenders with information about borrowers' credit history so they can more precisely estimate default risk and tailor their interest rates and other credit terms to the risk presented by the borrower.  For example, by identifying consumers with a good credit record, creditors can offer these customers a lower interest rate that reflects their lower default risk.  If credit information were frequently missing or wrong, then a good credit record would not be such a strong signal of a consumer's low default risk.

---

33.  *See id.* at 67.

34.  S*ee id.* at 68-69.

35.  *See id.* at 70.

36.  The use of credit scores in risk-based pricing allows lenders to assess the credit risk of the applicant before making an offer.  With risk-based pricing fewer consumers are refused credit outright because fewer credit decisions are absolute "grant/deny" determinations.  Indeed, credit scores are increasingly used in risk-based pricing calculations to set a wide variety of terms in granting loans – such as loan amount, rate, duration, down-payment or collateral requirements, fees, and payment schedule.  Depending on the criteria of the lender, relatively small differences in credit score can alter the mix of risk-based pricing elements offered to a consumer by a creditor.  Because scores in turn rely on all information in a consumer report (not just derogatory data), it is important that all information be accurate.  The information relevant to a credit score includes items that have not typically been regarded as "negative," such as number and type of tradelines, credit limits, inquiries, and open dates of accounts.

Federal Trade Commission

There are a number of reasons why a consumer report may not be a complete, accurate representation of a consumer's credit history.  First, there may be problems with the data provided by a furnisher.  A data furnisher may send a CRA information that is incorrect, may provide incomplete information, or may not provide any information at all.  Second, there may be problems with assigning data to the proper consumer files (file building).  A data furnisher may send correct information, but the CRA may not place it in the correct person's file.  Third, there may be problems with file retrieval.  A CRA may send to a subscriber a consumer report that pertains to the wrong person, or it may fail to send a report entirely.

These issues will be discussed below in more detail.

### 1.    Data provided by furnishers

If a CRA does not receive complete and accurate information from data furnishers, the CRA will be unable to provide complete and accurate consumer reports.  For example, if a consumer pays off her car loan with ABC Bank but the bank does not update its records, it might report an outstanding balance for the consumer's account.  In such cases, the CRA has no way of knowing that the information in question is inapplicable to the consumer's current creditworthiness.

Identity theft produces a similar type of inaccuracy.  When an identity thief opens an account in a victim's name, the account information will be reported to CRAs as if the account had been opened by the victim.  Until the furnisher of the data discovers that the account is fraudulent, there is no way for either the furnisher or the CRA to identify the information in the victim's credit file as incorrect.

A file may be incomplete because information was never furnished to a CRA.  Some creditors do not furnish information to the CRAs at all, and some report to only one or two of the three national repositories.[37]  For instance, a regional retailer that sells some products on credit might furnish data about its credit accounts to only one CRA.  The fact that some furnishers do not provide data to all three nationwide CRAs is one reason that many lenders, particularly in the mortgage industry, use reports from all three CRAs to evaluate a single consumer.

In addition, a creditor may deliberately withhold certain information for strategic reasons.  For instance, some lenders, particularly subprime lenders, choose to withhold positive credit information about their customers to prevent their most profitable customers from receiving competing offers.[38]  Several years ago, a few large creditors stopped reporting credit limits for

---

37.   *See* Statement of Stuart K. Pratt, *supra* note 2, at 4.

38.   *See* Robert B. Avery, Paul S. Calem & Glenn B. Canner, *Credit Report Accuracy and Access to Credit*, *Federal Reserve Bulletin*, Summer 2004, at 305, note 23 [hereinafter 2004 FRB Study]; and Comment of the Consumer Data Industry Association to the Federal Reserve Board, Sept. 17, 2004, at 4.  Many creditors obtain lists of consumers from CRAs for the purpose of making firm offers of credit (often referred to as "prescreened offers").  By refraining from reporting positive data on their best customers, banks and other creditors can keep their competitors from "cherry picking" those customers through prescreened offers.

many or all of their customers' accounts.  Again, this practice was apparently intended to prevent competitors from stealing the creditors' customers.[39]

The three nationwide CRAs attempt to encourage full reporting, in some cases by refusing to sell consumer reports to creditors who do not furnish consumer data.[40]  Their ability to enforce such rules, however, is limited by competitive pressures; if a CRA refuses to sell consumer reports to a particular lender, that lender could simply turn to another CRA.

## 2.  Assigning data to consumer files (file building)

There may also be problems with assigning data to the proper consumer files.  When a CRA's system fails to assign a consumer's data correctly, it can create either a "mixed file" or a "fragmented file."  Mixed files are a source of inaccuracy, and fragmented files are a source of incompleteness.

- A "mixed file" refers to a file that contains information pertaining to more than one consumer.  For example, if Tom Jones's credit card account were contained in Tom Brown's file, then Brown's file would be described as a mixed file.

- A "fragmented file" refers to a situation where more than one file in a CRA database exists for the same individual.  For example, Frederick von Strong might conceivably have one file listed under "Frederick von Strong" and another listed under "Frederick V. Strong."

These problems are most likely to occur when the right file is not easy to identify – typically when the identifying information the CRA receives from a data furnisher is not complete and accurate.[41]  For example, suppose a CRA receives information about a new credit account with the following identifying information:

K. Smith
111 First St.
Anytown, NJ 15555
Age: 26
Account No.  1234 5678

---

39.   *See* 2003 FRB Study, *supra* note 2, at 58, note 18.  A sample of consumer reports that FRB staff drew in June 1999 revealed that approximately 70% were missing credit limits on one or more of their revolving accounts. In a sample drawn in June 2003, the percentage had dropped to approximately 14%, due to public and private efforts to encourage the reporting of credit limits.  *See* 2004 FRB Study, *supra* note 37, at 306.

40.   For example, at the end of 1999, TransUnion stopped selling consumer reports to subprime lenders that did not furnish data to TransUnion, and Equifax announced that credit card issuers that did not furnish credit limit information would not receive credit limit information from Equifax.  *See* Lisa Fickenscher, *Credit Bureaus Move Against Lenders That Withhold Info*, *American Banker* (Dec. 10, 1999).

41.   Sources of matching problems are discussed in more detail in section IV of this report.  *See infra* page 35.

Federal Trade Commission
_____

The closest match in the CRA's database might be:

Kevin Adam Smith
111 First St.
Anytown, NJ 15555
Age: 26
SSN: 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

It is very likely that this is the right person, but it is not certain – the new account might belong to someone else (perhaps a spouse or sibling) with the same address, age, last name, and first initial.  The misidentified person could be someone with no existing file (presumably someone with no credit history), or someone with an existing file who has recently moved to Kevin's address.[42]

In developing their procedures for matching data to particular consumer files, the CRAs must decide what to do when matching information is incomplete.  If the CRA does not add the account to Kevin's consumer file, but instead creates a new file for "K. Smith," then it is quite likely that this will be a fragmented (incomplete) file.  If the CRA does add the account to Kevin's file, there is the risk of creating a mixed (inaccurate) file.  Although this risk might be relatively small, the CRAs receive billions of data updates each year.[43]  Even a small probability of error can translate into a significant number of actual files with errors.

"File segmentation" strategies can also create fragmented files.  Because of the serious consequences of a bad credit history, some consumers may attempt to manipulate the system to escape their existing credit history by applying for credit using identifying information that will not be matched to the existing file.[44]  CRAs have procedures to guard against manipulation of the system to some degree.  However, when these safeguards fail and the deception succeeds, the consumer will create a new, significantly incomplete file.[45]

## 3.   File retrieval

There may also be problems with file retrieval – that is, whether the CRA retrieves and sends the correct consumer's report in response to an inquiry.  For example, the CRA might send

_____

42.   For example, suppose Kendra Jones recently married Kevin Smith, changed her last name to Smith, and moved to his address.  In this case, there will be two people named K. Smith living at this address, but the CRA database will contain only one (at least until Kendra's records have been updated).  Possibilities such as this mean that the "best match" in the CRA's database is not always the correct one.

43.   *See* Statement of Stuart K. Pratt, *supra* note 2, at 4 (noting that "furnishers provide nearly 2 billion updates of information per month").

44.   For example, some "credit repair" organizations have advised consumers that they can establish a new credit identity by applying to the Internal Revenue Service for an Employer Identification Number, and then using this in place of the SSN when applying for credit.  The Commission has brought enforcement actions to stem this practice.  *See* FTC v. West Coast Publications, LLC, No. 99-04705GHK (C.D. Cal. 2000); *see also Credit Repair Scammers Settle FTC Charges* (FTC press release Mar. 9, 2000) available at http://www.ftc.gov/opa/2000/03/id1.htm.  Such schemes, as well as other credit repair strategies that abuse the credit reporting system, violate the Credit Repair Organizations Act, 15 U.S.C. § 1679.

45.   FTC staff communication with CRA representatives.

a single wrong report that pertains to the wrong person; might send multiple reports, one or more of which pertains to the wrong person; or might send no report when the consumer in fact has a file in the CRA's system.

To see how this can happen, suppose a lender requests a consumer report using the identifying information for "K. Smith" from the example above.  Faced with an uncertain match, the CRA must decide whether to provide a report based on Kevin Smith's file or to provide no report at all (a "no-hit," suggesting that no such consumer exists in its database).  If the CRA provides the report, and the applicant is not Kevin Smith, then the lender may process the application using the wrong consumer's credit information.  If the CRA does not provide the file, and the applicant is indeed Kevin Smith, then the creditor may deny credit in the belief that the applicant has no credit history.[46]  In other words, the matching procedures for retrieving files – like those for building files – involve a tradeoff between providing the wrong information (here, an entirely wrong file), and providing too little information (reporting a "no-hit" when a file in fact exists).

It is uncommon for the CRAs to send out a single consumer report that pertains to the wrong person.  Suppose that person A and person B both have files in the CRA's system, and that their identifying information is very similar.  If person A applies for credit, the CRA may identify two files as being close matches, but it is very unlikely that person B's file will be identified as a *better* match than person A's file.  The CRAs report a small number of complaints from users about receiving the wrong file; one reported that in 2003 it had fewer than 200 complaints of this type from subscribers.[47]

The case where a single wrong match seems most likely is when a credit applicant (person A) does not have a file in the CRA's database, but there is someone else in the database (person B) with very similar identifying information.  In this case, person B's file will be identified as the best match, and if the match is close enough, the CRA might provide a report on B even though the correct outcome would be a no-hit.[48]  If a given consumer does have a file in the CRA's

---

46.  In either case, the potential harm to Kevin (or to Kendra, if she is the K. Smith applying for credit) depends on the actions of the user of the consumer report.  If the user receives the wrong person's file, he or she may notice the discrepancy and investigate further, rather than simply denying credit.  If the user receives no report, he or she may request a report again, this time using more complete information.

47.  FTC staff communications with CRA representatives.  In many cases neither the consumer nor the creditor might notice if the wrong file is furnished.  For example, where credit decisions are highly automated – essentially constituting a "yes" or "no" determination – the person processing the application may not examine any information from the consumer's file apart from whether the application was approved.  Particularly if the answer is "yes," there may be little incentive for anyone to check whether the report in fact pertains to the right person.  It is also possible that users will realize they received the wrong report, perhaps because they made the inquiry based on insufficient information, and will simply resubmit the request with more complete information.  In these cases, the CRA might not receive a complaint, but there also would be no effect on the consumer's application for credit if the correct file is ultimately furnished.

48.  A case that appears to fit this description is that of *Jason Turner v. Equifax Credit Information Services, Inc*, No. CV 02-J-0787-S (N.D. Ala. filed Mar. 28, 2002).  *See* Evan Hendricks, *Credit Scores & Credit Reports: How the System Works, What You Can Do* 145 (2004).  According to Hendricks, when Turner applied for his first credit card, Equifax furnished the report of another person with the same name and a similar SSN.  Moreover, Turner was unable to correct the problem through the dispute process because he had no file in the CRA's database that could be corrected.

system (and applies for credit using his own identifying information), then it is quite unlikely that the CRA will provide the wrong file.

In determining which file to return, the CRA could also return multiple consumer reports on the same consumer. This might happen when a subscriber's inquiry seems to match more than one file in the CRA's system. For example, the CRA might have a file for "Kevin Smith" and another file for "K. Smith." The CRA knows that this might represent a fragmented file, but may not be confident enough to merge the two files. If a subscriber requests a report for "Kevin Smith," the CRA might return two reports, one based on the "Kevin Smith" file and one based on the "K. Smith" file. This would give the user an opportunity to consider information that probably pertains to Kevin Smith, but also signals that the CRA is not entirely confident of the match. Sending out the second file also allows the CRA to provide information that might otherwise be missed, without permanently mixing that information with other data known to pertain to the consumer (and thus risking creation of a "mixed file").

In this case, there is a reasonable chance that one of the reports pertains to the wrong consumer. If one report is wrong, and the report's user does not discover the error, the consumer's application for credit might be adversely affected.

Only one of the nationwide CRAs currently has a policy of sending out multiple files in response to a single request.[49] Another changed its system in August of 2004 in such a way that it never sends out multiple files, and the third stopped sending out multiple files within the last several years. The CRA that supplies multiple reports in response to a single inquiry says that its system identifies multiple matches in response to fewer than 4% of inquiries and that it sends out multiple reports only when the subscriber making the inquiry asks to see them all.[50] This CRA reports that it actually sends out multiple reports in response to fewer than 1% of inquiries.[51]

## D.  The Accuracy and Completeness Requirements of the FCRA[52]

The FCRA contains a number of important requirements relating to the accuracy of consumer reports, including requirements imposed when the FCRA was enacted in 1970 and those added by the 1996 amendments and the FACT Act. In general, these requirements use two

---

49.  FTC staff communication with CRA representatives.

50.  Fiserv/Chase Credit Research, a reseller of consumer reports, provided data to the FTC that independently confirm that this CRA furnishes multiple files in about 4% of cases. This estimate comes from a sample of consumer reports provided to mortgage lenders by the three nationwide CRAs.

51.  FTC staff communication with CRA representatives. As noted above (*supra* note 50), data provided by Fiserv/Chase Credit Research indicates that the CRA in question provides multiple reports to the mortgage industry in 4% of cases. Because mortgage lenders may be more likely than other users to request multiple files, the 4% figure is not necessarily inconsistent with the reported aggregate figure of 1% for all inquiries. For further discussion of the issue of multiple files, see *infra* page 57.

52.  As noted *supra* note 10, the term "completeness" has one meaning under the FCRA and a different meaning for purposes of this Report. "Completeness" under FCRA § 611 refers to the sufficiency of the information in specific items in the consumer's file, whereas the "completeness" addressed in this Report refers to the quantity of information in a consumer's file and whether relevant transactions have been included. To avoid confusion, the discussion in this section (and in part E, below) will use the term "accuracy" to encompass both the "accuracy" and "completeness" provisions of the FCRA.

major avenues to promote accuracy.  First, the FCRA establishes mechanisms for consumers to learn about possible errors in their consumer reports and have them corrected.  Second, the FCRA provides that CRAs must follow "reasonable procedures to assure maximum possible accuracy of the information" they report.[53]

Section 609 of the FCRA is one of the key mechanisms for ensuring that consumers learn about errors.  It gives consumers the right to request all of the information in their files (except risk scores), as well as the identity of all recipients of their report for the last year (two years in employment cases).[54]  Often, a consumer first learns about his or her ability to request this information after a creditor or other consumer report user denies the consumer's credit application or takes some other "adverse action" and provides a notice to the consumer under Section 615 of the FCRA.[55]  That provision requires users of consumer reports to notify consumers of any adverse action based in whole or in part on information in a consumer report, and to provide consumers with certain key information, including (1) the identity of the consumer reporting agency from which the creditor obtained the report; (2) the right to obtain a free copy of the report; and (3) the right to dispute the accuracy of information in the report.[56]

Once a consumer has reviewed his or her report and identified what the consumer believes is an error, Section 611 gives the consumer a right to dispute the error and, depending on the outcome of the dispute, to have the error corrected.[57]  The consumer initiates a dispute by notifying the CRA.  The investigation of the dispute includes consideration by the CRA of "all relevant information" submitted by the consumer, which the CRA must also provide to the original furnisher of the disputed information for review by the furnisher.  The CRA generally has 30 days to complete its investigation, after which it must record the current status of the information, or delete it if it is found to be inaccurate or unverifiable, and then report the results

---

53.   By its terms ("*reasonable* procedures . . . maximum *possible* accuracy"), the statute itself recognizes that absolute accuracy is, as a practical matter, impossible.  FCRA § 607(b), 15 U.S.C. § 1681e(b) (emphasis added).

54.   15 U.S.C. § 1681g.

55.   15 U.S.C. § 1681m.  In the original FCRA, adverse action notices were required only when "credit or insurance . . . or employment . . . is denied or the charge for such credit or insurance is increased . . . ."  In the 1996 amendments, Congress required adverse action notices when consumer reports are used in other situations, such as opening savings or checking accounts, apartment rentals, and retail purchases by check.  The 1996 amendments also included others changes affecting the scope of "adverse action" in credit, insurance, and employment transactions.  *See* FCRA § 603(k), 15 U.S.C. § 1681a(k).

56.   FCRA Section 612 provides that CRAs must provide a free disclosure if a consumer makes a request within 60 days of receipt of an adverse action notice, and may charge a fee (currently nine dollars) in other cases.  15 U.S.C. § 1681j.  Under the FACT Act, consumers now also have a right to obtain a free annual file disclosure from each of the nationwide CRAs through a "centralized source."  FACT Act § 211, codified at 15 U.S.C. § 1681j(a).  Under the Commission's rule implementing this requirement, the centralized source will first be available to some consumers beginning December 1, 2004, and available to all consumers by September 1, 2005.  *See* Free Annual File Disclosures; Final Rule, 69 Fed. Reg. 35,468 (June 24, 2004) (codified at 16 C.F.R. parts 610 and 698).  *See also* http://www.ftc.gov/os/2004/05/040520factafrn.pdf and http://www.ftc.gov/os/2004/06/040624factafreeannualfrn.pdf.  The FTC and Federal Reserve Board are charged under Section 313(b) of the FACT Act to study how CRAs and furnishers handle consumer disputes.  The agencies' report will be submitted to Congress under separate cover.

57.   15 U.S.C. § 1681*i*.

of the investigation to the consumer.[58]    If the investigation does not resolve the dispute, the consumer may file a statement with his or her version of the facts, which must then be included in any subsequent consumer report that includes the disputed item.[59]

Since 1996, and as supplemented by the FACT Act, the FCRA has also imposed certain accuracy and reinvestigation duties on furnishers of information to CRAs.  These requirements recognize that furnishers – the original source of the information – have a critical role to play in the overall accuracy of consumer report information.  Thus, Section 623 of the FCRA now requires furnishers to investigate disputes received from CRAs and to correct and update information provided to CRAs that they later learn is inaccurate.  In certain instances, after implementing regulations are issued, furnishers will also be required to investigate and respond to disputes made directly to them by consumers regarding the accuracy of their information.[60]

## E.   FTC Efforts to Promote Compliance with the FCRA Accuracy Requirements

Since the FCRA was first enacted in 1970, the Commission has made significant efforts to promote compliance with the law's accuracy requirements.  Such efforts have included law enforcement, business and consumer education, informal legal interpretive and other guidance, and rulemakings to implement FCRA amendments.

The Commission's law enforcement efforts have included cases[61] to ensure:  (1) compliance with the adverse action notice requirements on the part of creditors,[62] employers,[63] and

---

58. To address the problem of recurring errors, the FCRA prohibits CRAs from reinserting into a consumer's credit file previously deleted information without first obtaining a certification from the furnisher that the information is complete and accurate, and then notifying the consumer of the reinsertion. 15 U.S.C. § 1681i(a)(5).

59. Disputed information is utilized by most credit scoring models.

60. 15 U.S.C. § 1681s-2.

61. A significant majority of the complaints cited herein that the Commission has brought alleging FCRA violations were settled by entry of a consent order.  Additionally, administrative cases (generally those cases in the following footnotes with an "F.T.C." reporter citation) sunset after twenty years.  Those administrative cases that antedate 1984 are cited here to show the range and magnitude of Commission enforcement activity.

62. *See, e.g.,* Hospital & Health Services Credit Union, 104 F.T.C. 589 (1984); Associated Dry Goods Corp., 105 F.T.C. 310 (1985); Wright-Patt Credit Union, 106 F.T.C. 354 (1985); Federated Dep't Stores, 106 F.T.C. 615 (1985); FTC v. Winkleman Stores, Civ. No. C 85-2214 (N.D. Ohio  1985); FTC v. Strawbridge & Clothier, Civ. No. 85-6855 (E.D. Pa. 1985); FTC v. Green Tree Acceptance, Civ. No. CA 4 86 469 K (M.D. Tex. 1988); Quicken Loans Inc., D-9304 (FTC Decision and Order Apr. 8, 2003).  *See also* FTC v. Aristar, Inc., Civ. No. C-83-0719 (S.D. Fla. 1983); FTC v. Allied Finance Co., Civ. No. CA3-85-1933F (N.D. Tex. 1985); FTC v. Norwest Fin., Inc., Civ. No. 87 06025R (C.D. Cal. 1987); FTC v. City Fin. Corp., Civ. No. 1:90-cv-246-MHS (N.D. Ga. 1990); FTC v. Tower Loan of Mississippi, Civ. No. J90-0447 (J) (S.D. Miss. 1990); FTC v. Barclay American Corp., Civ. No. C-C-91-0014-MU (D.N.C. 1991); FTC v. Academic Int'l, Civ. No. 91-CV-2738 (N.D. Ga. 1991); FTC v. Bonlar Loan Co., Civ. No. 97C 7274 (N.D. Ill. 1997); FTC v. Capital City Mortgage Corp., Civ. No. 1:98CV00237 (D.D.C. 1998).

63. *See, e.g.,* Electronic Data Systems, 114 F.T.C. 524 (1991); Kobacker Co., 115 F.T.C. 13 (1992); Keystone Carbon Co., 115 F.T.C. 22 (1992); McDonnell Douglas Corp., 115 F.T.C. 33 (1992); Macy's, Inc.,115 F.T.C.

telecommunications providers;[64] (2) compliance with the privacy and accuracy requirements by the nationwide CRAs;[65] (3) compliance with the FCRA's dispute provisions by resellers of consumer reports (agencies that purchase consumer reports from the major CRAs and resell them);[66] and (4) compliance with respect to consumer reports used in non-credit transactions.[67]

Recent actions have also focused on the new accuracy provisions added by the 1996 amendments.  For example, the Commission settled cases with the three nationwide CRAs, charging that they failed to comply with the new requirement that they establish a toll free number, with "personnel accessible" during normal business hours to answer consumers' questions about their consumer reports.[68]  In addition, the Commission has settled cases against furnishers of information to CRAs alleging that they knowingly reported inaccurate information to the CRAs in violation of the new furnisher provisions added by the amendments.[69]  The Commission also aggressively pursues businesses engaging in fraudulent "credit repair" – by

---

43 (1992); Marshall Field & Co., 116 F.T.C. 777 (1993); Bruno's, Inc., 124 F.T.C. 126  (1997); Aldi, Inc., 124 F.T.C. 354 (1997); Altmeyer Home Stores, Inc., 125 F.T.C. 1295 (1998); U.S. v. Imperial Palace, Inc., Civ. No. CV-5-04-0963-RLH-PAL (D. Nev. 2004).

64.   *See, e.g.,* U.S. v. AT&T Corp., No. 04-4411(SRC) (D.N.J. 2004); U.S. v. Sprint Corp., No. 4:04 CV 361 RH/WCS (N.D. Fla. 2004).

65.   *See, e.g.,* TransUnion Credit Info. Co., 102 F.T.C. 1109 (1983); FTC v. TRW, Inc., 784 F. Supp. 361 (N.D. Tex. 1991); Equifax Credit Info. Services, Inc., 130 F.T.C. 577 (1995).  Each of these "omnibus" orders differed in detail, but generally covered a variety of FCRA issues including accuracy, disclosure, and permissible purposes.

66.   *See* First American Real Estate Solutions, LLC, 127 F.T.C. 85 (1999) (consent with a reseller concerning the dispute obligations of CRAs).

67.   Howard Enterprises, Inc. 93 F.T.C. 909 (1979) (bad check lists); Equifax, Inc. (formerly Retail Credit Company), 96 F.T.C. 844 (1980) (investigative consumer reports); MIB, Inc., 101 F.T.C. 415 (1983) (medical information reports).

68.   *See* FCRA § 609(c)(1), 15 U.S.C. § 1681g(c)(1).  The complaints in these cases alleged that the CRAs failed to maintain adequate personnel, resulting in busy signals, excessive hold times, and the blocking of consumer calls from particular locations.  The orders require the CRAs to maintain adequate personnel, establish auditing requirements to ensure future compliance, and pay a total $2.5 million in FCRA civil penalties.  *See* FTC v. Equifax Credit Info. Services, Inc., No. 1:00-CV-0087 (N.D. Ga. 2000); FTC v. Experian Mktg. Info. Solutions, Inc., No. 3-00CV0056-L (N.D. Tex. 2000); FTC v. TransUnion LLC, 00C 0235 (N.D. Ill. 2000); *see also* U.S. v. Equifax Credit Info. Servs., Inc., Civ. No. 1:0-CV-0087-MHS (N.D. Ga. 2003) ($250,000 violation of consent decree).

69.   *See* FTC v. NCO Group, Inc., 2004 WL 1103323 (E.D. Pa. 2004) (providing inaccurate delinquency dates; $1.5 million civil penalty); U.S. v. Fairbanks Capitol Corp., Civ. Action No. 03-12219 DPW (D. Mass. 2003) (furnishing information to a CRA knowing or consciously avoiding knowing that the information is inaccurate); FTC v. DC Credit Servs., Inc., No. 02-5115 (C.D. Cal. 2002) (furnishing information to a CRA knowing or consciously avoiding knowing that the information is inaccurate, failing to notify and provide corrections to CRAs when previously-reported information found to be inaccurate, failing to provide accurate delinquency dates, failing to report accounts as "disputed"; $300,000 civil penalty); FTC v. Performance Capital Mgmt., Inc., 2:01cv1047 (C.D. Cal. 2000) (providing inaccurate delinquency dates, failing to properly investigate disputes, failure to report accounts as "disputed"; $2 million civil penalty).

frivolously or fraudulently disputing accurate information in CRA databases, unscrupulous credit repair firms can degrade the accuracy and quality of information in credit reports."[70]

The FTC also promotes compliance with the accuracy requirements by educating businesses and consumers about the FCRA. For example, the Commission's FCRA Commentary[71] and Staff Opinion Letters[72] interpret the FCRA and provide concrete and specific guidance to businesses regarding the FCRA's accuracy provisions. Further, various business publications, available on the FTC's website and in print, provide guidance on the responsibilities of furnishers[73] and users of consumer reports[74] with respect to these provisions. In addition, the FTC continues to educate consumers about the FCRA and, in particular, the various mechanisms available to them for identifying and correcting inaccuracies in their reports. The agency's consumer publications include: *Your Access to Free Credit Reports*,[75] which provides an overview of consumer rights under the FCRA; *Credit Scoring*,[76] which explains the system creditors use to determine whether to grant consumers credit; *Building a Better Credit Record*,[77] which teaches consumers how to legally improve their consumer reports, deal with debt, and spot credit-related scams; *Credit Repair: Self-Help May Be Best*,[78] which explains how to improve your creditworthiness and lists legitimate resources for low or no cost help; and *How to Dispute Credit Report Errors*,[79] which explains how to dispute and correct inaccurate information on a consumer report and includes a sample dispute letter.

---

70. *See, e.g.*, FTC v. ICR Servs., Inc., Civ. No. 03-C-5532 (N.D. Ill. filed Aug. 8, 2003) ($1.15 million in consumer redress), available at http://www.ftc.gov/opa/2003/08/nationwide.htm. The Commission also has conducted several sweeps of fraudulent credit repair operations, including Operation Eraser (1998, 21 FTC enforcement actions and 11 companion actions brought by state attorneys general and the U.S. Department of Justice), Operation New ID - Bad Idea I (1999, 22 FTC enforcement actions and 14 actions brought by fellow law enforcement agencies), Operation New ID - Bad Idea II (1999, eight FTC enforcement actions and eight actions brought by fellow law enforcement agencies).

Under section 404 of the Credit Repair Organizations Act, "[n]o person may make any statement, or counsel or advise any consumer to make any statement, [to a CRA] which is untrue or misleading with respect to any consumer's credit worthiness, credit standing, or credit capacity . . . [or] the intended effect of which is to alter the consumer's identification to prevent the display of the consumer's credit record, history, or rating for the purpose of concealing adverse information that is accurate and not obsolete." 15 U.S.C. § 1679b.

71. 16 C.F.R. Part 600.

72. Available at http://www.ftc.gov/os/statutes/fcra/index.htm.

73. *See Credit Reports: What Information Providers Need to Know*, available at http://www.ftc.gov/bcp/conline/pubs/buspubs/infopro.htm.

74. *See Using Consumer Reports: What Employers Need to Know*, available at http://www.ftc.gov/bcp/conline/pubs/buspubs/credempl.htm.

75. http://www.ftc.gov/bcp/conline/pubs/credit/freereports.htm.

76. http://www.ftc.gov/bcp/conline/pubs/credit/scoring.htm.

77. http://www.ftc.gov/bcp/conline/pubs/credit/bbcr.htm.

78. http://www.ftc.gov/bcp/conline/pubs/credit/repair.htm.

79. http://www.ftc.gov/bcp/conline/pubs/credit/crdtdis.htm.

Finally, the Commission is currently engaged in implementing a host of new FCRA provisions, adopted as part of the FACT Act. As these provisions become effective, they should further enhance the accuracy of consumer reports. Among other things, they include a number of measures designed to improve the rigor of the dispute and reinvestigation process.[80] Also, consumers now have the right to a free annual file disclosure, which may encourage more consumers to check their consumer reports regularly for errors.[81] In addition, a number of the FACT Act's identity theft provisions promise to improve the prevention, detection, and remediation of identity theft, a significant source of inaccuracies in consumer reports, by imposing new duties on CRAs,[82] creditors,[83] merchants,[84] furnishers,[85] and debt collectors.[86] There are also new furnisher duties, including rules that will require furnishers to have reasonable procedures to ensure accuracy,[87] and a right for consumers to submit certain disputes, as will be determined by regulation, directly to a furnisher rather than going through a CRA.[88] Further, creditors will provide a new "risk-based pricing" notice when they offer credit on materially less favorable terms based on information in consumer reports.[89] Consumers will be able to request and obtain their credit scores from the CRAs and, in certain situations, creditors.[90] Finally, the FTC has implemented a new complaint referral system pursuant to the FACT Act[91] under which consumer complaints to the FTC regarding the accuracy of consumer report

---

80. *See* FACT Act § 314 (CRAs must report to furnishers results of reinvestigations; furnishers must modify records upon completion of reinvestigation); § 316 (reseller must refer reinvestigation to repository); § 317 (CRA reinvestigations must be reasonable).

81. *See* Free Annual File Disclosures, 69 Fed. Reg. at 35,468.

82. *See* FACT Act § 112 (fraud alerts and active duty alerts); § 315 (must report address discrepancy to users of consumer reports); § 115 (truncation of social security number in consumer file disclosures); and § 152 (blocking of information resulting from identity theft).

83. *See, e.g.*, FACT Act § 114 (requiring procedures to identify and respond to identity theft "red flags"); and § 112 (requiring creditors to check fraud alerts before granting credit, increasing credit limit, or issuing another card).

84. *See, e.g.*, FACT Act § 113 (credit and debit card truncation).

