**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

**ALEJANDRO ABRAHAM LOPEZ, JR.,**
*Individually and on behalf of all*
*similarly situated individuals,*

                    **Plaintiff,**

      **v.**                   **Civil Action No. 1:12-cv-902 (LO/JFA)**

**TRANS UNION, LLC,**

                    **Defendant.**

---

**ALEJANDRO LOPEZ, SR.,**
*Individually and on behalf of all*
*similarly situated individuals,*

                    **Plaintiff,**

      **v.**                   **Civil Action No. 1:12-cv-1325 (LO/JFA)**

**TRANS UNION, LLC,**

                    **Defendant.**

---

**PLAINTIFFS' OPPOSITION TO TRANS UNION'S MOTION FOR JUDGMENT
ON THE PLEADINGS AS TO COUNTS ONE AND TWO OF
PLAINTIFFS'CONSOLIDATED AMENDED CLASS COMPLAINT**

COMES NOW the Plaintiffs, ALEJANDRO A. LOPEZ, JR., and ALEJANDRO A.

LOPEZ, SR., (hereafter collectively the "Plaintiffs" or as Lopez, Jr. and Lopez, Sr.) by counsel,

*individually and behalf of all similarly situated individuals*, respectfully request the Court to

deny Defendant, Trans Union, LLC's Motion for Judgment on the Pleadings in its entirety and

state as follows:1

---

1 While some Courts have found private injunctive relief an available private remedy under the
FCRA, most have not.  Plaintiffs move to dismiss their prayer for injunctive or declaratory relief
under the FCRA.

## I.     INTRODUCTION

Plaintiffs have sued Trans Union because it furnished their credit reports containing their most private information to the creditors of a different person.    Not because social security numbers did not match, although they did not. Not because some information was merely confused.  Trans Union disclosed to each Plaintiff that it had furnished his report to a creditor with whom he did not have contact.  After the filing of the two separate individual complaints, and post-filing disclosures by the many co-Defendants, Plaintiffs discovered who was at fault – Trans Union.  Each co-Defendant was in turn able to confirm that it had (a.) provided Trans Union a full social security number; (b.) received the credit report of the other Lopez with a different social security number, and (c.) did not want that consumer's credit report.

And yet Trans Union acknowledges that it was not mistaken.  It intended its misconduct.  And it now defends at the weakest of litigation postures contending that its sale of reports to strangers who did not want them is somehow permitted as a matter of law.  Defendant violated the FCRA and its long-established requirement that a consumer reporting agency not furnish a credit report to a person unless "it has reason to believe [that person] intends to use the information in connection with a credit transaction involving ***the consumer on whom the information is to be furnished***."   15 U.S.C. § 1681b(a).  As must be obvious to all but the Defendant, furnishing a credit report based on Lopez Sr.'s information to Lopez Jr.'s credit transaction violates the FCRA.

## II.     FACTUAL BACKGROUND

Defendant largely ignores the allegations in the Amended Class Complaint, mentioning Plaintiffs' allegations only briefly as a means to mischaracterize their arguments, facts and claims.  They do not, as Trans Union would have the Court divert, allege that the FCRA is

2

violated "by allowing less-than perfect SSN matching." (Def. Mem. at 4).[2] Instead, in the first count, Plaintiffs allege violations on behalf of themselves and of a class based on Trans Union's violations of 15 U.S.C. § 1681b, which concerns when a consumer reporting agency may furnish a consumer report. *See* 15 U.S.C. § 1681b (stating "any consumer reporting agency may furnish a consumer report under the following circumstances and no other"). In addition, Plaintiffs' second count alleges violations of 15 U.S.C. § 1681e(a), which requires Trans Union to "maintain reasonable procedures" to limit the furnishing of consumer reports to the purposes listed in § 1681b. Plaintiffs allege that Defendant furnished their consumer reports to creditors that Trans Union had no reason to believe had a permitted purpose to receive one. This question – whether or not Trans Union had such a reasonable belief – is never addressed in Defendant's memorandum, and remains a factual dispute inappropriate at this posture. Plaintiffs have more than plausibly alleged that any such belief would be unreasonable in light of the substantial actual notice Trans Union had regarding the reckless failings of its matching procedures used to select and furnish credit reports.

**A. The Amended Class Complaint Allege that Trans Union Willfully Furnished Plaintiffs' Credit Reports Without a Reasonable Basis to believe they matched the Creditor Inquiry.**

**1. Lopez, Jr. discovers three accounts on his Trans Union credit report that belong to someone else.**

On or around July 20, 2010, Lopez, Jr. obtained a copy of his Trans Union Consumer Disclosure. (Am. Compl. ¶ 11). Upon review, Lopez, Jr. discovered that Trans Union was

---

[2] The Putative class consists only of consumers about whom Trans Union had a complete social security number and sold his or her report to a creditor that asked for and provided a full, but different social security number. The class would not include consumers about whom a social security number was incomplete, unknown, not provided or not requested.

reporting 25 credit accounts that did not belong to him. *Id*. In addition, Trans Union was reporting inaccurate personal identifying information that did not belong to Lopez, Jr. Almost immediately, Lopez, Jr. disputed the inaccurate identifying information and credit accounts with Trans Union and advised that the accounts did not belonging to him. (Am. Compl. ¶ 12). Upon receipt of the Trans Union's investigation results in August 2010, Lopez, Jr. was shocked to learn that after the investigation, one of the disputed accounts had been "verified" by the creditor as belonging to him and would remain on his credit report. *Id*. Once again, Lopez, Jr. made another dispute to Trans Union and the MetLife account was subsequently deleted. (Am. Compl. ¶ 13). Unaware of the Trans Union procedures, Lopez, Jr. believed his issues with Trans Union were resolved.

### 2. Lopez, Jr. discovers twelve entities obtained his consumer disclosure without a permissible purpose.

In January 2012, Lopez, Jr. applied to refinance his mortgage loan as a result of the historically low interest rates. (Am. Compl. ¶ 15). During the refinancing process, Lopez, Jr. received a copy of his credit report from Trans Union and learned that Trans Union had furnished his credit reports to approximately twelve entities with whom he had no relationship or contact. (Am. Compl. ¶ 15). Lopez, Jr. never signed any application for credit for any of the disputed credit accounts, nor authorized the above entities to receive his credit reports. (Am. Compl. ¶ 18). Because none of these entities had a permissible purpose to obtain Plaintiff's credit report, Plaintiff filed a lawsuit against each entity for violation of § 1681b. (Am. Compl. ¶ 30).

