IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ALEJANDRO ABRAHAM LOPEZ, JR.,
*Individually and on behalf of all*
*similarly situated individuals,*

               Plaintiff,

    v.                              Civil Action No. 1:12-cv-902 (LO/JFA)

TRANS UNION, LLC,

               Defendant.

---

ALEJANDRO LOPEZ, SR.,
*Individually and on behalf of all*
*similarly situated individuals,*

               Plaintiff,

    v.

                                    Civil Action No. 1:12-cv-1325 (LO/JFA)

TRANS UNION, LLC,

               Defendant.

**REBUTTAL MEMORANDUM IN SUPPORT OF TRANS UNION'S MOTION
FOR JUDGMENT ON THE PLEADINGS AS TO COUNTS ONE AND TWO OF
PLAINTIFFS' CONSOLIDATED AMENDED CLASS COMPLAINT**

### I.   INTRODUCTION

Plaintiffs' Complaint defines the putative class in this case as individuals whose credit reports were requested based on "<u>a nine digit social security number</u>, but where Trans Union furnished in the credit report file data that matched to a different <u>nine digit social security</u>

1

number." (Compl. ¶ 43 (emphasis added).)[1] Plaintiffs allege that, by failing to match all nine SSN digits, Trans Union mistakenly "matched the creditor inquiry (request for a credit report)" to data from either Lopez Senior or Lopez Junior, when a consumer report on the other had been requested. (Id. ¶ 32; see also id. ¶¶ 37, 40.) Common class issues allegedly include:

- "Were Trans Union's procedures for matching credit files and data based on unmatched social security numbers . . . unreasonable?" (Id. ¶ 45.a (emphasis added).)

- "Is Trans Union's unmatched social security number procedure to furnish a consumer report sufficient for it to obtain 'reason to believe' that the user to whom it was furnishing the report 'intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished[]'?" (Id. ¶ 45.b (emphasis added).)

- "When Trans Union furnishes a consumer report using its unmatched social security number procedure, does it have 'reasonable grounds for believing that the consumer report will not be used for a purpose' listed at 15 U.S.C. § 1681b?" (Id. ¶ 45.c (emphasis added).)

Despite these express allegations, Plaintiffs now contend that their class claims have nothing to do with partial SSN matching or resulting mixed files. Instead, Plaintiffs argue that Trans Union somehow "intended" to provide mismatched credit information and credit reports in response to credit inquiries. These arguments are entirely unsupported by any factual allegations, however, and are properly rejected under Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

---

[1] Terms are used herein as previously defined.

The reason for Plaintiffs' change in tactics is obvious. As explained in detail in Trans Union's prior Memorandum and herein, the statutory provisions upon which Plaintiffs base their class claims regulate only <u>who may receive</u> a consumer report, <u>not the content</u> of the report itself. Moreover, the FTC has endorsed, as a valid means to improve the accuracy and completeness of consumer reports, the very matching procedures challenged by Plaintiffs here.

Plaintiffs cannot escape their own allegations by attempting to amend the Complaint in their Opposition. See, e.g., <u>Jolly v. Acad. Collection Serv., Inc.</u>, 400 F. Supp. 2d 851, 859-860 (M.D.N.C. 2005). The gravamen of Plaintiffs' claims is Trans Union's use of a matching process the FTC endorsed in a formal report to Congress, prepared under specific statutory direction. To allow statutory damages claims for willful violations of law under these indisputable circumstances would be grossly unjust. Contrary to Plaintiffs' arguments in the Opposition, Trans Union does not claim that the furnishing of a consumer report containing "mixed file" information is "permitted as a matter of law." (Opp'n 2.) However, to the extent a credit report is inaccurate due to a mixed file, the potential remedy under the FCRA is based on 15 U.S.C. §§ 1681e(b) or 1681i only, not under §§ 1681b or 1681e(a). For that reason, Trans Union did not move on the § 1681e(b) and § 1681i(a) claims. The Motion, however, is valid as to the §§ 1681b and 1681e(a) claims. Accordingly, the Court should enter judgment on the pleadings in Trans Union's favor on Counts One and Two.[2]

---

[2] Plaintiffs concede that they cannot obtain declaratory or injunctive relief and have moved to dismiss their prayers for such relief. (Opp'n 1 n.1.) The Court also should enter an order reflecting the abandonment of these claims.