85. *See* FACT Act § 154 (prohibition on "repolluting" credit reports with identity theft related trade lines; prohibition on selling, transferring, or placing for collection identity theft debts after being notified of block by consumer reporting agency).

86. *See* FACT Act § 155 (must report identity theft to creditor; must share information with identity theft victims).

87. *See* FACT Act § 312.

88. *See* FACT Act § 312.

89. *See* FACT Act § 311.

90. *See* FACT Act § 212.

91. *See* FACT Act § 313(a).

information[92] will be forwarded to the three major CRAs.  The CRAs will review the complaints, correct the files if necessary, and report the results to the FTC.[93]

The FTC will continue these efforts to ensure that all of those who play a role in the consumer reporting system – CRAs, furnishers of consumer information, users of consumer reports, and consumers – contribute to the accuracy of the data stored within it.

## F.   Prior Studies of Accuracy and Completeness

Several empirical studies have already been conducted relating to the accuracy and completeness of consumer report data.  FTC staff reviewed these studies, both to gain a better understanding of the issues and to develop the Commission's own methodology for measuring the levels of accuracy and completeness in consumer reports.

One category of study, the consumer survey, asks consumers to review their own consumer reports and identify errors; the consumer's perception and recollection is the basis for determining accuracy.  These studies find a high rate of error in consumer reports.  A second category uses CRA dispute data as a proxy for accuracy.  Using statistics from the consumer reporting industry about how often consumers dispute information in their consumer reports and how often the disputes result in changes to the consumers' credit files, these studies generally conclude that there is a low rate of error.  A third category analyzes anonymous data supplied by several different CRAs to look at information about the same consumer.  These studies find differences across consumer reports maintained by each CRA for the same consumer and within individual consumer reports; they also identify problems with incomplete and missing data.

As described in greater detail below, each of these approaches can provide some useful information about the accuracy and completeness of consumer report information, but none provides a comprehensive view.[94]  Indeed, accuracy is a complex issue and presents challenges in defining and identifying errors.  To determine fully whether information in a consumer report is accurate and complete takes the cooperation of consumers, who are the best or only source for identifying certain kinds of errors, such as an account that does not belong to them; data furnishers, who can verify or refute what a consumer believes to be true about a particular account; and the CRAs, the repositories for consumer report data.  None of the existing studies

---

92.  The FTC collects complaints from consumers to identify important or emerging consumer protection issues and to target its law enforcement and education efforts.  Its complaint databases include a number of complaints alleging consumer report inaccuracies.  Although valuable as barometers of possible violations, these complaints alone do not necessarily indicate whether a serious problem with credit file inaccuracies exists, because the complaints are both underinclusive and overinclusive.  Some consumers whose credit files contain inaccuracies never complain to the FTC; some who do complain mistakenly believe that accurate information in their files is inaccurate.

93.  Additional information available at http://www.ftc.gov/opa/2004/04/cra.htm.

94.  As noted above, in June 2004, the FTC's Bureau of Economics held a roundtable discussion with researchers, scholars, and practitioners in the consumer reporting industry to review the methodologies that assess accuracy and completeness of consumer reports, including the empirical studies discussed here.  Many of the points discussed here were discussed at the roundtable.  A transcript of the proceedings is available on the Commission's website at http://www.ftc.gov/be/workshops/.

relies on the participation of all of these three key stakeholders.  Rather, each relies on different sources to draw conclusions about accuracy.

### 1.   Consumer surveys: consumer review of their own consumer reports

The U.S. Public Interest Research Group ("US PIRG") and Consumers Union have each conducted studies that asked consumers to review their own consumer reports for errors. Generally, these studies suggest high error rates.  For example, the 2000 Consumers Union study (which was based on 63 consumer reports obtained by 25 Consumers Union employees and family members) reported that more than half of the reports had an error "with the potential to derail a loan or deflect an offer for the lowest-interest credit card."[95]  The study cited examples of mismatched files, misattributed debts, and inconsistencies in files across the three nationwide CRAs.  US PIRG has also conducted consumer surveys on consumer report accuracy and completeness, and similarly concluded that many consumer reports contain mistakes.[96]

#### a.   *US PIRG study's findings*

US PIRG's most recent study, released in June 2004, was based on consumers reviewing their own consumer reports for errors; it updated a similar study conducted in 1998.[97]  PIRG sent email messages to its members requesting their voluntary participation in a study about the accuracy of consumer reports.  PIRG staff, family, and friends participated in the study as well.  The total sample for the study included 154 adults who completed 197 surveys (a survey was completed for each CRA that provided a consumer report; some participants requested their report from more than one CRA).  The participants were in 30 states and ranged in age from 20 to 81.

The 2004 US PIRG study reported that:

*   One in four (25%) of the consumer reports surveyed reportedly contained "serious" errors that could result in the denial of credit or other adverse consequences.  Such errors included accounts incorrectly marked delinquent; accounts inaccurately listed as being in collection; accounts that did not belong to the consumer; and bankruptcies, tax liens, and other judgments that did not belong to the consumer or were incorrectly listed as open.

---

95.   *Credit Reports: How do Potential Lenders See You?,* ConsumerReports.org, July 2000.

96.   *See* Jon Golinger, *PIRG: Mistakes Do Happen: Credit Report Errors Mean Consumers Lose*, (Mar. 1998); National Association of State PIRGs, *Mistakes Do Happen: A Look at Errors in Consumer Credit Reports* (June 2004) [hereinafter 2004 US PIRG Study].  Both of these reports are available at http://www.uspirg.org.

97.   The 1998 survey was based on 133 consumer reports obtained by 88 US PIRG employees and affiliates who were asked to check their own consumer reports.  The study reported that 70% of all reports contained some mistake, and 29% contained false delinquencies or accounts that did not belong to the consumer.  The report also described difficulties that participants experienced in acquiring copies of their reports, including busy signals, long waits to receive reports, or reports never being sent.  As noted above, the FTC subsequently investigated the three nationwide CRAs and settled charges that they violated the FCRA by failing to maintain a toll-free telephone number at which personnel were accessible to consumers during normal business hours. *See supra* note 65.

Federal Trade Commission

- More than half (54%) of the consumers surveyed reported that they found inaccurate personal identifying information in their consumer reports, such as name misspellings, inaccurate birth dates, out-of-date addresses listed as current, and incorrect addresses.

- Over one-fifth (22%) of the consumer reports surveyed listed a mortgage or loan twice.

- Almost one-third (30%) of the consumer reports surveyed contained an account that the consumer claimed had been closed but remained listed as open.

- Approximately one in twelve (8%) of the consumer reports surveyed reportedly were missing major credit, loan, mortgage, or other accounts that demonstrated the creditworthiness of the consumer.

- In total, nearly eight out of ten (79%) of the consumer reports surveyed reportedly contained some error.

### b.   Comments on consumer surveys

In its 2003 review of data about consumer report errors, the GAO concluded that the consumer survey research was of limited value in determining the frequency of errors in consumer reports.[98]  As the GAO noted, the surveys did not use a statistically representative sample and counted any inaccuracy as an error, regardless of the impact the error might have.[99]

In response to these studies, the Consumer Data Industry Association ("CDIA") has argued that many of the inaccuracies identified in consumer survey research are either unimportant to the credit rating decision (such as certain errors in personal identifying information), or are not errors at all.[100]  The CDIA asserts that consumers frequently make mistakes when evaluating their reports – for example, not recognizing an account because the original lender has sold the loan to another entity; believing that an account status is erroneous when it simply has not yet been updated; or not understanding that certain events, like a bankruptcy, may be reported for a number of years after the occurrence.  Because consumers do not fully understand how the consumer reporting industry works, the CDIA maintains, they may perceive information to be erroneous when it is not.

Despite these limitations, these studies are able to capture certain errors – like an account that does not belong to the consumer – that may be very important to consumers and to their credit rating, and that generally can be identified only by the consumer.  Further, the studies are good indicators of what consumers perceive to be errors and topics for which further consumer education might be useful.

---

98.   *General Accounting Office, Report No. GAO-03-1036T, Consumer Credit: Limited Information Exists on the Extent of Credit Report Errors and their Implications for Consumers* (July 31, 2003) [hereinafter "GAO Report"].  As the title of the report indicates, the GAO concluded that there was a lack of comprehensive information regarding the accuracy of consumer reports.  Although the GAO report did not consider US PIRG's 2004 study, it did consider US PIRG's 1998 study, which used a similar approach.

99.   The 2004 US PIRG study presents the same limitations.

100.  *See* Statement of Stuart K. Pratt, *supra* note 2.

## 2.   Dispute data: records of CRAs and furnishers of information

The consumer reporting industry has looked at dispute data as a measure of consumer report accuracy.  There are two main sources of information about consumer disputes.  The first is a 1992 Arthur Andersen study conducted on behalf of the Associated Credit Bureaus (now the CDIA).[101]  The Andersen study considered a sample of consumers who were denied credit and tracked how many disputed information in their reports and whether reinvestigation by furnishers and reevaluation by creditors resulted in a different credit decision.  The second source is a set of more recent summary statistics related to disputes provided by the CDIA, which can also be used to make approximate inferences about accuracy.

### a.   Arthur Andersen 1992 study

The ACB Consumer Information Foundation commissioned Arthur Andersen & Company to perform a study about consumer report accuracy.  The study requested five creditors to provide a list of all credit applicants who had been declined credit and received a notice of adverse action for a three-month period in 1991.  Of these 111,770 applicants, a random sample of 15,703 credit applicants was selected for the study.  The study then asked the CRAs to review the credit files of the individuals in the sample and determine whether the credit applicant had requested a copy of his or her consumer report, and if so, whether he or she disputed the accuracy of any information in the report.  For those consumers who had disputed information in their files, Andersen asked the creditors to reevaluate the files, to see whether there was a correction made that affected the initial credit decision.

The Andersen study reported that:

- Of the 15,703 consumers who were denied credit and received an adverse action notice, 1,223 (8%) requested a copy of their consumer report.

- Of the 15,703 consumers who were denied credit and received an adverse action notice, 304 (2%) disputed information contained in their report.[102]

- All 304 files were reinvestigated, and at the time of Andersen's report, 267 of these had been reevaluated by the credit grantors.[103]  Of the 267 files that were reevaluated, 36 resulted in a reversal of the original decision to deny credit.  Thus,  Andersen concluded that less than

---

101.  The complete study is proprietary and was not made available publicly.  The key findings of the report were summarized by ACB in an Executive Summary on February 4, 1992, which Andersen verified.

102.  Another way to look at this data is that approximately 25% of all consumers who received an adverse action notice and requested a copy of their report disputed information contained in their report.

103.  No information was provided about the 37 files that had not been reevaluated by the time of the study.

Federal Trade Commission ───────────────────────────────────

3% of consumers who requested a copy of their consumer report would have received a different result.[104]

### b.    2003 CDIA statistics

In testimony to Congress in July 2003, the CDIA reported industry-wide data from its nationwide consumer reporting system members.  The CDIA estimated that approximately 16 million consumer reports are disclosed to consumers each year.  The majority of these – 84% – are in response to adverse action notices.  The CDIA further estimated that of the 16 million file disclosures issued annually to consumers, about half of the consumers (8 million consumers) do not contact the CRAs again.  Of those who do, about half (4 million consumers) have a question, and half have a dispute.

The CDIA estimated the breakdown of dispute results as follows[105]:

•    46% of disputes result in the original information being verified as reported.

•    27% of disputes result in the information being modified per furnisher instructions.

•    10.5% of disputes result in the information being deleted per furnisher instructions.

•    16% of disputes result in the information being deleted due to the expiration of the 30-day limit on dispute resolution.

Thus, at least 46% of files that are disputed are in fact, according to the furnisher, correct and not inaccurate.  Although this suggests that the error rate in disputed files would be 54%, the CDIA argues that in the second and fourth categories listed above, it is not clear whether there is an actual error.  In the second category, the modification might be an update to account information, rather than a correction.  For example, a consumer in the process of applying for a mortgage might pay down a credit card, then immediately dispute the account balance with the CRA (rather than wait for the next routine monthly update by the card issuer) in order to improve a credit score.  In the fourth category, the deletion may have occurred because the furnisher ran out of time in its reinvestigation, not because an error was identified.[106]  Thus, it

─────────────────────

104.  In a paper on the FCRA and accuracy, professors Michael Staten and Fred Cate claim that the Andersen study's finding that less than 3% (36/1223) of consumers would have achieved a different credit decision after reviewing and disputing information in their consumer report is likely an upper bound for the error rate.  They argue that by focusing on consumers who received adverse action notices and requested copies of their reports, the study methodology was biased toward finding a higher error rate than that for the entire population – as these are the consumers most likely to have data in their file that would trigger a negative decision and most likely to find any errors.  *See* Staten & Cate, *supra* note 17, at 37.  On the other hand, the study made no findings about the error rate for 92% of its sample – those consumers who received adverse action notices but did not request a copy of their consumer reports.

105.  These statistics represent the first three quarters of 2002.  GAO reports that CDIA officials explained that, in providing this data, each CRA reported data from a different quarter.  *See* GAO Report, *supra* note 97, at 8.

106.  The CDIA warned that phony "credit repair" agencies, which encourage consumers to dispute accurate, derogatory information that might be deleted if the dispute process takes more than thirty days, may be at least partially responsible for some of these deletions.  As noted above, the FTC and other law enforcement agencies have taken action against such scams.  *See supra* note 67.

can be concluded that for between 10.5% and 54% of disputes, the furnisher agrees that there is an error. Combined with the estimate of approximately four million disputes each year, this would mean that approximately 400,000 to two million errors are corrected through consumer review of their credit files, or that an estimated 2.5% to 12.5% of consumer file disclosures lead to correcting of errors.

### c.   Comments on dispute data

As the GAO Report found, the dispute data studies also have serious limitations in providing a meaningful measure of the frequency of errors in consumer reports. The GAO noted that no methodology was provided for the Andersen study or for the statistics cited by the CDIA.[107] Further, as the GAO pointed out, the Andersen study excluded a potentially large number of errors, because it considered only cases in which a loan was denied and an adverse action notice provided. This approach provides no information about errors that may exist in the consumer reports of consumers who did not receive adverse action notices and those who were not currently seeking a loan.

The dispute data is valuable because it focuses on an important segment of the population – consumers who have been denied credit[108] – and how often significant errors occurred. As a way to measure the overall accuracy and completeness of consumer reports, however, the approach relies on assumptions about whether those consumers who receive copies of their reports are representative of the population as a whole. It also relies on the assumption that every consumer who receives a report with an important error or omission identifies the problem and disputes it. This approach also treats the data furnisher as the final arbiter of whether information is correct. Finally, neither of these studies provides information about the type or significance of the error found.

### 3.   Anonymous data:  analyzing consumer reports about the same consumer

A third approach in studying the accuracy and completeness of consumer reports looks at large samples of anonymized consumer reports (consumer data from which all identifying information has been stripped) for patterns pertaining to credit information, creditors, and information reported across CRAs. Although this approach does not involve consumer assessment and thus cannot identify whether a particular item in a consumer report is erroneous, it does provide valuable information about the completeness and consistency of consumer report data. One such study, conducted in 2002 by the Consumer Federation of America together with the National Credit Reporting Association ("the CFA study"), examined credit information about the same consumers across CRAs, and in particular looked at differences in the credit score reported by each CRA.[109] The Federal Reserve Board also conducted two studies that examined credit information about a large sample of consumers from one CRA. Although the purpose of

---

107.  *See* GAO Report, *supra* note 95.

108.  As noted above, the CDIA's recent statistics reported that most of the consumers who request their consumer report do so in response to an adverse action notice.

109.  *See* Consumer Federation of America and National Credit Reporting Association, *Credit Score Accuracy and Implications for Consumers* (Dec. 17, 2002).

its inquiry was to determine the usefulness of credit data in providing the Board with information on the debt status, loan payment behavior, and overall credit quality of domestic consumers, the Board's first study also found that aspects of credit data may be ambiguous, duplicative, or incomplete.[110]  The second study sought to determine the effect that correcting these data limitations would have on consumers' credit scores, which are increasingly relied upon by creditors in making credit decisions.[111]

### a.   CFA 2002

The CFA study was based on a sample of credit files that had been requested by mortgage lenders on behalf of consumers seeking mortgages.  These files included merged reports from all three nationwide consumer reporting agencies.  The study used the merged files to compare credit scores across the CRAs and to identify inconsistencies in data reported by each CRA about the same consumer.  The study had three phases.  Phase One and Phase Two each analyzed credit scores across the CRAs, but in Phase One researchers manually reviewed a sample of 1,704 credit files, and in Phase Two they conducted an electronic review of a much larger sample of 502,623 files.  In Phase Three of the study, researchers took an in-depth look at 51 files from the Phase One sample to determine how many files contained inconsistent, missing, or duplicate information, based upon information contained in the other CRAs' reports.

The CFA study reported that:

- On average, the highest and lowest of the credit scores reported by the three CRAs for a given consumer differed by more than 40 points.  In the Phase Two sample of over 500,000 files, 29% of files had a difference of 50 points or greater between the highest and lowest score, and 4% of files had a difference of 100 points or greater between scores.  (The CFA study attributes the score differences to differences in the information contained in consumer files, rather than differences in scoring models.)

- Almost 10% of the files in the Phase One sample were missing a credit score from at least one CRA.

- Of the 1,545 files in Phase One that contained at least three reports and scores, 155 contained at least one additional CRA report.  In some of these cases, the additional file was clearly for the wrong person.  In others, one person had multiple files based on variations in his or her name, and in a third group, the additional report contained a mixture of credit information, some of which belonged to the applicant and some of which did not.

- The CFA study found many accounts listed in one report that were absent from another.  For example, of the 51 files that the CFA considered in depth, 17 had a mortgage account with no derogatory information listed in one report and absent from another, and 40 had a revolving account with no derogatory information listed in one report and missing from another.

---

110.  *See* FRB Study 2003, *supra* note 2.

111.  *See* FRB Study 2004, *supra* note 37.

The CFA study also conducted further review of Phase One files that might be closest to the boundary between the prime mortgage lending market and the higher-priced subprime mortgage lending market, generally considered to be a credit score of 620.[112]  Overall, the study found that one in five consumers may be at risk for misclassification into the subprime market due to inaccurate information in their consumer report.[113]

### b.   FRB 2003 & 2004

The 2003 FRB Study examined the credit files for a nationally representative sample of 248,000 individuals as of June 1999 from one of the nationwide CRAs.  Individuals and creditors were not identified by name or other personal identifier, but were assigned unique codes so that all credit files about an individual, and creditor data across files, could be analyzed.

As the FRB authors note, because the study did not involve consumer assessment, it could not necessarily identify actual errors.  The study did find that consumer reporting data may contain duplications or ambiguities, or may not be complete.  In particular:

- Creditors failed to report the credit limit for about one-third of the open revolving accounts in the sample, and about 70% of files had at least one account missing a credit limit.  When the credit limit is missing, it is reportedly common practice to use the highest historical balance in place of the credit limit.  Because this is a downward-biased estimate of the actual credit limit, it leads to an upward-biased estimate of credit utilization rates, lowering the credit score.

- Approximately 8% of all credit accounts were not currently reported, but had a positive balance when last reported.  Because these accounts either have been paid or are delinquent, the data must be inaccurate as reported.

- Between 1% and 2% of the accounts in the sample were reported by creditors that reported derogatory information only.  Approximately 11 to 12% of creditors in the sample followed this practice.

- The study also found many inconsistencies in the reporting of public record information such as bankruptcies and collections.  For example, a single episode often was recorded multiple times.

In 2004, the FRB released a follow-up study expanding upon its earlier research.  The purpose of the study was to examine the significance of the data limitations identified in the earlier study by estimating how correcting the data problems would affect consumers' credit scores.  For this study, the FRB used a nationally representative sample of 301,000 files drawn as of June 30, 2003.  As in the previous study, the credit files were anonymous and were provided by a single consumer reporting agency.  This time, the FRB also obtained the CRA's credit score

---

112.  Therefore, the study recorded more detailed information for files that (1) had a range of 50 points or more between the highest and lowest scores; (2) had a middle score between 575 and 630 and had a range of 30 points or more between the highest and lowest scores; or (3) had high scores above 620 and low scores below 620.

113.  The study notes that just as many consumers were likely to be favorably misclassified from the subprime to prime markets.

for 83% of the files in the sample.  The researchers used this data to develop an approximation of the credit-scoring model to determine the effects of correcting a data problem or omission.

The 2004 FRB Study reported that, in most cases, the problems or omissions had only a small effect on credit scores.  The report explained that this is because (1) most consumers have a large number of accounts, which minimizes the effect of an error in a particular account, and (2) credit scoring models already take into account data problems.  The report noted that some data problems – such as inaccuracies in reporting collection accounts –  have a more significant effect on credit scores than others.  The report also noted that individuals with lower credit scores are more likely to experience a larger change in their scores when problems are corrected.

### c.   Comments on anonymous data studies

As the GAO Report noted, the 2003 FRB Study used a statistically valid and representative sample of consumer reports, but because the reports came from one CRA, the findings of the study may not be representative of the other CRAs.[114]  The findings in the CFA report based on Phase Three of its study pertained to a small number of files, and the GAO noted that, as with the consumer surveys discussed above, the CFA report counts any inaccuracy, including missing data, as an error.  Staten and Cate observe that the CFA and 2003 FRB studies both primarily identify problems that stem from non-reporting of information in a voluntary system, not inaccuracies.[115]  Further, what appears to be conflicting information – reported in the CFA study as an "error of commission" – may be due to different reporting and tape loading schedules across data furnishers or CRAs.

The 2004 FRB Study is particularly interesting because it attempts to quantify the effects of correcting certain types of possible data problems – an issue the GAO Report identified as not having been addressed by earlier studies.  Although the study found that the majority of consumers would experience little improvement in their scores if certain data problems were corrected, there are two important caveats to this finding.  First, the consumers who did experience the most improvement in their scores were the ones for whom the improvement most mattered:  those with lower scores, near the boundary for classification in the subprime market.  Second, as the authors note, some of the errors that might more dramatically affect a credit score – such as incorrect accounts or public record information – were not captured by the study.

### 4.   Summary

Each of the empirical studies conducted to date offers important insight into aspects of consumer report accuracy and completeness, but none provides a comprehensive picture.  Consumers are typically in the best position to identify certain errors in their consumer reports, and the existing consumer survey studies find that consumers identify many errors – including potentially significant ones – when they review their reports.  These studies, however, did not include a nationally representative sample of consumers.  Further, because they rely on

---

114.  The 2004 FRB Study followed the same methodology.

115.  *See* Staten & Cate, *supra* note 17.

consumers' perceptions and their understanding of consumer reporting practices, they may identify certain items as errors that are, in fact, correct.

The studies based on dispute data provide information about how often consumers who suffer adverse action request their consumer reports and dispute data, and how often the dispute results in a change to their consumer reports. Unlike the consumer surveys, the dispute data studies do provide a measure of whether errors were significant by looking at whether correcting the errors resulted in a different credit decision. Their usefulness, however, is also limited. The Andersen study is based not on a nationally representative sample of consumers, but only on those consumers who suffered adverse action. Further, it relies on certain unsupported assumptions – for example, that the consumer reports of certain groups of consumers, such as those who were granted credit, those who were denied credit but did not request their consumer report, and those who did not apply for credit, do not generally contain errors.

The CFA and FRB studies, which analyze consumer reports without consumer input, identify inconsistencies and omissions and provide insight into the completeness of consumer reports. In particular, the CFA study shows a wide variation in credit scores across consumer reporting agencies, which could be particularly troubling for those consumers whose credit scores are close to the boundary between the prime and subprime lending markets. The difference in scores is likely attributable to information contained in the reports, not the scoring models, and thus may be the result of errors, or may simply be the result of the voluntary reporting system, in which creditors may report data to one CRA but not others. The more recent FRB study attempts to quantify the effects of certain data problems. It finds that, generally, consumers' scores do not change much when these data problems are "corrected." The consumers most likely to be affected by a correction, however, are those for whom it could make a difference – those with lower scores near the boundary of the prime and subprime markets. Further, as the study's authors note, only some potential sources of error were investigated because certain errors can generally only be identified by consumers. Further, only one CRA and its credit scoring model were relied upon for the study.

Thus, none of the existing studies provides a comprehensive assessment of the accuracy and completeness of consumer report data. None used a nationally representative sample of consumers as well as credit information from all three consumer reporting agencies. Each study identifies possible errors, but some may be over-inclusive and others under-inclusive in what was counted as an error.

## G.  FTC Proposed Pilot Study and Nationwide Survey

Based on its review of the issues and of the previous studies conducted in this area, the Commission is seeking to determine whether it can develop its own methodology for measuring the level of accuracy and completeness in consumer reports. In particular, the Commission is examining the feasibility and costs of conducting a comprehensive nationwide consumer

survey.[116]  In designing such a survey, the Commission would seek to address some of the shortcomings that have been identified with earlier studies of accuracy in consumer reports.  As the GAO has noted, "comprehensive or statistically valid data on credit report errors . . . have not been collected," and "[t]o adequately assess the impact of errors in consumer reports would require access to the consumer's credit score and the ability to determine how changes in the score affected the decision to extend credit . . . ."[117]  Although the Commission (and other law enforcement agencies) receive and compile consumer complaints, and although those complaints may give certain insights into broader compliance issues,[118] looking to such complaints as a reliable index of accuracy in credit reports would not be statistically sound.  As discussed more fully below, the Commission study will instead look at a representative cross-section of consumer files.

There are a number of important questions about the design and the cost of a large-scale consumer survey.  To attempt to answer some of these questions, the Commission has designed and proposed a pilot study to test the methodology of such a survey and to further examine questions about its design and feasibility.

## 1.    Proposed pilot study

To determine the feasibility of a nationwide survey, the Commission has proposed to conduct a pilot study.[119]  The pilot study would serve both as a test of a specific methodology and as a way to shed light on many of the design questions outlined above.  It is intended as a tool for better designing a larger nationwide survey, and is not an instrument from which any statistical inferences could or would be drawn.

The Commission is making preparations to carry out the pilot study and has begun the process of seeking Office of Management and Budget clearance, under the Paperwork Reduction

---

116.   Among other things, and as noted above, the Commission convened a roundtable of interested parties – including authors of some of the previous studies summarized in this report – to examine the design and feasibility of such a survey.  The roundtable was announced in the *Federal Register*.  The Notice of Roundtable to Aid Federal Trade Commission Staff in Conducting a Study of the Accuracy and Completeness of Consumer Reports, Pursuant to Section 319 of the Fair and Accurate Credit Transactions Act of 2003, 69 Fed. Reg. 32,549 (2004) can be found in Appendix A to this Report.  The agenda for the roundtable, the list of participants, and a transcript of the proceedings are available on the FTC Website at http://www.ftc.gov/be/workshops/.

117.   *See generally* GAO Report, *supra* note 95.

118.   *See* discussion of consumer complaints and of the complaint referral system established by the FTC and nationwide CRAs pursuant to Section 313(a) of the FACT Act, *supra* notes 91-92, and text accompanying.  As noted previously, how CRAs and furnishers handle consumer disputes is the subject of another study, which will be separately reported to Congress under Section 313(b) of the FACT Act.

119.   In a *Federal Register* Notice published in October 2004, the FTC discusses the pilot study and invites comment on a number of issues, including ways to enhance the quality, utility, and clarity of the information to be collected and ways to minimize the burden on those who participate in the study.  69 Fed. Reg. 61,675 (Oct. 20, 2004), available in Appendix B to this Report.

Act, for the collection of information involved in the proposed study.  Some of the specific elements of the proposed pilot study are as follows:

•   The study will consist of approximately 35 consumers having a diversity of credit scores that cover at least three broad categories ("poor," "fair," and "good").  The consumers will be adult members of households to whom credit has been extended in the form of credit cards, automobile loans, home mortgages, or other forms of installment credit.  They will be screened through telephone interviews preceded by an official letter from the FTC regarding the nature and purpose of the pilot study.  As consumers give consent to participate (and thereby give permission to obtain their credit scores), a contractor working on behalf of the Commission will use their credit scores to determine a final list of participants that includes the desired range of scores.

•   The contractor will help the participants obtain their consumer reports from the three national CRAs (Equifax, Experian, and TransUnion).  The three reports pertaining to each study participant will be requested on the same day; the reports pertaining to different participants may be requested on different days.

•   The contractor will help the participants review their consumer reports by (a) clearing up common misunderstandings that they may have about the information in their reports (educating the participant wherever appropriate), (b) helping to identify errors or potential errors, and (c) helping to locate any material differences or discrepancies among their three reports, and checking whether these differences indicate inaccuracies.

•   The contractor will then determine the importance of errors identified by the consumer by assessing the degree to which correcting such an error would improve the consumer's credit score.  In those cases where the alleged error causes a significant change in the consumer's score, the contractor will facilitate a participant's contact with the CRAs and with the furnishers of information to attempt to informally resolve items that the participant describes as inaccurate.

•   When items are resolved, the contractor will determine whether consumer report information is changed and whether any such change led to a change in the participant's credit score.

•   When disputes cannot be resolved informally, the contractor will guide participants through the dispute process provided by the FCRA.  At the conclusion of this process, the contractor will ascertain whether consumer report information is changed and whether any such change led to a change in the credit score.

As noted above, the results of the pilot study will not be used for statistical projection to a larger population.  The most important information to be obtained from the pilot study is an assessment of the degree of difficulty, and the types of difficulties, with which each of the above tasks was performed.  The results of the pilot study, and the next steps taken by the Commission in this ongoing accuracy study, will be provided in the next interim Report to Congress.

### 2.  Proposed nationwide survey

The contemplated nationwide survey would focus on consumers and their experiences in identifying and disputing errors in their reports.  In designing the survey, the Commission would attempt to address many of the concerns that have been raised by the GAO and others about previous studies.  Specifically, the proposed survey would have the following characteristics:

- It would be based on a nationally representative sample.

- It would use a reliable method for identifying errors and omissions.  As discussed below, simply asking consumers whether they can identify errors may lead to important biases in measurement.  Thus, the study would use expert "coaches" to assist consumers in identifying and resolving errors.[120]

- It would categorize errors by their type and seriousness in terms of consumer harm. As noted above, there are several potential sources of error, and determining the sources of error is a necessary step in determining how to address the errors.  Furthermore, it is important to learn what types of error have the greatest consequence for individual consumers.[121]

The main advantage of using consumer surveys is that the technique exploits a consumer's knowledge about his or her own credit history.  To obtain comparable information from other sources would require contacting many furnishers and speaking to people with no personal memory of the relevant events.  Moreover, asking consumers to order and review their own reports addresses some of the privacy concerns associated with using consumer data to conduct research.  Because the approach involves the consumer's direct participation, researchers would naturally obtain a consumer's permission before using his or her file.

Use of consumer surveys does have some important drawbacks, however, that the Commission would attempt to address in the survey design.  One potential problem is that consumers may mistakenly question items that are in fact correct because they do not understand the report or their credit obligations.  For example:

- A credit account with a retailer (for example, XYZ Department Store) may be managed by a large bank (for example, ABC Bank).  A consumer who sees an account for ABC Bank may not realize that the account in fact represents her XYZ charge card and might therefore identify the ABC account as an error in his or her report.

- A married woman co-signs a loan with her husband.  Later, they divorce, and her ex-husband agrees to be responsible for paying this loan.  If the ex-husband fails to make payments, she is still jointly responsible, and the missed payments would properly appear on her credit record.  Therefore, the delinquency on her report would be accurate.