### 3. Lopez, Sr. discovers six entities obtained his consumer disclosure without a permissible purpose.

Around February 1, 2012, Lopez, Sr.  obtained a copy of his Trans Union Consumer Disclosure and discovered that Trans Union provided his credit reports to six different entities –

4

on multiple occasions. (Am. Compl. ¶¶ 23-24). Lopez, Sr. never signed any application for credit for any of the disputed credit accounts and never authorized the above entities to receive his credit reports. (Am. Compl. ¶ 27). Because none of these entities had a permissible purpose to obtain Plaintiffs credit report, Plaintiff filed a lawsuit against each entity for violation of § 1681b. (Am. Compl. ¶ 31).

### 4. Co-Defendants, under oath, confirm that Trans Union provided the information of Lopez, Jr. when provided the identifying information of Lopez, Sr.

After the lawsuit commenced, Lopez, Jr., through counsel, discovered that none of the Co-Defendants alleged of having impermissible requested the credit reports of Lopez, Jr. ever did so. *Id.* Instead, almost every entity confirmed under oath that it specifically requested the credit report of Lopez, Sr., but that Trans Union impermissibly furnished the credit report of Lopez, Jr. *Id.* The various declarations are not only detailed in the Amended Class Complaint — each declaration is also attached as an Exhibit. (Am. Compl. ¶ 30; Ex. 1-8). Shockingly, there is not a single reference to any of the declarations in Defendant's entire memorandum. (Def.'s Mem. 1-20). Trans Union's utter silence on the significant of the declarations speaks almost as loudly as the declarations themselves, which undisputedly confirm Defendant's liability for violating § 1681b.

### 5. Co-Defendants, under oath, confirm that Trans Union provided the information of Lopez, Sr. when provided the identifying information of Lopez, Jr.

In November 20102, Lopez, Sr. filed his own lawsuit against the six entities who he believed impermissibly obtained his credit report. (Am. Compl. ¶ 31). After the lawsuit commenced, Lopez, Sr., through counsel, discovered that none of the previous Co-Defendants alleged of having impermissible requested the credit reports of Lopez, Sr. ever did so. *Id.* Instead, almost every entity confirmed under oath that it specifically requested the credit report

5

of Lopez, Jr., but that Trans Union impermissibly furnished the credit report of Lopez, Sr. *Id.* These declarations are also attached to the Amended Class Complaint.

### 6. Trans Union's Storied History of Willful Misconduct

Even though Trans Union's mixed file problem is well documented in regulatory investigations, voluminous lawsuits, and consumer complaints, Trans Union moves the Court for judgment on the pleadings as to Counts I and II of the Amended Class Complaint. In support of its motion, Trans Union ignores its long history of conduct in connection with mixing consumer credit files and reporting of information that is not likely to pertain to the consumer who is the subject of the requested report. (Am. Compl. ¶ 36).

### a. Trans Union's Procedures Scrutinized as Early as 1992.

Trans Union's history is perhaps best, but certainly far from exclusively, documented by the litigation in 1992 where the Attorneys General of seventeen states were forced to file a lawsuit against *Trans Union* because of its conduct in connection with mixing consumer credit files and reporting of information that is not likely to pertain to the consumer who is the subject of the requested report.. (Am. Compl. ¶ 36; Ex. 13). Because of Trans Union's purported "shared concerns… regarding the protection of Consumers in the credit report process," Trans Union agreed to making the following changes:

> 1. ***Implement*** or continue to utilize and maintain reasonable ***procedures to avoid the occurrence or reoccurrence of Mixed Files***.
> …
> 3. Analyze incoming data submitted by Subscribers to Trans Union as well as historical statistics in an attempt to detect data format errors, programming errors, or other inaccuracies, and take such corrective action with respect thereto as may be appropriate.
>
> 4. ***Take reasonable measures to prevent reporting of information that is not likely to pertain to the Consumer*** who is the subject of the Report and to prevent duplicate listings of an account with the same member number, opening date and consumer account number.

6

…

5. [a]dvise their Subscribers, that they shall attempt to (i) ***obtain Full Identifying Information from Consumers***; (ii) use, when provided by the Consumer, Full Identifying Information when reporting Credit Information to Trans Union; and (iii) ***use Full Identifying Information when requesting Consumer Reports***, except where a reliable and accurate alternative methodology is utilized for requesting Consumer Reports.

(Am. Compl. ¶ 36, Ex. 13).

Trans Unions violations of § 1681b would not have occurred if Trans Union maintained reasonable procedures to limit the furnishing of consumer reports as mandated by § 1681e(a). Yet, despite its agreement to adopt reasonable measures and its overwhelming notice of the failure of its procedures, Trans Union still merely requires the user of the credit report to provide the first name, last name, and address of the consumer. (Am. Compl. ¶ 37).

Trans Union maintains this procedure even though the use of the nine digit social security number[3] would greatly improve accuracy because no two individuals in the United States have the same nine digit social security number and the Social Security Administration does not reuse a number after the holder's death. (*See* Lopez, Jr. Interrog. #14; Lopez, Sr. Interrog. #14; www.ssa.gov/history/hfaq.html (last visited on May 2, 2013)). However, use of the nine digit social security number would reduce the number of credit reports Trans Union could sell, especially to those entities that seek to make a quick sale, collect debts or promote credit to

---

[3] In the Amended Class Complaint, presently proposes to certify a class of natural persons, "for whom Tran's Union's records note that a credit report was furnished to a third party after February 11, 2008, who requested a credit report and where that third party provided a nine digit social security number, but where Trans Union furnished in the credit report file data that matched a different digit social." (Am. Compl. ¶ 43). However, after conducting discovery, Plaintiff may determine to seek an alternative definition(s) than the proffered class definition in the Consolidated Amended Complaint. (*See* Lopez, Jr. Interrog. Resp. #25; Lopez, Sr. Interrog. Resp. #25). In addition, the Court may within its own discretion define the class as it finds more appropriate. *Bratcher v. Nat'l Standard Life Ins. Co.* (*In re Monumental Life Ins. Co.*), 365 F.3d 408, 414 (5th Cir. 2004) *cert.denied*, 125 S.Ct. 277 (2004). Thus, Trans Union's overwhelming focus on the proposed class definition is premature and inappropriate at this juncture.

consumers who do not already possess the nine digit social security number of the consumer. (*See* Am. Compl. ¶ 37).