## II. ARGUMENT

**A. The FCRA's "Permissible Purpose" Provisions Do Not Address the "Mixed File" Claims Alleged Here.**

As set forth in Trans Union's prior Memorandum, the "permissible purpose" provisions of the FCRA regulate only who may receive a consumer report, not the content of the report itself. There is no question that Trans Union had "reason to believe" that the persons who requested Lopez Junior's reports intended to use the information they requested in connection with credit transactions involving Lopez Junior, and that that the persons who requested Lopez Senior's reports intended to use the information they requested in connection with credit transactions involving Lopez Senior.[3] Regardless of the <u>accuracy</u> of the reports, Trans Union had "reason to believe" that each requestor intended to use each report for a permissible purpose. Thus, no violation of the FCRA's permissible purpose provisions occurred.

The plain text and structure of the FCRA make this clear. The FCRA sets forth <u>separate</u> requirements for permitting access to the CRA's data and for the accuracy of the data delivered in response to a valid credit inquiry. The FCRA regulates access to credit data (but not the data's accuracy) through the "permissible purpose" provisions of 15 U.S.C. §§ 1681b(a) and 1681e(a).[4]

---

[3] For the sake of simplicity, Trans Union will continue to use the "Junior" and "Senior" distinctions in this brief to differentiate between the two plaintiffs. It is worth nothing, however, that when Plaintiffs were deposed on May 7 and 8, 2013, they testified that they almost never use those designations in their everyday lives and, with only one recent exception, never used them to distinguish themselves when applying for credit.

[4] Plaintiffs contend, "At the outset, Trans Union concedes for purposes of [the Motion] that it must deliver reports that relate only to the consumer who is the intended target of the report." (Opp'n 12.) Trans Union does not make this "concession." Rather, Trans Union contends that §§ 1681b and 1681e(a) require users of credit reports to have a permissible purpose. As discussed, one such purpose is where the CRA has "reason to believe" that the user "intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished." 15 U.S.C. § 1681b(a)(3)(A). The statute identifies many other permissible purposes as well.

Under these provisions, users of credit reports must certify the purposes for which information is sought and certify that the information will be used for no other purpose. See 15 U.S.C. § 1681e(a). The CRA, in turn, may not furnish reports if knows the user's certification of permissible purpose to be false. Id. By contrast, the accuracy of credit reports is governed by 15 U.S.C. § 1681e(b), which requires CRAs to use "reasonable procedures to assure maximum possible accuracy," and § 1681i, which requires CRAs to conduct an investigation into the accuracy of disputed information and to delete any inaccurate, incomplete or unverified information.

As previously explained, the alleged mixing of Plaintiffs' files does not violate § 1681b(a) because it does not bear on the requesting party's intended use of the data. "[T]he plain language of [§ 1681b] . . . focuses on the *intent* of the party obtaining the consumer report." Trikas v. Universal Card Servs. Corp., 351 F. Supp. 2d 37, 42 (E.D.N.Y. 2005) (italics in original). Thus, a permissible purpose exists under § 1681b (as to the CRA's compliance with the statute) as long as the creditor intends to use a credit report for a permissible purpose, even if it does not ultimately use the data as originally intended. See id. at 42-43 (holding that bank had a permissible purpose when it intended to use report to review former customer's account, even though account should have been closed); McNall v. Credit Bureau of Josephine Cnty., 689 F. Supp. 2d 1265, 1273 (D. Or. 2010) (holding that debt collector's mistaken request for credit report did not violate the FCRA because debt collector intended to use report in collection of debt, which was a permissible purpose). Here, there is no dispute that the entities that requested Lopez Junior's and Lopez Senior's credit reports intended to receive credit reports on Lopez Junior and Lopez Senior, respectively, and that there was some underlying permissible purpose for each request.