---

120.  Each consumer would work with the expert coach to identify instances of inaccuracy and incompleteness in his or her own consumer report.  The consumer and/or coach would then attempt to resolve perceived errors in their reports with the records of the repositories and the furnishers who supplied the information in question.

121.  As a measure of the seriousness of particular errors, the survey would use the impact of errors on consumers' credit scores.  Mistakes in a consumer report that have large effects on the credit score are also likely to have a large impact on the consumer.

A potential solution involves the use of expert "coaches" who would help address these and similar problems.  Such coaches would be able to inform consumers about the law and common practices related to consumer reporting and thereby prevent consumers from reporting errors inappropriately.

In addition, some consumers might mistakenly view some accurate items as inaccurate because of memory lapses or failure to consult appropriate records.  Consumer responses may also be biased, in that consumers may be more likely to confirm favorable information in their files than to confirm derogatory information.  To protect against these problems, the study would attempt to confirm reported errors with the furnisher of the information that the consumer views as incorrect.  This could be done by either asking the consumer to try to dispute the item directly with the furnisher, or asking the consumer to carry through a formal dispute process with the CRA in question.  A third approach would be to have a member of the research team contact furnishers.

It is also likely that a consumer survey is better suited to measuring accuracy than to measuring completeness.  Consumers may be more likely to notice information that is incorrect than information that is missing.  Also, as discussed above, consumer reports may be incomplete either because the CRA did not place submitted information in the correct file, or because the furnisher never provided the information in the first place.  Follow-up investigations might not succeed at identifying the reasons behind incomplete reports.

At this time, it is very difficult to give a reliable estimate of the cost of a national study.  It is also unclear how effectively the survey design can address the challenges outlined above.  The proposed pilot study will both allow the FTC to estimate the cost of a larger nationwide survey and point to potential obstacles that can then be avoided in designing a larger survey.  For example, the pilot will tell us how much time and effort is necessary to go over each consumer's report, how effective the "expert coach" approach is in helping consumers through the process, and how effectively consumers and researchers are able to resolve discrepancies in consumer reports through informal and formal means.

Depending on the outcome of the pilot study described above, further pilot studies may be necessary to provide a basis for a robust national survey.  Further, the Commission may need to reassess the design of the national survey currently being considered.

## IV.  Data Matching

### A.  Introduction

Section 318(a)(2)(A) of the FACT Act requires the FTC to study:

the efficacy of increasing the number of points of identifying information that a credit reporting agency is required to match to ensure that a consumer is the correct individual to whom a consumer report relates before releasing the consumer report to a user, including (i) the extent to which [such a requirement] would (I) enhance the

accuracy of credit reports; and (II) combat the provision of incorrect consumer reports to users.

As one example, the Act proposes requiring an "exact match" on name, SSN, address, and zip code.  The Act also asks the FTC to describe the effect of allowing CRAs to use "partial matches" on SSN and the use of "name recognition" software.

To understand the likely effects of such requirements, Commission staff interviewed representatives of consumer groups, consumer reporting agencies, and experts on data matching procedures.  Due to the need to understand the details of CRA matching procedures, and the proprietary nature of these procedures, confidential discussions with CRA representatives played a particularly important role in this study.  Responses to the Federal Register notice regarding the "same report" study were also useful in understanding CRA matching procedures.

This report describes what Commission staff has learned about how and why errors occur in the matching process, and discusses the costs and benefits of imposing requirements on the CRA matching procedures.  The proposed requirements could affect matching at two points, in both the file building and file retrieval process.[122]  As discussed in the previous section, inaccuracy can result from the file building process if a CRA receives correct information, but fails to assign it to the correct consumer's file (creating either a mixed file or a fragmented file).  Problems in the file retrieval process occur when a CRA receives an inquiry requesting the file of one consumer, but provides a file pertaining to another consumer.  Requiring CRAs to match consumer identifying information more closely could address either or both of these problems.  This study considers the separate effects of the proposal on file building and file retrieval.

## B.  CRA Databases and the Matching Process

Although the CRAs attempt to assign accurately all incoming information to the correct person's file, their systems sometimes fail to do so.  As will be described in more detail below, the main reason for such a failure is that the identifying information provided to the CRAs is imperfect.  Ambiguities in identifying information give rise to cases where a record cannot be matched with 100% certainty.  If the identifying information were perfectly reliable – specifically, if all consumer records were linked to a unique, reliable identifier – matching would be straightforward.

The lack of a fully reliable identifier means that the CRAs inevitably face situations where records match with a high probability, but not with certainty.  In such cases, a CRA must make a difficult choice.  Accepting the match risks assigning a credit history to the wrong consumer, while rejecting the match risks excluding information that is legitimately part of the consumer's credit history.  Either outcome can hurt consumers.  At the individual level, both the inclusion of false negative information and the exclusion of true positive information can cause a consumer to appear to be a worse credit risk than he or she actually is.  At the market level, unreliable

---

122.  In considering matching requirements that would apply "before releasing a consumer report to a user," the Act seems to suggest a focus on the file retrieval process.  However, the fact that the Act asks the Commission to study "the extent to which requiring additional points of identifying information to match would. . . enhance the accuracy of credit reports. . ." suggests that Congress intended that the report consider file building as well.



consumer reports are less useful in measuring default risk and could therefore raise interest rates for consumer loans and reduce the amount of credit offered to consumers.

## 1.    Why is data matching difficult?

In designing their matching procedures, the CRAs face two challenges.  First, their systems must be able to discriminate between consumers with very similar identifying information, such as a father and son with the same first and last name, living at the same address.  Second, their systems must recognize an individual consumer even when his or her identifying information changes significantly, such as when a woman marries and moves to a new home, changing both her name and address.

Although name, address, and SSN would appear to be sufficient to uniquely identify a consumer, inaccuracies in the data can frustrate this process.  Names and addresses may change over time, and spelling errors and nicknames are common.  The SSN can be a very useful for matching; however, as explained below, it is often missing, and even when present, errors are quite common.  In the absence of a unique, reliable identifier for each consumer, the CRAs employ a "matching algorithm," or a set of rules that determine the likelihood that two sets of identifying information represent the same consumer.  In some cases, the matching algorithm is straightforward – if an incoming record and an existing file both include the exact same name, address, and SSN, the pair clearly constitutes a correct match.  Matching becomes difficult when some fields match, but other fields either do not match or are missing.

### a.    Problems at the data creation level

The CRAs compile information that is generated by third party furnishers, and they must use this information to link different accounts belonging to the same person.  Each firm that sends information to a CRA may have its own unique system for collecting and maintaining consumer identifying information.  As a result, the form and content of the updates and inquiries received by CRAs can be inconsistent.  Further, the updates may not contain a unique identifier that allows all of a consumer's accounts to be linked.[123]

For example, when XYZ Bank sends a CRA data on all of its auto loans, the CRA attempts to match each of these sets of data to the appropriate consumer files in its database.  These files were "built" using data from other furnishers – for example, one of the auto loan accounts might belong to a consumer whose existing file contains only an account with ABC Electronics.  Because the CRA does not control the identifying information that either furnisher reports about its customers, the information provided by XYZ Bank may be difficult to match to the information provided by ABC Electronics.

In addition to the challenge of linking disparate information, the CRAs must distinguish new credit users from individuals with an existing CRA file.  Information that the CRAs receive

---

123.  In contrast, a credit card issuer can assign each new customer a unique account number that will be linked to all incoming records.  This makes it relatively easy to link an in-store transaction to an individual's credit account.  As a result, matching problems are rare for credit card charges and it is very rare for a charge to person A's credit card to show up on person B's bill.

does not indicate whether the individual consumer already has a file in the CRA's database, or is a new consumer opening a credit account for the first time. Because they are generally not in direct contact with consumers, the CRAs must rely on information from furnishers to inform them about name or address changes.[124] This makes it hard to distinguish a consumer who is genuinely new to the system from one who is in the system, but whose information has changed.

### b.   The SSN is important for data matching, but the CRAs cannot rely on it completely

To some degree, the SSN has served as a unique identification number that can be used to link consumer accounts. But the SSN was not designed for the purposes of data matching, and it is not the perfect tool for this task. There are two issues that limit the SSN's usefulness for linking records in the CRAs' systems. First, it is often missing from consumer credit information, largely due to concerns about privacy and identity theft. Second, errors are common in recording SSNs.

The CRAs do not require that subscribers submit an SSN as part of an inquiry. Although many creditors require consumers to provide an SSN as part of an application for credit, some do not. The CRAs report that between 5 and 10% of inquiries from users either do not contain an SSN or include an invalid SSN, and that the SSN is even less prevalent in data sent by furnishers.[125] An inquiry may be missing an SSN because a consumer does not know or remember his or her SSN, or because the consumer withholds his or her SSN due to concerns about identity theft. Privacy concerns may also prevent furnishers from maintaining the SSN as part of their account data.

To an increasing extent, public policy is also limiting the availability of the SSN. For example, as of December 2003, bankruptcy records available through the Public Access to Court Electronic Records ("PACER") system include only the last four digits of the SSN.[126] In addition, legislative proposals could reduce the prevalence of SSNs in company records and could prevent creditors and others from requiring applicants to provide their SSN.[127]

---

124. There are additional pragmatic reasons why CRAs rely on furnishers, not consumers, for this information. As discussed above (*see* note 25 *supra,* and text accompanying), CRAs receive an immense volume of information from furnishers, and the CRAs' procedures for updating information based on that stream of information are already well established. The opportunity for abuse, such as "phishing" (scams specifically designed to deceive consumers into divulging sensitive personal information) or identity theft, might also increase if consumers could directly alter address information.

125. FTC staff communication with CRA representatives.

126. PACER is an electronic public access service whereby users may obtain information from federal appellate, district, and bankruptcy courts. There are indications that the limitations on use of SSN that PACER currently applies to bankruptcy records will be expanded to require that a broader range of personal data identifiers be removed from all public filings (or redacted when they are needed). *See, e.g.,* http://www.nyed.uscourts. gov/adminorder04-09.pdf and http://www.txsd.uscourts.gov/news/2004-11.htm (court orders citing the E-government Act of 2002 and the policy of the Judicial Conference of the US with respect to confidentiality of personal identifying information).

127. For example, the proposed Social Security Number Privacy and Identity Theft Prevention Act of 2003, introduced in the House of Representatives, would prohibit firms from refusing to do business with a consumer who does not provide an SSN. *See* H.R. 2971, 107th Cong. (2003); *see also* Social Security Number Privacy and Identity Theft Prevention Act of 2004, S. 2801, 108th Cong. (2004), a related bill introduced in the Senate in 2004.

Concerns about identity theft arise from the SSN's current use as both an identifier and an authenticator. As an identifier, the SSN is used to determine which records belong to a particular individual – i.e., who an individual *claims* to be. As an authenticator, the SSN is used to establish whether an individual really *is* who he or she claims to be. Whereas an identifier is most effective when it is easily accessible to users, an authenticator is most effective when it remains a secret between the holder and the validator.[128] For example, in the case of bank accounts, the account number is the identifier, and it would be difficult for the bank to carry out its functions and provide appropriate customer service if bank employees were denied access to it. The Personal Identification Number ("PIN"), however, as the authenticator, is never provided to bank employees, and is used only by the account holder in confidential electronic validations. Thus, the problems of identity theft are aggravated because the SSN cannot be both widely known and kept confidential at the same time.[129] Therefore, while the SSN plays an important role in data matching, this role must be analyzed in light of concerns about identity theft.

The SSN is also subject to error. Errors in SSNs may arise when a consumer does not know his or her number when filling out an application, from illegible handwriting or faulty transcription, or from mistyping the number when entering it into a database. Studies of unemployment insurance records suggest error rates in the SSN data entry process of between 0.5% and 4%.[130] The CRAs account for the possibility of errors by allowing "partial matches" on SSN – for example, when seven or eight of nine digits match, or when the entire number is shifted by one digit. Such "partial matches" are allowed when other data elements match closely enough; the CRAs report that this happens between 1% and 2% of the time.

The format of the SSN means that errors are not easily detected. Credit card numbers, for example, include a "checksum digit" that almost guarantees that a small typographical error will

---

128. "Phishing" schemes and other scams are specifically designed to deceive consumers into divulging sensitive personal information that serves just such an authentication function. *See also* note 212, *infra*.

129. This role of the SSN has also given rise to a phenomenon that has been referred to as "SSN-only identity fraud." *See, e.g.*, Lesley Mitchell, *New Wrinkle in ID Theft, Salt Lake Tribune*, June 6, 2004, available at http://www.sltrib.com. In a Utah mortgage fraud scheme, individuals, many of whom were apparently illegal aliens without a valid SSN, were able to establish a credit identity using their own names, but using another individual's SSN. Although acquiring a valid SSN was part of the scheme, the purpose was not to use another individual's credit history to acquire credit, but rather to use the SSN to establish a completely new credit identity. The result was the creation of two files in the CRA databases that contained the same SSN – one relating to the SSN's true owner and one relating to the perpetrator of the fraud. Further, because the CRAs considered the two files to belong to different consumers, the true owners of the SSNs could not view the second file or "correct" it through the dispute process. Although this incident caused concern among the true owners of the SSNs, consumers will not ordinarily be harmed by the existence of the second file. As discussed *infra,* CRAs will not include information in a file or provide a file to a user based solely on an SSN match.

130. *See* John M. Abowd and Lars Vilhuber, U.S. Census Bureau*, The Sensitivity of Economic Statistics to Coding Errors in Personal Identifiers*, TP-2002-17 (2003). Abowd and Vilhuber estimate an error rate of 0.5%, but caution that their method may underestimate actual errors. A study by the Bureau of Labor Statistics in 1997, in which unemployment insurance wage records were compared directly to Social Security Administration records, found that names and SSNs did not match in 7.8% of cases (with considerable variation across states). Bureau of Labor Statistics, *Quality Improvement Project: Unemployment Insurance Wage Records* (Oct. 1997). If half of these cases reflect an error in the SSN (and the other half reflect an error in the name), the error rate for SSNs would be 3.9%.

generate an invalid number.[131]  This means that the wrong person's account will not be charged, and the person processing the number can be alerted immediately to the problem.  Because it lacks a checksum digit, small typographical errors in the SSN can easily yield a number that is valid but belongs to the wrong individual.

Until recently, SSNs were assigned sequentially, meaning that if a parent applied for SSNs for multiple children at the same time, their SSNs would be very similar (possibly differing by only one digit).  Because these siblings might have the same last name and address, the similarity in their SSNs makes confusion quite possible.[132]

Because of these problems, the CRAs do not rely exclusively on SSNs in their matching procedures.  If 5% of inquiries include no valid SSN, and 1% include an SSN that is valid but incorrect, this translates to an estimated 250,000 inquiries each day for which an exact SSN match either could not be used or would yield the wrong consumer report.[133]  This leads the CRAs to use other identifiers, such as name and address, to aid in matching.  As discussed above, the CRAs will rely on SSNs that do not match if the match on other data elements is strong enough.  By contrast, if the SSN *is* an exact match, but other data elements do not match at all, the CRAs will not consider the records to match.  The CRAs instead follow a policy of maintaining separate files for what appear to be different consumers who are using the same SSN.[134]

When a CRA maintains a second file with one consumer's SSN but a different consumer's name, the CRA will ordinarily not provide the second consumer's file when the first consumer applies for credit.  Unless it receives additional information that causes it to consolidate files, the CRA will keep the two files separate, because the SSN alone is not enough to justify merging the files.  Further, all three nationwide CRAs state that they will not provide a credit report based solely on an SSN match.[135]

---

131. Incorporating a "checksum digit" is a way of designing an account number (or other identifying number) so that typographical errors will almost certainly yield a number that is invalid.  For example, the last digit of a credit card number is typically derived from the preceding digits using a relatively straightforward mathematical formula.  A small error in the data entry process – mistyping a single digit, or reversing two digits – will mean that the final digit no longer matches those that precede it, so that a computer will recognize the number as invalid.

132. An example of this is the case of Jerry Crabill, where TransUnion furnished both the plaintiff-consumer's credit report and the report of his brother, whose first name started with the same letter and whose social security number differed by only one digit.  *See* Crabill v. TransUnion, L.L.C., 259 F.3d 662 (7th Cir. 2001).

133. These numbers are based on an estimate of 1.5 billion inquiries per year, or about 4 million per day.

134. It appears that the CRAs do not routinely conduct investigations of such cases.  A likely reason is that, because of the automated nature of the credit reporting system, such investigations would be very costly.

135. FTC staff communication with CRA representatives.  Although no CRA will supply a full credit report in response to only a submitted SSN, at least two of the three nationwide CRAs do offer a product that allows users to retrieve limited non-credit consumer identifying information using only an SSN.  For example, Experian offers a product known as "Social Search" that allows users to retrieve consumer identifying information such as name and address based solely on an SSN search.  *See* http://www.experian.com/products/ social_search.html.  TransUnion offers a similar service known as "TRACE."  *See* http://www.transunion. com/Business/Solution.jsp?id=/transunion/solutions/data/FncCollections.xml&view=products.

## 2.   Types of data problems

The CRAs use a combination of identifying information in matching records.  Matching is difficult when some identifying information that the CRA receives is either (1) missing; (2) incorrect; (3) correct, but has changed (e.g., a new address); or (4) correct, but inconsistent (e.g., a nickname).  These problems may be caused by either the consumer or the furnisher that records and reports the consumer's information.

Problems with the information the consumer provides can arise either from error or deliberate choice.  For example, a consumer may mistakenly reverse the first and last names on an application, or report the wrong SSN.  A consumer might also omit some personal information if he or she is concerned about revealing this information to a stranger.  Thus, for example, the consumer may choose not to record an SSN (or may record a false one), may provide only a first initial rather than a full first name, or may misreport or fail to report his or her age.

Having collected information from a consumer, a creditor (or other user of consumer reports) may make mistakes when entering the consumer's data into its system.  Information from a written application must be entered into a computer, introducing the possibility of keystroke error and errors arising from illegible handwriting.  When credit applications are made orally over the phone, names and addresses may be misspelled.

Reliable matching requires identifiers that are *persistent*, so that they do not change throughout a consumer's life, and *discriminating*, so that they allow consumers to be distinguished from one another.  Of the currently available identifiers, the SSN is the best candidate, because it is unique and persistent, but as described above, the CRAs cannot rely entirely on the SSN.[136]  Apart from the SSN, the most important fields used in matching are name and address.

There are a number of inherent problems in using name and address as identifiers.  A leading problem is that both are subject to change.  The Census Bureau reports that 14% of Americans move each year.[137]  Consumers change names, most frequently when a woman marries or divorces.  CRAs typically obtain this information from furnishers, not consumers;[138] therefore, the CRAs must accommodate name and address variations in order to maintain the continuity of consumer files.

Even a consumer whose name and address have not changed may report this information inconsistently.  Consumers may use nicknames, may use a middle name or initial, or use a first initial only.  Name reversals are also common and sometimes hard to identify.  For example, it is quite possible that a consumer listed as "Frank Howard" is actually "Howard Frank," but that the first and last names were reversed in the application process.

---

136.  In those instances where a CRA is merely updating an existing account, the CRA can use account numbers to match the data with the file.  Account numbers are quite reliable, as they uniquely identify consumers and are unlikely to contain errors (both because account numbers generally include a checksum digit, and because they are generally not re-entered by hand each time an account is updated).  Because of this, matching errors are unlikely when updating the consumer's existing accounts.

137.  *See* Jason P. Schacter, U.S. Census Bureau, *Geographic Mobility: 2002 to 2003*, *Current Population Reports* (2004).

138.  *See* note 124 *supra.*

The CRAs report that people often omit their apartment number from their address, making it difficult to distinguish people with similar names living in the same apartment building.  Many consumers maintain multiple addresses – in addition to a residential address, a consumer might have a business address, a vacation home, or a Post Office Box.  Addresses are often written down in an inconsistent manner – people may use abbreviations (Str. or St. for Street), neglect to use a directional suffix such as SE, misspell a street name, etc.  The CRAs use address standardization software to accommodate these variations, but these tools do not eliminate all problems.

Names are not unique – for instance, the Census Bureau reports that in 1990, 1% of the U.S. population had the surname "Smith," 3.3% of American males had the first name "James," and 2.6% of females had the first name "Mary."[139]  Distinguishing individuals within a family is a particular problem because the combination of name and address may not provide any additional discriminatory power.  A particular challenge is fathers and sons with the same name – when the generational suffix is missing, it is difficult to keep John Doe Sr.'s and John Doe Jr.'s files separate.  SSNs can be used to distinguish individuals whose identifying information is otherwise similar, but, as discussed above, correct SSNs are not always available for matching.

Although telephone numbers seem to offer an additional point of identifying information, they often do not provide useful information not already contained in the address.  If an address has changed, it is likely that the telephone number has changed as well.  Additionally, if two people live at the same address, they are likely to have the same telephone number.

## 3.   Sources of data problems

At least to some degree, the quality of identifying information received by CRAs reflects choices made by data furnishers.  Creditors determine what information to require from applicants and how much care to exercise in collecting it and making sure that it is correct.  They also decide what information to maintain in their files.  Creditors and other data furnishers have an incentive to maintain the accuracy of their own files, but they may not have a similar incentive to maintain their files in such a way as to make the CRAs' data matching process easier.  For example, because furnishers' own account numbers are usually very effective identifiers, furnishers may have less need to maintain or report SSNs, data on past addresses, or full names.

The CRAs encourage furnishers to report data in ways that make matching easier.  However, because data furnishers provide consumer information to the CRAs on a voluntary basis, the CRAs have only limited influence.  The CRAs have been somewhat successful in convincing furnishers to adopt an improved format for electronic submission of account data.  The credit reporting industry has collaborated in developing a standard format (the "Metro" format) for data

---

139.   *See U.S. Census Bureau, Name Files,* available at http://www.census.gov/genealogy/names/.  The problem may become even more severe in connection with a geographic region where certain names are especially common, and may even be linked to certain dates or time periods.  For example, it is common for people of Irish descent to give the name Patrick or Patricia to a child born on or near St. Patrick's Day.  People of Mexican origin often name a girl Guadalupe if she is born on December 12th, which commemorates the second appearance of the Virgin of Guadalupe.  Interview with Chuck Coleman, U.S. Census Bureau (Mar. 2004).  Examples such as these demonstrate that name and birth date together may not be highly discriminating in some cases.

submitted by furnishers.  The CDIA reports that as of 1996, more than 95% of data received by the CRAs used the Metro format.  A newer version of the format ("Metro 2") was introduced in 1997, and by 2003, more than half of all accounts were reported in this format.[140]

Although a standard format makes maintaining computer files easier, effective matching depends on the quality of the identifying information provided.  The CRAs have made efforts to encourage furnishers to submit more complete information.  For example, one CRA described a program that offered its subscribers financial incentives to include an SSN with all data submitted.[141]  However, most furnishers are subscribers of only one nationwide CRA, but may report data to all three.  Therefore, because an improvement to the data would benefit not just the CRA but its competitors, the incentive to offer such discounts may be limited.

Identifying information in public records and collection accounts often does not come directly from contact with consumers, so consumers may not have an opportunity to notice mistakes or to note changes in name or address.  Also, furnishers that are not necessarily users of consumer reports (e.g., providers of public record information and some collection agencies) may have less incentive to ensure the accuracy of their information.

Unlike a firm that is furnishing data, a subscriber submitting an inquiry does have strong incentives to submit complete identifying information.  If a creditor receives the wrong person's file, or fails to receive a consumer report when that consumer in fact has a file in the system, the creditor risks making a credit decision based on faulty information.  On the other hand, in attempting to attract new customers, creditors may have incentives to make the application process as easy as possible and may therefore not insist on complete, detailed information.

This tradeoff between accuracy and convenience varies depending on the type of furnisher.  For example, identifying information from mortgage applications is probably quite reliable.  Given the importance of a mortgage transaction, both lenders (or brokers) and their customers are likely to take care in checking that an application is filled out properly and completely.  For other transactions, the parties may be less careful.  For example, in retail point-of-sale applications, consumers may provide much less comprehensive information.  A retailer might also be interested in processing an application quickly, and in making the application process as convenient as possible for customers.  Retail credit accounts also typically have relatively low credit limits, so the cost of an error may be lower.

## 4.   The CRAs' management of data quality problems

Much of the CRAs' business success depends on their ability to organize disparate information into files that are as accurate and complete as possible.  To this end, the CRAs have all developed procedures for proper matching, within the limitations of the data they receive.

The CRAs start by "cleaning" the data.  For example, they use address standardization tools that translate address variations into a standard format (e.g., 1500 East Main Avenue, Suite 201 becomes 1500 E MAIN AVE STE 201).  A similar process checks for common problems with names (e.g., "John Smkth" might be changed to "John Smith," and "O'Neal Kenneth" might

---

140.  *See* Statement of Stuart K. Pratt, *supra* note 2.

141.  FTC staff communication with CRA representatives.

be changed to "Kenneth O'Neal"). The CRAs validate SSNs by comparing the SSN to lists of invalid SSNs and the SSNs of people known to be dead. They also maintain information about variations in an individual's identifiers – for example, former addresses, former or alternate names, or other SSNs that have been used by the same individual.

All three CRAs have stated that they are constantly seeking improvements in their matching processes. Because of their complexity and their connection to databases, however, the impact of changes to the data-matching protocols can be unpredictable. Therefore, before it is implemented, any possible change is tested carefully on actual data, side-by-side with the existing algorithm. The CRAs then focus on the cases where the two algorithms yield different matches, and, where possible, use human judgment to identify the best result. This allows the CRAs to evaluate whether existing problems are fixed by the change and whether new problems arise. A similar technique is also used to identify problems with the working algorithm – the CRAs analyze samples of the data to identify problems and look for opportunities to improve.

An important response to inconsistencies and gaps in consumer identifying information is the creation of "temporary" fragmented files. After receiving information that cannot be definitively matched to a file in the database, a CRA is faced with a choice. Adding an "update" to a file risks creating a mixed file, while not adding the update risks creating a fragmented file. In facing this problem, the CRAs are more tolerant of fragmented files than mixed files. One reason is that fragmented files are easier to correct at a later point. It is difficult to write a computer program that will identify and fix mixed files, and once a mixed file has been created, the problem can "snowball" – that is, once some information about person B has been added to person A's file, it becomes more likely that future information about B is matched to A's file.[142] In contrast, the CRAs' computers are programmed to search for fragmented files and merge them when appropriate. Because of this, the CRAs are more likely to create a new file and routinely check whether that file can be merged with an existing file. Knowing that it has a certain number of fragmented files in its database, each CRA routinely re-checks for potential file merges as new data arrives.

Figure 2 illustrates the main steps in the matching process that relate to processing uncertain matches. The diagram refers to matching in the file building process, but the process for file retrieval is substantially the same.

---

142. For instance, if the CRA's system places an account for John B. Smith, at 123 Maple St., in the file for John A. Smith, at 456 Oak Lane, John B.'s address will become part of John A.'s file. This makes it more likely that new records related to John B. will match John A.'s file.



**Figure 2**: CRA procedures for handling uncertain matches

As an example of how this process works, suppose that a consumer (John Doe) moves from New York to St. Louis and applies for credit using only his name and (new) address.  As a result, a CRA receives an inquiry with the following identifying information:

| | |
|---|---|
| Name: | John Doe |
| Address: | 123 Main St. |
| | St.  Louis, MO |
| SSN: | (missing) |

Although the CRA has many files for consumers named John Doe, it does not have any that match this address.  The CRA is therefore unable to determine whether the inquiry refers to a consumer with no file (most likely someone who has never before applied for credit), or to a consumer with an existing file who has recently moved.  In this situation, all three of the major CRAs would create a new file for John Doe while continuing to check whether this file can be linked to another file in the database.  As the consumer updates the address information with his or her existing creditors, this new information will be added to the CRA's files.  For example, the CRA might receive an update from credit card issuer, XYZ Bank, that includes an account with the following identifying information:

| | |
|---|---|
| Name: | John Doe |
| Address: | 123 Main St. |
| | St.  Louis, MO |
| SSN: | 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 |
| XYZ Acct # | 1111 2222 3333 4444 |

With this information, the CRA is able to match the account to the following file:

| | |
|---|---|
| Name: | John Doe |
| Address: | 456 Elm St. |
| | New York, NY |
| SSN: | 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 |
| XYZ Acct # | 1111 2222 3333 4444 |

At this point, the CRA is able to update the address information in this consumer's file and to merge this file with the small file created by the earlier record that could not be matched.

In this example, the CRA initially did not provide a report in response to the inquiry because information did not match closely enough.  But once presented with a matching name, SSN, and account number, the CRA merged two files despite a non-matching address.  When the CRAs accept a match despite variations in the data, they maintain information about these variations in the consumer's file.  A file will include information about a consumer's past or alternate addresses and alternate names that have been used.  For example, an individual's file may contain multiple SSNs if that person has made occasional mistakes in filling out credit applications.  Similarly, if a consumer changes his or her name, the CRA will maintain information about the former name.  Retaining this type of information means that it can be used for matching if the variant is used in incoming records or updates.

## C.  Benefits and Costs of the Proposed Matching Requirements

Section 318(a)(2)(A) of the FACT Act contemplates two types of matching requirements: rules on the number or type of identifiers that must match (e.g., "increasing the number of points of identifying information" that must match), and rules on how closely such identifiers must match (e.g., requiring an "exact match" or disallowing "partial matches of [SSNs] and name recognition software.").  Either type of requirement could establish a stricter standard than is currently used by CRAs to match consumer files, and would therefore have the potential benefit of increasing the accuracy of consumer reports.  The main potential costs would include a decrease in the completeness of consumer reports and in the CRAs' flexibility and efficiency in matching files.

Unfortunately, these benefits and costs are very difficult to quantify.  As discussed in Part III of this report, there is currently very little reliable information available about the levels of accuracy and completeness in consumer reports.  As a result, it would be difficult to estimate precisely how the proposed requirements would affect these levels.  However, a variety of factors and likely effects are discussed below.

### 1.  The tradeoff between accuracy and completeness

As discussed above, the CRAs face a choice between files that are more accurate and files that are more complete.  The CRAs often identify matches that are close, but not perfect.  Accepting an imperfect match risks inaccuracy – either a mixed file (if a mismatch occurs in the file building process), or the delivery of the wrong person's consumer report to a user (if a mismatch occurs in the file retrieval process).  On the other hand, rejecting the match risks incompleteness – either a file that is missing some accounts or the failure to deliver a correct file to a user.  The CRAs attempt to minimize both inaccuracy and incompleteness, but the limitations of the identifying information mean that they cannot eliminate both.  If the CRA adopts a "stricter" matching algorithm that reduces inaccuracy, the necessary result is that incompleteness will increase.

When Congress passed the FCRA, it was responding in part to consumer concerns that the CRAs overemphasize completeness at the expense of accuracy.  Many of the CRAs' customers are lenders, whose main concern in consulting a consumer report is assessing the likelihood that a borrower will default.  For many lenders, the loss incurred when a borrower defaults is much larger than the profit earned when a borrower repays a loan.  Because of this, lenders may prefer to see all potentially derogatory information about a potential borrower, even if it cannot all be matched to the borrower with certainty.  This preference could give the CRAs an incentive to design algorithms that are tolerant of mixed files, which could harm consumers to whom derogatory information is mistakenly assigned.

The FCRA addresses this issue by requiring CRAs to use "reasonable procedures" to ensure the maximum possible accuracy of consumer reports, giving consumers access to their files, and establishing a dispute process.  These measures work to increase accuracy at the cost of completeness.  Because the proposed requirements would increase accuracy even further, the challenge is to determine whether this increase justifies the associated reduction in the completeness of consumer reports.