### b. Lawsuits Involving Trans Union's Inadequate Matching Criteria

Trans Union has even been previously warned of similar FCRA misconduct in numerous court cases. (Am. Compl. ¶ 41). Recently, the United States District Court for the Eastern District of Pennsylvania commented on Trans Union's litigation history, stating "[g]iven Defendant's general knowledge of the mixed file problem and Defendant's failure to act to ensure these problems did not continue, a jury could reasonably find that Defendant acted in reckless disregard and summary judgment should be denied." *Price v. Trans Union, LLC*, 737 F. Supp. 2d 281, 289 (E.D. Pa. 2010). Moreover, as documented in the Amended Class Complaint, *Price* is not the only litigation involving allegations of the inadequacy of Trans Union's loosing matching criteria. (Am. Compl. ¶ 39) *citing* by example only *Philbin v. Trans Union Corp.*, 101 F.3d 957 (3d Cir. 1996); *Cousin v. Trans Union Corp.*, 246 F.3d 359 (5th Cir. 2001); *Guimond v. Trans Union Credit Information Co.*, 45 F.3d 1329 (9th Cir. 1995); *O'Conner v. Trans Union Corp.,* Civ. No. 97-4633, 1999 WL 773504 (E.D. Pa. Sept. 29, 1999); *see also Thomas v. Trans Union*, C.A. No. 00-1150 (D. Or. 2002) (jury verdict of $5.3 million remitted to $1.3 million); *Soghomonian v. Trans Union*, (E.D. Cal.) ($990,000 verdict); *Price v. Trans Union*, LLC, 737 F. Supp. 2d 281 (E.D. Pa. 2010); *Neclerio v. Trans Union*, LLC, Civ. No. 3:11-cv-1317 (D. Conn. Aug. 17, 2011).

### c. Trans Union's Conduct Compared to its CRA Counterparts

While not model citizens of FCRA compliance, Experian and Equifax's consumer reports for Lopez, Sr. and Lopez, Jr. further confirm the substantial deficiencies with Trans Union's procedures for compliance with § 1681b. As reflected in the original complaints in these

consolidated actions, Lopez, Sr.'s consumer reports from Experian and Equifax reflect that neither CRA provided Lopez, Sr.'s consumer report to any credit grantor requesting credit data on Lopez, Jr. within two years prior to the filing of the complaint. (*See* Lopez, Sr. Compl. (Doc. 1); Lopez, Sr. RFP # 7). Similarly, Lopez, Jr.'s Experian and Equifax consumer reports reflect that Lopez, Jr.'s consumer report was impermissibly furnished to a total of five credit grantors combined for Experian and Equifax. (*See* Lopez, Jr. Compl. ¶¶ 31-32 (Doc. 1); Lopez, Jr. RFP # 7). More importantly, Plaintiffs' consumer disclosures from Experian and Equifax reveal in most instances where Trans Union furnished the wrong consumer disclosure, Experian and Equifax furnished the consumer disclosure requested by the credit grantor. For example, Experian properly furnished Lopez, Sr.'s consumer disclosure to MetLife/Total Credit Services on May 4, 2010, May 11, 2010, and May 18, 2010. Similarly, Equifax properly furnished Lopez, Sr.'s consumer disclosure to MetLife/Total Credit Services on almost these exact same dates, *i.e.*, May 4, 2010, May 11, 2010, and May 13, 2010. Yet, Trans Union furnished Lopez, Jr.'s consumer disclosure on these same dates. (Lopez, Jr. RFP # 7; Lopez, Sr. RFP # 7; Lopez, Jr. Interrog. #6; Lopez, Sr. Interrog. #6). Worst yet, this same scenario happened on multiple occasions just within the past two years.[4]

### 7. Trans Union Mischaracterizes the Usefulness and Relevance of the 2004 FTC Report.

The Federal Trade Commission, one of the agencies that was still involved with

---

[4] Similarly, Experian and Equifax both properly furnished Lopez, Sr.'s consumer disclosure to Bank of America/LandSafe on April 20, 2010, April 22, 2010, and April 28, 2010. Conversely, Trans Union furnished Lopez, Jr.'s report on all three occasions. *Id*. Similarly, on August 30, 2010, Southstar Mortgage *via* Credco requested Lopez, Sr.'s consumer disclosure. Once again, Experian and Equifax provided Lopez, Sr. while Trans Union provided Lopez, Jr. *Id*. Experian and Equifax also properly furnished Lopez, Sr.'s consumer disclosure to Kroll on November 4, 2010, and November 17, 2010, but Trans Union once again furnished Lopez, Jr.'s data both times. *Id*.

supervision of the FCRA in 2004[5] issued a report in response to instructions from Congress contained in the FACTA amendments to the FCRA.  It was not, of course, a regulation or even an informal guidance document interpreting the statute.  It was at best a factual discussion, informed on this subject largely by "FTC staff communication with CRA representatives."  FTC, Report to Congress Under Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003 (Dec. 2004)(the "FTC Report") at n.125. None of the conclusions suggested by Trans Union were accepted even in the FTC's most recent omnibus summary report.  Federal Trade Commission, *40 Years of Experience with the Fair Credit Reporting Act*, at 33-34 (Dec. 2011) (available at http://www.ftc.gov/os/2011/07/110720fcrareport.pdf, last visited May 3, 2013).

And certainly, nothing about the FTC Report suggests as Trans Union claims, that "The Less-Than-Perfect SSN Matching Procedures Challenged in the Complaint Are Endorsed by the FTC."  (Def. Mem. at 6).  Noticeably absent from the report is any legal analysis of any kind concerning the relevant provisions of the FCRA.  Given the stated purpose of this report, the total absence of any legal analysis should not come as a surprise:

> In addition to these affirmative requirements, Sections 318 and 319 of the FACT Act direct the Commission to study and report to Congress on various issues related to the accuracy and completeness of consumer reports. Specifically, Section 319 requires "an ongoing study of the accuracy and completeness of information contained in consumer reports prepared or maintained by CRAs and methods for improving the accuracy and completeness of such information." . . . Part III of this report is the Commission's first interim Report to Congress under Section 319.

FTC Report at 2.  Simply put, the FTC operates not as a legal guide to interpretations, but rather a compilation of data gathered by the FTC to advise Congress concerning the need for further

---

[5] FCRA supervision, interpretation and enforcement is now under the jurisdiction of the Consumer Financial Protection Bureau.

legislation.   The study neither purports to nor operates in any way as an interpretation of the

FCRA.  As such, any reliance on it for this purpose is misguided from the outset.