In their Opposition, Plaintiffs assert that "[t]heir claims are not based on a claim that their data was merely mixed." (Opp'n 13.) However, Plaintiffs offer no other explanation why Trans Union would have provided either of Plaintiffs' information in response to a request concerning the other. To the contrary, the Complaint itself is perfectly clear that the alleged violations of §§ 1681b(a) and 1681e(a) resulted from a mixed file—and specifically, from a mixed file resulting from seven-out-of-nine-digit SSN matching. (See Compl. ¶¶ 32, 37, 43, 45.) Plaintiffs' attempt to liken their situation to an instance where a person requests a report on "Jerry" but receives a report on "Tom" is therefore entirely flawed. (Opp'n 23.) This case does not deal with creditors who requested reports on "Jerry" but were intentionally provided with reports on "Tom." Rather, this case deals with requests for reports on a father and son with the same first name, same last name, at least one matching address and SSNs that matched on all but the last two digits. (Compl. ¶ 32 & Ex. 3.) This data is consistent with there being only <u>one</u> Alejandro Lopez. Thus, as matter of law, Trans Union had "reason to believe" this was so, and "reason to believe" that it provided data about that one Alejandro Lopez to those with a permissible purpose to receive the data. Accordingly, <u>Koropoulos v. Credit Bureau</u>, 734 F.2d 37 (D.C. Cir. 1984), is inapposite, as it involved intentional delivery of a husband's file in a transaction involving only the wife, rather than the mixed-file situation alleged by Plaintiffs here.

The Complaint nowhere alleges that Trans Union intentionally provided either of Plaintiffs' information or reports in response to a request concerning the other. Indeed, such an allegation would be illogical. Contrary to Plaintiffs' argument, this is not a case of delivering a report on "Tom" when the CRA knew "Jerry" was desired, but rather is like a situation where a report on "William" is delivered in response to a request for "Bill," or a report on "Margaret" in response to a request for "Peggy." In these circumstances, the CRA has "reason to believe" the

6

name difference was immaterial, particularly if other data (such as last name and address) was similar. The closeness of the data establishes "reason to believe" that just one subject existed here, and therefore as a matter of law the permissible purpose claims cannot proceed.

Plaintiffs similarly—and mistakenly—argue that "[b]y Trans Union's analysis, a creditor could access a spouse's, relative's or friend's report without their permission in order to determine whether or not it would be safe to lend money to a separate consumer." (Opp'n 15.) Contrary to Plaintiffs' assertion, Trans Union does not contend that a creditor may intentionally, and without consent, access a spouse's, relative's or friend's report in connection with a transaction with another consumer. Indeed, the circumstances under which a CRA may intentionally provide a credit report on another consumer are entirely irrelevant because Plaintiffs do not allege that such an event occurred here. Rather, Plaintiffs contend that information as to Lopez Junior was mistakenly provided in transactions involving Lopez Senior (and vice versa) because Plaintiffs' files were mixed, not because anyone insisted on access to the father's data as a condition of lending to the son (or vice versa).

Plaintiffs also do not dispute that a failure to plead a violation of § 1681b(a) is fatal to their claims based on a violation of § 1681e(a). See Washington v. CSC Credit Services Inc., 199 F.3d 263, 268-69 (5th Cir. 2000) (holding that a plaintiff bringing a claim that a reporting agency violated the "reasonable procedures" requirement of § 1681e(a) must first show that the reporting agency released the report in violation of § 1681b(a)). Because Plaintiffs fail to plead a viable claim under § 1681b(a), their claim under § 1681e(a) necessarily fails as a matter of law.[5] Accordingly, Trans Union is entitled to judgment on the pleadings as to Counts One and Two.

---

[5] And it independently fails because the only allegedly improper procedure identified is the use of partial SSN matching endorsed by the FTC, as discussed in greater detail below.