## 2.   Mandatory matching rules would be likely to lower match efficiency

CRAs have an incentive to make their matching processes as efficient as possible.  A matching process is efficient if the number of incorrect matches cannot be reduced without also reducing correct matches, or vice-versa.  For example, a process that completely ignored middle names would be inefficient because middle names will sometimes allow the CRA to keep different consumer records separated, while not preventing the CRA from matching records that should be matched.

An efficient matching process will be very complex, and should adapt as technology and the available identifying information change.  Because uniform rules would be unlikely to capture the necessary complexity and flexibility, they are likely to lower the algorithm's efficiency.  The likely difficulties are described below.

### a.   An "exact match" is hard to define

As noted above, the Act proposes a sample rule that would require an "exact match of the first and last name, Social Security number, and address and ZIP code . . . ."[143]  Such a requirement would be very inefficient if it did not allow certain data variations.  For example, if a rule did not allow common nicknames, such as "Dave" for "David," then the system would return a large number of false non-matches.  Similar issues arise with addresses and other identifiers, for example, the use of "St." or "Str." for "Street."  Acknowledging that variations like these should be allowed, however, leads to the considerable challenge of exhaustively defining what constitutes an "exact match."  Efficient matching demands that tolerance for spelling variations depend on the context.  For example, "Clarence Smith" and "Clarenw Smith," are likely to refer to the same person, whereas "Mary Jones" and "Mark Jones," probably refer to different people.  No rigid and simple rule specifying, for example, the number of mismatched letters allowed, can capture the subtleties required for an efficient matching algorithm.

---

143.  FACT Act § 318(a)(2)(A)(ii).

> b.    *Matching on more data elements does not always guarantee a better match*

Flexibility is also important in determining what combinations of identifiers should be allowed as a match.  Even when several elements match exactly, other elements may indicate that the overall match is poor.  Consider the following two pairs:

| | |
|---|---|
| Eli C. Whitney | Eli W. Whitney |
| 333 E. Main St. | 333 E. Main St. |
| Maplewood, TX 75200 | Maplewood, TX 75200 |
| Phone: (214) 555-1234 | Phone: (214) 555-1234 |
| Birth date: 2/14/1955 | Birth date: 5/27/1982 |
| | |
| Thomas Edison | Edison Thomas |
| 4275 N. Maple St. | 4275 North Maple St. |
| Chicago, IL 60600 | Chicago, IL |
| Phone: (312) 555-4567 | Phone: |
| Birth date: 3/14/1965 | Birth date: 01/01/1966 |

The first pair matches exactly on many points of identifying information:  first name, last name, address, ZIP code, and phone number, but it is likely to be a bad match.  The difference in middle initial and birth date suggest a strong possibility that this pair represents a father and son.  Because of this, the exact match on other identifiers becomes much less important.  By contrast, the second pair matches exactly only on address and city.  However, this pair is much more likely to represent a good match, because the discrepancies in name and birth date are easily explained as the result of small errors.

> c.    *Some identifiers are more discriminating than others*

Efficient matching also requires matching algorithms that take into account how discriminating a particular identifier is.  For instance, the CRAs may use stricter matching requirements for a consumer with a common name than for a consumer with an unusual one.  Consider the following pair of records:

| | |
|---|---|
| John Smith | J. Smith |
| 1324 Mulberry St. | 210 Plum Ave. |
| New York, NY | Yonkers, NY |
| SSN: 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 | SSN: 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 |

This could represent the combination of a move and a typographical error in the SSN, or it could represent two people with similar names who have very similar SSNs.  If instead of "John Smith," the names were "Zbigniew Brzezinski/Z. Brzezinski," then the likelihood that the SSN had been mistyped would be much larger, and one would be much more confident that these records should match.

It would be extremely difficult for even a carefully crafted rule to capture all of the complexities of an efficient matching process.  Even if such a rule could be developed, it might inhibit innovation or prevent changes to keep pace with developments.  For example, new identifiers could become available, or technological changes might allow improvements.

The following two sections address more specifically the costs and benefits of the "exact" match proposal for the relevant use – file building and file retrieval.

### 3.    Costs and benefits of matching rules for file building

#### a.    Effects on accuracy and completeness

This section considers the impact of matching requirements on file building – that is, requirements that would govern when CRAs are allowed to add data to a consumer's file or to merge files.

The benefit of the proposed "exact" match rule would stem from a decrease in mixed files, serving the proposal's purpose to enhance the accuracy of consumer reports.  Mixed files are not always harmful to consumers,[144] but when the information is harmful, a consumer may be denied credit or offered less favorable terms because of information that in fact belongs to someone else.  Such a consumer may lose an important opportunity – for example, an offer on a new home might not be accepted.  Although consumers have the right under the FCRA to correct errors through the dispute process, this task requires time and effort on the consumer's part.  Some consumers also report considerable difficulty in removing another person's accounts from their files and preventing such accounts from reappearing in the future.

The proposed "exact" match requirement would decrease the completeness of consumer reports, however, and this has real costs for consumers.  When files are incomplete, an individual consumer may suffer because his or her consumer file is missing information that would demonstrate creditworthiness.  The decrease in completeness would be most severe for consumers whose files are relatively difficult to link – for example, consumers who move often, who change their names, or whose names or other identifying information are particularly prone to data-entry errors.  A reduction in completeness will also harm the system as a whole by reducing the information available for making credit decisions.  Currently, a relatively positive credit history predicts a low default risk, making it a very valuable signal of creditworthiness.  If creditors knew that information might be missing from a consumer report, they would find a good consumer report much less predictive, which could lead to higher expected default rates, increased interest rates, and/or a decrease in the amount of credit extended to consumers.[145]

It is difficult to estimate precisely the extent of these effects.  As noted above, there are no reliable estimates of the frequency of inaccurate or incomplete files under current practices, so it

---

144.  When a consumer's file includes information that pertains to someone else, the mistake can either help or hurt the consumer.  For example, 85% of credit accounts contain no derogatory information.  Adding an account in good standing could either help or hurt a consumer's credit score, depending on other elements in the consumer's file.  *See* 2003 FRB Study, *supra* note 2.

145.  This situation arises because a higher default rate would mean greater losses for lenders.  To compensate, lenders would either have to raise interest rates or stop lending to certain borrowers.

would be hard to estimate the likely effect of changes to these practices.[146]  However, the sample rule proposed in Section 318 – which would require an exact match on five elements:  first and last name, SSN, address, and ZIP code[147] – would likely reduce the creation of new mixed files to almost zero and dramatically increase the number of fragmented files.  This would result because an individual's records could be linked only if he or she had provided the exact same identifying information to every creditor, and only if all creditors had entered the information fully and correctly.  If these conditions were not met, the records could not be linked and a new file would be created.  For example, the CRAs report that, in the information they currently receive from furnishers, the SSN is present less than 90% of the time.[148]  Under a five-point requirement, information without an SSN would be lost completely, because it could never be merged with another file.  Other updates could not be merged because of mistakes or data variations.  Changes of address or names would be a particular concern – a five-point matching rule would leave no means for the CRA to link the records of an individual whose name or address had changed to that person's records before the change, unless an update included both the old and new identifying information.[149]

A less stringent requirement would have less impact on completeness but would still decrease it.  For example, a rule might specify a list of four identifiers (such as name, address, birth date, and SSN), and require that at least three match to a "reasonable degree of certainty."[150] This would not eliminate all the mixed files that would be eliminated by the stricter five-point rule considered in the Act, but it would have a less dramatic effect on incompleteness.  It is hard to determine the extent of these effects in advance of implementing the requirement.

The FACT Act also asks the FTC to consider the effects of allowing CRAs "to use partial matches on social security numbers and name recognition software," which the FTC interprets as techniques that identify two names or SSNs as similar even when they are not exactly the same. As discussed above in section IV.B.1.b., the CRAs already allow partial matches on SSNs and names because of the large numbers of errors and spelling variations in the data they receive.

---

146. In discussions with FTC staff, the CRAs stated that they have difficulty estimating the extent of mixed and fragmented files.  Through the dispute process, they have estimated the fraction of disputes that lead to the discovery of a mixed file, but these estimates vary considerably among CRAs, from less than 0.2% to almost 5%.  (It is not clear whether this reflects significant differences in the number of mixed files, or differences in the way the CRAs classify consumer disputes.)  As discussed above, because the CRAs tolerate a substantial number of fragmented files to prevent mixed files, the number of fragmented files is likely to be far greater. Indeed, the CRAs have tens of millions more files in their databases than there are credit-using consumers in the U.S.  One CRA reports that the number of files in its system is typically more than 1.5 times greater than the number of actual consumers.

147. In considering this rule, the FTC interpreted an "exact match" strictly, assuming for example, that every character in a name must match, so that "Tom" and "Thomas" are not considered an exact match.  Further, if information were missing (for example, no SSN is provided), an exact match would be impossible.

148. FTC staff communication with CRA representatives.

149. The CRAs estimate that about 50% of inquiries would not meet the five-point matching rule for providing a file.  *See infra* note 155 and text accompanying.  The number of new records that could not be added under the proposed five-point rule could be in the same range.

150. The quoted language is from the California statute that somewhat parallels the FACT Act proposed requirements on matching; *see* notes 156-157 *infra*.  An approach specifying a minimum number of matching elements is also analogous to one taken in the FTC's consent agreement with Equifax.  *See* Equifax Credit Info. Services, Inc, 120 F.T.C. 577 (1995).

*b.   Matching proposal would facilitate "file segmentation" abuses*

Another cost of the proposed matching requirement would be to make "file segmentation" strategies easier.  Because of the serious consequences of a bad credit history, some consumers currently attempt to manipulate the system to escape their existing credit history.  File segmentation is a strategy in which the consumer attempts to establish a new credit identity by applying for credit using identifying information that will not be matched to the customer's existing file.[151]  Requiring a match on a minimum number of points of identifying information would make such abuse easier.  For example, if a match on address were necessary before an account could be added to a file, then by simply moving (or applying for credit using an address not previously used, such as a P.O. Box), a consumer could establish a new credit profile.

An increase in file segmentation would be particularly harmful to consumers with relatively little credit history.  Because lenders cannot distinguish such consumers from bad credit risks who have managed to establish a new "segmented" file, an increase in segmented files would be likely to make lenders hesitant to extend credit to a consumer with a "thin" file.

## 4.   Costs and benefits of matching requirements for file retrieval

This section considers the effect of requirements that apply to file retrieval, but not file building.

The potential benefit of the proposed "exact" match requirement would be to decrease the provision of the wrong consumer's file to users and to impede identity theft, thereby meeting the proposal's goal to combat the provision of incorrect consumer reports to users.[152]  The potential costs would be an increase in the frequency with which a user's request does not return any file, which would, at a minimum, cause confusion, inconvenience, and delay for some consumers seeking credit.  Also, consumers would likely be forced to provide more information when applying for credit.  Although this might create additional challenges for identity thieves, it could also be costly for consumers who are reluctant to provide personal information because of concerns about privacy or identity theft.[153]

*a.   Matching rules would increase no-hits*

A stricter matching rule for file retrieval would make it more likely that a file that exists in the CRA's system is not provided when that consumer applies for credit.  Currently, between five and eight percent of inquiries result in a "no-hit," that is, a reply from the CRA that no such

---

151.  *See supra* note 44 and accompanying text.

152.  On the other hand, changes to the file retrieval process would not affect the content of the files themselves, and thus would have no direct impact on accuracy.

153.  It should be noted that another section of the FACT Act may further the same goals intended by the stricter matching for file retrieval proposal.  Section 315 requires CRAs to notify the user of a consumer report when the address provided by the user "substantially differs" from the addresses on file for the consumer.  Although the main goal of this provision is to create a "red flag" pointing to possible identity theft, such a notice would also notify the user of the possibility of an error.  The proposed matching rule would go further, in that it would cover more identifiers than the address, and it would prevent the consumer report from being sent in the first place, rather than relying on the user to further investigate the source of the discrepancy.

consumer file exists in the system.[154]  In many cases, this means that the applicant in fact has no file because he or she has no credit history.  In other cases, the application contains too little identifying information for the CRA to find a confident match.  A stricter rule would increase the no-hit rate by increasing the number of times that a file is in the CRA's system but cannot be provided.  In fact, the CRAs estimate that 50% or more of the files they currently provide could not be provided under the requirement of an exact match on first and last name, address, ZIP code, and SSN.[155]

In 1997, California passed amendments to its Consumer Credit Reporting Agencies Act, targeted at reducing identity theft, that somewhat parallel the proposed requirements on matching.[156]  One provision of the California law requires that when a retailer requests a consumer report for an applicant, the CRA may provide the consumer report only if the application matches the credit file on at least three points of identifying information.[157]  The three nationwide CRAs estimate that, as a result of this rule, a large number of consumer reports that would otherwise be provided to retailers in California cannot be provided.  Each CRA estimated somewhat different numbers, but on average the number of reports that could not be provided to retailers in California as a result of the requirement was over 10%.[158]

The economic impact of the increase in California in no-hits is difficult to gauge, in part because it is not apparent how retailers and consumers respond to these no-hits.  When a consumer's application is rejected because of a no-hit, the consumer may simply reapply with more complete information, in which case the costs to the consumer are frustration and delay.  If the applicant is turned down for a credit account but does not reapply, the applicant and the retailer lose whatever joint benefits the account would have generated.

Some no-hits presumably reflect cases where identity theft is in fact being prevented because the identity thief is unable to provide enough identifying information about the victim to effect a match.  Although this is a benefit to consumers when it in fact frustrates identity theft, in most cases a no-hit does not provide a benefit, but rather prevents a consumer's application from being approved.

### b.   For file retrieval, matching requirements are essentially application requirements

As discussed previously,[159] because data are furnished to the CRAs on a voluntary basis, matching requirements for file building would be unlikely to have a direct effect on the quality of the identifying information that the CRAs receive.  In contrast, for file retrieval any firm that wanted to receive a consumer report would be forced to conform to rules specifying what identifying information must match.  The proposed rules could lead creditors to collect more complete information from consumers or to check applications more carefully for errors.  For

---

154.  FTC staff communication with CRA representatives.

155.  FTC staff communication with CRA representatives.

156.  Act of October 7, 1997, Cal. Stat. Ch. 768.

157.  *See* Cal. Civ. Code § 1785.14(a)(1).  The points of identifying information include, but are not limited to, name, address, SSN, and birth date.

158.  FTC staff communication with CRA representatives.

159.  *See supra* page 41.

example, if the law required a match on SSN, creditors would understand that no inquiry without a valid SSN would yield a consumer report.  This would presumably lead them to insist that applicants provide SSNs with credit applications.

Thus, a rule requiring an exact match on SSN would be tantamount to requiring the SSN as part of any credit application.  Errors in the provision of SSNs would still exist, but they would be caught more frequently; indeed, if an application yields a no-hit because of an error in the SSN, the unexpected outcome might lead the consumer to double-check the number.  In addition to increasing the likelihood that the report a creditor receives is the correct match, the additional identifying information would mean that CRA files were more complete, improving the quality of future matches.

c.    *Impact of requiring an exact SSN match*

As noted above, a stricter matching rule for file retrieval would make it more likely that even an appropriate file that exists in the CRA's system is not provided when that consumer applies for credit.  On the other hand, matching rules for file retrieval would increase the accuracy of the "match" when a file is, in fact, retrieved.  Because of these competing considerations, it is not clear that any potential benefits that might flow from absolute matching rules would improve upon the existing voluntary system.

Considering whether it might make sense to "require" provision of an exact match to a SSN provides a good illustration of the tradeoffs involved.  The SSN's primary utility is as a unique identifier.  Errors in the provision and recording of SSNs always will exist, but they would be caught more frequently if an exact match were required.  Nonetheless, if an application were to yield a no-hit because of an error in the SSN, remedying the error would require some additional expenditure on the part of the consumer or user.  Balanced against this extra expenditure is the benefit that would flow from the greater likelihood that the correct file will be retrieved.

Any impact on preventing and deterring identity theft also should be considered.  Identity theft stems in part from the SSN's current use as both an identifier and authenticator.[160]  Thus, simply requiring the SSN is not likely to prevent identity theft.  Nonetheless, requiring the SSN to match would necessitate that an identity thief obtain that additional piece of identifying information, which may prevent or deter some thieves.  At the same time, requiring the consumer to provide his SSN to the creditor creates another opportunity for the identity thief to intercept and misuse the SSN.  Other mechanisms, however, such as information security measures and alternative methods of authentication, can minimize that risk.  Again, given these competing considerations, it is unclear what impact mandatory SSN use would have on identity theft.

## D.  Conclusion

This study has examined whether the accuracy of consumer reporting would be enhanced by adding a requirement that certain points of identifying information match before a consumer report is furnished to a user.  It has considered two possible approaches to implementing such a requirement: (1) requiring a stricter match before adding information to a consumer's file (file

---

160.  *See supra* section IV.B.1.b.

building), and (2) requiring a stricter match before providing a file in response to an inquiry (file retrieval).  Both approaches would address important concerns, but they would also entail significant costs.  Although it is difficult to quantify both the benefits and costs, the Commission is concerned that the costs could outweigh the potential benefits.

If the requirement were imposed in the matching process for file building, the result would be a reduction in mixed files.  Mixed files are costly for consumers, but their cost, and therefore the benefit of the proposed requirement, may be mitigated by the dispute process already provided in the FCRA.  A consumer who is harmed because another consumer's derogatory credit history has been assigned to him has the opportunity to dispute and correct the error so that it will not be an obstacle in the future, although the consumer incurs the costs of time and resources necessary to pursue the dispute.[161]

At the same time, the stricter match proposal for file building would likely lead to an increase in fragmented, incomplete files, and thus a decrease in the informativeness of consumer reports.  If this occurred, the result might be a significant increase in costs of credit for consumers generally, because lenders would need to hedge against potentially greater uncertainty in assessing their customers' creditworthiness.

The implications are less substantial when considering the effect of the proposed requirement on the matching process for file retrieval, both in terms of benefits and costs.  There are two potential benefits: (1) a reduction in the number of times a CRA supplies the wrong file in response to an inquiry, and (2) an increase in the amount and quality of identifying information that users submit when requesting a consumer's file.

Still, the incidence of creditors receiving the wrong consumer's file appears to be quite small.  When the creditor does receive the wrong file, it is most likely to be one among multiple files, which should signal the creditor that one or more of the files may not pertain to the applicant.  The system might improve if users were required to collect more complete and accurate information from applicants, because this would improve the quality of information in CRA files.  For example, if CRAs were required to match the SSN before providing a consumer report, then more consumer files would include SSNs, which would make them more effective in matching CRA records.  However, such requirements would impose real costs on credit applicants – both those who seek to protect their privacy, and those who experience delay and frustration in the application process because their application information does not meet the matching requirements.

In sum, there are considerable uncertainties in calculating the costs and benefits of requiring several matching points, and it is unclear whether the benefits to consumers would outweigh the costs.  Moreover, several of the new provisions of the FACT Act – including the requirement that a CRA alert a user of a credit report when an address that the user has provided for a consumer differs from the address in the CRA's file – could help ameliorate the problems that the matching requirement is intended to solve.  The FTC's ongoing study of accuracy may shed light on the frequency with which matching errors occur, and whether the new provisions reduce these errors.

---

161.  The consumer may also lose an opportunity for a specific transaction, particularly if the dispute takes much time to resolve.  As noted previously, how CRAs and furnishers handle consumer disputes is the subject of another study, which will be separately reported to Congress under Section 313(b) of the FACT Act.



For these reasons, requiring several points of matching, as suggested by section 318(a)(2)(A) of the FACT Act, appears premature at this time.

# V.   Same Credit Report

## A.   Introduction

Section 318(A)(2)(C) of the FACT Act requires the FTC to study the effects of:

> requiring that a consumer who has experienced an adverse action based on a credit report receives a copy of the same credit report that the creditor relied on in taking the adverse action, including – (i) the extent to which providing such reports to consumers would increase the ability of consumers to identify errors in their credit reports; and (ii) the extent to which providing such reports to consumers would increase the ability of consumers to remove fraudulent information from their credit reports.

The proposed requirement is meant to address the situation where a report provided to a consumer subsequent to an adverse action notice does not disclose the same information that was provided to the creditor.  Consumers cannot exercise their rights to identify and correct any inaccuracies if they do not see the information that is inaccurate.  By requiring that the consumer receive the same report used by the creditor, the proposal seeks to ensure that the consumer can spot and dispute inaccurate information that would otherwise go undetected.[162]

To understand the implications of the proposed requirements, Commission staff relied on discussions with representatives of consumers, CRAs, and creditors who use consumer reports. The Commission also issued a *Federal Register* Notice that requested input from interested parties on a number of specific questions.  The notice yielded 63 responses from consumers and industry representatives, and these responses were helpful in preparing the study.

Based on this information, the study first discusses the circumstances under which a "same report" requirement would be useful to consumers, and then describes the costs and benefits of the requirement for consumers and industry.  These costs and benefits could vary substantially, depending on how the requirement is implemented.  As a basis for analysis, this report considers two possible approaches.

- Under the first approach, the CRA that provided the report to the creditor would provide the "same report" to the consumer.  In this case, the requirement would essentially amend consumers' existing right to receive a copy of their reports following an adverse action. Under this arrangement the "same report" would be sent only when a report is explicitly requested by a consumer who has experienced an adverse action.

---

162.  As specified in the FACT Act, this study is limited to situations when a consumer obtains a credit report following an adverse action taken by a creditor.  Section 603(k)(1)(A) of the FCRA states:  "The term 'adverse action' has the same meaning as in Section 701(d)(6) of the Equal Credit Opportunity Act" ("ECOA").  15 U.S.C. § 1681a(k)(1)(A).  Under the ECOA and its implementing Regulation B, "adverse action" is defined to include denials of credit and, in some instances, charging a higher price or less favorable terms (for example, if the creditor makes a counteroffer that is not accepted by the consumer, or if the creditor makes an unfavorable change in the terms of a particular consumer's account).  *See* 12 C.F.R. § 202.2(c)(1).

- Under the second approach, the creditor who took the adverse action would provide the "same report" to the consumer. This approach would be similar to the current requirement regarding employers who take adverse actions.[163] In this case, the consumer would receive a copy of his or her report along with the adverse action notice, without having to request it explicitly.

These approaches are not the only ways that the proposal could be implemented, and different choices could lead to different costs and benefits. Where appropriate, this report discusses how alternative policy choices would affect the costs and benefits of the measure.

## B.  Background

### 1.   How consumers and creditors might see different reports

Currently, the CRAs add information to consumer files when it arrives from furnishers. At any given time, the information contained in a particular consumer file is the same whether a request to access the file comes from a consumer or a subscriber. If a consumer and a user see consumer reports derived from the same file at the same time, the consumer will see all the information that a creditor sees.[164] This leaves two possible ways that a consumer might not see information that the creditor sees:

(1)  the two reports were generated at different times, and

(2)  the consumer's disclosure request does not identify and supply the same file, or all of the files, that were provided to the creditor.

Differences based on timing are probably quite common. Information is constantly being added to consumer files or updated as it is received from furnishers, and deleted from files when it becomes obsolete. For example, if a user requests a report on April 1 and then rejects a consumer's application, the consumer would not receive his or her free disclosure until a later date, perhaps April 20. Any information that has changed between April 1 and April 20 would appear on the consumer's disclosure, but not the earlier report received by the user.

If the consumer were to receive the historical document that the creditor had relied on, it might sometimes help alleviate any confusion about why a credit decision was made. For example, suppose a creditor receives a consumer report showing high credit card balances. These balances might be lower by the time the consumer receives a disclosure. Seeing the "same report" would give the consumer a clearer picture of what had caused the creditor's decision. On the other hand, informing the consumer of historical information might be less likely to further

---

163.  Section 604(b)(3)(A)(i) of the FCRA requires employers, before taking any adverse action based in whole or in part on a consumer report, to provide the employee or job applicant with a copy of the report. 15 U.S.C. § 1681b(b)(3)(A)(i).

164.  The FCRA prohibits CRAs from including certain information in reports to users. For example, inquiries that were not initiated by the consumer (e.g., inquiries associated with prescreening) are prohibited by Section 604(c)(3), and furnishing medical information is restricted to certain circumstances by Section 604(g). 15 U.S.C. §§ 1681b(c)(3) and (g), respectively. Such information appears in consumer disclosures.

the primary aim of the proposal, which is to help consumers identify errors and fraud.  For this purpose, the most recent information is most relevant.

Receiving the "same report" could be much more valuable when a creditor receives a consumer report based on a totally different file than the report that would otherwise be disclosed to the consumer.  There are two situations in which this could occur.  First, the creditor could receive a report consisting of a single file pertaining to the wrong consumer.  Second, the creditor could receive multiple reports, while the consumer receives only one of these reports.

Either result can be caused by problems in the identifying information provided by the creditor.  For instance, suppose Jane A. Smith applies for credit, and that there is another consumer with similar identifying information (Jane B. Smith).  If the creditor provides incorrect or incomplete identifying information to the CRA, it might receive a report on Jane B. Smith only, or two consumer reports pertaining respectively to Jane A. and Jane B.  In either case, it is possible that information pertaining to Jane B. will adversely affect Jane A.

If Jane A. requests a copy of her own consumer report, it is less likely that she will see Jane B.'s file.  CRAs generally require consumers who seek file disclosure to provide more complete identifying information than subscribers who make an inquiry; thus, a consumer request is more likely than a user inquiry to screen out files belonging to someone else.[165]  Even if the consumer's request does initially match another consumer's file, the requesting consumer might still not get to see it because when a consumer's request matches more than one file, the CRA generally requests additional information from the consumer in an attempt to determine whether the additional file or files belong to him or her.[166]  Any files found not to belong to the consumer will be excluded from the report that is provided.  Although the consumer may end up with the correct report, he or she will not have access to the incorrect report used by the creditor, making it more difficult for the consumer to determine what went wrong and to correct it.

Some consumers, however, currently do see the same report that the creditor sees as part of the credit granting process.  Particularly in mortgage lending, some creditors discuss the reports directly with the applicants.  Also, resellers of "merged" credit reports – typically used by mortgage lenders – will retain these merged reports and provide them to consumers when they request a disclosure.[167]

---

165. One reason for this is that, in providing reports to consumers, the CRAs must establish that the requesting consumer is indeed who he or she claims to be, in order to prevent fraudulent access to consumer information by others.  Requiring sufficient information for authentication purposes means this information is also available for matching.  When a creditor requests a file, the creditor is in a better position than the CRA to verify the consumer's identity – for example, the creditor may request a copy of a driver's license or other identification.  In responding to creditor inquiries, the CRA requires information only for matching, and not for authentication.

166. FTC staff communication with CRA representatives.

167. Even if they have provided two separate reports relating to a particular consumer (e.g., because of requests from two different mortgage lenders), industry sources indicate that these resellers can and do ask follow-up questions to ensure that the report sent to the consumer is the one that was sent to the mortgage lender that took the adverse action.

## 2.   How often do creditors see files that consumers do not see?

As noted above, a consumer and a creditor could see different reports if (1) the creditor received a single report based on the wrong consumer's file, or (2) the creditor received multiple reports and consumer received only one.  As described in section III, the first scenario appears to be uncommon, and generally involves incorrect identifying information being entered in the request.[168]  This situation could occur if two people share some identifying information, and the creditor makes an error entering information that is not common to both.  It is also possible if a creditor requests a report relating to a consumer who is new to the credit system, and therefore does not have a file or has a file with only limited information, that the CRA will supply a report on an existing file that is the "closest match."

As to the second scenario, two of the three major CRAs report that they currently do not send multiple reports to their subscribers.  The other CRA states that, depending on the subscriber's preference, it sometimes supplies reports containing more than one file.[169]  In these cases, the CRA presents each file as a separate report and scores each report separately.

It appears that in many instances when multiple files are identified in response to a single inquiry, one file contains the bulk of the consumer's credit history, and one or more "secondary" files contain relatively little data, perhaps a single account.[170]  These secondary files contain information that the CRA has not been able to assign to this consumer, or any other, with what it considers a sufficient degree of certainty to cause it to merge the information.  Yet, the CRA may still consider the information likely to pertain to the same consumer.

A sample of recent reports obtained by the FTC independently indicates that, for the CRA that does provide multiple reports, about four percent of inquiries match to more than one file.[171]  However, this CRA has stated that many of its subscribers choose not to receive multiple files and request to receive only the single file that best matches their request.  The CRA states that it supplies multiple files in response to fewer than one percent of subscriber requests.[172]

---

168.   As discussed in section III, the CRAs report that they receive a small number of complaints from subscribers about receiving a single wrong report.  *See* discussion *supra* page 15.

169.   In order to comply with Section 607(a) of the FCRA, a CRA that furnishes multiple files (including fragmentary files) in response to an inquiry on a single individual must have reasonable procedures to assure that the information it furnishes pertains only to that consumer.  In other words, a CRA cannot furnish multiple files unless it has reasonable procedures to ensure that each file contains information pertaining to the same consumer.

170.   FTC staff communication with CRA representatives.

171.   Data provided to the FTC by Fiserv/Chase Credit Research.

172.   The CRA also states that, over time, it continues to refine the accuracy of its matching software and to reduce the incidence of reports containing multiple files.

This CRA also has stated that most of the multiple files it sends out apply to the correct consumer.[173]  On the other hand, the fact that the CRA has not merged the files suggests that it believes there is a non-trivial probability that the files belong to different people.  If so, and if the creditor does not recognize the error, then the creditor may evaluate the consumer's application based on information that does not pertain to him or her, but the consumer may have no way to discover the problem by requesting his or her report from the CRA.

### 3.   What do creditors do when they receive multiple reports?

As noted above, many users of consumer reports choose not to receive multiple reports, and ask to receive only the report based on the "best match."  When a creditor chooses to receive multiple reports, the creditor is likely to recognize that multiple reports signal greater than normal uncertainty about whether all the reports in fact apply to the consumer in question.  The effect of any "secondary" reports on the consumer depends on what the creditor does in this circumstance.

There is evidence that some creditors take steps to verify whether multiple reports indeed apply to the consumer in question, particularly in the mortgage industry.  A creditor may attempt to verify the applicability of a report either directly or by using a reseller.  One service a reseller provides is to investigate whether the file or files furnished actually pertain to the applicant.  Creditors can also resolve questions by manually reviewing the files or by taking the additional step of contacting the consumer.  The benefit to the creditor of verifying the applicability of the file is that the creditor could avoid rejecting a loan that would, in fact, meet its standards.  The greater the potential revenue associated with making a loan, the more likely a creditor would be to bear the costs associated with such steps.

According to the Mortgage Bankers Association, the general practice in the mortgage industry is to discuss any significant derogatory credit item with the consumer before a final credit decision is made.  Mortgage lenders make this effort because mortgage loans typically involve greater revenue and because compensation for loan officers and mortgage brokers typically depends on the loan closing.

Similarly, a credit union officer stated that credit unions generally follow this practice, not only for mortgage loans, but for all loans.[174]  Moreover, Boeing Employees' Credit Union indicated that the first step for any creditor is to determine if there is an obvious reason why there are multiple "in-files," such as a generation issue (Junior and Senior), married/maiden/ hyphenated name issue, or some other logical issue.  Boeing also pointed out that in processing

---

173.  As a basis for this claim, the CRA cites two sources of information.  One source is feedback from creditors.  As discussed below, there are a number of creditors who, when they receive a report containing multiple files, attempt to verify the applicability of the files to the consumer by contacting the consumer and obtaining more information.  Such creditors might be expected to inform the CRA if they found that most "secondary" files pertain to the wrong person.  Another source is research that the CRA has done on the accuracy of its matching procedures, the details of which were not disclosed by the CRA.