Instead, the report was a general factual review of the efficacy and cost vs. benefit studies

yet to come:

> Finally, the ongoing accuracy and completeness study that the Commission is
> considering, beginning with the pilot study, could help shed light on the
> continuing concerns that are addressed in this report. In particular, the
> Commission believes that the ongoing accuracy study may provide a better
> estimate of the costs and benefits of the specific proposals that the Commission
> currently considers to be premature. As the Commission pursues the study, it will
> attempt to identify any areas where further reform is needed, as well as any
> improvements observed due to the FACT Act or the ongoing changes in the
> marketplace.

FTC Report at viii.  Based on the lack of conclusive data, the FTC made no recommendations for

changes to the law.

> ***<u>Based on the findings and conclusions of these studies, the Commission is not
> making legislative or administrative recommendations at this time</u>***. In addition
> to concluding that the costs of specific proposals examined in the Section 318
> studies could exceed their benefits, the Commission believes that it is premature
> to enact alternative requirements of this nature.

FTC Report at vii.  These signposts disclaim any authoritative value of the report at the time, and

more so any value that the report might have now, nearly 10 years after the report's submission

to Congress.  The report does not, and could not conceivably constitute and "authoritative

guidance", let alone an "endorsement."

Even still, an actual review of the relevant text of the report further refutes Trans Union's

suggestion of the report's relevance to this case.  The primary impediment or argument against

the use of full social security numbers as identifiers is the inconsistency with which some

creditors report or use SSNs in the information and inquiries they send to the credit bureaus.  But

11

the class defined in this case is limited to those consumers who were the subject of consumer reports sold to a creditor that requested a report using and with a complete and different SSN. The limited concerns expressed as a tradeoff in the report are inapplicable in the present case.

## III.    ARGUMENT

### THE COMPLAINT ADEQUATELY STATES A PLAUSIBLE CLAIM FOR TRANS UNION'S "WILLFUL" VIOLATIONS OF THE FCRA.

As previously explained by this Court, "[a] Rule 12(c) motion … is appropriate when all material allegations of fact are admitted in the pleadings and only questions of law remain." Republic Ins. Co. v. Culbertson, 717 F. Supp. 415, 418 (E.D. Va. 1989) (Cacheris, J.). A Rule 12(c) motion is evaluated under the same standard as a Rule 12(b)(6) motion. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). When a claim is challenged under Federal Rule of Civil Procedure 12(b)(6), the court must "construe the complaint in the light most favorable to the plaintiff, read the complaint as a whole, and take the facts asserted therein as true." *Feeley v. Total Realty Mgmt.*, 660 F. Supp. 2d 700, 707 (E.D. Va. 2009) (citing *Mylan Lab., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993)); *see also Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007).

### A.    Plaintiffs Complaint States a Plausible Claim that Trans Union violated §§ 1681b and 1681e(a).

At the outset, Trans Union concedes for purposes of this brief that it must deliver reports that relate only to the consumer who is the intended target of the report. Plainly, Trans Union may not deliver a report for "Tom" when the user has requested a report for "Jim." These provisions are plain, clear, and unambiguous:

12

(a) In general Subject to subsection (c) of this section, any consumer reporting agency may furnish a consumer report under the following circumstances and no other:

\* \* \*

(3) To a person which it has reason to believe-

(A) intends to use the information in connection with a credit transaction involving ***the consumer on whom the information is to be furnished*** and involving the extension of credit to, or review or collection of an account of, the consumer; or

\* \* \*

(C) intends to use the information in connection with the underwriting of insurance ***involving the consumer***; […]

15 U.S.C. § 1681b(a).  The same is true for 1681e(a), which incorporates by reference the standards in 1681b(a) ("Every consumer reporting agency shall maintain reasonable procedures designed to . . . limit the furnishing of consumer reports to the purposes listed under section 1681b of this title.").

However, Defendant opens its argument with a threshold assertion that §§ 1681b(a) and 1681e(a) are inapplicable for the claims of "a person whose data is mistakenly mixed into another person's credit report."  (Def. Mem. at 11).  This mischaracterizes both the Plaintiffs' arguments and claims and the allegations in the Complaint.  Plaintiffs allege that Trans Union sold and furnished their credit reports to another person's creditor.  Their claims are not based on a claim that their data was merely mixed.  For this reason alone, Defendant contends that the class claims should be dismissed in their entirety based on its theory that § 1681b only applies to "who may receive a report, not the content of the report itself." (Def.'s Mem 3, 12).  Under Defendant's interpretation, it does not matter whose credit information is furnished as long as Trans Union "had reason to believe" the creditor grantor had a permissible purpose. In essence, Trans Union's real position is that it does not violate the FCRA if its data matching criteria results in the furnishing of *any* consumer's report so long as the credit grantor had a permissible

purpose to access *any* consumer's report. This argument is contrary to the plain language of the statute and case law interpreting CRAs liability under § 1681b.  But most importantly, it is contrary to the facts alleged in the complaint.

To challenge the otherwise self-evident claim presented by Defendant's selling of Lopez, Sr. reports to creditors requesting Lopez, Jr. reports, Trans Union grossly simplifies the statutory scheme by which it has for forty years been governed.  Here, the complaint alleges that Trans Union provided reports of each of the Plaintiffs to persons seeking information about the other Lopez, even though Trans Union had ample information to properly identify the intended subject of the requests report:

- Trans Union prepared a consumer report concerning Mr. Lopez Jr. (Complaint at ¶ 15).

- Trans Union disclosed that it had prepared reports concerning Mr. Lopez Jr.'s and given those reports to "numerous entities" that had no relationship or contact with Mr. Lopez.  (Complaint at ¶ 15).

- Trans Union provided Mr. Lopez Jr.'s consumer report to Metlife, Total Credit Services, Southstar, Credico, Gateway, Kroll, Citibank, Fannie Mae, Capital One, FIA, and Discover. (Complaint at ¶ 16).

- Those users had no permissible purpose to review Mr. Lopez Jr.'s consumer report.  (Complaint at ¶ 17).

- Mr. Lopez, Sr. received a disclosure from Trans Union informing him that Trans Union had provided copies of his consumer report to GECRB, Credco, United One, LexisNexis, Unitrin and Sterling (Complaint at ¶ 23-24).

- These users and no permissible purpose to receive Mr. Lopez Sr.'s consumer report.   (Complaint at ¶ 26).

- Trans Union gave these reports out, without a reasonable procedure to confirm that these entities had a permissible purpose (or even wanted the reports). (Complaint at ¶ 22 and 29).

- That creditors who impermissibly received Mr. Lopez, Jr.'s credit report had in fact requested Mr. Lopez, Sr.'s report.  (Complaint at ¶¶ 30(a)-30(h)).