**B.      Trans Union Did Not "Willfully" Violate §§ 1681b(a) and 1681e(a) by Providing Credit Information Without Requiring Matching SSNs.**

As previously explained, Plaintiffs' "permissible purpose" claims also must be dismissed because Plaintiffs have elected to pursue those claims solely on a theory of willful violation that is both novel and in conflict with published FTC guidance.  The United States Supreme Court has held that statutory penalties for "willful" noncompliance with the FCRA require proof of either a knowing or reckless disregard of the law's requirements.  See Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 59-60, 127 S. Ct. 2201, 167 L. Ed. 2d 1045 (2007).  Even if a defendant's interpretation of the law is mistaken, no statutory damages may be awarded unless that interpretation was "objectively unreasonable" in light of published appellate authority or regulatory guidance.  See id. at 69-70.  If "the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation," statutory damages may not be imposed on "a defendant who merely adopts one such interpretation."  Safeco, 551 U.S. at 70 n.20.  Moreover, this is an objective test.  A defendant's subjective intent (or lack of any intent) cannot be used to challenge whether an interpretation of a statute is objectively reasonable.  See Fuges v. Sw. Fin. Servs., Ltd., 707 F.3d 241, 250 (3d Cir. 2012).

Here, as in Safeco, Trans Union's interpretation of the statutory requirements is supported by the statutory text, no court of appeals has adopted Plaintiffs' interpretation of the statute, and no authoritative guidance supporting Plaintiffs' position has been issued by the FTC (or the CFPB).  To the contrary, the FTC generally endorses the use of partial SSN matches to improve the overall completeness of consumer reports.  See FTC Report 39-40, 50; accord Crabill v. Trans Union, L.L.C., 259 F.3d 662, 664 (7th Cir. 2001) (rejecting claim that Trans Union violated the FCRA by providing credit reports for plaintiff's brother based on partial match of SSN because "Trans Union was entitled to program its computer to select any file

8

whose identifiers closely matched those contained in the creditor's request for information"); see also id. at 664 (holding that plaintiff "cannot possibly obtain punitive damages" on FCRA claims arising from mixed files). According to the FTC Report, less-than-perfect matching rules, on balance, benefit consumers by allowing more complete credit information to be delivered. "Margaret" should not be denied a loan because positive credit information about her only resides in the CRA's files under the name "Peggy." To subject Trans Union to the risk of statutory or punitive damages will effectively force Trans Union to reject a procedure that the FTC expressly recognized, in its report to Congress, as both appropriate and generally beneficial to consumers. The consequence of rejecting partial SSN matching will be "an increase in the frequency with which a user's request does not return any file, which would, at a minimum, cause confusion, inconvenience, and delay for some consumers seeking credit." See FTC Report 51. The Court should give significant weight to the FTC's analysis, which Congress specifically asked it to provide, based on the agency's "specialized experience" in this area. See Skidmore v. Swift & Co., 323 U.S. 134, 139, 65 S. Ct. 165, 89 L. Ed. 124 (1944). Under Safeco, willfulness liability cannot be imposed under the FCRA unless the defendant is acting directly contrary to pellucid (crystal-clear) authority from unquestionably authoritative sources. See Safeco, 551 U.S. at 70-71. Here, by contrast, Plaintiffs challenges a procedure that was expressly considered and recognized by the FTC as reasonable.

There is no willful violation here because any errors result from a process recognized, on the whole, to be valid, necessary and helpful to more consumers by promoting more complete inclusion of data. In other contexts, the Fourth Circuit recognizes that identity confusion is sometimes inevitable, particularly when similar data is involved. Significantly, even where the injury resulting from confusion is demonstrably more severe—such as in the case of false arrest