174.  Telephone conversation with Beverly Rutherford, Vice President/Compliance, Virginia Credit Union, Inc. (Sept. 16, 2004).

Federal Trade Commission

loan applications, multiple "in-files" are screened out of automated decision and require manual review by an underwriter, who can ask for additional information from the consumer.[175]

When creditors take steps to verify the applicability of any files they receive, the "credit report that the creditor relied on" is the report or reports that the creditor determined in fact pertains to the consumer, rather than all the reports that the CRA sent. However, it is not clear whether this practice is common among creditors as a general matter. For example, for creditors who use automated loan approval systems, it is costly to subject files to additional manual review. When such creditors choose to receive multiple reports, it is unclear how often they perform any "check" on the applicability of the files they receive.

## C.  Benefits and Costs of a "Same Report" Requirement

As noted above, this study addresses two ways to implement the proposed requirement: (1) requiring CRAs to provide a copy of the same report that they furnished to a creditor when the consumer subsequently requests a consumer disclosure, and (2) requiring creditors themselves to provide a copy of the report they used in making a decision. The discussion below focuses first on the benefits and costs to consumers, regardless of who provides the report, and then on the benefits and costs that are specific to how the requirement is implemented.

### 1.  Benefits to Consumers

The proposed "same report" requirement is intended to ensure that consumers always know what information was used by creditors in taking an adverse action. Consumer groups have argued that this is important both so that consumers can "discover and correct any inaccuracies that may be contained in credit reports received by creditors," and so that when consumers dispute information with creditors, both parties "refer to the same information to ensure that they are reviewing and discussing the same report or information . . . ."[176]

The proposal would provide these benefits in situations in which a report provided to a consumer following an adverse action does not include information that was contained in the report furnished to the creditor. To assess the likely benefits of the proposal, it is important to know how often this situation arises and to what extent the proposal would help consumers address it.

At present, it is unclear how often creditors base decisions on information from a report that is not disclosed to the consumer, or how often these cases result in adverse actions. In order to estimate the extent of these errors, one would need a random sample of consumer files relied on by creditors in taking an adverse action, the correct consumer files at the time of the adverse actions, and input from the creditors or some other means of evaluating whether the adverse

---

175.  Comment of Boeing Employees' Credit Union, at 2. Comments received in response to the FTC's Request for Public Comments on the "same report" proposal are available at:  http://www.ftc.gov/os/comments/factaadverseactstudy/index.htm.

176.  Comment of The National Consumer Law Center, the Consumer Federation of America, Consumer's Union, The Electronic Privacy Information Center, The Identity Theft Resource Center, Privacy Rights Clearinghouse, Privacy Times, and U.S. Public Interest Research Group, at 3.

actions would have been reversed if the correct file had been used.  This information could not be obtained within the time frame of the study, and it is unclear whether it could be obtained even with a longer time frame.

The problem could occur in particular when a creditor receives multiple consumer reports and takes an adverse action based on negative information contained in a report that does not belong to a consumer.  Multiple reports are sent in less than one percent of cases by one of the three nationwide CRAs, but this could still translate into a significant number of reports each year.  Even in these cases, however, the benefits of the proposed "same report" requirement are unclear.

The CRA that sends multiple reports argues that in most cases, the "secondary files" that are sent do pertain to the correct consumer.[177]  In these cases, the CRA says that the consumer will see the same information the creditor sees.  Sometimes, a consumer's disclosure request will provide enough information for the CRA to merge the files, and so the consumer will receive all the information in the form of a single file.  If the CRA is not confident enough to merge the files, but cannot confirm that the "secondary" files belong to another consumer, then the CRA says it will send the multiple files to the consumer as well.

If the secondary file in fact contains negative information that pertains to a different consumer, the problem is potentially more serious.  When this occurs, the harm to consumers – and the benefits of the proposed requirement in addressing this harm – depend on how the creditor processes the reports it receives.  For example, receipt of multiple reports should act as a signal that the creditor should take care to check that the information in fact applies to the applicant.  For mortgage transactions, where stakes are arguably the highest, further review in the case of multiple reports appears common.  Other creditors, particularly those who use automated systems for credit approval, may not take extra steps to evaluate multiple reports.

The benefits of the proposal would also depend on the actions taken by consumers in response to the information shown in the "same report" and the likely outcome of such actions.  For example, if a secondary file had been created as the result of identity theft, the "same report" requirement could bring the fraudulent activity to the victim's attention.  Learning about the file would enable the consumer to file an identity theft report and dispute the fraudulent information.[178]

When the CRA has sent a secondary file that is not created by identity theft, but in fact belongs to a different consumer, fixing the problem could be more difficult.  Even if the CRA learns that a particular file does not belong to a consumer, it may be difficult to guarantee that a future inquiry will not match that same file.  The CRA cannot delete the information because it presumably pertains to some legitimate consumer.  Further, it may be costly for the CRA to redesign its matching procedures to prevent any possibility of this occurring.

There are other steps that a consumer could take, apart from informing the CRA, after discovering that the CRA had sent a creditor the wrong consumer's file.  The consumer could make sure to provide more complete identifying information when applying for credit.  He or she

---

177.  *See supra* note 173.

178.  However, as discussed below, there is also some risk that the "same report" proposal could make it easier for identity thieves to operate and thus increase the incidence of fraud.

can also warn creditors that there is the possibility they will receive a file belonging to the wrong consumer. The effectiveness of such steps depends on how the creditor responds. For example, if a creditor uses automated systems, it may have limited ability to act on a consumer's warning that the wrong file might be supplied by the CRA.

## 2.   Costs to consumers

Many of the costs of implementing the same report requirement would fall on industry, and these costs depend substantially on whether CRAs or creditors provide the reports. Consumers would also bear some costs, regardless of who provided the report.

One cost to consumers results from receiving a report that may be several months old. By the time a creditor processes the consumer's application, informs the consumer of a decision and the consumer's right to obtain disclosure from the CRA, and the consumer requests a report, the data in the consumer's file are likely to have changed. If the data in question are out of date, or have been corrected, the consumer might waste time and effort disputing data that are no longer inaccurate. The consumer might also fail to uncover inaccuracies that currently exist, but are not reflected in the historical document.[179]

Second, if the same report proposal were to require that reports be sent even to consumers who had not affirmatively requested one, the proposal might increase the incidence of identity theft.[180] Many parties noted that identity thieves might exploit the requirement as a means to gain access to another party's consumer report.[181] An increased volume of reports in the mail and trash could also enable identity thieves to gain increased access to consumer reports.[182] These

---

179.   As noted by MasterCard International: "[p]roviding consumers with an outdated consumer report can therefore provide consumers with a false sense of concern if negative or erroneous information is no longer in the consumer's file, or a false sense of security if the consumer's file has been damaged more recently than would be reflected in the historical consumer report." Comment of MasterCard International, at 3.

180.   A related issue is that the requirement could raise privacy concerns. If the creditor mistakenly relied on a consumer report that actually pertained to a different person, the "same report" requirement could mean that a consumer would receive another person's consumer report.

181.   This point was made in numerous comments. For example, the American Financial Services Association noted:

> lenders could inadvertently send credit reports or similar information to identity thieves if lenders were required to provide declined applicants with such information ... To require a creditor to send a credit report with the adverse action notice could provide perpetrators of identity theft with additional information about the consumer that may enable the perpetrator to be more successful on the next application for credit in the victim's name.

Comment of American Financial Services Assoc., at 2. *See also* Comment of the American Bankers Association, at 2, Comment of MasterCard International, at 4, and Comment of Background Investigations, Inc., at 6.

182.   For example, the Boeing Employees Credit Union noted that a requirement to provide a copy of the consumer report whenever an adverse action notice is given

> potentially exposes more consumers to fraud or identity theft risk by forcing creditors or CRAs to provide a large volume of credit reports to consumers. That volume will travel through channels that ultimately put the consumer at risk. If fraudsters are able to use a monthly credit card statement to do significant damage to consumers, what will they be able to do with an entire credit report?

concerns would be substantially reduced if the "same report" were sent only when a consumer explicitly requested one.

### 3.    Costs if the CRA provides the report

The three nationwide CRAs would incur substantial costs from the proposed requirements due to the need to design, build, and maintain systems to store historical data.  These systems would be required to store consumer files regardless of whether an adverse action is taken.  A CRA would not know in advance which data requests would result in adverse actions, so they would need to assume that any report provided might need to be disclosed to a consumer at a future date.

As an estimate of this effect, one of the three nationwide CRAs noted that the "same report" requirement could eventually swell its database from its current 210 million credit files to 5 billion records because of the multiple reports retained for consumers.  It further stated that the increased costs of data retrieval and error correction in such a system "would be passed on in higher report prices to creditors."[183]  The other two nationwide CRAs each estimate the cost of additional equipment and staff necessary for such a system to be in the in tens of millions of dollars.[184]

Given current law, an unintended consequence of the proposal would be to substantially increase the quantity of information that a CRA would provide as part of a consumer disclosure. Section 609 of the FCRA requires CRAs to disclose *all* information in the consumer's file at the time of the consumer's request.  Because all information in the consumer's file would consist of every historical document that is being saved, the consumer could receive much more information than is needed after requesting a copy of the file.[185]  One CRA noted that under the

---

. . . Our members do not like us mailing their confidential information unless they specifically requested it, as mail is not secure.  This proposal takes that consumer right away.  Additionally many consumers just throw this type of information in the unsecured trash can.  We believe this is putting those individuals at risk for dumpster divers and identity theft and fraud.

Comment of Boeing Employees Credit Union, at 5-6.  The American Bankers Association made a similar point, noting that

Unlike the case where the consumer has specifically ordered a report and is expecting it, consumers denied loan applications will not be expecting or necessarily wanting a credit report.  Accordingly, they will be less likely to dispose of it properly, either because they overlook it or are not interested.

Comment of American Bankers Assoc., at 2.  *See also* Comment of Mortgage Bankers Association, at 3.

183.  *See* Comment of Equifax Information Services LLC, at 4.

184.  *See* Comment of Experian, at 2; Comment of TransUnion LLC, at 4.

185.  There may also be other unintended costs associated with the proposed requirement.  For example, the Independent Community Bankers of America noted that

if consumer loan applicants were required to receive the same credit report on which an adverse action was based, the need to streamline operations and reduce costs might force creditors to use a single credit report.  This would reduce the amount of information available for underwriting decisions, potentially affecting borderline loan applicants particularly, since the reduced information might increase the number of loan denials.

Comment of Independent Community Bankers of America, at 3.

proposal, consumers would be likely to receive "an enormous disclosure package of multiple credit reports issued over a long period of time in addition to the current disclosure copy of their credit file."[186]

An alternative policy that would avoid the costs associated with the CRAs' storage of historical data would be to simply require CRAs to mail consumers a copy of their consumer report at the same time that the creditor is sent a copy of the consumer's report. This would result in all consumers who apply for credit being sent a copy of their consumer report regardless of whether an adverse action was taken. However, it is far from clear how consumers would react to such a policy. In any given year, some people may apply several times for credit. For consumers who are not denied credit, the benefit of receiving all these reports appears limited, and it seems likely that they would object to it both as a nuisance and as something that increased the risk of identity theft. Moreover, as discussed below, CRAs often provide creditors only a credit score or other form of summarized data that would not be readily understood by consumers.

This alternative approach would also increase the number of files sent to consumers in a year from the tens of millions to the billions.[187] The associated costs could increase the cost of credit substantially and potentially eliminate the use of consumer reports for certain lending decisions.

## 4.   Costs if the creditor provides the report

An alternative way to implement a "same report" requirement would be to require creditors to provide each consumer with a copy of the consumer report that the creditor used to evaluate the consumer's application. The creditor could provide this information at the same time it provides the triggering adverse action notice to the consumer, obviating the need for the consumer to go through the extra step of requesting a disclosure from the CRA.[188] The consumer would receive the report directly from the creditor and would thus benefit from the timeliness of receipt of the report and the ability to immediately interact with the creditor. This approach has several drawbacks that could offset consumer benefits, however.

One drawback of this approach is that the information the creditor receives may be considerably less detailed than the information in the CRA's files. Another concern is that sending consumers an unsolicited report might raise privacy concerns and increase the risk of identity theft.

In order to comply with such a requirement, creditors at a minimum would have to build systems to create a consumer-friendly version of the file that they access and employ personnel to respond to inquiries from consumers about their consumer reports. Many creditors use

---

186.   Comment of Equifax Information Services LLC, at 14.

187.   The CDIA estimates that two billion credit reports are sold each year, and that there are fewer than 20 million consumer disclosures each year. *See* Statement of Stuart Pratt, *supra* note 2.

188.   Alternatively, the consumer might be required to request a copy of the report from the creditor during a short period after he or she receives the adverse action notice. This would mitigate some of the costs below, but would require creditors to retain files containing consumer reports for a longer period of time.

automated systems and do not receive or keep paper reports.  As noted by the American Financial Services Association,

> [l]enders receive raw data that they cannot typically print out in consumer-friendly format.  The data feeds from credit bureaus are designed for computers to communicate with each other.  Today's systems will not allow the typical lender to generate a readable credit report from their files.[189]

Requiring creditors to provide the "same report" could also result in consumers receiving less information than they receive if they seek file disclosure from the CRA under the current system.  For example, it is common for a creditor to use a credit score or another form of summarized data from the CRA in lieu of a complete consumer report.  Consumer groups have pointed out that the report is only effective if it includes "the specific information that forms the basis for the adverse action."[190]  If the creditor provided only summarized information to the consumer, the consumer could not observe the underlying data that generated the report.  In this case, the notice might not serve its fundamental purpose, because the summary data might not inform the consumer about the specific negative information that led to the adverse action.

However, consumers might not always need to see all of the specific information.  For example, if a report contained two scores and it was obvious to the consumer from the identifiers that one score belonged to someone else and was the reason for the denial, the scores would be sufficient to inform the consumer of what had happened.  Even if a consumer did not receive the same report, the adverse action notice supplied pursuant to the Equal Credit Opportunity Act, which is typically supplied concurrently with the FCRA adverse action notice and requires that the consumer be informed of the "specific reasons" for the adverse action,[191] may itself alert the consumer to inaccuracies in the underlying consumer report – for example, if one reason for adverse action were "too many finance company loans" and the consumer knew that he or she had *no* finance company loans.

The proposal could be implemented in such a way as to require creditors to supply the underlying information that had generated the score, but this would impose additional costs on creditors.  Creditors would need to purchase, store, and process information that they do not otherwise need in order to make it available to consumers who experience adverse action and

---

189. Comment of American Financial Services Association, at 4.  Similarly, Wells Fargo noted that "[t]he overwhelming majority of consumer reports used by credit grantors – more than 90% – are obtained in electronic format and never converted to paper.  In most cases, the contents of the report are analyzed by an automated decision system, and even if a 'manual' review of the decision is performed, only certain aspects of the report will be converted to a human-readable form.  Even when a consumer report is provided to a creditor on paper, or converted to human-readable form by the creditor, the information is displayed in a highly condensed form using codes and abbreviations that would be meaningless to most consumers."  Comment of Wells Fargo & Company, at 1.  *See also* Comment of MasterCard International, at 5; Comment of Coalition to Implement the FACT Act, at 1-2.

190. Comment of The National Consumer Law Center, the Consumer Federation of America, Consumer's Union, The Electronic Privacy Information Center, The Identity Theft Resource Center, Privacy Rights Clearinghouse, Privacy Times, and U.S. Public Interest Research Group, at 5.

191. *See* 12 CFR § 202.9(a)(2)(i).  Section 202.6(b)(6)(ii) of Regulation B, which  implements the Equal Credit Opportunity Act, also provides a vehicle for a consumer to bring to the attention of a creditor ". . . any information the applicant may present that tends to indicate the credit history being considered by the creditor does not accurately reflect the applicant's creditworthiness . . . ."  12 CFR § 202.6(b)(6)(ii).

Federal Trade Commission

request it.  Also, creditors would need to purchase this extra information for all consumers, because they have no way of knowing in advance which consumers will be turned down on the basis of information in the report.[192]

## D.  Conclusion

When a consumer disclosure does not include information that led a creditor to take an adverse action, the consumer protections provided by the FCRA can be significantly compromised.  The proposed requirement seeks to address this situation by ensuring that the consumer receives the "same report" as that provided to the creditor.  Because there may be substantial costs associated with the proposal, and given the uncertainty and limited nature of its benefits, together with the possibility that new duties under the FACT Act will reduce the problem addressed by the proposal, the Commission does not recommend adopting the same report proposal at this time.

This requirement may benefit consumers when a creditor has relied on a report regarding the wrong consumer in lieu of, or in addition to, a report regarding the correct consumer.  In such cases, the consumer would be able to quickly determine what had gone wrong and begin to take steps to address the problem.  As discussed above, this benefit is most likely when a creditor's inquiry identifies multiple reports, but a consumer's request identifies only one.  If the "secondary" report or reports contain negative information, the consumer's disclosure may not reveal the cause of an adverse action.  We do not at this time have data that allows us to determine how often this occurs.  However, multiple reports are provided in less than 1% of cases, and many creditors take extra steps to determine whether multiple reports all pertain to the consumer in question.  Therefore, the harm caused in these instances, and the presumed benefits of the proposed requirement, are not clear.

At the same time, the same report proposal would impose substantial costs on consumers and industry.  The costs to consumers include (1) costs associated with reliance on a historical document rather than a current report; (2) privacy concerns raised by receiving a report that belongs to someone else; and (3) a possible increase in identity theft if the proposal led to an increase in the volume of reports circulating.  Although the benefits, if any, would be realized in less than 1% of cases, these costs would be imposed every time a consumer is sent a file disclosure.

The costs to industry would likely be substantial because:

- If the CRA were required to provide the "same report," it would have to build systems to store historical documents, even though only a small fraction of these would ever be sent to a consumer.  This would be expensive, and the higher costs could be passed on to users of consumer reports.

- If  creditors were required to provide the "same report," they would have to build systems to create and store consumer-friendly versions of these documents.  Further, because many

---

192.  Although the requirement could be fashioned to allow creditors to obtain this information later, after they decide to take an adverse action, this would not be consistent with the proposal, because it would not provide consumers with the same report that had led to the creditor's negative decision.

creditors currently receive only summary or partial data, their disclosure to consumers could be missing key information or the creditors would need to supplement their data.

Because the same report proposal would impose substantial costs to obtain uncertain (and likely limited) benefits, it may be more appropriate to develop a response that focuses on instances in which the creditor may be using a report that pertains to the wrong consumer. Certain provisions of the FACT Act, which are designed to address identity theft and are still being implemented, provide such a response. Section 315 requires CRAs to notify the user of a consumer report when the address provided by the user "substantially differs" from the addresses on file for the consumer, and requires creditors to develop procedures for responding to this notification. Section 114 requires users of consumer reports to implement procedures to identify and respond to identity theft "red flags." Such procedures are intended to help creditors spot possible instances of identity theft and then to act to prevent the possible identity theft.

Both measures will impose extra responsibilities on creditors to determine that a credit applicant is indeed the person to whom a consumer report pertains. Thus, they appear to address the problems described in this study more directly than would the proposed same report requirement. For example, if the creditor receives two consumer reports, including a "secondary" report that pertains to the wrong consumer, it is likely that the secondary report will contain an address that does not match that of the applicant. This will trigger a notification under section 315. Although the creditor's obligations under the FACT Act have not yet been finalized, it is likely that they will increase the chance that the creditor or consumer will discover whether the secondary file in fact pertains to the consumer.

If these measures succeed in ensuring that credit decisions are based on the right applicant's file, the benefits of imposing an additional same report requirement would be reduced considerably. Given the substantial costs associated with the proposal, the uncertainty and limited nature of its benefits, and the possibility that new duties under the FACT Act will reduce the problem addressed by the proposal, the Commission does not recommend adopting the same report proposal at this time.

# VI.  Negative Information Notices

## A.  Introduction

Section 318(a)(2)(B) of the FACT Act requires the Commission to study:

> the effects of requiring notification to consumers when negative information has been added to their credit reports, including – (i) the potential impact of such notification on the ability of consumers to identify errors on their credit reports and (ii) the potential impact of such notification on the ability of consumers to remove fraudulent information from their credit reports.

To understand the effects of the proposed notice, Commission staff consulted the relevant literature and conducted interviews with representatives of consumers, CRAs, and furnishers of credit information. Based on these sources, the study describes current reporting of negative

information and existing negative information notices, and discusses what the Commission has learned about the costs and benefits of the proposed requirement.

The goal of a negative information notice would be to give consumers a chance to identify and correct any errors in their consumer reports before the errors caused harm.  Currently, the FCRA requires creditors to notify consumers when they take "adverse action" based on information in a consumer report.[193]  By the time a consumer receives this notification, however, it may be too late for the consumer to salvage the transaction by correcting any inaccuracies in the report.  The idea behind the proposed notice is that consumers would learn about negative information in their reports *before* they apply for credit, when there could be sufficient time to remedy any errors.

The proposed notice could also fill any "gaps" that remain when consumers obtain their free file disclosures under the FACT Act.[194]  The FACT Act now gives consumers the right to obtain a free consumer report from each nationwide CRA once a year.  This right should help consumers spot inaccuracies in their consumer reports and thereby avoid injury.  However, some consumers might not order reports that they assume will be accurate.  Further, even consumers who check their consumer reports every year might be harmed if inaccurate information is added shortly after they examine the report.

There are many ways that the proposed notice requirement might be implemented.  Some of the main issues to consider include: what information would trigger the notice; what form the notice should take; and who would send the notice.  In order to focus the discussion, the study makes the following assumptions:

- *The notice would be triggered when a furnisher reports payment delinquencies, collection accounts, or public records.*  The elements that would trigger notification are consistent with Section 217 of the FACT Act, which defines "negative information" as "information concerning a customer's delinquencies, late payments, insolvency, or any form of default."[195]  Other information could lower a consumer's credit score, but would not generally be considered "negative information."[196]

- *The notice would be required the first time that a particular account delinquency appears on a consumer's report.*  For example, if a furnisher reports that a consumer is 30 days late in paying an account, and the consumer does not pay within the following 30 days, the

---

193.  *See* FCRA § 615, 15 U.S.C. § 1681m.  *See also* discussion of risk-based pricing notice *infra* note 199.

194.  FACT Act § 211.

195.  As discussed below, Section 217 of the FACT Act requires creditors to notify consumers when they report negative information about the consumers to a CRA.

196.  Many types of credit-related activities, such as opening a new credit account, applying for credit, or using a high percentage of available credit, can have a negative effect on a consumer's credit score.  However, attempting to include any event that lowers a consumer's credit score would entail sending notices in response to relatively innocuous events (such as a change in the balance of a credit card) and would risk reducing the impact of the notices by overloading consumers with too much information.  This seems well beyond the purpose of the proposal.  The proposed approach is also consistent with the language of the FACT Act, which refers to "negative information [that] has been added to [consumers'] credit reports," not "information that has a negative effect on consumers' credit scores."  *See* FACT Act § 318(a)(2)(B).

furnisher will typically report that the consumer is 60 days late.  This study assumes that the required notice would be triggered only by the first appearance of a delinquency or other negative information on a consumer's report.  Additional notices regarding the same event would have sharply diminishing additional benefits in terms of alerting consumers to possible inaccuracies.[197]

- *The notice would be specific enough to allow the consumer to dispute the information.*  For example, the notice might state that "This is to inform you that [Creditor] has reported that payment on your account ending in [#1234] is 90 days late.  This information will be included in your consumer report whenever it is provided by [CRA].  If you believe this information to be in error, you may contact [CRA]/[Creditor] as follows . . . ."

Either the CRA or the company that furnishes the negative information to the CRA could send the notice.  Each approach has unique costs and benefits.  For example, many creditors could provide the notice at relatively little cost, because they are already in regular contact with consumers.  On the other hand, a notice provided by CRAs could alert consumers to some types of error, such as those arising from mixed files, that consumers could not discover directly from furnishers.  In considering the benefits and costs of the proposal, this report discusses each of these approaches.

## B.  Background

### 1.  Existing notice requirements

The law already requires that consumers in certain situations be notified when negative information in their consumer reports has caused them harm.  As noted above, an "adverse action notice" must be given to any consumer who suffers adverse action based in whole or in part on the consumer's report.[198]  The FACT Act also amends the FCRA to require that consumers receive a "risk-based pricing notice" from creditors that offer credit on terms that are materially less favorable than the terms available to a substantial proportion of the creditor's other customers.[199]  These existing notices seek to alert consumers that information in their consumer reports could be affecting them.  The proposed notice would notify consumers of negative information earlier, which would allow consumers to take steps to address any inaccuracy before it causes harm.

Another provision of the FACT Act (Section 217) requires that consumers be notified when a creditor reports negative information about them to a CRA.  The law provides, however, that

---

197.  It may be more costly, however, to determine whether each report of negative information is the "first" one than to simply send negative information notices whenever negative information is reported.

198.  *See* FCRA § 615 (a), 15 U.S.C. § 1681m(a).

199.  Section 311 of the FACT Act amends FCRA Section 615 by requiring that "if any person uses a consumer report in connection with an application for, or a grant, extension, or other provision of, credit on material terms that are materially less favorable than the most favorable terms available to a substantial proportion of consumers from or through that person, based in whole or in part on a consumer report, the person shall provide an oral, written, or electronic notice to the consumer . . . ."

creditors may notify consumers *before* negative information is reported, including through a generic notice in routine statements to customers.[200]  Therefore, although the Section 217 notice could educate consumers generally about the consumer reporting implications of account defaults, it is unlikely to alert consumers to the need to check for specific potential errors.

## 2.   Sources of inaccurate information

There are three main sources of inaccuracies in consumer reports.  Depending on how the proposed notice is implemented, it could help address all three, to varying degrees.

• *Mistakes in existing accounts.*  When a furnisher's records contain errors, the information provided to the CRA will also contain errors.  When such an error is harmful, the notice would call it to the consumer's attention.  As discussed below, consumers already are likely to learn about such errors when they have an ongoing relationship with the furnisher.

• *Mixed files.*  When a CRA places one consumer's information in another consumer's file, the consumer will typically be unaware of the event until the consumer examines his or her own consumer report.  If the inaccurate information is negative, the proposed notice could provide the consumer with early notice of the problem.

• *Identity theft.*  When an identity thief opens new accounts using the victim's name, the fraudulent accounts will appear on the victim's consumer report.  The notice requirement could alert consumers to the theft after at least one such account becomes delinquent, potentially enabling the consumer to limit the damage.

## 3.   How much negative information is currently reported?

The recent Federal Reserve Board studies (discussed in more detail in Part III of this report) provide some insight into how often negative information is reported.  These studies use large samples from one CRA to estimate the proportion of consumer reports and credit accounts in those reports that have various characteristics.[201]

There are three categories of negative information that would trigger the proposed notice: credit account information (such as a late payment or default on a credit card); collections information (such as an unpaid utility or medical bill that has been sent to a collection agency); and public records (such as a bankruptcy).

---

200. As required by the FACT Act, the Federal Reserve Board has provided model language for furnishers to use in the notice.  The model allows for the following language:  "We may report information about your account to credit bureaus.  Late payments, missed payments, or other defaults on your account may be reflected in your credit report."  69 Fed. Reg. 33,281, 33,285 (June 15, 2004) (amending 12 C.F.R. part 222).

201. *See* 2003 FRB Study, *supra* note 2; 2004 FRB Study, *supra* note 38.

The studies showed the following:

- Three percent of actively reported credit accounts were delinquent (based on data collected in 1999).[202]  In most cases, this figure does not represent the first report of that particular delinquency.  For example, current payment delinquencies include 90 or 120-day delinquencies that typically would have been first reported as delinquencies of shorter time periods, such as 30 or 60 days.  A reasonable estimate is that, in any given month, about one percent of all accounts are being reported as delinquent for the first time, although the number could be as low as one-half of one percent.[203]  A one percent rate would translate into over 132 million notices sent each year.[204]

- 36.5% of files had at least one collection action reported by a collection agency, mostly related to unpaid medical and utility bills.[205]  Such information could be quite old, and it is difficult to translate this into an estimate of how often collections information is added.

- 12% of the sampled consumer reports contained at least one public record item.[206]  These include bankruptcies, tax liens, foreclosures, and civil judgments.

It should be noted that these estimates reflect only one CRA's files.  Because most large creditors report to all three nationwide CRAs, the total number of negative reports could be up to three times higher.

---

202.  "Credit accounts" include revolving, nonrevolving, mortgage, and installment loan accounts from financial institutions, major retailers, and other businesses such as oil and gas companies.  Some utility and medical companies also report on their accounts.  "Actively reported" refers to credit accounts for which the latest report was within the prior two months.  Many of these accounts are closed.  Overall, 26% of the accounts analyzed were not currently reported while 74% were, with 57% of the latter being closed accounts.  Thus, much of the derogatory information on credit accounts is associated with closed accounts that are still being reported.

203.  Payment status as of the most recent report is distributed among *all* credit accounts (currently reported as well as not currently reported) as follows: no derogatory, 94.6%; 30-59 days late, 0.5%; 60-89 days late, 0.3%; 90-119 days late, 0.2%; 120-149 days late, 0.5%; and "other major derogatory," 3.8%.  *See* 2003 FRB Study, *supra* note 2, at 62 (table 7).  Assuming that the "other major" derogatories relate to accounts that are not currently reported, it is likely that the negative information underlying these reports has previously been conveyed to the consumer.  Some creditors, however, do not report delinquencies of less than 60 days, and some do not report minor derogatories (delinquencies up to 119 days) at all, which means that some portion of 60 plus day delinquencies as well as of the "other" major derogatories may reflect the first appearance of delinquency.

204.  This figure is based on estimates that, as of 1999, records on about 1.1 billion credit accounts were actively reported to the three national CRAs.  *See* 2003 FRB Study, *supra* note 2, at 52 (derived from information in table 2).  The number of notices could be roughly 20-25% higher because the Federal Reserve data adjust for joint accounts and co-signers so that each account is counted only once.  *See id.* at 54, note 14.  Under the proposal, notices would be sent to each individual on whose report the negative information appears.

205.  *See* 2004 FRB Study, *supra* note 38, at 303 (table 1).

206.  *See id.*

Federal Trade Commission

## 4.   Current examples of negative information notices

### a.   Notification in Colorado

The Colorado Consumer Credit Reporting Act requires CRAs to notify a consumer by mail and provide him or her with the ability to request a copy of her consumer report, whenever either of the following events occurs within a 12-month period: (1) the CRA receives eight credit inquires pertaining to the consumer or (2) the CRA receives a report that would add negative information to the consumer's file.[207]  Thus, Colorado has already imposed one specific form of a negative information notification requirement on CRAs.[208]

The CDIA reports that, over a typical one-year period in Colorado, CRAs on average sent 2.6 million of these notices to consumers.  As a result of these notices, an average of 180,000 consumer reports were sent to consumers by each CRA, which in turn generated an average of 9,000 calls or inquiries (including disputes) by consumers.  Thus, 5% of consumer reports sent pursuant to the Colorado requirement were associated with a call to a CRA, and about 0.34% of the original notices were ultimately associated with a CRA contact.  These numbers indicate a low contact rate for the CRA notice of negative information required in Colorado.[209]

### b.   Market-provided credit monitoring services

Recently, a market has developed for credit monitoring services offered by the nationwide CRAs and others.  These services offer consumers notification, often by electronic mail, when certain types of information are added to their credit files.[210]  Consumers must sign up for these fee-based services in order to receive the notices.  This market is only just emerging and is in flux; it is currently not known how much the market may grow or how effectively it will function.  However, the development of this market provides evidence that notification of negative information is valued by at least some consumers, and that the market is providing one type of response.