- That creditors who impermissibly received Mr. Lopez, Sr.'s credit report had in fact requested Mr. Lopez, Jr.'s report and provided full identification of the subject including an address and full social security number (Complaint at ¶¶ 31(a)-31(d)).

- Even though each of these users had provided an extensive description of the intended target of the report, Trans Union provided each of these users with a report concerning a person other than the person whose report they had asked for. (Complaint at ¶¶ 30-31).

Defendant's legal argument – that the report always regards the consumer about whom the requesting creditor is to transact a loan or credit even if the contents of the report solely regard a different person is absurd. Of course, there is nor a single decision to support this contortion. The results of an extension of this logic offer a reason why. Consumer 1 could apply for a loan and provide Consumer 2's social security number – that is how identity theft occurs. By Defendant's analysis, when a report regarding the uninvolved innocent consumer is provided to the identity theft creditor, it instantly becomes the report of the identity thief, rather than of the innocent victim. In fact, the provision at § 1681b that restricts the creditor/user from impermissibly obtaining a report would also become meaningless. Section 1681b(f) commands that: A person shall not use or obtain a consumer report for any purpose unless— (1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section […]" 15 U.S.C. § 1681b(f). By Trans Union's analysis, a creditor could access a spouse's, relative's or friend's report without their permission in order to determine whether or not it would be safe to lend money to a separate consumer. And that report of the spouse, relative or friend would become the report of the applicant, even though nothing in the report would regard or pertain to that consumer.

Defendant's argument is also contrary to the plain language of § 1681b, as interpreted by the United States Court of Appeals for the District of Columbia in *Koropoulos v. Credit Bureau,*

15

*Inc.*, 734 F.2d 37 (1984). In *Koropoulos*, the court rejected this precise argument in a case with weaker facts than the present facts before this Court. In that case, the appellants appealed the trial court's dismissal of their suit alleging, *inter alia*, a violation of § 1681b. On appeal, the court vacated the district court's ruling because the credit reporting agency provided a credit grantor with an entirely different credit report, *i.e.*, the report of a husband when the retail store requested the report of the wife. *Id*. at 46. In doing so, the court concluded that a genuine issue of material fact existed with respect to whether the CRA "negligently or willfully issued a report for an impermissible purpose, a violation of 15 U.S.C. § 1681b(3)(A)." *Id*. at 47. In reaching this conclusion, the court stated:

> We cannot sustain the dismissal of this claim either, because, even under the district court's assumption that CBI may have sent Lord & Taylor a report on Mr. Koropoulos, CBI may be liable to plaintiffs for violation of the FCRA. The Act addresses the confidentiality of credit information as well as the accuracy of credit reports. To protect confidentiality it provides that:

> [a] consumer reporting agency may furnish a consumer report [only] . . . to a person which it has reason to believe -- intends to use the information in connection with a credit transaction ***involving the consumer on whom the information is to be furnished*** and involving the extension of credit to, or review or collection of an account of, the consumer. 15 U.S.C. § 1681b(3)(A).

> The plain language of this provision seems to prohibit CBI from sending a report on Mr. Koropoulos in response to a request for a report on Mrs. Koropoulos.

> FN 17.  As both the Federal Trade Commission and we read section 1681b(3)(A), "a consumer reporting agency may not report information from spouse A's file which relates only to his or her individual credit history when spouse B applies for credit." Division of Credit Practices, Bureau of Consumer Protection, Federal Trade Comm., Compliance With the Fair Credit Reporting Act 20.1 (2d ed. revised 1979) *Id*. at 46. (emphasis in original).

*Id*. at 46, n.17. (emphasis in original).

16

**B.**    **Plaintiffs' Complaint States a Plausible Claim that Trans Union's FCRA Violations were "Willful."**

Trans Union also attacks the Plaintiffs' claims brought under 15 U.S.C. § 1681b(a) and 1681e(a) by claiming that Plaintiffs cannot establish willfulness under authority of *Safeco Ins. Co. of America v. Burr*.[6]  Specifically, Trans Union argues that as a matter of law, it has adopted a "not objectively reasonable" reading of the FCRA based on FTC report supporting dismissal of the claims of willful violations of the FCRA. While Trans Union has correctly identified the controlling authority, *Safeco Ins. Co. of America v. Burr*, it has failed to properly set forth the two-pronged analysis required by that case for testing claims of willful violations of the FCRA. Moreover, Trans Union has ignored alternative tests for willfulness that the complaint amply satisfies.  Trans Union uses this half-done, good-enough analysis to justify its actions in mis-delivering consumer reports concerning individuals who had never applied for credit to the enquiring parties in the face of ample information to have correctly identified the intended targets of the reports. The Court should deny the motion to dismiss claims of willful violations of the FCRA for the reasons that follow.

**1.**    **The Complaint adequately alleges that Trans Union consciously disregarded the rights of the Plaintiffs and class members.**

While Trans Union maintains that the Court may dismiss the complaint under *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 69-70  (2007), it has failed to complete its analysis under that standard.  Under *Safeco* § 1681n willfulness "cover[s] not only knowing violations…but reckless ones as well." 551 U.S. at 48; *see also Vidoni v. Acadia Corp.*, 2012 WL 1565128 (D.

---

[6] For purposes of this motion, Trans Union does not seek dismissal of the claims for willful violation of 15 U.S.C. § 1681e(b) concerning the accuracy of the reports delivered for the Mr. Lopez, Sr. and Mr. Lopez, Jr.  As such, this section exclusively address the willfulness in relation to the class claims under §§ 1681b(a) and 1681e(a).

Me. Apr. 27, 2012) ("*Safeco* . . . did not discard or undermine the Court's earlier explanations of the term 'willful'").  Defendant ignores this portion of the *Safeco* opinion, and as a result their willfulness argument misunderstands its import.

*Safeco* carefully limited the scope of its decision to that subset of willful violations premised upon an alleged reckless disregard arising from a statutory misinterpretation:

> Thus, a company subject to FCRA **does not act in reckless disregard** of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.

551 U.S. at 69. (emphasis added).  The express language of this opinion limits its applicability to those situations involving willful violations involving "reckless" disregard.