—liability does not necessarily follow.⁶ The Fourth Circuit has held repeatedly that "[n]ot every mix-up in the issuance of an arrest warrant, even though it leads to the arrest of the wrong person, with attendant inconvenience and humiliation, automatically constitutes a constitutional violation for which a remedy may be sought[.]" Thompson v. Prince William County, 753 F.2d 363, 364 (4th Cir. 1985). In Thompson, an undercover officer purchased drugs from a suspect. Id. Later, the officer applied for and obtained an arrest warrant, which detailed the suspect's physical description. Id. Relying on this information, another officer arrested the plaintiff, who was not the suspect but who had the same name as the suspect and drove a similar vehicle. Id. at 365. Notably, however, the plaintiff's height, weight and hair color did not match the suspect's height, weight and hair color. Id. The court nevertheless found that probable cause existed and that the plaintiff's arrest was constitutional in spite of the presence of some non-matching identifying data. Id. Similarly, in Mensh v. Dyer, 956 F.2d 36, 38 (4th Cir. 1991), officers mistakenly arrested the plaintiff where the warrant described a different individual. The plaintiff was the father of the person identified in the arrest warrant and shared his first and last name. Id. After being provided with a name, address and photographs of the suspect, the officers arrived at the plaintiff's home and arrested him. Id. After being informed that they had arrested the father by mistake, the officers released him. Id. Citing Thompson, the Court held that the father's Fourth Amendment rights were not violated because the father and son shared the same name and address. Id. at 39-40. Accordingly, because the officers had probable cause to arrest the plaintiff's son, their mistaken arrest of the plaintiff did not allow the plaintiff to sue. Id.; see also

---

⁶ Here, the alleged confusion never resulted in either Plaintiff ever being denied credit or suffering any other adverse consequences. This lack of any adverse impact likewise undermines the validity of the claims challenged here. See Dowell v. Wells Fargo Bank, N.A., 517 F.3d 1024, 1026 (8th Cir. 2008) ("A reasonable reading of the statute could still require proof of actual damages but simply substitute statutory rather than actual damages for the purpose of calculating the damage award).

Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) ("The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested[.]"). Based on the allegations here, Trans Union was even more justified—had even greater "reason to believe"—that the two plaintiffs were one person and that Trans Union delivered data each time to someone with a permissible purpose to receive it.

Plaintiffs concede that "the FTC Report suggests that . . . some errors in the assembly of reports may be acceptable," but assert that "the FTC assumes that bureaus may not mis-deliver consumer reports concerning a person whose report was not requested." (Opp'n 22.) Plaintiffs cite no authority for the FTC's supposed "assumption" in this regard—which is unsurprising, because the FTC Report clearly contradicts Plaintiffs' argument. In the Report, the FTC examined exact-match requirements for both file building as well as file retrieval. (See FTC Report 49, 51.) With respect to the latter (as quoted at length in Trans Union's prior Memorandum), the FTC observed:

> The potential benefit of the proposed "exact" match requirement [for purposes of file retrieval] would be to decrease the provision of the wrong consumer's file to users and to impede identity theft, thereby meeting the proposal's goal to combat the provision of incorrect consumer reports to users. The potential costs would be an increase in the frequency with which a user's request does not return any file, which would, at a minimum, cause confusion, inconvenience, and delay for some consumers seeking credit. Also, consumers would likely be forced to provide more information when applying for credit. Although this might create additional challenges for identity thieves, it could also be costly for consumers who are reluctant to provide personal information because of concerns about privacy or identity theft.

(FTC Report 51.) The FTC also observed that requiring CRAs to identify matching information based on complete SSNs in the file retrieval process, as Plaintiffs request here, would both prevent CRAs from matching to the correct credit file in many circumstances as well as result in erroneous matches that might otherwise be avoided. In the present case, seven out of nine digits

11

of the Plaintiffs' SSNs matched, as well as their names and one address. The FTC considered similar facts and in its report to Congress and deemed this match protocol reasonable:

> Errors in SSNs may arise when a consumer does not know his or her number when filling out an application, from illegible handwriting or faulty transcription, or from mistyping the number when entering it into a database. Studies of unemployment insurance records suggest error rates in the SSN data entry process of between 0.5% and 4%. The CRAs account for the possibility of errors by allowing "partial matches" on SSN – for example, when seven or eight of nine digits match, or when the entire number is shifted by one digit. Such "partial matches" are allowed when other data elements match closely enough; the CRAs report that this happens between 1% and 2% of the time.
>
> . . .
>
> If 5% of inquiries include no valid SSN, and 1% include an SSN that is valid but incorrect, this translates to an estimated 250,000 inquiries each day for which an exact SSN match either could not be used or would yield the wrong consumer report. This leads the CRAs to use other identifiers, such as name and address, to aid in matching. As discussed above, the CRAs will rely on SSNs that do not match if the match on other data elements is strong enough. By contrast, if the SSN is an exact match, but other data elements do not match at all, the CRAs will not consider the records to match.