---

207.  Colo. Rev. Stat. Ann. § 12-14.3-104(2) (2004).  The Colorado law provides generally that consumers may obtain one consumer report annually from each CRA at no cost, but the notification provision does not provide the right to an additional free report.

208.  The Colorado law, however, requires that consumers be notified, at most, only once per year.  This means that a number of distinct pieces of negative information could be added to a consumer's consumer report before the consumer is notified of any of them.  *See id.* § 12-14.3-104(2)(b).  Note also that the law requires notification of a substantial number of inquiries, as well as of the addition of negative information.  *See id.* § 12-14.3-104(2)(a). A spike in inquiries can indicate the presence of fraudulent activity, similar to a spike in new accounts opened.

209.  It is unclear what proportion of the Colorado notices are sent only because negative information was added to a consumer report, or because the CRA received eight or more inquiries about the consumer.  Another qualification of the Colorado data is that consumers are notified about information added to their consumer reports over the entire previous year, rather than only very recent information, and this may reduce the contact rate.

210.  All three nationwide CRAs sell credit monitoring services directly to consumers.  Some other firms offer the service, either selling directly to consumers (as with Fair Isaac) or through credit card companies (as with Intersections, Inc.).  *See* Lavonne Kuykendall, *Young Credit Monitoring Firm Gets Cap One Feather in Cap*, *American Banker*, Sept. 15, 2004, at 7.  The article also reports that the top six firms that offer monitoring services have over 20 million subscribers.

## C.  The Benefits and Costs of Negative Information Notices

### 1.   Benefits to consumers of early notification

Currently, consumers often discover harmful errors only after experiencing an adverse action.  In some cases, learning about the error earlier would have had considerable benefits. For example, suppose a consumer makes an offer to buy a house, but the consumer's mortgage application is turned down because of an error in his or her report.  It will take some time to correct the information with the CRA, and in the meantime the seller may find another buyer for the house.  Moreover, there is no guarantee that the consumer will be able to convince the lender to reconsider his or her mortgage application.  The proposed notice would give consumers a better chance to correct errors before they create these obstacles.

For victims of identity theft, early notification could provide the opportunity to prevent the thief from causing further damage.  However, when it comes to identity theft, notification after negative information has been added to a consumer's file may be "too little, too late."  Among other things, many victims would receive the notice only after the fraudulently opened account had become delinquent.  The Commission's study of identity theft indicates that many victims discover the identity theft within 30 days of the theft, and most victims discover the theft within 60 days.[211]  It would generally be at least 30 days, and probably much longer, before the resulting negative information would be reported to a CRA.  Consumers would gain more from a notice that occurs earlier, such as at the time the thief first opens an account in the victim's name. Such notification is offered with some credit monitoring services, and this is the motivation for Colorado's inclusion of inquiries as a source of notices.  Other measures in the FACT Act will require creditors to look for "red flags" identifying potential identity theft, such as address changes.[212]

### 2.   The cost of additional disputes

To the extent that the negative information notice would increase consumers' detection and disputing of possibly inaccurate information in their reports, that benefit would come with an associated cost.  It is costly for consumers, CRAs, and furnishers to generate and process disputes.  These costs, however, are a necessary part of the dispute resolution mechanism prescribed by the FCRA.  In other words, the FCRA reflects a congressional judgment that the cost of resolving disputes (including invalid disputes) is generally justified by the benefits of

---

211.  FTC's Identity Theft Survey Report is available at http://www.ftc.gov/os/2003/09/synovatereport.pdf (the data cited, however, were obtained from the survey results and were not included in the published report). For the purposes of the Identity Theft Survey, "identity theft" includes fraudulent use of an existing account. Victims may discover fraud sooner in those cases because the fraudulent activity will appear on regular billing statements.

212.  *See* FACT Act § 114.  Another provision under the FACT Act will require CRAs to notify potential credit grantors when an application for credit carries an address significantly different from the one that the CRA has on file for that consumer.  *See* FACT Act § 315.  If the creditor notes multiple addresses for the applicant, and sends a negative information notice to both addresses, victims would be more likely to learn about negative information caused by identity theft.  More importantly, the provision should improve the ability of creditors to detect attempted identity theft in the first place, decreasing the number of inaccuracies that arise from it.

correcting erroneous information.  However, without data indicating whether disputes generated by negative information notices are more or less likely to lead to invalid disputes than are disputes under the current system, it is not possible to assess additional costs and benefits from the notices' potential to generate more disputes.

### 3.    Provision of notice by furnishers

Requiring furnishers to provide the proposed notices would generate costs for furnishers, and at the same time might not achieve all of the benefits intended by the proposal.  Although most furnishers are already in regular contact with consumers, they likely would need to revise their systems and procedures to add the notice.  For example, if furnishers were to provide the notice to consumers through a regular billing statement, they would need to link their billing systems with their information furnishing systems – that is, the system that generates regular statements to consumers of amounts due would also have to notify consumers of what information was furnished to CRAs.

Where there is no monthly statement, it would not be possible for the furnisher to notify consumers through a regular statement, in which case a new mailing would have to be made to the consumer.  For instance, creditors may not provide consumers with regular statements for certain types of accounts – e.g., some closed-end credit accounts.  In addition, some creditors may not send a statement if there was no billing activity during a given period.

Although furnisher notices could benefit consumers by enabling them to correct erroneous information, those benefits would be limited in certain respects.  Furnishers are not in a position to notify consumers about every type of negative information that might be added to their files.  For example, most public record information is not "furnished" by the entity that generates the information (e.g., county courthouses) but is gathered by independent contractors who in turn supply it to CRAs.

Further, to the extent furnishers do know about the negative information, they may already be informing consumers about it.  There are three types of records that could contain negative information: credit accounts, collection accounts, and public records.  When negative information is added to credit records, consumers generally learn about it directly from the creditor (i.e., the furnisher).  The creditor usually sends the consumer a regular billing statement, and will often make further efforts to notify consumers about any delinquency.  This means that if a creditor mistakenly adds negative information to a consumer's account, the consumer will already have a chance to discover it and incentives (such as avoiding added interest or fees) to dispute it.  In this circumstance, a separate notice would not be useful in alerting consumers that negative information has been added to their accounts.[213]

---

213.  Under the proposed requirement, the creditor would also have to inform the consumer that the information will be reported to a CRA.  This might be helpful to some consumers.  For example, if a creditor mistakenly records a consumer as being 30 days late in making a payment, the late fees for this delinquency may be quite minor.  The consumer may be content with confirming with the creditor that the account is now current, and not bother to dispute the accuracy of the past delinquency.  But if the consumer knows that his or her credit record will be affected, the consumer may be more likely to dispute and correct the reported delinquency.

For collection accounts, the notice may be somewhat more useful.  Although collection agencies do not have established relationships with consumers, they contact consumers in order to collect payments and often inform them that negative information will be reported to a CRA.[214]  Some debt collectors, however, do not notify consumers that they are reporting negative information to a CRA.[215]  Moreover, the collector may not be licensed to do business in the state in which the consumer resides, and therefore collectors believe that they could not legally initiate contact with the consumer through a negative information notice.[216]

For public records, a furnisher notice is not likely to be useful at all.  Indeed, public records are not "furnished" to CRAs in the way that credit and collection accounts are.  Rather, each CRA must collect them itself (or hire another firm to do so).  Thus, only CRAs are in the position to notify consumers when public records are added to their files.  The benefits and costs of a CRA notice requirement are discussed in the next section.

In addition, when an inaccuracy stems from a mixed file or identity theft, a furnisher-provided notice is likely to fail because it probably will be sent to the wrong consumer.[217]

In sum, requiring furnishers to provide negative reporting notices would have some benefits to consumers, although those benefits might be limited.  At the same time, such a requirement is likely to have costs for furnishers that might outweigh any benefits.

## 4.   Provision of the notice by the CRAs

Requiring CRAs to provide negative information notices would more directly address the goals of the proposal.  There are certain types of errors that can be detected only through the CRAs' data: mixed files, errors in transmission, errors in public records, and negative information due to identity theft.  As a result, there is reason to believe that CRAs would be the best source of a negative information notice.

---

The size of this benefit is unclear, however.  First, creditors already have an incentive to notify consumers that negative information is likely to hurt their credit ratings because this information helps to motivate consumers to pay their bills on time.  Second, many consumers are  generally aware that failure to pay bills on time is recorded in one's credit history.  Third, much of the negative information that is inaccurate will be challenged by the consumer simply because the consumer wants to avoid penalties for delinquency, regardless of any additional notice required by the FCRA.

214.  One reason is that doing so increases a consumer's incentives to repay the debt.

215.  In recent years the Commission, along with consumer groups, has received complaints from consumers that collection account information was sent to a CRA without the consumer ever being notified by the collection agency.

216.  See Comment Letter on Matter No. R411013, ACA International, at http://www.ftc.gov/os/comments/FACTA-summaries/511461-0016.pdf (stating that debt collectors may furnish information to credit bureaus about consumers residing in states in which the collector is not licensed to do business, and that any direct contact with the consumer might be an "attempt to collect a debt" in violation of state law).

217.  For mixed files, if consumer A's account is placed in consumer B's file, the furnisher will not realize this and will send the notice to consumer A.  For identity theft, the victim will be unaware of the theft if billing statements are being sent to a false address (a common element in identity theft).  In this case, the negative information notice would go to the false address as well.

On the other hand, CRA provision of the notices could entail much higher costs.  Every year, a considerable amount of negative information is added to consumer reports from a variety of different sources.  Although much of this information is correct, the CRAs would incur substantial expense if they were required to send a notice each time such information is added.[218] The most obvious costs come from processing the notices and mailing them to consumers.

In addition, the CRAs argue that many consumers are not familiar with the CRAs and it is thus not clear how consumers would respond to the proposed notices, especially when they do not recognize the sender.  Some would not read the notice, or would ignore it if they did read it. Furthermore, the CDIA has argued (citing its experiences with the Colorado law) that consumers do not like being reminded about negative information of which they are already aware, and that many of them, particularly the elderly, find unsolicited notices offensive and even threatening.

The situation may also open avenues for fraud.  In particular, unscrupulous entities posing as CRAs might be able to trick consumers into providing personal information under the pretense of confirming negative information in a consumer report.[219]  Furthermore, unsolicited CRA notices could provide additional opportunities for identity thieves to acquire consumers' personal information.  Since a consumer would not necessarily be expecting a notice, he or she might simply throw it away without opening it, unaware that it contains information that could be used to open a fraudulent account in the consumer's name.

Many of these concerns arise from the fact that the CRAs would be sending the notices to consumers who are not expecting them.  These concerns could be addressed by having consumers "opt in" to a system that would notify them when negative information has been added to their reports.  Such systems are essentially what the market has begun to provide in the form of credit monitoring services.

The provision of credit monitoring services requires that consumers pay for a service that provides notices relating to changes in their consumer reports.  Consumers frequently receive the notices by electronic mail, reducing delivery costs substantially.  Unlike recipients of unsolicited notices, consumers who purchase credit monitoring services are not only familiar with the CRAs, but expect to receive notices from them and are willing to pay for them.  Because the notices are expected, consumers are also less likely to be susceptible to "phishing" and other fraudulent schemes.  Another advantage of the market approach is that CRAs have incentives to determine what products are most useful – for example, some monitoring services notify consumers about new accounts, address changes, and significant changes in account balances.

---

218. The experience with Colorado's notices, for example, shows that almost 300 negative information notices were sent for every item that was disputed.  *See* discussion *supra* page 72.

219. The CDIA relates that the Colorado Attorney General's office discovered that a letter had been sent to consumers ostensibly from a CRA complying with the Colorado law.  The letter asked consumers to provide a host of personal and financial information.  No CRA had sent the letter.  The practice of "phishing," whereby a party uses a pretext to request personal or financial information from consumers to be used in perpetrating credit fraud or identity theft, has raised concerns at the FTC, which has addressed it through enforcement and education.  *See, e.g.*, FTC v. Zachary Keith Hill, Civ. Action No. H 03-5537 (S. D. Tex. 2004) (final order) http://www.ftc.gov/opa/2004/03/phishinghilljoint.htm; *see also How Not to Get Hooked by a "Phishing" Scam*, FTC Consumer Alert, available at http://www.ftc.gov/bcp/online/pubs/alerts/phishingalrt.htm.



Overall, a market-based notice may be the most efficient one available for improving accuracy at minimal cost and ensuring that consumers get notices that they want and will read. Consumers have shown that they are willing to pay for such notices, but the market is new and evolving, so it is probably too soon to tell whether the benefits to consumers outweigh their costs.[220]  This is particularly true in light of the fact that free reports will become available to consumers beginning in 2005.  As the market develops, the costs and benefits of these types of notices should become more clear.

## D.  Conclusion

A negative information notice would encourage consumers to check the accuracy of information in their consumer reports when the potential benefits from doing so are the highest, enabling them to correct errors before they become an obstacle to obtaining credit, employment, insurance, or other services.  However, this requirement would also have substantial costs.

A requirement that data furnishers provide the notice would be costly even when they have relationships with consumers, and such a notice would not alert consumers to many important inaccuracies, including mixed files, inaccuracies in public records, and accounts generated by fraud.  A CRA notice could address these limitations, but could be associated with higher costs for both consumers and industry.

An opt-in system in which consumers elect to receive negative information notices would avoid many of these costs.  The market already provides such a service, for a price.  These services are new, and are being offered at a time when consumers are becoming more and more aware of consumer reports and their importance.  Moreover, implementation of free annual file disclosures will make an important difference in consumer access to consumer reports. Accordingly, the Commission believes that imposing on furnishers or CRAs a requirement to notify consumers when negative information is reported is premature at this time.

## VII. Common Unreported Transactions

### A.  Introduction

Sections 318(a)(2)(D) and (E) of the FACT Act require the Commission to study:

any common financial transactions that are not generally reported to the consumer reporting agencies, but would provide useful information in determining the credit worthiness of consumers; and

any action that might be taken within a voluntary reporting system to encourage the reporting of [these] types of transactions. . . .

---

220.  Some consumer groups have expressed concern that credit monitoring services may be too expensive for some consumers to afford, and that internet-based services would not be accessible to all consumers.

Federal Trade Commission

The concern prompting this request is that many Americans may be missing out on the benefits associated with the consumer reporting system even though they may have a demonstrable history of financial responsibility.  For example, if someone has made mortgage payments consistently and on time for many years, this typically will be reflected in his or her file in nationwide CRA databases.  On the other hand, if someone has paid rent consistently and on time for many years, it probably will not.  Although both types of payments may be evidence of financial responsibility, rental information is generally not reported to the nationwide CRAs and thus will not be conveyed to creditors evaluating the renter's creditworthiness.

This study differs from the others mandated in section 318 because the Commission has not been asked to consider any specific proposal.  The goal of the study is to describe the main types of transactions that could provide valuable information about the creditworthiness of consumers who are not well represented in the consumer reporting system.

In gathering information for this study, Commission staff contacted a wide variety of individuals and groups with an interest in these issues, including consumer representatives, CRAs, users of credit information, and organizations attempting to gather and report the types of information described in this section of the Act.  The study describes what Commission staff learned about the obstacles to reporting such "non-traditional" credit information, recent private-sector initiatives to make this information available to creditors, and some measures that could be taken to encourage greater reporting of this information.

## B    Background

### 1.    Who would benefit from the reporting of additional payment information?

Fair Isaac Corporation estimates that of the roughly 215 million non-incarcerated adults in the United States, 22 million have no credit files at all.[221]  An additional 32 million have "thin files," meaning files that do not contain sufficient information to calculate a standard credit score.[222]  Creditors find it difficult to predict performance for consumers with little or no credit history, and are therefore reluctant to extend them credit.  A lack of credit history information can stand in the way of obtaining a credit card, buying a car on credit, or purchasing a home.

There are a variety of reasons why someone might have little or no credit history.  Of the 54 million Americans without a file that can be scored, about 10 million are recent immigrants. Others include young people living on their own for the first time; people who established credit through a spouse or other family member and not in their own names; and people who have either not used credit or who rely on credit sources, such as pay-day loans, that do not report to the major CRAs.

Minorities are over-represented among persons with limited or no credit histories.  African Americans represent 6.0% of persons with a credit score based on four or more accounts, but 14.6% of persons without a credit history or with a history too thin to be scored by traditional

---

221.  Information with respect to Fair Isaac came from the company's website,  http://www.myfico.com, and from interviews with Fair Isaac executives.

222.  *See* http://www.fairisaac.com/Fairisaac/Solutions/FICO+Expansion+Score/Value+to+Lenders/.

models.  Hispanics represent 8.5% of those with a credit score based on four or more accounts, but 24.5% of those with no credit history or a credit history too thin to be scored.[223]

The mandate for this study is to determine whether there are transactions that consumers with limited or no credit histories undertake that could be reported and would be useful in predicting creditworthiness.  For some groups, such as young people moving out on their own for the first time, the existence of such transactions is unlikely.  For the same reasons they do not have credit histories, they are unlikely to have histories of other non-traditional transactions that could be useful in evaluating creditworthiness.  Identifying such transactions is more feasible for people who have engaged in repeated non-traditional credit transactions for an extended period of time, but who do not participate in mainstream credit markets.

## 2.    The importance of "scoreable" credit files in automated underwriting

Automated underwriting is a tool that allows lenders to accept applicants based on automated decisions, rather than relying on more expensive and time consuming manual underwriting.  It has become particularly important in the mortgage market – for example, Desktop Underwriter is a program provided by Fannie Mae that will tell a lender if Fannie Mae will purchase the loan without full manual underwriting.[224]  According to industry sources, the percentage of mortgage loans that are made through automated underwriting has stabilized at about 75%.  In 2003, 94% of lenders had implemented at least one automated underwriting system, up from 83% in 2001 and 91% in 2002.[225]

Credit scores are an increasingly important component of many credit transactions, and are of particular importance in automated underwriting.  Frequently, consumers whose files contain insufficient information to calculate a score are not considered in systems that rely on automated underwriting.  For example, a 2003 survey of mortgage lenders found that "no credit score" was the single most important reason why loan applications were not submitted to an automated underwriting system.[226]  Thus, for consumers who currently have no file or insufficient information in their file, the potential to build a file through data that are not now reported is of heightened value.

---

223.  *See* Presentation by Eric Rosenblatt, *Automated Underwriting for Non-Traditional Credit Borrowers: Where Mission, Market Opportunity and the American Dream Converge*, Presentation at the Fifth Annual Fannie Mae Fair Lending Conference, Washington, DC (Sept. 29, 2004) [hereinafter Rosenblatt Presentation].

224.  Information in this section is based on the Rosenblatt Presentation.  *See id.*

225.  *See id.*  Automated underwriting has a number of advantages both for lenders and borrowers.  A major advantage to lenders is that automated underwriting can save them $1,000 per loan versus manual underwriting.  Automated underwriting streamlines origination and frees up underwriting staff to focus on more complex loans.  It also facilitates point-of-sale underwriting decisions and allows lenders to expand their product offerings using statistically based and validated underwriting models.  For borrowers, automated underwriting allows them to provide less documentation than traditional underwriting, can carry lower origination fees, and can lead to quicker lending decisions.

226.  Cited in Rosenblatt Presentation, *supra* note 223.

### 3.   Possible additional sources of data

Users of consumer reports have identified several things that they would look for in a consumer report system based on non-traditional credit information: (a) the system must cover a large number of people without traditional credit files; (b) the data must be predictive of loan default, that is, it must provide useful information about whether or not the borrower is likely to make timely payments; (c) the system's effectiveness at predicting creditworthiness must be explained and well-supported; and (d) the value of the information must be worth the cost of collecting and evaluating it.

In order for data to be a useful supplement or substitute for traditional credit history information, the data must be predictive of credit behavior.  The most likely data candidates are rent payment history and utilities payments.[227]  These types of payments, as well as remittances from recent immigrants to their families abroad, are discussed below.

#### a.   Rental payment information

In principle, payments for rental housing would appear to be a useful source of information for determining whether or not an individual would be responsible in making credit payments, particularly mortgage payments.  Although rent is not technically credit, because it is paid in advance, it is like a mortgage payment in that it is typically a routine, regularly scheduled payment.  For most people, rent is a major expense relative to income.[228]

Given its potential value, the question arises – why is rental information not typically included in a consumer report?  The most likely answer is the diffuse nature of the rental market. Ninety percent of rental units are owned by individual investors, who may own a small number of units.  Although approximately 35 to 40 million households rent their homes, the top 50 landlords own only 2.5 million units, less than 8% of the total rental properties.  Even these top 50 landlords would face serious barriers to reporting to the CRAs because they do not typically centralize their payment information, but rather maintain it at the rental location.  To report their tenants' payment information to the CRAs, landlords would either need to completely revamp their recordkeeping systems or submit data from 12,000 different locations.

One CRA explained that all of the account data it receives from banks and credit unions is furnished via approximately 9,500 collection points.[229]  In contrast, the CRA would have to collect data from 12,000 locations in order provide payment information for only 8% of renters. This means that collecting rental data covering a substantial portion of renters would be much more expensive than collecting data from *all* banks and credit unions.  These substantial costs are the biggest barrier to using rental payments to determine creditworthiness.

---

227.  Without collecting and testing the data, one cannot determine with any certainty which types of information would actually be predictive of credit performance.  Nevertheless, this report discusses various considerations and possible effects.

228.  Consumers might be expected to perform better on mortgage payments than rental payments.  This is because mortgage payments are typically a repayment of principal, in part, and therefore a mortgage payment builds equity.  Further, the costs associated with failing to pay a mortgage – the potentially high costs of foreclosure – are probably greater for most people than the costs of eviction.

229.  FTC staff conversation with CRA representatives.

### b.   Utility payment information

Utility payment history also appears to be a good candidate for providing information about a consumer's creditworthiness.  Utilities' services are provided on credit, as they are paid for after services are provided.  Utility payments are sometimes secured by a security deposit, and because most utilities have the power to withhold future services, there can be strong incentives for customers to pay.

Utilities do not face the same type of problem as landlords in reporting data.  There are far fewer utility companies in the country, and they have centralized billing systems that could be used to generate data for CRA files.  Utilities, however, currently provide only limited reporting to the CRAs.  To the extent that they do report, the information reported tends to be only negative information, such as when unpaid utility bills are sent for collection.  Although partial reporting such as this has some benefits for the system as a whole, it provides no way for a consumer to demonstrate consistent on-time payment of utility bills to other potential creditors.

There are a number of reasons why utilities may be reluctant to report their customers' full credit information to the CRAs.  Some utilities may face regulatory barriers to reporting.  For example, one California law forbids telephone companies from revealing payment information without the express permission of the customer.[230]  Further, some state regulatory schemes may create disincentives to reporting.  Theoretically, utilities should have an incentive to report data to the CRAs because reporting such data might encourage consumers to pay their bills on time.[231]  However, under certain state rate-setting systems,[232] any reductions in cost (including those associated with more timely payment by customers) may lead state regulators to lower the rate utilities can charge for their services, thereby reducing the incentives for utilities to report.

Another barrier to reporting may be the costs that the FCRA imposes on data furnishers.  If utilities reported to the CRAs, they would be required to devote resources to responding to consumer disputes concerning information contained in consumer reports.[233]  CRAs and furnishers express particular concern[234] about the new requirement for free annual file disclosure,[235] because they expect that, as more consumers examine their consumer reports, more consumers will dispute information contained in them.  In addition, one CRA said that it

---

230.  *See* Cal. Pub. Util. Code § 2891(a) (2004). .  However, such an approach – in which consumers with negative information could effectively "opt-out" of reporting their utility payment history – would differ from that used in the reporting system in general, which seeks to report comprehensively both positive and negative information.

231.  As an example, Nicor Gas, a Midwestern utility, experienced a 20% reduction in bad debts over three years after it started full-file reporting.  TransUnion LLC, *TransUnion Case Study: How Reporting Helped Nicor Gas Reduce Bad Debt* (May 2002), at 2.

232.  For example, a "rate of return" regulatory system specifies the rate of return that a utility can earn on its capital.  Because a reduction in costs would imply a higher rate of return, it will lead to a rate adjustment that could eliminate the benefit of the cost reduction.  Many states use other regulatory strategies that do maintain incentives to reduce costs.

233.  In the Nicor Gas example, the annual customer dispute rate was less than 1%.  TransUnion LLC, *supra* note 231.

234.  FTC staff communication with CRA and utility representatives.

235.  FACT Act § 211.

experienced a decrease in reporting by utilities following the 1996 FCRA amendments, which imposed liability on furnishers of data.[236]

Finally, cellular phone companies rarely provide full-file reporting to CRAs.  This appears to be at least in part a strategic decision.  Because the market is very competitive, with customers frequently switching carriers, companies are reluctant to provide information to CRAs which may facilitate competitors' marketing efforts through prescreened offers.[237]  Because of the value of credit data, it is possible that these companies would benefit from providing full-file reports to the CRAs; nevertheless, the incentives facing each individual company causes them to choose not to report.

### c.    Other potential sources of information

There may be other information, not currently reported, that would be useful in assessing consumers' eligibility for credit.  Most sources of such data have various pragmatic or other barriers to traditional reporting.[238]  At this time, the Commission does not have specific information regarding other sources of information or the likely value of their utilization in existing credit reporting.  As discussed above, several innovative products have recently been introduced to address the needs of consumers who lack traditional reported credit experience.  At this point it is important to gain more experience with the implementation, possible effectiveness, and potential benefits of these products.

## C.  Possible Approaches to Increase Reporting of Non-Traditional Credit Data

### 1.    Commercial efforts to supplement existing consumer report data

Approximately 160 million consumers have consumer files that contain enough information from which to calculate a credit score.[239]  The provision of financial services to these consumers is considered to be a mature market.  In contrast, providing services to the remaining 54 million consumers who have no files or whose files currently lack sufficient information for a score

---

236.  FACT Act § 312.

237.  This is similar to the decision by some credit card issuers not to furnish credit limit information to the CRAs, which is discussed in Section III of this report.

238.  An example is remittances by recent immigrants, many of whom send money to their families in their countries of origin.  Each year, $70 billion is sent out of the country in this manner.  Remittances to Mexico alone exceed $13 billion.  Although these types of payments do not arise from a business transaction, some businesses are exploring whether remittances could be used as evidence of financial responsibility and the ability to make regular payments.  There are many questions, however, about how a reporting scheme for remittances would work.  For example, the equivalent of centralized billing records do not exist, and these payments do not translate naturally into existing concepts of on-time or delinquent payments.  Despite these hurdles, several companies are exploring these payments as a possible source of information on creditworthiness, including PayRentBuildCredit, Experian, Fannie Mae, and others.  *See* Rosenblatt Presentation, *supra* note 223.  *See also*  "A Bid to Cuts Cost [sic] Of Money Transfers For Immigrants," *Washington Post*, November 29, 2004, E 1.

239.  *See* https://www.ficoexpansionscore.com/Content/LenderValue.aspx (Fair Isaac "Expansion" score website).

represents an opportunity for growth.[240]  Credit firms therefore have an interest in products that can aid them in assessing the creditworthiness of these consumers.

One example can be seen in the mortgage market.  In a 2003 survey of lenders, respondents identified allowing non-traditional credit as the most important change to automated underwriting that would allow more loans to be made to under-served groups.[241]

In response to the demand for information that can be used to estimate the creditworthiness of consumers with thin or no credit files, several firms have recently introduced products that rely on other sources of payment information.  Development of these products is very recent, and in some cases the products have been launched during the time this study was being completed.  In general, however, these developments suggest that the market is rapidly developing mechanisms to meet a need.  It remains to be seen how successful these efforts will be in expanding the benefits of consumer reporting.  Thus, we believe it is premature to consider additional legislative recommendations at this time.

### a.  PayRentBuildCredit

PayRentBuildCredit ("PRBC") is a new for-profit firm, based in Annapolis, MD, that was  publicly launched on December 10, 2003.  It has introduced one private sector response to lack of payment information.  The firm is in the process of gathering rental and other payment information for the purpose of determining creditworthiness, and considers itself to be a CRA regulated by the FCRA.[242]  The firm has also obtained letters from the Federal Reserve Board and other government entities stating that lenders will receive credit under the Community Reinvestment Act for using PRBC's services.

In an interview with FTC staff, the firm's founder and CEO, Michael Nathans, stated that he recognizes the difficulties that the major CRAs have had in collecting payment information from landlords, and says that he does not believe that this would be easier for his start-up firm.  He has therefore focused on getting consumers to voluntarily report their rental payment information through third parties.  As of this writing, these third parties, called "Verification Partners," consist of a dozen firms, including mortgage brokers, realtors, and an insurance company (State Farm).  The verification partners examine paper records (such as cancelled checks and bank statements), verifying that consumers have made rental payments, utility payments, insurance payments, day care payments, etc.  The consumer and the verification partner jointly enter this information into PRBC's database.  Consumers are not charged to enroll or enter their data.  Creditors are charged a fee to access a consumer's PRBC consumer report.

---

240.  *See* notes 221-222 *supra* and text accompanying.

241.  Cited in Rosenblatt Presentation, *supra* note 223.

242.  Information about PayRentBuildCredit is based upon the firm's website, available at http://www. payrentbuildcredit.com and FTC staff's interview with founder Michael G. Nathans.

Federal Trade Commission

### b.   Expansion

"Expansion" is a new product from Fair Isaac, introduced in July of 2004.[243]  It is a credit score specifically designed to evaluate those with thin or no traditional credit files.  In order to sell this product, Fair Isaac has established a CRA subsidiary, which will combine payment data derived primarily from non-traditional credit sources, such as payday loan payments and product purchase payment plans.[244]  These data will be maintained in consumer files, which can be used to calculate the Expansion score.

### c.   NTreport (Non-Traditional Credit Report)

NTreport is a new product from First American CREDCO, a large reseller of consumer reports.  The company introduced the product in September 2004.[245]  NTreport is sold as a supplement to First American CREDCO's Instant Merge consumer report.  The Instant Merge report is created by combining information from an applicant's consumer reports from the three nationwide CRAs.  For loan applicants with thin or no consumer reports, NTreport supplements the Instant Merge report with "alternative credit sources (e.g., rent payments, gas bills, phone bills, etc.)."  First American CREDCO has stated that the supplemental information is then "researched and verified."[246]  The FTC does not have information on the sources of data First American CREDCO is using.

## 2.   Possible steps to encourage greater voluntary reporting of non-traditional data

Given the diffuse nature of the market for rental housing, the barriers to widespread reporting of rental payment information appear to be largely based on cost.  For some individuals, however, such as people with limited credit histories who wish to buy a home, the benefits of credibly demonstrating a good rent payment history may well outweigh the costs.  Several third-party verification firms, such as PayRentBuildCredit, are trying to provide that service.  It remains to be seen whether this will be a successful business model.

It may be more feasible to increase the voluntary reporting of utility payment information.  Data on utility payments are much more centralized than rent payment information, and some utilities are already providing full-file reports to CRAs.  To the extent that state regulations create barriers to reporting, these regulations would need to be addressed at the state level.  For example, states might actively encourage utilities to report.  They might also be able to change the way cost savings are treated in the rate setting process.  As noted above, current rate-setting schemes may create disincentives for the utilities to promote timely payments through reporting.

---

243.  *See* https://www.ficoexpansionscore.com/Content/LenderValue.aspx.

244.  The National Community Reinvestment Coalition has expressed concern about the product because of the use of payday lending data.  *See* Comment of John Taylor, President and CEO of the National Community Reinvestment Coalition, RE: FACT Act Scores Study, Matter No. P044804 (Aug. 10, 2004), available at http://www.ftc.gov/os/comments/creditscoresstudy/index.html.