Shortly after *Safeco* was decided, the Fourth Circuit confirmed that an FCRA plaintiff may prevail under either the pre-*Safeco* knowing or "conscious disregard" standard or the lower-threshold "reckless disregard" test.  In *Saunders v. Branch Banking and Trust Co.*, the Court of Appeals affirmed a punitive damages award under the FCRA's "conscious disregard" instruction prevailing at the time of trial and was the first Court of Appeals decision in the nation to consider the now five-year old argument offered by TransUnion.  *Saunders* rejected the defense attempt to construe *Safeco* as imposing a new and universal requirement that there exist standing appellate authority before a violation could be willful. In the face of the argument, the court stated:

> The Supreme Court has since held that willful violations of FCRA include violations committed in reckless disregard of a company's obligations under FCRA. *Safeco Ins. Co.,* 127 S.Ct. at 2208–10. Thus, the jury instructions placed an even greater burden on Saunders than current Supreme Court precedent would require.

18

526 F.3d 142, 151 n.4 (4th Cir. 2008).  This Court reached the same conclusion in affirming a

jury verdict in *Mullins v. Equifax Information Services, LLC*, 2007 WL 2471080, *2 (E.D. Va.

Aug. 27, 2007) (Payne):

> The case was tried on, and the jury was instructed pursuant to, the law of this circuit at the time of trial in the issue of willfulness. See *e.g., Dalton v. Capital Associated Industries, Inc.,* 257 F.3d 409 (4th Cir.2001). Thereafter, the Supreme Court of the United States decided *Safeco Ins. Co. of America v. Burr,* 127 S.Ct. 2201 (2007), which actually articulated a standard for willfulness that was less stringent than the standard which controlled the trial and the jury verdict.
>
> Viewed as a whole, the record here supports a finding of willfulness under either standard. The plaintiff presented evidence from which the jury reasonably found [the defendant CRA] deliberately and consciously committed the violations of the FCRA found by the jury. Certainly, the evidence supports a finding under the rule of *Safeco.*

To counsel's knowledge, *Mullins* was the first District Court decision to consider the present

TransUnion argument.

Similarly, a complaint that alleges that a defendant "knew of the standard and voluntarily

or intentionally violated it," will satisfy *Safeco. See also Vidoni v. Acadia Corp*., 2012 WL

1565128, *2 (D. Me. Apr. 27, 2012) ("In order to allege a willful violation, there must be some

allegation that the Defendant knew of the standard and voluntarily or intentionally violated it.").

- Trans Union has prior knowledge of the requirements of the FCRA concerning delivery of information concerning only the intended target of a consumer report, rather than information concerning other individuals (Complaint at ¶¶ 35-36, 39, and 41).

- The mis-delivery problem that is the subject of the class claims finds its foundation in the same systems that give rise to mixed files.  (Complaint at ¶¶ 32-33).

- That Trans Union has refused to study whether the 7-of-9 protocol poses unjustifiable risks to the accuracy and privacy of the consumers that are the subject of this practice. (Complaint at ¶¶ 32 -34).

These allegations establish that Trans Union has a problem giving rise to a number statutory violations including mis-delivery of entire reports (§ 1681b(a) and § 1681e(a)) and inaccurate reports (§ 1681e(b)) concerning an intended target of a report; Trans Union knows of this problem; Trans Union is aware of the legal requirements; and Trans Union has refused to fix the problem. In short, the complaint alleges that Trans Union's entire matching protocol fails to properly match intended targets of reports with the files in Trans Union's possession, even though Trans Union knows of the requirements of the law. These allegations amply support a claim of a willful violation of § 1681b(a) and 1681e(a) under both *Safeco* and *Dalton*.

    **2.**    **The complaint properly alleges that Trans Union acted with reckless disregard of § 1681b(a) and 1681e(a) under *Safeco*.**

Trans Union posits that the FTC permits it to rely on a 7-of-9 match of social security numbers. In specific, Trans Union argues that the FTC has authorized "partial SSN matching" as "appropriate" or permissible method to match credit files to requests from subscribers. (Def. Memo at 15). Citing this claimed "authorization" from the FTC, Trans Union argues that the decision in *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47 (2007) provides it an affirmative defense for reliance on a "not objectively unreasonable" reading of the FCRA supported by the FTC. (Def's memo at 14). Leaving aside the question of whether the FTC has actually "authorized" the specific conduct in this case, Trans Union's argument improperly abridges the *Safeco* analysis. Trans Union's truncated analysis fails to identify any <u>statutory</u> ambiguity, an alternative "colorable" reading, and any justification for its refusal to adopt the facially plain meaning of this unambiguous provision. As such, the *Safeco* defense fails at the outset.

    **A.**    **The *Safeco* test requires a two-step analysis.**

In *Safeco*, the Supreme Court reviewed the conduct of an insurance company in deciding whether the FCRA required a notice when the company decided to charge higher rates to its customers based on the contents of the consumer's credit report.   The Court found that the statutory language at issue was murky and undeterminable and therefore not subject to an objectively unreasonable interpretation necessary to establish recklessness:

> Thus, a company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.
>
> * * *
>
> Given this dearth of guidance and the less-than-pellucid statutory text, Safeco's reading was not objectively unreasonable, and so falls well short of raising the "unjustifiably high risk" of violating the statute necessary for reckless liability. FN20

*Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 69-70   (2007).    Under this rule the Court required a two-part analysis of any defense based upon a misreading of a statute's requirement. The first part of this analysis requires a simple objective analysis to determine whether the company adopted an objectively unreasonable reading of the law.   In other words, the statute must present an ambiguity or lack of "pellucidity" that lends itself to the misinterpretation by the defendant.   The second step requires the court to assess whether the risks associated with adopting that interpretation were substantially greater than those presented under a negligent violation:  Was the risk "unjustifiable" in light of possible harm?  *Safeco*, at 68 and 70.

      **B.**     **Trans Union has failed to present any "reading" of 15 U.S.C. § 1681b(a) or 1681e(a) that would permit it to deliver reports concerning persons other than the intended target.**

Trans Union suggest that the FTC Report be considered as legal guidance to support its objective reading of the statute such that even if Defendant was incorrect, it would not have been reckless.  But the Defendant does not suggest any particular statutory reading of § 1681b(a) that it contends or even suggests the FTC Report would sanction.  The FTC Report is at best a summary of data as to the efficacy of different methods of credit reporting.

Trans Union concludes the FTC's failure nearly a decade ago to recommend new legislation to expressly prohibit this match process is tantamount to a legal interpretation of the statute that is not "objectively unreasonable."  This naked claim is unfounded – it never suggests falls short of the analysis required by *Safeco*.[7]

Further, the FTC Report text offered by Trans Union pertains solely to the accuracy protections or restrictions at 15 U.S.C. § 1681e(b), and not the privacy restrictions at § 1681b(a). Even though the FTC Report suggests that although some errors in the assembly of reports may be acceptable, the FTC assumes that bureaus may not mis-deliver consumer reports concerning a person whose report was not requested.  Likewise, the FTC Report points to no ambiguous language within the FCRA itself to support a rule of law allowing this.  Trans Union has failed to identify a single passage or any provisions of the FCRA or the FTC Report that would permit it to deliver the report of someone other than the intended target of the report.  More importantly, the cited passes from the FTC Report, do not facially purport to interpret the language of § 1681b(a) to allow this.