Id. at 39-40 (footnotes omitted) (emphasis supplied).

Plaintiffs argue that Trans Union cannot rely on the FTC Report provided to Congress because it does not constitute "authoritative guidance" with respect to the requirements of the FCRA or purport to interpret any particular statutory provisions. (Opp'n 22-23.) This argument is nonsensical; the FTC Report is uncontradicted and it unquestionably "can bring the benefit of specialized experience to bear on the subtle questions in this case." See United States v. Mead Corp., 533 U.S. 218, 235, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001). Moreover, under Safeco, Trans Union does not bear the burden of establishing authoritative guidance in favor of its interpretation; to defeat a willfulness claim, Trans Union needs only to show the lack of contrary authoritative guidance. See Safeco, 551 U.S. at 59-60, 70 n.20. It is Plaintiffs' burden to plead

and prove that Trans Union violated clearly established law, and Plaintiffs fail to carry their burden here because they identify nothing authoritative to contradict the FTC Report.

This Court also should reject Plaintiffs' contention that Trans Union cannot rely on Safeco because Trans Union's argument is not based on a textual ambiguity. (See Opp'n 20.) Quite simply, §§ 1681b(a)(3)(A) and 1681e(b) do not, by their terms, apply to inaccurate credit reports resulting from mixed files because, in providing such reports, the CRA "has reason to believe" that the person requesting the report "intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished." 15 U.S.C. § 1681b(a)(3)(A) (emphasis added). Instead, such inaccuracies are governed exclusively by §§ 1681e(b) and 1681i, as discussed at length herein and in Trans Union's prior Memorandum. In Trans Union's view, the text clearly favors it, but to the extent Plaintiffs argue for a novel interpretation, Safeco precludes any award of statutory damages against Trans Union even if Plaintiffs' new interpretation ultimately is adopted.[7] And because Plaintiffs seeks only statutory damages in Counts One and Two, it is appropriate to dismiss those claims now under Rule 12(c).

Plaintiffs' contention that the issue of willfulness cannot be determined at the pleading stage also lacks merit. (Opp'n 24-26.) Plaintiffs cite a lengthy passage from Singleton v. Domino's Pizza, LLC, No. CIV.A. DKC 11-1823, 2012 WL 245965, at * 9-10 (D. Md. Jan. 25, 2012). However, the district court in Singleton based its holding primarily on a conclusion that,

---

[7] The danger of allowing potential statutory damages claims to persist has been well recognized as a genuine threat to lawful business activity. See Stillmock v. Weis Mkts., Inc., 385 Fed. Appx. 267, 276 (4th Cir. 2010) (Wilkinson, J., concurring specially) ("I worry that the exponential expansion of statutory damages through the aggressive use of the class action device is a real jobs killer that Congress has not sanctioned. . . . Certainly nothing in 15 U.S.C. § 1681n(a)(1) would lead us to believe that Congress intended the modest range of statutory damages to be transformed into corporate death by a thousand cuts through Rule 23.").

at the pleading stage, "there [was] no evidence that [defendant] actually adopted the interpretation of [the FCRA] that it proposes here." Id. at *9. Here, however, Plaintiffs plead that Trans Union violated the FCRA by using seven-out-of-nine-digit SSN matching, which is the exact practice described in the FTC Report. Moreover, Plaintiffs' argument is foreclosed by other caselaw. See Fuges, 707 F.3d at 251 ("[Defendant] does not lose the potential protection of the 'reasonable interpretation' defense, even if it never actually interpreted FCRA prior to the commencement of this lawsuit. Safeco requires only that 'the company's reading of the statute is objectively reasonable . . . . Safeco does not require that the defendant actually have made such an interpretation at any particular point in time.").