245.  The product is described at First American CREDCO's website, at http://www.credco.com/emergingmarkets.

246.  *Id.*

## D.  Conclusion

As discussed above, there is a sizeable portion of the population that is difficult to evaluate for credit purposes because they have thin credit files or no credit history.  At the same time, there is a growing interest among providers of credit to serve these customers, and certain non-traditional credit transactions may be useful in evaluating their creditworthiness.  These include rent and utility payment information.

Many of the barriers to reporting this information appear to be based on cost.  Others may be tied to state regulatory systems.  Despite these barriers, certain private efforts are underway to collect and report this data.  These efforts are still at their beginning stages.  As they develop, the FTC will continue to monitor these effects to determine whether they succeed in providing greater access to common, unreported transactions.  At this time, however, it appears premature to make legislative recommendations to address an issue that is the subject of developments in the marketplace that may provide responsive remedies more rapidly and efficiently than statutory approaches.

## VIII.  Conclusion

This report has examined a variety of issues related to the accuracy and completeness of consumer reports.  It serves as the FTC's interim Report to Congress under Section 319 of the FACT Act, which mandates an ongoing study of accuracy and completeness, and the FTC's Report to Congress under Section 318, which mandates a study of four possible ways to improve operation of the FCRA.

Section III of this report discusses the Commission's research and findings thus far in its ongoing accuracy and completeness study.  Among other things, the report discusses the history and current practices of the consumer reporting industry; the potential sources of error in consumer reports; the accuracy and completeness requirements of the FCRA, as well as FTC efforts to promote compliance with them; and the studies conducted to date on consumer report accuracy and completeness.  The FTC's review of the studies, which included a roundtable with a diverse group of experts, showed that none of the prior studies provided a comprehensive view of consumer report accuracy and completeness, and many had methodological problems that limit their usefulness as a "baseline" measure.  As discussed in the report, the Commission plans to conduct a pilot study to determine the feasibility and cost of conducting a more comprehensive survey of consumer report accuracy and completeness.

The Section 318 part of the report assesses the benefits and costs of three specific proposals to improve accuracy and completeness – stricter data matching, "same report" disclosures, and negative information notices – and examines whether there are common, unreported financial transactions that would be useful in determining creditworthiness.  Given the lack of a reliable baseline to gauge current levels of accuracy and completeness, it is difficult to quantify the precise effects of the three proposals.  Nevertheless, the studies were able to identify the likely benefits and costs and draw certain conclusions.  In particular, they concluded that each of the proposals addresses important concerns and could benefit some consumers in certain situations, but that the costs to consumers and industry as a whole could be substantial.  As to common

unreported transactions, the study concluded that there are such transactions – most notably, rental and utility payment information – and that some private sector efforts are underway to collect and provide this data to potential creditors.

Based on its findings and conclusions, the Commission is not making legislative or administrative recommendations at this time.  In addition to concluding that the costs of specific proposals examined in the studies could outweigh benefits to consumers, the Commission believes that it is premature to enact alternative requirements of this nature.  As discussed in Part III of this report, the FACT Act imposed a host of new requirements that should further enhance the accuracy and completeness of consumer reports, including measures to strengthen the dispute and reinvestigation process, a new consumer right to obtain a free annual file disclosure, measures designed to reduce identity theft, and new requirements on those who furnish information to the CRAs.  Many of these requirements are still being implemented, and their precise effects on accuracy and completeness are yet to be seen.  However, when fully implemented, these new requirements are likely to improve accuracy and completeness and should also address some of the specific concerns underlying the proposals in Section 318.  For example, consumers' new right to obtain a free annual disclosure should help consumers spot negative information before it causes harms, consistent with the goals of the negative information notice proposal.  Also, the FACT Act now requires CRAs to notify users of consumers reports when the address provided for a consumer substantially differs from the address in the CRA's file – a requirement that coincides with the proposed matching requirements.

In addition, the consumer reporting industry is in a period of rapid change, due not only to the FACT Act reforms but also to the increasing prominence of consumer reports in today's economy.  Once limited to credit transactions, consumer reports are now used, for example, to screen job applicants and price insurance.  Consumers are also increasingly aware of the importance of consumer reports and the need to check their accuracy.  In the midst of these changes, the market appears to be responding to some of the problems highlighted in the Section 318 proposals.  For example, the industry now provides credit monitoring services that, for a fee, alert consumers when certain information is added to their files.  Although these services are fairly new, and consumer groups have expressed concerns about their cost, they could fulfill some of the same goals as the negative information notice.  Further, new products have been introduced that attempt to gather information on rental payments, utility payments, and other common unreported transactions.  The success of these products remains to be seen, but they could help ensure that this data is considered in evaluating consumers for credit.  The combination of new requirements under the FACT Act and recent market developments lead the Commission to conclude that additional legislation is not called for at this time.

Finally, the ongoing study that the Commission is considering, beginning with the pilot study, should help shed light on the continuing concerns about accuracy and completeness that are addressed in this report.  As the Commission pursues the study, it will attempt to identify any areas where further reform is needed, as well as any improvements observed due to the FACT Act or the ongoing changes in the marketplace.

Federal Trade Commission

## Appendix A:  Roundtable Federal Register Notice

**Federal Trade Commission**

## FEDERAL RESERVE SYSTEM

### Formations of, Acquisitions by, and Mergers of Bank Holding Companies

The companies listed in this notice have applied to the Board for approval, pursuant to the Bank Holding Company Act of 1956 (12 U.S.C. 1841 *et seq.*) (BHC Act), Regulation Y (12 CFR Part 225), and all other applicable statutes and regulations to become a bank holding company and/or to acquire the assets or the ownership of, control of, or the power to vote shares of a bank or bank holding company and all of the banks and nonbanking companies owned by the bank holding company, including the companies listed below.

The applications listed below, as well as other related filings required by the Board, are available for immediate inspection at the Federal Reserve Bank indicated. The application also will be available for inspection at the offices of the Board of Governors. Interested persons may express their views in writing on the standards enumerated in the BHC Act (12 U.S.C. 1842(c)). If the proposal also involves the acquisition of a nonbanking company, the review also includes whether the acquisition of the nonbanking company complies with the standards in section 4 of the BHC Act (12 U.S.C. 1843). Unless otherwise noted, nonbanking activities will be conducted throughout the United States. Additional information on all bank holding companies may be obtained from the National Information Center website at *www.ffiec.gov/nic/*.

Unless otherwise noted, comments regarding each of these applications must be received at the Reserve Bank indicated or the offices of the Board of Governors not later than July 6, 2004.

**A. Federal Reserve Bank of New York** (Jay Bernstein, Bank Supervision Officer) 33 Liberty Street, New York, New York 10045–0001:

*1. Rhinebeck Bancorp, MHC,* Poughkeepsie, New York; to become a bank holding company by acquiring 100 percent of the voting shares of Rhinebeck Savings Bank, Rhinebeck, New York.

**B. Federal Reserve Bank of Chicago** (Patrick Wilder, Assistant Vice President) 230 South LaSalle Street, Chicago, Illinois 60690–1414:

*1. Wintrust Financial Corporation,* Lake Forest, Illinois; to acquire 100 percent of the voting shares of Northview Financial Corporation, Northfield, Illinois, and thereby indirectly acquire voting shares of Northview Bank & Trust, Northfield, Illinois.

**C. Federal Reserve Bank of St. Louis** (Randall C. Sumner, Vice President) 411 Locust Street, St. Louis, Missouri 63166–2034:

*1. First Centralia Bancshares, Inc.,* Centralia, Kansas, and Morrill Bancshares, Inc., Merriam, Kansas; to acquire directly and indirectly up to 36.8 percent of the voting shares of Century Capital Financial, Inc., Kilgore, Texas, and thereby indirectly acquire voting shares of Century Capital Financial–Delaware, Inc., Wilmington, Delaware, and City National Bank, Kilgore, Texas.

*2. Davis Bancorporation, Inc.,* Davis Oklahoma; to acquire up to 17.90 percent of the voting shares of Century Capital Financial–Delaware, Inc., Wilmington, Delaware, and Century Capital Financial, Kilgore, Texas, and thereby indirectly acquire voting shares of City National Bank of Kilgore, Kilgore, Texas.

Board of Governors of the Federal Reserve System, June 4, 2004.

**Robert deV. Frierson,**
*Deputy Secretary of the Board.*
[FR Doc. 04–13148 Filed 6–9–04; 8:45 am]
**BILLING CODE 6210–01–S**

## FEDERAL RESERVE SYSTEM

### Notice of Proposals to Engage in Permissible Nonbanking Activities or to Acquire Companies that are Engaged in Permissible Nonbanking Activities

The companies listed in this notice have given notice under section 4 of the Bank Holding Company Act (12 U.S.C. 1843) (BHC Act) and Regulation Y (12 CFR Part 225) to engage *de novo*, or to acquire or control voting securities or assets of a company, including the companies listed below, that engages either directly or through a subsidiary or other company, in a nonbanking activity that is listed in § 225.28 of Regulation Y (12 CFR 225.28) or that the Board has determined by Order to be closely related to banking and permissible for bank holding companies. Unless otherwise noted, these activities will be conducted throughout the United States.

Each notice is available for inspection at the Federal Reserve Bank indicated. The notice also will be available for inspection at the offices of the Board of Governors. Interested persons may express their views in writing on the question whether the proposal complies with the standards of section 4 of the BHC Act. Additional information on all bank holding companies may be obtained from the National Information Center website at *www.ffiec.gov/nic/*.

Unless otherwise noted, comments regarding the applications must be received at the Reserve Bank indicated or the offices of the Board of Governors not later than July 6, 2004.

**C. Federal Reserve Bank of St. Louis** (Randall C. Sumner, Vice President) 411 Locust Street, St. Louis, Missouri 63166–2034:

*1. First Centralia Bancshares, Inc.,* Centralia, Kansas, and Morrill Bancshares, Merriam, Kansas; to acquire up to 77.7 percent of FBC Financial Corporation, and thereby directly and indirectly acquire 1st Bank Oklahoma, both of Claremore, Oklahoma, and thereby engage in operating a savings association, pursuant to section 225.28(b)(4)(ii) of Regulation Y.

Board of Governors of the Federal Reserve System, June 4, 2004.

**Robert deV. Frierson,**
*Deputy Secretary of the Board.*
[FR Doc. 04–13149 Filed 6–9–04; 8:45 am]
**BILLING CODE 6210–01–S**

## FEDERAL TRADE COMMISSION

### Notice of Roundtable To Aid Federal Trade Commission Staff in Conducting a Study of the Accuracy and Completeness of Consumer Reports, Pursuant to Section 319 of the Fair and Accurate Credit Transactions Act of 2003

**AGENCY:** Federal Trade Commission.

**ACTION:** Notice of roundtable meeting.

**SUMMARY:** The Federal Trade Commission (the ''Commission'' or ''FTC'') is conducting a study of the accuracy and completeness of consumer reports, as mandated by section 319 of the Fair and Accurate Credit Transactions Act of 2003 (''the Act'' or ''FACT Act''). The Commission's Bureau of Economics is holding a roundtable with scholars, researchers, and other relevant parties on a review of methodologies pertinent to testing the accuracy and completeness of consumer reports.

**DATES:** The roundtable will take place on June 30, 2004.

**ADDRESSES:** The roundtable will be held at the Federal Trade Commission, 601 New Jersey Avenue, NW., Washington, DC 20580.

**FOR FURTHER INFORMATION CONTACT:** Persons seeking to attend the roundtable should contact Marie Tansioco at (202) 326–3613 (Federal Trade Commission, Bureau of Economics, 601 New Jersey Avenue, NW., Washington, DC 20580) by June 18, 2004. Please include in your request an explanation or statement

setting forth expertise in or knowledge of methodologies pertinent to assessing the accuracy and completeness of consumer reports. As a reminder, the roundtable will not be dealing with policy matters.

The FTC Act and other laws the Commission administers permit the collection of information concerning persons seeking to attend the roundtable to consider and use in this proceeding as appropriate. More information, including routine uses permitted by the Privacy Act to the extent applicable, may be found in the FTC's privacy policy, at *http://www.ftc.gov/ftc/privacy.htm.*

**SUPPLEMENTARY INFORMATION:** The FACT Act was signed into law on December 4, 2003. Fair and Accurate Credit Transactions Act of 2003, Public Law 108–159 (2003). In general, the Act amends the Fair Credit Reporting Act ("FCRA") to enhance the accuracy of consumer reports and to allow consumers to exercise greater control regarding the type and amount of marketing solicitations they receive. To promote increasingly efficient national credit markets, the FACT Act also establishes uniform national standards in key areas of regulation regarding consumer report information. The Act contains a number of provisions intended to combat consumer fraud and related crimes, including identity theft, and to assist its victims. Finally, the Act requires a number of studies to be conducted on consumer reporting and related issues.

Section 319 of the Act mandates that the Federal Trade Commission shall conduct an ongoing study of the accuracy and completeness of information contained in consumer reports prepared or maintained by consumer reporting agencies and methods for improving the accuracy and completeness of such information. The time horizon for the mandated study, inclusive of a series of biennial reports to Congress, runs eleven years. The first report is due in early December 2004.

The roundtable has a limited purpose: it is a review of various methodologies pertinent to testing the accuracy and completeness of consumer reports (also known as "credit reports"). This review is not part of any rule-making procedure and does not address any FTC policy matter. Also, in reference to the language of the Act, the roundtable discussion is solely a forum for review of methodologies applicable exclusively to the accuracy and completeness aspect of the section 319 study and will not address methods for *improving* accuracy and completeness, nor the costs and

benefits of requirements, or potential requirements, pertaining to credit reports.

By direction of the Commission.
**Donald S. Clark,**
*Secretary.*
[FR Doc. 04–13081 Filed 6–9–04; 8:45 am]
**BILLING CODE 6750–01–P**

---

**FEDERAL TRADE COMMISSION**

**[File No. 031–0201]**

**Itron, Inc., et al.; Analysis To Aid Public Comment**

**AGENCY:** Federal Trade Commission.
**ACTION:** Proposed consent agreement.

**SUMMARY:** The consent agreement in this matter settles alleged violations of Federal law prohibiting unfair or deceptive acts or practices or unfair methods of competition. The attached Analysis to Aid Public Comment describes both the allegations in the draft complaint that accompanies the consent agreement and the terms of the consent order—embodied in the consent agreement—that would settle these allegations.

**DATES:** Comments must be received on or before July 2, 2004.

**ADDRESSES:** Comments should refer to "Itron, Inc., *et al.,* File No. 031 0201," to facilitate the organization of comments. A comment filed in paper form should include this reference both in the text and on the envelope, and should be mailed or delivered to the following address: Federal Trade Commission/Office of the Secretary, Room H–159, 600 Pennsylvania Avenue, NW., Washington, DC 20580. Comments containing confidential material must be filed in paper form, as explained in the **SUPPLEMENTARY INFORMATION** section. The FTC is requesting that any comment filed in paper form be sent by courier or overnight service, if possible, because U.S. postal mail in the Washington area and at the Commission is subject to delay due to heightened security precautions. Comments filed in electronic form (except comments containing any confidential material) should be sent to the following e-mail box: *consentagreement@ftc.gov.*

**FOR FURTHER INFORMATION CONTACT:** Matthew Reilly, FTC, Bureau of Competition, 600 Pennsylvania Avenue, NW., Washington, DC 20580, (202) 326–2350.

**SUPPLEMENTARY INFORMATION:** Pursuant to section 6(f) of the Federal Trade Commission Act, 38 Stat. 721, 15 U.S.C.

46(f), and section 2.34 of the Commission's Rules of Practice, 16 CFR 2.34, notice is hereby given that the above-captioned consent agreement containing a consent order to cease and desist, having been filed with and accepted, subject to final approval, by the Commission, has been placed on the public record for a period of thirty (30) days. The following Analysis to Aid Public Comment describes the terms of the consent agreement, and the allegations in the complaint. An electronic copy of the full text of the consent agreement package can be obtained from the FTC Home Page (for June 3, 2004), on the World Wide Web, at *http://www.ftc.gov/os/2004/06/index.htm.* A paper copy can be obtained from the FTC Public Reference Room, Room 130–H, 600 Pennsylvania Avenue, NW., Washington, DC 20580, either in person or by calling (202) 326–2222.

Public comments are invited, and may be filed with the Commission in either paper or electronic form. Written comments must be submitted on or before July 2, 2004. Comments should refer to "Itron, Inc., *et al.,* File No. 031 0201," to facilitate the organization of comments. A comment filed in paper form should include this reference both in the text and on the envelope, and should be mailed or delivered to the following address: Federal Trade Commission/Office of the Secretary, Room H–159, 600 Pennsylvania Avenue, NW., Washington, DC 20580. If the comment contains any material for which confidential treatment is requested, it must be filed in paper (rather than electronic) form, and the first page of the document must be clearly labeled "Confidential." [1] The FTC is requesting that any comment filed in paper form be sent by courier or overnight service, if possible, because U.S. postal mail in the Washington area and at the Commission is subject to delay due to heightened security precautions. Comments filed in electronic form should be sent to the following e-mail box: *consentagreement@ftc.gov.*

The FTC Act and other laws the Commission administers permit the collection of public comments to consider and use in this proceeding as appropriate. All timely and responsive

---

[1] Commission Rule 4.2(d), 16 CFR 4.2(d). The comment must be accompanied by an explicit request for confidential treatment, including the factual and legal basis for the request, and must identify the specific portions of the comment to be withheld from the public record. The request will be granted or denied by the Commission's General Counsel, consistent with applicable law and the public interest. *See* Commission Rule 4.9(c), 16 CFR 4.9(c).

## Appendix B:  Pilot Study Federal Register Notice

**Federal Trade Commission**

Bank Holding Company Act (12 U.S.C. 1843) (BHC Act) and Regulation Y (12 CFR Part 225) to engage *de novo*, or to acquire or control voting securities or assets of a company, including the companies listed below, that engages either directly or through a subsidiary or other company, in a nonbanking activity that is listed in § 225.28 of Regulation Y (12 CFR 225.28) or that the Board has determined by Order to be closely related to banking and permissible for bank holding companies. Unless otherwise noted, these activities will be conducted throughout the United States.

Each notice is available for inspection at the Federal Reserve Bank indicated. The notice also will be available for inspection at the offices of the Board of Governors. Interested persons may express their views in writing on the question whether the proposal complies with the standards of section 4 of the BHC Act. Additional information on all bank holding companies may be obtained from the National Information Center website at *www.ffiec.gov/nic/*.

Unless otherwise noted, comments regarding the applications must be received at the Reserve Bank indicated or the offices of the Board of Governors not later than November 3, 2004.

**A. Federal Reserve Bank of Boston** (Richard Walker, Community Affairs Officer) 600 Atlantic Avenue, Boston, Massachusetts 02106–2204:

*1. Boston Private Financial Holdings, Inc.,* Boston, Massachusetts; to acquire KLS Professional Advisors, LLC, New York, New York, and thereby engage in financial and investment advisory activities, pursuant to sections 225.28(b)(6) and (b)(6)(vi) of Regulation Y.

**B. Federal Reserve Bank of Cleveland** (Cindy C. West, Banking Supervisor) 1455 East Sixth Street, Cleveland, Ohio 44101–2566:

*1. Wesbanco, Inc.,* Wheeling, West Virginia; to acquire Winton Financial Corporation, Cincinnati, Ohio, and thereby indirectly acquire The Winton Savings and Loan Company, Cincinnati, Ohio, and thereby engage in owning and operating a savings and loan association, pursuant to section 225.28(b)(4)(ii) of Regulation Y.

Comments regarding this application must be received at the Reserve Bank or the office of the Board of Governors not later than November 15, 2004.

Board of Governors of the Federal Reserve System, October 14, 2004.

**Robert deV. Frierson,**
*Deputy Secretary of the Board.*
[FR Doc. 04–23421 Filed 10–19–04; 8:45 am]
**BILLING CODE 6210–01–S**

## FEDERAL RESERVE SYSTEM

### Sunshine Act Meeting

**AGENCY HOLDING THE MEETING:** Board of Governors of the Federal Reserve System.

**TIME AND DATE:** 11:30 a.m., Monday, October 25, 2004.

**PLACE:** Marriner S. Eccles Federal Reserve Board Building, 20th and C Streets, N.W., Washington, D.C. 20551.

**STATUS:** Closed.

**MATTERS TO BE CONSIDERED:**

1. Personnel actions (appointments, promotions, assignments, reassignments, and salary actions) involving individual Federal Reserve System employees.

2. Any items carried forward from a previously announced meeting.

**FOR FURTHER INFORMATION CONTACT:** Michelle A. Smith, Director, Office of Board Members; 202–452–2955.

**SUPPLEMENTARY INFORMATION:** You may call 202–452–3206 beginning at approximately 5 p.m. two business days before the meeting for a recorded announcement of bank and bank holding company applications scheduled for the meeting; or you may contact the Board's Web site at *http://www.federalreserve.gov* for an electronic announcement that not only lists applications, but also indicates procedural and other information about the meeting.

Board of Governors of the Federal Reserve System, October 15, 2004.

**Robert deV. Frierson,**
*Deputy Secretary of the Board.*
[FR Doc. 04–23544 Filed 10–15–04; 4:43 pm]
**BILLING CODE 6210–01–S**

## FEDERAL TRADE COMMISSION

**Notice of a Pilot Study to Aid Federal Trade Commission Staff in Conducting a Study of the Accuracy and Completeness of Consumer Reports, Pursuant to Section 319 of the Fair and Accurate Credit Transactions Act of 2003**

**AGENCY:** Federal Trade Commission.

**ACTION:** Notice of pilot study and request for comment.

**SUMMARY:** Pursuant to section 319 of the Fair and Accurate Credit Transactions Act of 2003 ("the Act" or "FACT Act"), the Federal Trade Commission (the "Commission" or "FTC") is evaluating ways to study the accuracy and completeness of consumer reports. The purpose of the current pilot study is to evaluate the feasibility of a methodology

that involves direct review by consumers of the information reported in their consumer reports. Due to the small size of the study group, statistical conclusions will not be drawn from this pilot study. Comments will be considered before the FTC submits a request for Office of Management and Budget ("OMB") review under the Paperwork Reduction Act.

**DATES:** Public comments must be received on or before December 20, 2004.

**ADDRESSES:** Interested parties are invited to submit written comments. Comments should refer to the "Accuracy Pilot Study: Paperwork Comment" to facilitate the organization of the comments. A comment filed in paper form should include this reference both in the text and on the envelope, and should be mailed or delivered to the following address: Federal Trade Commission/Office of the Secretary, Room H–159 (Annex Y), 600 Pennsylvania Avenue, NW., Washington, DC 20580. Comments containing confidential material must be filed in paper (rather than electronic) form, and the first page of the document must be clearly labeled "Confidential." [1] The FTC is requesting that any comment filed in paper form be sent by courier or overnight service, if possible, because U.S. postal mail in the Washington area and at the Commission is subject to delay due to heightened security precautions. Comments filed in electronic form (except comments containing any confidential material) should be sent to the following e-mail box: *AccuracyPilotStudy@ftc.gov*.

The FTC Act and other laws the Commission administers permit the collection of public comments to consider and use in this proceeding as appropriate. All timely and responsive public comments, whether filed in paper or electronic form, will be considered by the Commission, and will be available to the public on the FTC Web site, to the extent practicable, at *http://www.ftc.gov*. As a matter of discretion, the FTC makes every effort to remove home contact information for individuals from public comments it receives before placing those comments on the FTC Web site. More information, including routine uses permitted by the

---

[1] Commission Rule 4.2(d), 16 CFR 4.2(d). The comment must be accompanied by an explicit request for confidential treatment, including the factual and legal basis for the request, and must identify the specific portions of the comment to be withheld from the public record. The request will be granted or denied by the Commission's General Counsel, consistent with applicable law and the public interest. *See* Commission Rule 4.9(c), 16 CFR 4.9(c).

Privacy Act, may be found in the FTC's privacy policy, at *http://www.ftc.gov/ ftc/privacy.htm.*

**FOR FURTHER INFORMATION CONTACT:** Peter Vander Nat, Economist, (202) 326– 3518, Federal Trade Commission, Bureau of Economics, 601 New Jersey Avenue, NW., Washington, DC 20580.

**SUPPLEMENTARY INFORMATION:** The Fair and Accurate Credit Transactions Act of 2003, Pub. L. 108–159 (2003), among other purposes, amends the Fair Credit Reporting Act ("FCRA") to enhance the accuracy of consumer reports. The FACT Act requires the FTC to conduct a number of studies on consumer reporting and related issues.

Section 319 of the FACT Act requires the FTC to study the accuracy and completeness of information in consumers' credit reports and to consider methods for improving the accuracy and completeness of such information. The Act requires the Commission to issue a series of biennial reports to Congress over a period of eleven years. The first report is due in December 2004.

As the first step in conducting the accuracy and completeness study, the FTC is conducting a pilot study which will evaluate the feasibility of a methodology that directly involves consumer review of the information contained in their credit reports. The pilot study does not rely on the selection of a nationally representative sample of consumers, and statistical conclusions will not be drawn from the pilot study. The FTC has designated a contractor with high-level expertise in credit reporting and related issues, subject to OMB clearance for the study under the Paperwork Reduction Act. The pilot study will involve a small group of consumers who give the contractor permission to review their credit reports. The contractor will help the consumers to understand their reports and to discern inaccuracies or incompleteness in them.

The FTC invites comments on: (1) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, which includes the duties provided by the FACT Act, and whether the information will have practical utility; (2) the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used; (3) ways to enhance the quality, utility, and clarity of the information to be collected; and (4) ways to minimize the burden of the collection of information on those who are to respond, including through the

use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g., permitting electronic submission of responses. The FTC will submit the proposed information collection requirements to OMB for review, as required by the Paperwork Reduction Act, 44 U.S.C. 3501–3520.

**Description of the Collection of Information and Proposed Use:**

The design elements of the study are the following:

1. The study will consist of approximately 35 consumers having a diversity of credit scores covering at least three broad categories: poor, fair, and good.[2] The study group will consist of adult members of households to whom credit has been extended in the form of credit cards, automobile loans, home mortgages, or other forms of installment credit. The study group will be constructed by using list-assisted random digit telephone numbers with associated addresses. The FTC will send an official letter from the FTC regarding the nature and purpose of the pilot study to potential study participants. The study contractor then will screen consumers through telephone interviews. As various consumers give consent to participate (and thereby give the contractor permission to know their credit scores), if the respective categories of credit scores have an unequal distribution of consumers, then an array will be chosen to favor consumers with the relatively lower credit scores.

2. The contractor will help the participants obtain their credit reports from the three national repositories ("credit bureaus"): Equifax, Experian, and Trans Union.[3] Each study participant will request his or her three credit reports on the same day; although different participants will generally request their reports on different days.

3. The contractor will help the participants review their credit reports by (a) resolving common misunderstandings that they may have about the information in their reports

(this will involve educating the participant wherever appropriate), (b) helping to identify errors or potential errors, and (c) helping to locate any material differences or discrepancies among their three reports, and checking whether these differences indicate inaccuracies.

4. The contractor will facilitate a participant's contact with the credit bureaus and with the furnishers of information to help resolve items on the credit report the participant views as inaccurate. After the completion of the review, the contractor will determine whether the credit report information has changed, and whether any such change on the credit report led to a change in the participant's credit score.

5. To the extent necessary, the contractor will guide participants through the FCRA dispute process (by law, this process is limited to 30 days, but may be extended to 45 days if the consumer submits relevant information during the 30-day period). Specifically, participants who have issues that could not be resolved informally will use the dispute process provided by the FCRA. At the conclusion of this process, the contractor will ascertain whether the credit report information has changed, and whether any such change led to a change in the credit score.

The most important information to be obtained from the study is an assessment of the degree of difficulty with which each of the above tasks was performed by the participants, including the average amount of time needed for the respective tasks. The contractor also will provide an opinion on the feasibility of a national survey of credit reports using a methodology similar to that of the pilot study.

*Estimated Hours of Burden*

Consumer participation involves the initial screening and any subsequent time spent to understand, to review, and, if deemed necessary, to dispute information in credit reports. The FTC staff estimates that up to 225 consumers may need to be screened through telephone interviews and that each screening interview may last up to 10 minutes, resulting in approximately 38 hours (225 contacts × (1/6) hour per contact).

With respect to the hours spent by study participants, in some cases, the relative simplicity of a credit report may render little need for review, and the consumer's participation may only be an hour. For reports that involve difficulties, it may require a number of hours for the participant to be educated about the report and to resolve any disputed items. For items that are

---

[2] A credit score is a numerical summary of the information in a credit report and is designed to be predictive of the risk of default. Credit scores are created by proprietary formulas that render the following general result: the higher the credit score, the lower the risk of default. The designated contractor for the pilot study plans to use the "FICO" credit score, which is a commonly used score in credit reporting that is developed by the Fair Isaac Corporation.

[3] Participants will use the Web site *http:// www.myfico.com* to request credit reports. For participants who do not have Internet access, the contractor will provide it.

disputed formally, the participant must submit a dispute form, identify the nature of the problem, present verification from the participant's own records to the extent possible, and, upon furnisher response, perhaps submit follow-up information. All participants will have expert assistance available to them, and staff estimates that, on average, approximately 5 hours would be spent per participant, resulting in a total of 175 hours (5 hours × 35 participants).[4] Total burden hours are thus in a neighborhood of 200 hours (up to 38 hours for screening plus approximately 175 hours for study participants, then rounded to the nearest 50 hours).

*Estimated Cost Burden*

Participation by the consumer is voluntary. All participants will benefit by receiving assistance from the contractor in reviewing their credit reports, and identifying and resolving any errors. No monetary costs are involved for the consumer; specifically,

[4] From testimony before Congress by the Consumer Data Industry Association (*see* Statement of Stuart K. Pratt, CDIA, Before the Committee on Banking, Housing and Urban Affairs of the United States Senate, July 9, 2003), there were approximately 16 million consumer-requested credit reports across the three major credit bureaus for year 2003. Roughly 50% of these reports did not lead to any further response from the consumer (such as a call to, or dispute with, the credit bureaus). Regarding the remaining reports, about half of these (*i.e.*, about 4 million reports) involved questions or clarifications; the other half (roughly another 4 million reports) involved some type of dispute. These data, although approximate, can be used to help create an estimate of the average time spent by participants in reviewing their credit reports.

The following estimates are for the purpose of calculating burden under the Paperwork Reduction Act. The estimates are conservative and likely overestimate the amount of time that will be spent by study participants. For reports that do not require the participants to pose any questions to a credit bureau about their report (estimated to be 50% of reports), staff estimates the participants's time spent to be an hour or less. For reports that involve questions to a credit bureau but not a formal dispute (estimated to be 25% of reports), staff estimates the participant's time spent to be 2 to 3 hours. For reports that involve a formal dispute (estimated here to be 25% of consumer-requested reports), there may be significant differences for time spent by the participants, and this variation is itself one element to be discerned by the pilot study. Staff believes that, as a preliminary estimate, a formal dispute would not involve more than 15 hours of the participant's time, particularly in light of the fact that the participants will have expert assistance available to them, including guidance through the FCRA dispute process. Overall, the staff has calculated the average time per participant by using the weighted average over the three categories of reports: (.50 × 1 hour) + (.25 × 3 hours) + (.25 × 15 hours) = 5 hours.

participants will not pay for their credit reports.