---

[7]  The FTC Report provisions offered by Trans Union do not purport to represent a comprehensive scheme for matching the targets of inquiries to files.  Rather, the FTC report address only the suggestion that the credit bureaus require a 9-of-9 matching process insofar as the credit reporting agencies rely in part on Social Security numbers as part of the overall matching protocol.  The complaint in this case sets forth facts showing that Trans Union has additional information that would have easily allowed it to deliver appropriate reports for both Mr. Lopez, Sr. and Mr. Lopez, Jr.

Thus, as opposed to the language at issue in *Safeco* that created ambiguity about whether the FCRA required defendant to deliver a notice, the FCRA presents no similar ambiguity here. The plain language of §1681b(a) permits the CRA to deliver reports relating *only* to the consumer when it receives and inquiry relating to applications for credit.   Unlike the provisions in *Safeco*, the FCRA is perfectly "pellucid" on this point.   In the face *Safeco* – which requires a statutory ambiguity as a precondition of the defense – Trans Union has not even attempted to parse or challenge the plain statutory language and offer any alternate explanation of § 1681b(a) which appears on its face to be manifestly "pellucid."   No reasonable consumer reporting agency could conceivable read these requirements as allowing it to deliver a report concerning "Tom" when the creditor requested a report concerning "Jerry."   Accordingly, the Court should deny Trans Union's motion to dismiss.

In *Safeco*, the Supreme Court faced nearly the same attempt now made by Trans Union, only in reverse when the consumer-party sought to rely upon an FTC opinion letter to support its contention that Defendant's interpretation was unreasonable.   In rejecting the FTC's opinion letter's usefulness as "authoritative guidance," the Supreme Court observed that the FTC had no rule-making authority over the act, and did not effectively "canvas" the issue:

> Before these cases, no court of appeals had spoken on the issue, and no authoritative guidance has yet come from the FTC FN19 (which in any case has only enforcement responsibility, not substantive rulemaking authority, for the provisions in question, see 15 U.S.C. §§ 1681s(a)(1), (e)).

---

FN19. Respondent-plaintiffs point to a letter, written by an FTC staff member to an insurance company lawyer, that suggests that an "adverse action" occurs when "the applicant will have to pay more for insurance at the inception of the policy than he or she would have been charged if the consumer report had been more favorable." Letter from Hannah A. Stires to James M. Ball (Mar. 1, 2000), http:// www. ftc. gov/ os/ statutes/ fcra/ ball. htm (as visited May 17, 2007, and available in Clerk of Court's case file). But the letter did not canvass the issue, and it explicitly indicated that it was merely "an informal staff opinion ... not binding on the Commission." *Id*.

*Safeco Ins. Co. of America v. Burr*, 551 U.S. 47,70, n19 (2007).  Thus, the lack of Congressional

authorization, complete analysis and disclaimer of the reliability of the letter all contribute to the

conclusion that the FTC's report does not constitute "authoritative guidance" for purposes of

*Safeco*.

### 3.    The Court cannot resolve claims of "Willfulness" at a Rule 12 Posture.

Irrespective of whether the Complaint states a claim for willfulness under the conscious

disregard standard, Defendant cannot establish its reckless disregard defense as a matter of law

to show that the misinterpretation of § 1681b(a) is not "objectively unreasonable."  Yet even if

this issue were to properly present itself after discovery and at trial, a Rule 12 posture is

premature and inappropriate for such a determination.  Rather than burden this Court with

unnecessary content, Plaintiffs present this cogent explanation from United States District Judge

Chasanow of the District of Maryland in the following extended quotation from the *Domino's*

*Pizza's* opinion demonstrating beyond question why Defendants' motion cannot be sustained:

> D. Domino's Is Not Entitled to Dismissal of Counts Two and Three on the
> Ground that Its Interpretation of the FCRA "Was Not Objectively Unreasonable"
>
> In its final argument, Domino's maintains that, even if the BIIC form did
> violate the FCRA, its interpretation of the statute's disclosure and authorization
> requirements "was, at a minimum, not objectively unreasonable."….
>
> The Supreme Court has held that a defendant does not willfully violate the
> FCRA "unless the [challenged] action is not only a violation under a reasonable
> reading of the statute's terms, but shows that the company ran a risk of violating
> the law substantially greater than the risk associated with a reading that was
> merely careless." *Safeco,* 551 U.S. at 69. That is, unless the defendant's
> interpretation of the statute is objectively unreasonable, a plaintiff will be unable
> to show that the defendant willfully violated the FCRA. "Where the reading has 'a
> foundation in the statutory text ... and a sufficiently convincing justification,' " the
> interpretation is not objectively unreasonable, even if the reviewing court
> disagrees with it. *Smith,* 711 F.Supp.2d at 434 (quoting *Safeco,* 551 U.S. at 69).

Domino's clings to this language, asserting that its inclusion of the liability release in the BIIC form resulted from a reasonable reading of § 1681b(b)(2). The company's reliance on *Safeco,* however, is misplaced for two reasons.

First, the procedural posture of the *Safeco* case differed in a critical manner from the present action. "[T]he Supreme Court [in *Safeco* ] was operating under a summary judgment standard of review. It found no genuine issue of material fact as to whether the defendant's interpretation of the statute—albeit erroneous—was objectively unreasonable." *Id.* at 436. In this case, however, a motion to dismiss is pending, and discovery has not yet begun. Thus, at present, there is no evidence that Domino's actually adopted the interpretation of § 1681b(b)(2) that it proposes here. *See Gillespie v. Equifax Info. Servs.,* No. 05 C 138, 2008 WL 4316950, at *7 (N.D.Ill. Sept. 15, 2008) (denying a motion for summary judgment where, among other reasons, a defendant had not offered evidence that it "actually adopted a particular construction" of the relevant statutory section). On similar facts, numerous courts have declined to examine the reasonableness of a defendant's statutory interpretation when ruling on motions to dismiss. *See, e.g., id.* at 436–37; *Korman v. Walking Co.,* 503 F.Supp.2d 755, 761 (E.D.Pa.2007) (noting that, "at the motion to dismiss stage, the Court's only role is to determine" whether the complaint sufficiently alleges willfulness (citing *Jordan v. Fox, Rothschild, O'Brien, & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994))).[FN18]

FN18. Indeed, the few courts that have considered the matter when evaluating a motion to dismiss have offered no justification for doing so. *See, e.g., King v. MovieTickets.com, Inc.,* 555 F.Supp.2d 1339, 1341–42 (S.D.Fla.2008).