Many courts recognize that lack of willfulness under Safeco may be determined at the pleading stage. See, e.g., Shlahtichman v. 1-800 Contacts, Inc., 615 F.3d 794, 803-04 (7th Cir. 2010) (affirming dismissal of FCRA claims where defendant's construction of statute was objectively reasonable and defendant did not act "knowingly or recklessly"), cert. denied, 131 S. Ct. 1007 (2011); King v. MovieTickets.com, Inc., 555 F. Supp. 2d 1339, 1342 (S.D. Fla. 2008) (dismissing claims for willful violation where statute was not clear whether it applied to electronically transmitted receipts); In re Allstate Ins. Co. Underwriting & Rating Practices Litig., No. 3:02-MD-1457, 2008 WL 9010059, at *3-*5 (M.D. Tenn. Nov. 14, 2008) (dismissing claim where "statutory text with 'less than pellucid' language is plainly capable of the defendant's reasonable interpretation, and the defendant had little to no statutory, judicial or regulatory guidance to assist it in understanding the statutory language"). The nature of the allegations in this case likewise lend themselves to an early determination that Plaintiffs cannot recover statutory damages under §§ 1681b(a) or 1681e(a).

In summary, Plaintiffs' permissible purpose claims fail because a CRA may provide consumer reports containing information based on a partial match of SSNs or other information, without violating §§ 1681b(a) or 1681e(a), even if the information turns out to be sourced from another consumer. Moreover, Plaintiffs' claim for "willful" noncompliance with the FCRA also fails because Trans Union's interpretation of the statutory requirements in this regard is not objectively unreasonable generally, and was not objectively unreasonable here, given the identity of the two Plaintiffs' names and address, and the near-identity of their SSNs (matching on seven out of nine digits).

### III.   CONCLUSION

For the foregoing reasons, Trans Union respectfully requests that the Motion be granted in its entirety, and judgment on the pleadings be entered in its favor on Counts One and Two. Respectfully submitted,

/s/_____
Michael R. Ward
Virginia bar number 41133
Attorney for Trans Union LLC
Morris & Morris, P.C.
P.O. Box 30
Richmond, VA 23218
Telephone: (804) 344-8300
Facsimile: (804) 344-8359
mward@morrismorris.com

Paul L. Myers, ***Pro Hac Vice***
Texas Bar Number 14765100
Attorney for Trans Union LLC
Strasburger & Price LLP
2801 Network Blvd., Suite 600
Frisco, TX 75082
Telephone: (469) 287-3903
Facsimile:  (469) 227-6567
paul.myers@strasburger.com

                                        Stephen J. Newman, ***Pro Hac Vice***
                                        Attorney for Trans Union LLC
                                        Stroock & Stroock & Lavan LLP
                                        2029 Century Park East, Suite 1600
                                        Los Angeles, CA  90067-3068
                                        Telephone: (310) 556-5800
                                        Facsimile:  (310) 556-5959
                                        snewman@stroock.com

## **CERTIFICATE OF SERVICE**

       I hereby certify that a true and correct copy of the above and foregoing document has been forwarded on the 13 day of May, 2013, to all counsel of record by electronic mail and US Mail as follows:

Leonard Anthony Bennett  
lenbennett@cox.net  
Susan M. Rotkis  
srotkis@clalegal.com  
Consumer Litigation Assoc PC  
763 J Clyde Morris Blvd, Ste 1A  
Newport News, VA 23601  

Kristi Cahoon Kelly  
kkelly@siplfirm.com  
Andrew J. Guzzo  
aguzzo@siplfirm.com  
Surovell, Isaacs, Petersen & Levy, PLC  
4010 University Dr., Ste 200  
Fairfax, VA  22030  

Matthew J. Erausquin  
matt@clalegal.com  
Janelle Elene Mason  
janelle@clalegal.com  
Casey Shannon Nash  
casey@clalegal.com  
Consumer Litigation Assoc PC  
1800 Diagonal Road, Ste 600  
Alexandria, VA 22314  

       I further certify that I will cause a copy of the foregoing Motion and corresponding NEF by electronic mail on the following non-filing user:  None.

/s/_____
Michael R. Ward
Virginia bar number 41133
Attorney for Trans Union LLC
Morris & Morris, P.C.
P.O. Box 30
Richmond, VA 23218
Telephone: (804) 344-8300
Facsimile: (804) 344-8359
mward@morrismorris.com