**John D. Graubert,**
*Acting General Counsel.*
[FR Doc. 04–23453 Filed 10–19–04; 8:45 am]
**BILLING CODE 4750–01–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

## National Committee on Vital and Health Statistics: Meeting

Pursuant to the Federal Advisory Committee Act, the Department of Health and Human Services (HHS) announces the following advisory committee meeting.

*Name:* National Committee on Vital and Health Statistics (NCVHS).
*Time and Date:* November 4, 2004, 9 a.m.–3 p.m., November 5, 2004, 10 a.m.–3:15 p.m.
*Place:* Hubert H. Humphrey Building, 200 Independence Avenue, SW., Eisenberg Room—Room 800, Washington, DC 20201.
*Status:* Open.
*Purpose:* At this meeting the Committee will hear presentations and hold discussions on several health data policy topics. On the morning of the first day the Committee will hear updates and status reports from the Department on topics including Clinical Data Standards, the Consolidated Health Informatics Initiative, and the HIPAA Privacy Rule. There will also be updates on activities of the National Center for Health Statistic's (NCHS) Board of Scientific Counselors and on the National Health Information Infrastructure (NHII). In the afternoon the Committee will hear a presentation on the Census Bureau's American Community Survey and will discuss various materials prepared by NCVHS Subcommittees.

On the second day the Committee will be briefed on the National Institutes of Health's (NIH) Roadmap for the Future plan and the Clinical Trial Research Agenda. The Committee will also discuss plans for its annual report to Congress and there will be reports from the Subcommittees and a discussion of agendas for future Committee meetings.

The times shown above are for the full Committee meeting. Subcommittee breakout sessions are scheduled for late in the afternoon of the first day and in the morning prior to the full Committee meeting on the second day. Agendas for these breakout sessions will be posted on the NCVHS Web site (URL below) when available.

*For Further Information Contact:* Substantive program information as well as summaries of meetings and a roster of committee members may be obtained from Marjorie S. Greenberg, Executive Director, NCVHS, National Center for Health Statistics, Centers for Disease Control and Prevention, 3311 Toledo Road, Room 2402, Hyattsville, Maryland 20782, telephone (301) 458–4245. Information also is available on the NCVHS home page of the HHS Web site: *http://www.ncvhs.hhs.gov/*, where further

information including an agenda will be posted when available.

Should you require reasonable accommodation, please contact the CDC Office of Equal Employment Opportunity on (301) 458–4EEO (4336) as soon as possible.

Dated: October 12, 2004.

**James Scanlon,**
*Acting Deputy Assistant Secretary for Science and Data Policy, Office of the Assistant Secretary for Planning and Evaluation.*
[FR Doc. 04–23412 Filed 10–19–04; 8:45 am]
**BILLING CODE 4151–05–M**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

## National Committee on Vital and Health Statistics: Meeting

Pursuant to the Federal Advisory Committee Act, the Department of Health and Human Services (HHS) announces the following advisory committee meeting.

*Name:* National Committee on Vital and Health Statistics (NCVHS), Workgroup on the National Health Information Infrastructure (NHII).
*Time and Date:* November 12, 2004, 9 a.m.–5 p.m.
*Place:* Hubert H. Humphrey Building, 200 Independence Avenue, SW., Room 705A, Washington, DC 20201.
*Status:* Open.
*Purpose:* The Workgroup will hold the first in a series of hearings to gather information about personal health records, including key issues and current approaches. Subsequent hearings will be scheduled early in 2005.

*For Further Information Contact:* Substantive program information as well as summaries of meetings and a roster of committee members may be obtained from Mary Jo Deering Ph.D., Lead Staff Person for the NCVHS Workgroup on the National Health Information Infrastructure, NCI Center for Strategic Dissemination and NCI Center for Bioinformatics, National Cancer Institute, National Institutes of Health, 6116 Executive Boulevard—Room 4087, Rockville, MD 20852, telephone (301) 594–8193, or Marjorie S. Greenberg, Executive Director, NCVHS, National Center for Health Statistics, Centers for Disease Control and Prevention, 3311 Toledo Road, Room 2402, Hyattsville, Maryland 20782, telephone (301) 458–4245. Information also is available on the NCVHS home page of the HHS Web site: *http://www.ncvhs.gov/*, where an agenda for the meeting will be posted when available.

Should you require reasonable accommodation, please contact the CDC Office of Equal Employment Opportunity on (301) 458–4EEO (4336) as soon as possible.

Dated: October 12, 2004.

**James Scanlon,**
*Acting Deputy Assistant Secretary for Science and Data Policy, Office of the Assistant Secretary for Planning and Evaluation.*
[FR Doc. 04–23413 Filed 10–19–04; 8:45 am]
**BILLING CODE 4151–04–M**

**Federal Trade Commission**

**Appendix C:  "Same Report" Federal Register Notice**

**Federal Trade Commission**

The proposed order's specific provisions are as follows:

Paragraph II.A prohibits respondents from entering into or facilitating any agreement between or among any physicians: (1) To negotiate with payors on any physician's behalf; (2) to deal, not to deal, or threaten not to deal with payors; (3) on what terms to deal with any payor; or (4) not to deal individually with any payor, or to deal with any payor only through an arrangement involving the respondents.

Other parts of Paragraph II reinforce these general prohibitions. Paragraph II.B prohibits the respondents from facilitating exchanges of information between physicians concerning whether, or on what terms, to contract with a payor. Paragraph II.C bars attempts to engage in any action prohibited by Paragraph II.A or II.B, and Paragraph II.D proscribes inducing anyone to engage in any action prohibited by Paragraphs II.A through II.C.

As in other Commission orders addressing providers' collective bargaining with health care purchasers, certain kinds of agreements are excluded from the general bar on joint negotiations. First, respondents would not be precluded from engaging in conduct that is reasonably necessary to form or participate in legitimate joint contracting arrangements among competing physicians, whether a "qualified risk-sharing joint arrangement" or a "qualified clinically-integrated joint arrangement." The arrangement, however, must not facilitate the refusal of, or restrict, physicians from contracting with payors outside of the arrangement.

As defined in the proposed order, a "qualified risk-sharing joint arrangement" possesses two key characteristics. First, all physician participants must share substantial financial risk through the arrangement, such that the arrangement creates incentives for the physician participants jointly to control costs and improve quality by managing the provision of services. Second, any agreement concerning reimbursement or other terms or conditions of dealing must be reasonably necessary to obtain significant efficiencies through the joint arrangement.

A "qualified clinically-integrated joint arrangement," on the other hand, need not involve any sharing of financial risk. Instead, as defined in the proposed order, physician participants must participate in active and ongoing programs to evaluate and modify their clinical practice patterns in order to control costs and ensure the quality of

services provided, and the arrangement must create a high degree of interdependence and cooperation among physicians. As with qualified risk-sharing arrangements, any agreement concerning price or other terms of dealing must be reasonably necessary to achieve the efficiency goals of the joint arrangement.

Also, because the order is intended to reach agreements among horizontal competitors, Paragraph II would not bar agreements that only involve physicians who are part of the same medical group practice (defined in Paragraph I.E).

Paragraph III, for a period of three years, bars Ms. Gomez and Ms. Ray from negotiating with any payor on behalf of SENM or any SENM member, and from advising any SENM member to accept or reject any term, condition, or requirement of dealing with any payor. This temporary "fencing-in" relief is included to ensure that the alleged unlawful conduct by these respondents does not continue.

Paragraph IV, for three years, requires respondents to notify the Commission before entering into any arrangement to act as a messenger, or as an agent on behalf of any physicians, with payors regarding contracts. Paragraph IV sets out the information necessary to make the notification complete.

Paragraph V, which applies only to SENM, requires SENM to distribute the complaint and order to all physicians who have participated in SENM, and to payors that negotiated contracts with SENM or indicated an interest in contracting with SENM. Paragraph V.B requires SENM, at any payor's request and without penalty, or within one year after the Order is made final, to terminate its current contracts with respect to providing physician services. Paragraph V.C requires SENM to distribute payor requests for contract termination to all physicians who participate in SENM. Paragraph V.D.1.b requires SENM to distribute the complaint and order to any payors that negotiate contracts with SENM in the next three years.

In the event that SENM fails to comply with the requirements of Paragraph V.A or Paragraph V.D.1.b, Paragraph VI would require Ms. Ray to do so.

Paragraphs VII and VIII generally require Ms. Gomez and Ms. Ray to distribute the complaint and order to physicians who have participated in any group that has been represented by Ms. Gomez or Ms. Ray since August 1, 2001, and to each payor with whom Ms. Gomez or Ms. Ray has dealt since August 1, 2001, for the purpose of contracting.

Paragraphs V.E, V.F, VIII.B, IX, and X of the proposed order impose various obligations on respondents to report or provide access to information to the Commission to facilitate monitoring respondents' compliance with the order.

The proposed order will expire in 20 years.

By direction of the Commission.

**Donald S. Clark,**

*Secretary.*

[FR Doc. 04–13483 Filed 6–14–04; 8:45 am]

**BILLING CODE 6750–01–P**

---

## FEDERAL TRADE COMMISSION

### Public Comment To Aid Staff in Preparing the FACT Act Section 318(a)(2)(C) Study

**AGENCY:** Federal Trade Commission.

**ACTION:** Notice and request for public comment.

**SUMMARY:** The Federal Trade Commission (the "Commission" or "FTC") is conducting a study of the effects of requiring that a consumer who has experienced an adverse action based on a credit report receives a copy of the same credit report that the creditor relied on in taking the adverse action, as required by the Fair and Accurate Credit Transactions Act of 2003 (FACT Act or the Act). The Commission is requesting public comment on a number of issues to assist in preparation of the study.

**DATES:** Public comments must be received on or before July 16, 2004.

**ADDRESSES:** Interested parties are invited to submit written comments. Comments should refer to "FACT Act section 318(a)(2)(C) Study, Matter No. P044804" to facilitate the organization of comments. A comment filed in paper form should include this reference both in the text and on the envelope, and should be mailed or delivered to the following address: Federal Trade Commission/Office of the Secretary, Room H–159 (Annex M), 600 Pennsylvania Avenue, NW., Washington, DC 20580. Comments containing confidential material must be filed in paper form, as explained in the **SUPPLEMENTARY INFORMATION** section. The FTC is requesting that any comment filed in paper form be sent by courier or overnight service, if possible, because U.S. postal mail in the Washington area and at the Commission is subject to delay due to heightened security precautions. Comments filed in electronic form (except comments containing any confidential material) should be sent to the following e-mail box: *FACTAStudy@ftc.gov*.

The FTC Act and other laws the Commission administers permit the collection of public comments to consider and use in this proceeding as appropriate. All timely and responsive public comments, whether filed in paper or electronic form, will be considered by the Commission, and will be available to the public on the FTC Web site, to the extent practicable, at *www.ftc.gov.* As a matter of discretion, the FTC makes every effort to remove home contact information for individuals from public comments it receives before placing those comments on the FTC Web site. More information, including routine uses permitted by the Privacy Act, may be found in the FTC's privacy policy, at *http://www.ftc.gov/ftc/privacy.htm.*

**FOR FURTHER INFORMATION CONTACT:** Carolyn Cox, Economist, (202) 326–3434, Federal Trade Commission, Bureau of Economics, 601 New Jersey Avenue, NW., Washington, DC 20580.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

*A. Current Requirements Under the Fair Credit Reporting Act*

Section 615 of the Fair Credit Reporting Act currently requires parties who take an adverse action on the basis of information contained in a consumer report to provide consumers with an adverse action notice that, among other things, contains the name, address, and telephone number of the consumer reporting agency that furnished the report, that notifies the consumer of his or her right to receive a free copy of a consumer report from the consumer reporting agency, and explains his or her right to dispute with the consumer reporting agency the accuracy or completeness of any information in that report. Section 615 provides no time limit within which the notice must be supplied. As a practical matter, however, most creditors who are required to supply an adverse action notice by the Equal Credit Opportunity Act [section 202.9 of Regulation B, 12 CFR 202.9] , which requires notification within 30 days [section 202.9(a)(1) of Regulation B, 12 CFR 202.9(a)(1)], combine the FCRA and ECOA notices.

A consumer who requests a copy of his or her credit report subsequent to receiving an adverse action notice may receive a credit report that looks different than the one that the creditor relied on in making its decision. For example, the report that the consumer receives may contain more up-to-date information or be in a more consumer-friendly format. In addition, if the creditor and the consumer each provided different identifying information to request a copy of the report, then the reports received by the two parties may differ. This difference could, for example, be due to errors in transcription by clerks or differences in the amount of the identifying information provided. In some instances, the creditor may even receive multiple reports from a single consumer reporting agency on an individual consumer, while the consumer only receives one report. Thus, the report that the consumer receives and the report that the creditor receives and relies on may differ.

In contrast, a consumer who experiences an adverse action regarding employment obtains a copy of the same consumer report that the party taking the adverse action relied on. Section 604 (b) (3) (A) of the FCRA notes that, except under certain circumstances, "in using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates— (i) a copy of the report; and (ii) a description in writing of the rights of the consumer under this subchapter, as prescribed by the Federal Trade Commission, under section 609 (c)(1) [section 1681g(c)(1) of this title]." [1]

*B. Study Required by the FACT Act*

The FACT Act was signed into law on December 4, 2003. Pub. L. 108–159, 117 Stat. 1952. Section 318 (a) (2) (C) of the Act requires the FTC to examine "the effects of requiring that a consumer who has experienced an adverse action based on a credit report receives a copy of the same credit report that the creditor relied on in taking the adverse action, including—(i) the extent to which providing such reports to consumers would increase the ability of consumers to identify errors in their credit reports; and (ii) the extent to which providing such reports to consumers would increase the ability of consumers to remove fraudulent information from their credit reports." Section 318 (a) (3) specifies that the Commission "shall consider the extent to which such requirements would benefit consumers, balanced against the cost of implementing such provisions." [2]

We believe it is significant that the Act requires the FTC to study only the effects of a consumer receiving a copy of the "same credit report that the creditor relied on" following an adverse action. Although "credit report" is a commonly-used non-technical term for "consumer report," because the provision refers also to "creditors," we interpret the study to encompass only the use of consumer reports in credit transactions. Of course, consumer reports are not only used to determine credit eligibility; they may also be used for the purposes of reviewing an account or making decisions involving insurance, employment, or government benefits. [3] Consumer reporting agencies may also provide reports to persons who have a "legitimate business need" for the information, such as a landlord deciding whether to rent an apartment to a consumer. [4] The scope of the study, however, would not include situations in which these other users of consumer reports rely on a consumer report in taking an adverse action.

Although the FACT Act requires the FTC to study "the effects of requiring that a consumer * * * receives a copy of the same credit report * * * relied on" following an adverse action, it does not specify who would be responsible for supplying a copy of the credit report or the manner in which it would be supplied. In particular, the Act does not specify whether the consumer reporting agency or the creditor would be required to supply the consumer with a copy of "the same credit report" or the manner by which they should fulfill the requirement. For example, a creditor could send a copy of the credit report or a notification of the consumer's right to receive a credit report from them, along with each adverse action notice. Alternatively, a consumer reporting agency could comply with a requirement to supply the same report relied on by a creditor in taking an adverse action to consumers who experience an adverse action by sending a copy of the report to consumers (regardless of whether they will experience an adverse action) at the same time that they send a copy to the creditor, or by responding to requests of consumers who experience an adverse action related to credit and request a copy of their report.

---

[1] The exceptions have to do with interstate truckers [section 604 (b) (3) (C) of the FCRA, 15 U.S.C. 1681b(b)(3)[C]] and investigations of workplace misconduct [section 603(x) of the FCRA, 15 U.S.C. 1681a(x)].

[2] Section 318 (b) notes that "Not later than 1 year after the date of enactment of this Act, the Chairman of the Commission shall submit a report to the Committee on Banking, Housing, and Urban

---

Affairs of the Senate and the Committee on Financial Services of the House of Representatives containing a detailed summary of the findings and conclusions of the study under this section, together with such recommendations for legislative or administrative actions as may be appropriate."

[3] FCRA section 604(a)(3); 15 U.S.C. 1681b(a)(3).

[4] FCRA section 604(a)(3)(F); 15 U.S.C. 1681b(a)(3)(F).

The Act also does not define "the same credit report that the creditor relied on," and it is not clear in all situations what the term means. For example, in the case of a creditor who uses a credit score to evaluate a consumer's creditworthiness, the "same" report could consist of only the score itself or it could also include all of the information that was used to derive the score. Likewise, if a creditor received multiple scores concerning an individual, the "same" report could mean only the score or scores that the creditor chose to use or all of the scores the creditor received. In addition to issues regarding the content of the report, providing the "same" report to consumers as to creditors also raises issues concerning the format of the report. If the report that the creditor relies on is received in an electronic file that can only be understood using queries made through a specialized software package, would the "same" report consist of the unintelligible electronic files, or might it consist of a reporting of the information contained in the files in some new, more consumer friendly format? The costs and benefits associated with providing the consumer a copy of "the same report" depend on what one means by the term "the same report."

## II. Request for Public Comments

The Commission is seeking comment on all aspects of the proposed requirement that a consumer who has experienced an adverse action based on a credit report receives a copy of the same credit report that the creditor relied on in taking the adverse action. The Commission specifically requests comment on the questions noted below, but these questions are intended to assist the public and should not be construed as a limitation on the issues on which public comment may be submitted. Responses to these questions should cite the numbers and subsection of the questions being answered. For all comments submitted, please submit any relevant data, statistics, or any other evidence upon which those comments are based.

The Commission requests that, as a threshold matter, parties explain how they define "the same report that the creditor relied on." In addition, in answering the questions please use both the most restrictive and the most expansive definition possible and feel free to comment on how your answer would change if an alternative definition were used. For example, in instances where a creditor used a credit score, under the most restrictive definition, the "same report" would consist of only the score, while under the most expansive definition, the "same report" would include the score and the underlying data in a consumer-friendly format. Thus, in instances where a creditor used a credit score, the Commission seeks comment on the benefits and costs under these two scenarios, but welcomes comment on additional scenarios that might arise if an alternative definition were used.

The Commission notes that the term "adverse action" has a specific definition under the FCRA. In particular, in terms of credit, the term adverse action "has the same meaning as in section 701(d)(6) of the Equal Credit Opportunity Act [Section 1691(d)(6)] of this title * * *." Thus, the term adverse action means "(i) a refusal to grant credit in substantially the amount or on substantially the terms requested in an application unless the creditor makes a counteroffer (to grant credit in a different amount or on other terms) and the applicant uses or expressly accepts the credit offered; (ii) a termination of an account or an unfavorable change in the terms of an account that does not affect all or substantially all of a class of the creditor's accounts; or (iii) a refusal to increase the amount of credit available to an applicant who has made an application for an increase." Therefore, situations that trigger a risk-based pricing notice would not be considered an "adverse action" for the purposes of this study. The Commission requests that comments use "adverse action" as it is defined under the FCRA, but welcomes parties to opine on how a more expansive definition of the term "adverse action" (e.g., one that included situations that trigger a risk-based pricing notice) would impact specific scenarios.

### A. Extent to Which the Proposed Requirement Would Benefit Consumers

1. How does the credit report received by the creditor currently differ from the information that consumers receive from a consumer reporting agency when they request a copy of their credit report in response to an adverse action notice?

a. What are the different types of consumer reports that are used by a creditor (e.g., credit score, "in file" credit report,[5] merged credit report)? To what extent are credit scores, as opposed to "in file" or merged credit reports, relied on by creditors in making decisions regarding the extension of credit? To what extent do creditors rely on two or more types of consumer reports (e.g., a credit score, an "in file" credit report, and/or a merged credit report) in their decisions on whether to extend credit? Does the form in which the credit file information is revealed to creditors differ significantly among creditors? If so, how?

b. How frequently are multiple "in files" and/or multiple credit scores received in response to a request for information on a single individual? How are multiple "in files" and/or multiple credit scores treated by parties in their credit granting decisions?

c. Does the creditor use all of the information that it receives in response to a request for information on an individual, or, in certain situations, does it use only a subset of that information? For example, if a reseller or a creditor receives multiple "in files" does the creditor rely on all of the "in files" in making its credit granting decision, or does it screen the "in files" to determine which files it will rely on in making its decision? What are the situations in which the creditor relies on a subset of the information in its credit granting decision?

d. Are credit scores based on more information than that which appears in a file that is disclosed to consumers? For example, is information used that is blocked or suppressed from the consumer's file?

e. Do consumers ever receive multiple file disclosures in response to their request to see their credit file? If so, how often does this occur?

f. What factors account for the differences in the consumer report that is relied on by a creditor versus the credit report that is seen by a consumer who requests a credit report after receiving an adverse action notice? In particular, are there differences due to (i) differences in the time at which the credit report is requested, (ii) differences in the format in which a credit report is presented to a consumer versus a creditor, or (iii) differences in the identifying information that is used to request a credit report? Are there differences due to the matching technologies used to respond to requests for information by the consumer versus the user of a consumer report? If the same identifying information was used by the creditor and the consumer to request a credit file and if the requests were placed at the same time, could the creditor receive multiple "in files" while the consumer only receives one file? Are there differences due to other factors? If so, what are these factors and why do they result in different credit reports being relied on by the creditor

---

[5] The term "in file" credit report refers to a set of information that a party (e.g., creditor or reseller) receives from a credit reporting agency in response to a request for information about an individual.

versus the consumer? Please describe in detail the source of any differences.

g. What information do consumer reporting agencies require consumers to provide to obtain a copy of their credit report? What information do consumer reporting agencies require creditors to provide to obtain information on an individual? To the extent that there are differences in the credit report seen by the creditor versus the consumer due to differences in identifying information, are these differences due to (i) differences in the amount of information that is required (*e.g.*, a creditor is not required to provide the middle name of the individual, but the consumer is required to provide a middle name), (ii) differences in the completeness of the information (*e.g.*, the consumer reports his name as John Doe, Jr., but the creditor reports only John Doe), (iii) typographical errors (*e.g.*, social security number or name is typed in incorrectly by the creditor), or (iv) something else? Please describe in detail the source of any differences, as well as the extent to which they occur.

2. What current problems exist when the consumer receives a report that is different in form or content from the report relied on by the creditor? Please provide examples of specific situations in which consumers would benefit from the proposed requirement that a consumer who has experienced an adverse action based on a credit report receives a copy of the same credit report that the creditor relied on in taking the adverse action.

a. Do the problems arise primarily from differences in the scope of the information seen by the creditor versus the consumer, differences due to the time at which the report is requested, or both? For example, are the concerns related to situations in which a consumer does not know what information led to the adverse action because the information is already corrected by the time the report is normally seen by the consumer? Or, is it more likely that any problems come from a situation where the creditor has information in a consumer report or in multiple ''in files'' that actually pertains to another individual?

b. Would the proposed requirement increase the ability of consumers to identify errors in their credit reports? If so, how?

c. Would the proposed requirement aid consumers who seek to have the adverse action decision reversed because of inaccuracies or incomplete information in the credit report relied on by the creditor?

d. Would the proposed requirement aid consumers who seek to obtain credit

from other parties following an adverse action?

e. Would the proposed requirement increase the ability of consumers to identify identity theft and/or remove fraudulent information from their credit report? If so, how?

f. Is the proposed requirement, in and of itself, sufficient to generate the benefits noted above, or are other requirements also necessary (*e.g.*, credit report must be provided by a certain party at a certain time in the credit granting decision process) in order for the benefits to be generated? If so, what additional requirements are necessary?

g. Would the proposed requirement generate benefits other than those noted above? If so, what benefits would likely be generated?

3. What information would consumers gain if they receive the same credit report that the creditor relied on in taking the adverse action?

a. Is there any information that appears in the report that the creditor relied on that is not currently reported to consumers, that, if corrected or deleted, would improve the consumer's ability to obtain credit?

b. Is there any information that appears in the report that the creditor relied on that is not currently reported to consumers that would enable the consumer to detect if he/she is a victim of identity theft, or if he/she continues to be a victim of identity theft?

c. Is there information that appears in the report that the creditor relied on that is not currently reported to consumers that generates benefits other than those noted above? If so, what additional information generates the benefits and what are the benefits?

4. Are there situations in which the consumer already has an opportunity to see a copy of the credit report that the creditor is relying on prior to the creditor taking an adverse action? In particular, what is the extent to which this situation occurs in the mortgage industry?

5. Are there situations in which the consumer already receives a copy of the credit report that the creditor relied on in taking the adverse action, after the action is taken? In particular, what is the extent to which this situation occurs in the mortgage industry?

*B. The Cost of Implementing the Proposed Requirement*

1. What are the various means by which the proposed requirement that a consumer who has experienced an adverse action based on a credit report receives a copy of the same credit report that the creditor relied on in taking the adverse action could be implemented?

What would be the costs associated with implementing the proposed requirement via these various means? Which party (creditor versus the consumer reporting agency) can provide the same report that the creditor relied on in taking the adverse action to consumers at least cost?

2. Why do consumer reporting agencies not currently give consumers a copy of the same credit report that the creditor relied on in taking the adverse action? What would be the costs to consumer reporting agencies of requiring them to do so?

a. Is the data base that is maintained by a consumer reporting agency kept in such a way that the consumer reporting agency can easily reconstruct a credit report from a prior date? If not, what would be the cost associated with requiring a change that would enable the consumer reporting agency to do that?

b. Would a consumer reporting agency know what information is drawn from a credit file by a creditor and the manner in which it is displayed to them? If not, how costly would it be for the consumer reporting agency to obtain this information?

c. Are there situations in which the cost of requiring the consumer reporting agency to provide a copy of the same credit report that the creditor relied on in taking the adverse action to a consumer who has experienced an adverse action would be minimal and/or nonexistent? If so, what are these situations?

3. Why do creditors not currently give consumers a copy of the same credit report that the creditor relied on in taking the adverse action? What would be the costs to creditors of requiring them to do so? Does the cost vary depending on the credit granting situation (*e.g.*, mortgages versus instant credit)? Are there situations in which the cost of requiring the creditor to provide a copy of the same credit report that they relied on in taking the adverse action to a consumer who has experienced an adverse action would be minimal and/or nonexistent? If so, what are these situations?

4. What would be the cost to consumers associated with obtaining a copy of the credit report that the creditor relied on in taking the adverse action in addition to or in lieu of the credit report that the consumer currently receives if he or she requests one after receiving an adverse action notice?

a. Would the proposed requirement lead consumers to mistakenly conclude that there are inaccuracies in their credit reports? Would giving consumers an

older version lead them to dispute inaccuracies that may have already been corrected? What sort of costs might result from these disputes?

b. Would the proposed requirement make it more difficult for consumers to determine if there are inaccuracies in their credit report? Are there situations where a consumer who views the version that the creditor has relied on might miss the opportunity to fix inaccurate information that appears on the report after it was requested by the creditor? What sort of costs (*e.g.*, denial of future credit) might result from these situations?

c. What would be the cost to creditors associated with retooling their credit granting process to produce consumer friendly versions of the consumer report that they relied on?

d. Would the proposed requirement make it more difficult for consumers to determine if they are, or continue to be, a victim of identity theft? If so, why?

e. Could the proposed requirement unintentionally increase identity theft, particularly in situations where credit is denied because identity theft is suspected or in situations in which multiple "in files" or scores are received by the creditor in response to a request for information on a single individual?

f. Could the proposed requirement raise privacy concerns in situations in which multiple "in files" or scores are received by the creditor in response to a request for information on a single individual?

*C. Additional Information*

1. Do the experiences of other countries (*e.g.*, Sweden) that have a similar, but not identical requirement that consumers receive the same report as that relied on by the creditor, inform our analysis here?

2. Do the FCRA's section 604 requirements regarding adverse action in employment, where the consumer already receives a copy of the same consumer report that the party taking the adverse action relied on inform our analysis here?

3. What other additional information should the Commission consider in studying the effects of the proposed requirement?

All persons are hereby given notice of the opportunity to submit written data, views, facts, and arguments addressing the issues raised by this Notice. Comments must be received on or before July 16, 2004. Comments should refer to "FACT Act Section 318(a)(2)(C) Study, Matter No. P044804" to facilitate the organization of comments. A comment filed in paper form should include this reference both in the text

and on the envelope, and should be mailed or delivered to the following address: Federal Trade Commission/ Office of the Secretary, Room H–159 (Annex M), 600 Pennsylvania Avenue, NW., Washington, DC 20580. If the comment contains any material for which confidential treatment is requested, it must be filed in paper (rather than electronic) form, and the first page of the document must be clearly labeled "Confidential." [6] The FTC is requesting that any comment filed in paper form be sent by courier or overnight service, if possible, because U.S. postal mail in the Washington area and at the Commission is subject to delay due to heightened security precautions. Comments filed in electronic form (except comments containing any confidential material) should be sent to the following e-mail box: *FACTAStudy@ftc.gov.*

The FTC Act and other laws the Commission administers permit the collection of public comments to consider and use in this proceeding as appropriate. All timely and responsive public comments, whether filed in paper or electronic form, will be considered by the Commission, and will be available to the public on the FTC Web site, to the extent practicable, at *www.ftc.gov.* As a matter of discretion, the FTC makes every effort to remove home contact information for individuals from public comments it receives before placing those comments on the FTC Web site. More information, including routine uses permitted by the Privacy Act, may be found in the FTC's privacy policy, at *http://www.ftc.gov/ ftc/privacy.htm.*

By direction of the Commission.

**Donald S. Clark,**

*Secretary.*

[FR Doc. 04–13482 Filed 6–14–04; 8:45 am]

**BILLING CODE 6750–01–P**

---

[6] Commission Rule 4.2(d), 16 CFR 4.2(d). The comment must be accompanied by an explicit request for confidential treatment, including the factual and legal basis for the request, and must identify the specific portions of the comment to be withheld from the public record. The request will be granted or denied by the Commission's General Counsel, consistent with applicable law and the public interest. *See* Commission rule 4.9(c), 16 CFR 4.9(c).

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Disease Control and Prevention**

[60Day–04–62]

**Proposed Data Collections Submitted for Public Comment and Recommendations**

In compliance with the requirement of section 3506(c)(2)(A) of the Paperwork Reduction Act of 1995 for opportunity for public comment on proposed data collection projects, the Centers for Disease Control and Prevention (CDC) will publish periodic summaries of proposed projects. To request more information on the proposed projects or to obtain a copy of the data collection plans and instruments, call the CDC Reports Clearance Officer on (404) 498–1210.

Comments are invited on: (a) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility; (b) the accuracy of the agency's estimate of the burden of the proposed collection of information; (c) ways to enhance the quality, utility, and clarity of the information to be collected; and (d) ways to minimize the burden of the collection of information on respondents, including through the use of automated collection techniques or other forms of information technology. Send comments to Sandra Gambescia, CDC Assistant Reports Clearance Officer, 1600 Clifton Road, MS–E11, Atlanta, GA 30333 or send an e–mail to *omb@cdc.gov.* Written comments should be received within 60 days of this notice.

**Proposed Project**

2005 National Health Interview Survey, OMB No. 0920–0214— Revision—National Center for Health Statistics (NCHS), Centers for Disease Control and Prevention (CDC).

The annual National Health Interview Survey (NHIS) is a basic source of general statistics on the health of the U.S. population. Respondents to the NHIS also serve as the sampling frame for the Medical Expenditure Panel Survey which is conducted by the Agency for Healthcare Research and Quality. The NHIS has long been used by government, university, and private researchers to evaluate both general health and specific issues, such as cancer, AIDS, and access to health care. Journalists use its data to inform the general public. It will continue to be a leading source of data for the

**Federal Trade Commission**

| FEDERAL TRADE COMMISSION | www.ftc.gov |
|---|---|
| 1-877-FTC-HELP | FOR THE CONSUMER |