Second, even if it were appropriate to reach this issue on a 12(b)(6) motion, Domino's would not prevail. Unlike in *Safeco,* where the FCRA provision at issue was "less-than-pellucid," 551 U.S. at 70, the text at issue here appears to have "a plain and clearly ascertainable meaning," *Smith,* 711 F.Supp.2d at 436. *See Edwards v. Toys "R" Us,* 527 F.Supp.2d 1197, 1209 (C.D.Cal.2007) ("This case presents a different situation than *Safeco* because [the FCRA provision at issue] is not ambiguous or susceptible of conflicting interpretations.").[FN19] Domino's has pointed to no authority that would lead to a contrary conclusion.

FN19. The remaining cases on which Domino's relies in support of this argument are distinguishable for the same reason. *See, e.g., Murray v. New Cingular Wireless Servs., Inc.,* 523 F.3d 719, 725–26 (7th Cir.2008) (concluding that a defendant did not willfully violate the FCRA's "clear and conspicuous" requirement when using six-point font in a disclosure document because, among other things, the meaning of "conspicuous" was "not 'clear' "); *Long v. Tommy Hilfiger U.S.A., Inc.,* No. 09–1701, 2011 WL 635271, at *5–7 (W.D.Pa. Feb. 11, 2011) (finding that statutory ambiguity, along with a "dearth of guidance" from agency or judicial authorities, rendered a defendant's interpretation "objectively reasonable"), *aff'd,* —— F.3d ——, 2012 WL 180874 (3d Cir. Jan. 24, 2012).

At bottom, the basis of the company's argument is that "the paucity of [judicial] authority on the [disputed] statutory provision" precludes the conclusion that the company acted in an objectively unreasonable manner. (ECF No. 24, at 12).[FN20] This argument is unpersuasive because it ignores the guidance provided within the statutory provision itself. Where "the text of [the] statute is clear and open to only one reasonable interpretation ... a dearth of guidance does not render [a] defendant's readings plausible." *Follman v. Hospitality Plus of Carpentersville, Inc.,* 532 F.Supp.2d 960, 964 (N.D.Ill.2007); *Ramirez v. MGM Mirage, Inc.,* 524 F.Supp.2d 1226, 1235 (D.Nev.2007) (quoting *Follman,* 532 F.Supp.2d at 964). Because the plain language of § 1681b(b)(2) indicates that inclusion of a liability release in a disclosure form violates the FCRA's disclosure and authorization requirements, Domino's fails to show that its interpretation of this section was "not objectively unreasonable." (ECF No. 22, at 21). Dismissal of counts two and three on this ground is, therefore, improper.

FN20. In its reply, Domino's states that the court in *Reardon* found the same arguments now advanced by Plaintiffs "novel" and " 'the legal issue with respect to the requirements of the statute' ... 'close.' " (ECF No. 24, at 16 (quoting 2011 WL 1628041, at *7)). Domino's, however, mischaracterizes the *Reardon* opinion in making this assertion. The *Reardon* court made these statements with regard to issues unrelated to those disputed here.

*Singleton v. Domino's Pizza, LLC*, *supra,* 2012 WL 245965 at * 9-10 (D. Md. 2012). Each explanation and conclusion that Judge Chasanow reached in *Domino's Pizza* applies with equal force here, and provides a dispositive basis to deny the motion. Simply put, granting Trans Union's motion would breach the fundamental precepts governing Rule 12(b)(6) practice: "A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Stout v. Meletis*, supra, 2012 WL 618688, *1 (citations and quotation omitted).  Because the Complaint adequately alleges a willful violation of § 1681b(a) and 1681e(a) of the FCRA, and because Trans Union's motion seeks to test evidences supporting the justifications for its actions, the Court should deny Trans Union's as premature.

## IV.   CONCLUSION

For the reasons stated herein, Defendant's Motion as opposed should be denied.

26

Respectfully submitted,

**ALEJANDRO ABRAHAM LOPEZ, JR.,
and ALEJANDRO LOPEZ, SR.,**
*Individually and on behalf of all
similarly situated individuals*,


By_____/s/_____
                 Of Counsel

Leonard A. Bennett, Esq. (VSB #37523)
Susan Rotkis, Esq. (VSB #40693)
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, Virginia 23601
(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
E-mail: lenbennett@clalegal.com
E-mail: srotkis@clalegal.com

Matthew J. Erausquin, Esq. (VSB # 65434)
Janelle E. Mason, Esq. (VSB # 82389)
Casey S. Nash, Esq. (VSB # 84261)
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Tel:     (703) 273-7770
Fax:     (888) 892-3512
Email: matt@clalegal.com
Email: janelle@clalegal.com
Email: casey@clalegal.com

Kristi Cahoon Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
SUROVELL ISAACS PETERSEN & LEVY, PLC
4010 University Drive, Second Floor
Fairfax, Virginia 22030
(703) 251-5400 - Telephone
(703) 591-9285 - Facsimile
E-mail:  kkelly@siplfirm.com
E-mail: aguzzo@siplfirm.com

*Attorneys for Plaintiff*

## Certificate of Service

I hereby certify that on this 4th day of May, 2013, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Michael R. Ward, VSB #41133
MORRIS & MORRIS, P.C.
11 S. 12th Street, 5th Floor
P.O. Box 30
Richmond, VA   23218
(804) 344-8300 – Telephone
(804) 344-8359 – Facsimile
mward@morrismorris.com
*Counsel for Trans Union LLC*

Paul L. Myers, VSB #41133
STRASBURGER & PRICE, LLP
2801 Network Boulevard, Ste 600
Frisco, TX 75034
(469) 287-3903 - Telephone
(469) 227-6567 – Facsimile
Email: paul.myers@strasburger.com
*Counsel for Trans Union LLC*

_____/s/_____
Andrew J. Guzzo, VSB #82170
SUROVELL ISAACS PETERSEN & LEVY, PLC
4010 University Drive, Second Floor
Fairfax, Virginia 22030
(703) 251-5400 - Telephone
(703) 591-9285 - Facsimile
E-mail:  aguzzo@siplfirm.com
*Counsel for Plaintiffs*

28